IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**Country Mill Farms, LLC** and **Stephen Tennes**,

                 Plaintiffs,

      v.

**City of East Lansing**,

                 Defendant.

Case No. 1:17-cv-487 _____

Verified Complaint

## INTRODUCTION

1.     This case is about a Policy specifically created by the City of East Lansing to exclude a farmer whose family farm is twenty-two miles outside the City from participating in its city-run farmers market solely because the City dislikes the farmer's profession of his religious beliefs about marriage on Facebook.

2.     This targeted Policy violates the First and Fourteenth Amendments of the United States Constitution as well as state law that prohibits Michigan cities from regulating activities outside city boundaries.

3.     The farm targeted by the City is Country Mill Farms, which is owned by Steve Tennes.

4.     Country Mill has participated in the East Lansing Farmer's Market since 2010 – the last six years as an "Invitational Vendor" invited by the City because Country Mill was an exceptional vendor year after year.

5.     On August 24, 2016, based on his Catholic belief that marriage is a sacramental union between one man and one woman, Tennes shared on Facebook that he honors his religious belief when hosting and participating in weddings at Country Mill.

6.     The post had nothing to do with East Lansing or the Farmer's Market.

7.      Tennes' Facebook statement professing his religious beliefs about marriage and his decision to host and participate in only those weddings on his family farm that comport with those beliefs violates no federal, state, or local law or policy.

8.      Yet, when East Lansing officials saw the Facebook post, they immediately started taking action to remove Country Mill from the Farmer's Market.

9.      First, City officials pressured Country Mill to leave the Market, telling the Tennes family that because of their statement of their religious beliefs (1) the City did not want them at the Market that coming Sunday and (2) people would protest and disrupt the Market if Country Mill continued to participate in it.

10.     When Country Mill decided to attend the remaining two months of the Farmer's Market season, which they did without any protests or disruptions, East Lansing stopped asking Country Mill to leave and started work to ban Country Mill by City Policy.

11.     Since Country Mill is located twenty-two miles outside of East Lansing, the City could not ban Country Mill under any existing City Ordinance.

12.     The Home Rule City Act prohibits such extra-jurisdictional enforcement of City laws.

13.     So, in an effort to circumvent this limitation on their jurisdiction, the City adopted a new Policy for the 2017 Market specifically designed to illegally extend its jurisdiction outside the City and to exclude Country Mill, and only Country Mill from the Market.

14.     The Policy incorporated the language of the City's Human Relations Ordinance by reference and required all 2017 Farmer's Market Vendors to comply with the City's interpretation of the Ordinance and its "public policy against discrimination . . . while at the [Market]" and in the vendors' "*general business practice[s]*." *See* Exhibit 1 (East Lansing Farmer's Market 2017 Vendor Guidelines attached to the letter from the City) (emphasis added).

15.     The City included the phrase "general business practice[s]" specifically to reach beyond its geographical limits so it could target and exclude Country Mill from the Farmer's Market.

16.     When applications opened for the 2017 Market season, the City did not invite Country Mill as it had for the past six years.

17.     When Country Mill applied through the non-invitational process, the City pulled Country Mill's application from the normal review process and reviewed it separately, something it did not do for other vendor applications.

18.     The City then excluded Country Mill from the Market for violating its new Policy.

19.     In doing so, the City indicated (1) that Tennes' Facebook post stating his religious beliefs violated the City's new Policy, (2) Country Mill was prohibited from the Market for that violation, and (3) if the City "misinterpreted or misunderstood" Tennes' statement – i.e., if Tennes changed his religious beliefs and expression of those beliefs – then the City would reconsider his application.

20.     The Policy and denial that followed violates Plaintiffs' First and Fourteenth Amendment rights because it regulates Plaintiffs' speech based on its content and viewpoint, creates a religious gerrymander designed to punish Plaintiffs for their religious beliefs, and conditions Plaintiffs' participation in a public benefit—i.e., participation in the Farmer's Market— on the surrender of Plaintiffs' constitutional rights to free speech, free press, the free exercise of religion, and equal protection under the law.

21.     The Policy also violates the Michigan Home Rule City Act because it incorporates and, therefore, applies the City's Human Relations Ordinance and public policies to Plaintiffs' protected expression outside the City's jurisdiction.

22.      Plaintiffs fully comply with the Ordinance when operating in East Lansing and at the Farmer's Market, gladly selling produce to all comers at the Market.

23.     To restore their constitutional freedoms and prevent a violation of the Home Rule City Act, Plaintiffs ask this Court to enjoin the Policy, declare it unlawful and unconstitutional, and to allow Country Mill to again serve all customers at the East Lansing Farmer's Market.

## JURISDICTION AND VENUE

24.     This civil rights action raises federal questions under the United States Constitution, particularly the First and Fourteenth Amendments, and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

25.     This Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1343.

26.     This Court has supplemental jurisdiction under 28 U.S.C. § 1367.

27.     This Court has authority to award the requested declaratory relief under 28 U.S.C. §§ 2201-02 and Federal Rule of Civil Procedure 57; the requested injunctive relief under 28 U.S.C. § 1343 and Federal Rule of Civil Procedure 65; the requested damages under 28 U.S.C. § 1343; and costs and attorneys' fees under 42 U.S.C. §1988.

28.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because all events giving rise to the claims detailed here occurred within the Western District of Michigan and the Defendant resides in the Western District of Michigan.

## PLAINTIFFS

29.     Plaintiff Steve Tennes is a Roman Catholic who bases his beliefs on the Bible and Catholic tradition.

30.     Tennes is a resident of Charlotte, Michigan and a citizen of the United States.

31.     Tennes is the sole owner and operator of Country Mill Farms, LLC, a for-profit company organized under Michigan law and located in Charlotte, Michigan.

## DEFENDANT

32.     The City of East Lansing, Michigan ("East Lansing") is a municipal corporation endowed under Michigan law with the power to sue and be sued and to enact and enforce the Policy and incorporated ordinance challenged in this lawsuit. Mich. Comp. Laws § 117.1 (1909) (the home rule city act – body corporate); Mich. Comp. Laws § 117.4o (2001) (the home rule city act – formation of nonprofit corporation by city); Mich. Comp. Laws § 81.1 (1895) (the fourth class city act); Mich. Comp. Laws § 450.2261(1)(b) (1982) (nonprofit corporation act – corporate powers); East Lansing City Charter § 2.1 (general municipal powers).

33.     East Lansing operates the East Lansing Farmer's Market which is a subject of this lawsuit.

34.     All actions taken by city officials were taken on behalf of, with the authority of, and to act on behalf of the City.

35.     The City is also responsible for the actions of its employees, including the Parks and Recreation Director and the Stewardship & Community Events Specialist.

36.     The City approved of, acquiesced in, and supports the enforcement of the challenged Policy against the Plaintiffs.

37.     All actions taken by city officials were taken under color of law.

## FACTUAL BACKGROUND

**Steve Tennes and His Family Farm, Country Mill.**

38.     Country Mill is a 120-acre, second generation family farm.

39.     Country Mill has roots back to the 1800's and was purchased and expanded by Ann and Bernie Tennes in 1971.

40.     It is now owned and operated by their son, Steve Tennes, who was born and raised on Country Mill.

41.     Tennes graduated from the University of Notre Dame where he participated in the R.O.T.C. program, and met his future wife, Bridget Tennes, who was also participating in the R.O.T.C. program, while she was attending college nearby at Saint Mary College.

42.     After college, Steve and Bridget Tennes married and then served on active duty for four years, he in the Marine Corps as an engineer and logistics officer, and she in the U.S. Army as a registered nurse.

43.     After their tours, the Tenneses decided to return to Country Mill and take over operation of Country Mill from Tennes' father.

44.     Country Mill Farms, LLC (also known as The Country Mill) was incorporated in September 2003.

45.     Tennes is the sole member owner of Country Mill Farms, LLC.

46.     Tennes then returned to school, this time at Michigan State University where he earned his Master's Degree in Horticulture, and he began implementing new practices at Country Mill.

47.     Tennes employs approximately seventy-six people, including seasonal employees.

48.     Tennes primarily grows apples—thirty-four different varieties of conventional and USDA certified organic apples—but also grows blueberries, peaches, cherries, sweet corn, and pumpkins.

49.     Because of the age of Country Mill, the trees in its orchards span from new to well over forty years old.

50.     It typically takes new trees ten years to become fully productive and trees will typically stay productive until they are forty years old.

51.     This means Tennes is constantly working to maintain the older trees while planting new trees to keep up with demand.

52.     Trees that Tennes ordered from the nursery ten years ago were intended to serve Tennes' current customers.

53.     This means Tennes plans his orchard intentionally, thinking years in advance, and strategizes particular trees to serve specific markets.

54.     That intentional planning carries over to Tennes' purposeful operation of Country Mill, which includes operating Country Mill according to certain priorities.

55.     One of Tennes' priorities is to provide his produce directly to his customers, so his customers get the freshest produce and know where their food is grown.

56.     Tennes does this by inviting customers to come to Country Mill and by serving customers at local farmers markets.

57.     Customers who come to Country Mill can pick their own "U-Pick" organic and conventional produce or they can purchase harvested produce at the large Farm Market located in one of the orchard's barns.

58.     Another of Tennes' priorities is to provide a place for his community to enjoy family fun on the farm.

59.     For this reason, both the U-Pick produce and the Farm Market at Country Mill are designed for all members of Tennes' community to come together to play and build memories.

60.     Over the years, generations of families have come to Country Mill to pick produce, to gather, and to eat together at the Farm Market, which carries fresh produce as well as fresh cider, donuts, fruit pies, caramel apples, and other products made at Country Mill.

61.     Tennes also hosts special family events and activities during the fall, including a pumpkin patch, a corn maze, hay rides, wagon rides, a petting zoo, a Cider Rush 5k & Donut Dash 1 Miler, and the Michigan Annual Pumpkin Carrying Contest.

62.     Tennes' focus on welcoming his community onto Country Mill has also led him to be actively involved in his community by serving in local and national agricultural organizations including Michigan Farm Bureau, Veteran Farmer Coalition, and Michigan Agritourism Association, which Tennes started with ten other farmers in 2004 and has grown to over 270 farms.

63.     Through the Veteran Farmer Coalition, Tennes has worked on projects close to his heart, addressing unemployment among Veterans by connecting returning Veterans with agricultural positions.

64.     For the last nine years, Tennes has also run "Pick a Peck for People," a program he started in which he invites his community to come to Country Mill and pick as many apples as possible over the course of a day and then all harvested apples are donated to a local food bank.

65.     In 2016, Tennes donated over 6,000 pounds of apples through the event, equipping the local food bank to provide fresh produce to families through the entire winter.

**Tennes' Religious Beliefs.**

66.     Tennes was raised Roman Catholic.

67.     He and his wife remain active parishioners at St. Mary's Catholic Church in Charlotte, Michigan.

68.     Their five children attend school at St. Mary's and Tennes has served on various boards for the Parish and School.

69.     Tennes' religious beliefs are central to his identity, his understanding of existence, and his conception of personal dignity and autonomy.

70.     As a Catholic, Tennes believes that his life is not his own, but belongs to God.

71.     Tennes believes everything he does—personally and professionally—should be done in a manner that glorifies God.

72.     Tennes believes that one day he will give an account to God regarding the choices he made in life, both good and bad.

73.     Tennes believes that God instructs Christians to steward the gifts He has given them in a way that glorifies and honors Him.

74.     Therefore, Tennes believes that he must operate his business—the gift God has given him—in a manner that honors God and that he must not use his business in a way that dishonors God.

75.     Operating his business in a manner that honors God is so important to Tennes that it is the top priority listed in Country Mill's mission statement, "To conduct all business dealings, so that a Christian philosophy is evident."

76.     Tennes' Catholic philosophy impacts the way he conducts his business, treats his customers, and his employees.

77.     For example, his desire to make Country Mill a place for his community to gather, make memories and be fed is borne out of his Catholic philosophy.

78.     Tennes always makes employment opportunities at Country Mill open to all people regardless of status, views or background.

79.     Tennes has employed people from a wide variety of racial, cultural, and religious backgrounds, including members of the LGBT community.

80.     Tennes also operates his business with concern for his employees' working conditions.

81.     By way of example, Tennes built four modern apartments on the property so that he could provide quality housing to his seasonal workers who normally live in temporary and mobile housing on many other farms.

82.     Tennes' religious beliefs also impact his convictions about marriage.

83.     Informed by his faith in God, Tennes believes that marriage is a God-ordained, lifelong, sacrificial and sacramental covenant between one man and one woman with profound spiritual and societal implications.

84.     Tennes feels compelled by his Catholic faith to promote this image of marriage.

85.     One way Tennes does this is by opening his own backyard at his home and farm to host weddings, which he participates in at Country Mill each summer and fall.

86.     Based on his religious beliefs, Tennes can only promote, participate in, and facilitate weddings at Country Mill between one man and one woman.

87.     To promote marriage as anything other than a union between one man and one woman, or to participate in or facilitate any wedding other than one between one man and one woman, would violate Tennes' deeply held religious beliefs.

**Country Mill and East Lansing Enjoyed a Positive, Seven-Year Relationship.**

88.     Around 2010, Country Mill began participating in farmers markets including the city-run East Lansing Farmer's Market which was started only the year before in 2009.

89.     The East Lansing Farmer's Market is run through the City's Parks and Recreation Department.

90.     It is held every Sunday from 10:00 a.m. to 2:00 p.m., starting the first Sunday in June and running through the last Sunday in October.

91.     The 2016 Market ran from June 5 to October 30, 2016.

92.     The 2017 Market starts June 4 and will run until October 29, 2017.

93.     The Market's purpose statement explains that "[t]he East Lansing Farmer's Market (ELFM) is an open-air, outdoor market that enhances community life by bringing residents, local growers and producers together." Ex. 1, Vendor Guidelines p. 1.

9

94.     Approximately thirty vendors participate in the Market and all of them are Michigan growers or Michigan "value-added producers" who only use Michigan ingredients in their products.

95.     Vendors are selected by applications reviewed by a Market Planning Committee comprised of vendors, residents and City staff, all of whom are authorized by the City to select the Market vendors. Ex. 1, Vendor Guidelines p. 1.

96.     Each January, the Market Planning Committee invites past Market vendors they deem to embody the spirit of the Market to apply for the upcoming Market.

97.     This invitation effectively pre-approves Invitational Vendors' applications.

98.     Any vendor slots not filled by Invitational Vendors are then filled by the Committee from applications filed by other potential vendors.

99.     The City licenses all vendors to participate in the Market.

100.    As part of their application, vendors sign a licensing agreement with the City that gives them license to use their designated stall at the Market and to participate in the Market.

101.    Unlicensed vendors are not permitted at the Market.

102.    From 2010 to 2016, the City licensed Country Mill to participate in the Market.

103.    From 2011 to 2016—every year after Country Mill's first year at the Market—the City invited Country Mill to be an Invitational Vendor at the Market.

104.    During its tenure at the Market, Country Mill has been the Market's only organic apple grower.

105.    East Lansing officials repeatedly praised Country Mill for its participation in the Market.

106.    For example, on August 2, 2016, East Lansing posted on its Farmer's Market Facebook page: "We love The Country Mill! Their already-picked berries will be at the market on Sunday. But if you feel the pull to pick your own, go and check them out!"

107.    Country Mill always followed all of the Vendor Guidelines while operating in the City and Country Mill never received even one customer complaint related to its participation in the Market.

**Tennes States His Religious Views On Facebook.**

108.    The City continued to praise Country Mill in this way until August 2016, when City officials saw a message Tennes posted on Facebook that referenced his belief in biblical marriage.

109.    Tennes' Facebook message was posted in response to questions from customers about the weddings he participates in at Country Mill.

110.    Tennes had been contacted in fall 2014 by two women who were seeking to have their same-sex wedding ceremony at an orchard.

111.    Because promoting and participating in a same-sex wedding at Country Mill would violate his deeply held religious beliefs, Tennes referred the women to a nearby orchard he knew hosted same-sex weddings.

112.    Tennes spoke with the women on one occasion.

113.    The conversation was short and civil.

114.    The conversation occurred before the decision in *Obergefell v. Hodges* and before same-sex marriage was legal in Michigan.

115.    On information and belief, the women were married in 2015 and held their reception at an orchard as they desired.

116.    On August 22, 2016, one of the women posted on Facebook encouraging Country Mill's customers to stop patronizing Country Mill because Tennes had declined to participate in her wedding.

117.    A few members of the public responded to the woman's post on Country Mill's Facebook page.

118.    Some of the public comments were supportive of Country Mill's beliefs and some were not.

119.     A few of Country Mill's customers asked questions about Tennes' religious beliefs.

120.     So, on August 24, 2016, in response to those customer questions, Tennes posted on Facebook that "[d]ue to our personal religious beliefs" he would refer any request to celebrate a same-sex ceremony at Country Mill to another mid-Michigan orchard nearby.

**East Lansing Reacts to Tennes' Facebook Statement.**

121.     East Lansing officials saw Tennes' Facebook message.

122.     These officials decided that because of Tennes' statement regarding his religious beliefs, the City no longer wanted Country Mill to participate in the Farmer's Market.

123.     Over the next six months, City officials took targeted actions to exclude Country Mill, and only Country Mill, from the Market.

124.     On Friday, less than two days after Tennes' Facebook post, the Parks and Recreation Director called Country Mill and asked Country Mill to agree not to attend the Market that coming Sunday, August 28, 2016.

125.     In support of his request, the Director told Country Mill that because of Tennes' statement of his religious beliefs, (1) the city did not want Country Mill at the August 28th Market, (2) that he had heard complaints about Tennes' Facebook post, and (3) that if Country Mill decided to come to the Market that Sunday anyway, people who disagreed with Tennes would protest the Market.

126.     The Director then proceeded to call and email Country Mill repeatedly over the next two days, each time urging Country Mill not to participate in the August 28th Market because of Tennes' post regarding his religious beliefs.

127.     Because of this pressure from East Lansing, Tennes decided he had to temporarily stop booking weddings at Country Mill.

128.     Tennes posted that decision on Facebook and informed the City that Country Mill would no longer book future wedding ceremonies.

129.     This information did not slow the City's phone calls to Country Mill.

130.     It did not change the City's request that Country Mill leave the Market.

131.    When Country Mill informed the City that it would continue to participate in the Market, the Director emailed all East Lansing Farmer's Market vendors, including Country Mill, and stated that "[a] controversy has risen regarding the Country Mill, one of our Farmer's Market vendors" and "due to the Country Mill controversy, it is likely that we will have protestors at the Market tomorrow."

132.    The email also informed vendors that the East Lansing Police Department would be present at the Market for security purposes.

133.    Country Mill attended the Market that Sunday, August 28th.

134.    No one protested the Market.

135.    None of Country Mill's customers made a single comment to Country Mill about Tennes' Facebook post.

136.    A couple of vendors mentioned the Director's email to Country Mill and their comments were supportive of Country Mill's right to express their religious viewpoint.

137.    Country Mill continued to participate in the remaining two months of the 2016 Market season without any protests or disruptions.

138.    The Market closed at the end of October 2016.

139.    In December 2016, Tennes decided that to live his life and run his business according to his religious beliefs, he must continue to promote his view of biblical marriages as a unique union between one man and one woman by publicly stating his beliefs and by hosting and participating in these weddings at Country Mill.

140.    Tennes announced his decision to begin booking weddings again at Country Mill on Facebook in December, 2016:

> This past fall our family farm stopped booking future wedding ceremonies at our orchard until we could devote the appropriate time to review our policies and how we respectfully communicate and express our beliefs. The Country Mill engages in expressing its purpose and beliefs through the operation of its business and it intentionally communicates messages that promote its owners' beliefs and declines to communicate messages that violate those beliefs. The Country Mill family and its staff have and will continue to participate in hosting the ceremonies held at our

orchard. It remains our deeply held religious belief that marriage is the union of one man and one woman and Country Mill has the First Amendment Right to express and act upon its beliefs. For this reason, Country Mill reserves the right to deny a request for services that would require it to communicate, engage in, or host expression that violates the owner's sincerely held religious beliefs and conscience. Furthermore, it remains our religious belief that all people should be treated with respect and dignity regardless of their beliefs or background. We appreciate the tolerance offered to us specifically regarding our participation in hosting wedding ceremonies at our family farm.

Ex. 1, Facebook post.

**East Lansing's New Policy.**

141.    East Lansing officials saw Tennes' December Facebook post.

142.    These officials decided that Tennes' public statements of his religious beliefs—that marriage is a union between one man and one woman—conflict with the City's views and public policy regarding sexual orientation.

143.    That policy is codified in the city's Human Relations Ordinance. *See infra.*

144.    However, the City has no authority to enforce its Ordinance based on Tennes' religious beliefs and their impact on how he operates Country Mill, which is located twenty-two miles outside of East Lansing.

145.    In addition to constitutional barriers to such enforcement, the City also has no authority to enforce its Ordinance in this manner because the Michigan Home Rule City Act prohibits cities, including East Lansing, from enforcing ordinances outside the cities' geographical jurisdiction.

146.    East Lansing has recognized the Home Rule City Act limitations in its statements on the City Human Relations Commission website and in pamphlets published by the Human Relations Commission that explain that the Ordinance only applies to "incident[s] . . . within the city's boundaries." *Civil Rights Complaints,* CITYOFEASTLANSING.COM, https://www.cityofeastlansing.com/469/Civil-Rights-Complaints (last visited May 29, 2017).

147.    In further recognition of its limitations, East Lansing did not pursue Country Mill or Tennes through any enforcement action under the Human Relations Ordinance.

148.    Instead, East Lansing adopted a new Policy designed specifically to exclude Country Mill from the Farmer's Market because of Tennes' stated religious beliefs.

149.    The Policy requires all vendors at the 2017 Farmer's Market to comply with the City's Human Relations Ordinance and the City's "public policy against discrimination . . . while at the [Market] and *as a general business practice.*" Ex. 1, Vendor Guidelines p. 3 (emphasis added).

150.    The 2017 vendor application requires vendors to attest to their compliance with the Policy.

151.    The Policy incorporates by reference the entire Human Relations Ordinance as well as the City's "public policy against discrimination" underlying that Ordinance. Ex. 1, Vendor Guidelines p. 3.

152.    The Policy does not define "general business practice."

153.    It does not provide any criteria to explain or guide how the City will enforce the Policy to regulate the general business practices of its Market Vendors.

154.    The Policy also does not contain any express geographical limitations.

155.    The Policy, therefore, seeks to extend the City's jurisdiction beyond its city boundaries.

156.    The Policy seeks to enforce the City's Human Relations Ordinance outside the City.

157.    The City interpreted its new Policy to regulate Tennes' religious speech, banning him from the Market for Facebook messages related only to his farm, twenty-two miles outside the City.

**East Lansing's Human Relations Ordinance.**

158.    By way of background, the City of East Lansing Human Relations Ordinance was adopted in 1972 and is contained in Chapter 22 of the East Lansing City Code.

159.    The Ordinance declares it "to be contrary to the public policy of the City of East Lansing for any person to deny any other person the enjoyment of his/her civil rights or for any person to discriminate against any other person in the exercise of his/her civil rights or to harass

any person because of religion, race, color, national origin, age, height, weight, disability, sex, marital status, sexual orientation, gender identity or expression, student status, or because of the use by an individual of adaptive devices or aids." East Lansing, Michigan, Mun. Code § 22-31.

160.   The Ordinance declares it to be illegal for any person to "[d]eny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service because of religion, race, color, national origin, age, height, weight, disability, sex, marital status, sexual orientation, gender identity or expression, student status, or because of the use by an individual of adaptive devices or aids." East Lansing, Michigan, Mun. Code § 22-35(b)(1).

161.   The Ordinance also declares it to be illegal for any person to "[p]rint, calculate, post, mail, or otherwise cause to be published a statement, advertisement, notice, or sign which indicates that the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service will be refused, withheld from, or denied an individual because of religion, race, color, national origin, age, height, weight, sex, disability, marital status, sexual orientation, gender identity or expression, or student status, or because of an individual's use of adaptive devices or aids, or that an individual's patronage of, or presence at a place of public accommodation, is objectionable, unwelcome, unacceptable, or undesirable because of religion, race, color, national origin, age, height, weight, disability, sex, marital status, sexual orientation, gender identity or expression, or student status or because of the use by an individual of adaptive devices or aids." East Lansing, Michigan, Mun. Code §22-35 (b)(2).

162.   The Ordinance defines "harass" to mean "to have physical conduct or communication which refers to an individual protected under this article, when such conduct or communication demeans or dehumanizes and has the purpose or effect of substantially interfering with an individual's employment, public accommodations or public services, education, or housing, or creating an intimidating, hostile, or offensive employment, public accommodations,

public services, educational, or housing environment." East Lansing, Michigan, Mun. Code § 22-32.

163.    The Ordinance defines "place of public accommodation" to "mean[] a business, or an educational, refreshment, entertainment, recreation, health or transportation facility, or institution of any kind, whether licensed or not, whose goods, services, facilities, privileges, advantages, or accommodations are extended, offered, sold, or otherwise made available to the public." East Lansing, Michigan, Mun. Code § 22-35(a).

164.    The Ordinance defines a "public service" to "mean[] a public facility, department, agency, board or commission, owned, operated, or managed by or on behalf of the state, a political subdivision, or an agency thereof, or a nonprofit organization, or a tax-exempt private agency established to provide service to the public." East Lansing, Michigan, Mun. Code § 22-35(a).

165.    The Ordinance does not define the terms "discriminate," "unwelcome," "objectionable," "unacceptable," and "undesirable." *See* East Lansing, Michigan, Mun. Code § 22-32.

166.    The Ordinance does not contain any standards or criteria to guide enforcement officials in determining whether a person's words or actions "discriminate" or communicate that a person is "unwelcome," "objectionable," "unacceptable," and "undesirable."

167.    "Any person claiming to be aggrieved by a violation of civil rights" may file a complaint with the Human Relations Commission. East Lansing, Michigan, Mun. Code § 22-38(c).

168.    The Human Relations Commission administers and enforces the Ordinance.

169.    The Human Relations Commission has the power to "receive, initiate, investigate, mediate, conciliate, adjust, dispose of, issue orders, and hold hearings on complaints alleging a violation of [the ordinance]." East Lansing, Michigan, Mun. Code § 22-38(b).

170.    Penalties under the Ordinance include fines of up to $500 and up to 90 days imprisonment in jail. East Lansing, Michigan, Mun. Code § 22-38(h)(11).

171.    Each day upon which a violation occurs is considered a separate offense punishable by up to $500 in fines and up to 90 days in jail. East Lansing, Michigan, Mun. Code § 22-38(h)(11).

172.     If a person who operates by virtue of any city license violates the Ordinance, the Human Relations Commission may refer that person to the licensing authority for suspension or revocation of his or her license. East Lansing, Michigan, Mun. Code § 22-38(i).

173.     A violation of the Ordinance "shall be grounds for suspension or revocation of the respondent's license." East Lansing, Michigan, Mun. Code § 22-38(i).

174.     East Lansing issues licenses and permits as listed in Chapter 8 of the City Ordinance and on East Lansing's website. *Licensing & Permits,* CITYOFEASTLANSING.COM, https://www.cityofeastlansing.com/217/Licensing-Permits (last visited May 29, 2017).

175.     Licensed or permitted activities include: licenses to do business in the City, licenses for soliciting, operating a news vending business, selling alcohol, operating a restaurant, food truck, or providing entertainment, holding block parties, a run & walk event, public dances at a dance hall, or use of a public facility including use of community parks, downtown parking, and urban plazas.

176.     This means, for example, that East Lansing has authority under the Ordinance to strip the business license from a business it finds in violation of the Human Relations Ordinance, therefore, prohibiting it from doing business in the City.

177.     It also means, for example, that East Lansing has authority under the Ordinance to bar a nonprofit organization it finds in violation of the Ordinance from using public facilities like community parks or city plazas for events such as organization-wide picnics or even events designed as outreach to serve homeless populations.

178.     The Human Relations Commission's webpage contains information for the public on the requirements and enforcement of the Ordinance. *Human Relations Commission,* CITYOFEASTLANSING.COM, https://www.cityofeastlansing.com/257/Human-Relations-Commission (last visited May 29, 2017).

179.     This website does not contain any guidelines by which the Commission interprets or enforces the Ordinance's undefined terms: discriminate, unwelcome, objectionable, unacceptable, and undesirable.

180.    The Human Relations Commission website does, however, state that the Ordinance is geographically limited to incidents occurring within the city boundaries --"[t]he incident must have occurred within the city's boundaries." *Civil Rights Complaints,* CITYOFEASTLANSING.COM, https://www.cityofeastlansing.com/469/Civil-Rights-Complaints (last visited May 29, 2017).

181.    This limitation is mandated by the Michigan Home Rule City Act.

182.    The website also states that the Ordinance only applies to discrimination related to housing, employment, or public accommodations/services, leaving unregulated all other areas of life. *Id.*

183.    This information is also reiterated in a pamphlet published by the East Lansing Human Relations Commission entitled "When you face discrimination or prejudice... Contact the Human Relations Commission," which states in bold, italics, and underlined font that to enforce the East Lansing Ordinance "[t]he incident must have occurred within the City's boundaries and must be within the context of housing, employment or public accommodations/services." Human Relations Commission Initial Inquiry Form, *Civil Rights Complaints,* CITYOFEASTLANSING.COM, https://www.cityofeastlansing.com/DocumentCenter/View/964.

184.    The Human Relations Commission website also explains that "East Lansing's [O]rdinance provides non-discrimination protections that are more inclusive than either Michigan's Elliott-Larsen Civil Rights Act or Federal Law," containing prohibitions on discrimination "based on student status, sexual orientation and gender identity or expression." *Human Relations Commission,* CITYOFEASTLANSING.COM, https://www.cityofeastlansing.com/257/Human-Relations-Commission (last visited May 29, 2017).

185.    In 1972, East Lansing was the first city in Michigan to add sexual orientation to its Human Relations Ordinance. Alan Woods, *The 7 Best Towns in Michigan for LGBT Families*, Movoto.com,  http://www.movoto.com/guide/mi/the-7-best-towns-in-michigan-for-lgbt-families/ (last visited May 29, 2017).

186.     According to the Commission, because of "the unique role that East Lansing plays in ensuring that LGBT individuals are protected from discrimination in the community, the City of East Lansing has appointed" an individual as the HRC Staff Resource "to serve as a designated liaison to the LGBT community." *Human Relations Commission,* CITYOFEASTLANSING.COM, https://www.cityofeastlansing.com/257/Human-Relations-Commission (last visited May 29, 2017).

187.     Other Michigan municipalities have also adopted city ordinances that expand beyond the Elliott-Larsen Civil Rights Act.

188.     For example, Ann Arbor and Lansing prohibit discrimination on the basis of political beliefs or affiliation.

189.     Country Mill is located in Charlotte, Michigan, in Eaton County.

190.     Neither Charlotte nor Eaton County have adopted a civil rights ordinance.

191.     Events in Charlotte and Eaton County are governed solely by the Elliott-Larsen Civil Rights Act, which prohibits discrimination in places of public accommodation based on "religion, race, color, national origin, age, sex, or marital status." Mich. Comp. Laws § 37.2302 (1976).

192.     Country Mill complies fully with the Elliot-Larsen Civil Rights Act.

**East Lansing Enforces its New Policy to Expel Country Mill from the Market for Tennes' Religious Statements.**

193.     The Market Planning Committee met in January 2017 to select Invitational Vendors for the 2017 Farmer's Market.

194.     The City barred the Committee from inviting Country Mill to the 2017 Market.

195.     The City also instructed the Committee that if Country Mill applied anyway, the Committee must send Country Mill's application directly to the City for review by the City, a process unique to the 2017 Market and to Country Mill.

196.     Based on the City's instruction, the Committee did not send Country Mill an invitational application like it had every year since 2011.

197.     When Country Mill did not receive an invitation for the 2017 Market, Country Mill applied anyway through the non-invitational process.

198.     Tennes noticed the new Policy but because he had never violated any law believed he complied with it and attested to his compliance with the Policy accordingly.

199.     East Lansing reviewed Country Mill's application directly.

200.     On March 7, the City sent Country Mill a letter informing Country Mill that it was prohibited from participating in the Market for violating the new Policy.

201.     The letter, attached as Exhibit 2, states in part:

> The City of East Lansing has received your vendor application for The Country Mill to participate in the East Lansing Farmer's Market during the 2017 season.
>
> It was brought to our attention that The Country Mill's general business practices do not comply with East Lansing's Civil Rights ordinances and public policy against discrimination as set forth in Chapter 22 of the City Code and outlined in the 2017 Market Vendor Guidelines, as such, The Country Mill's presence as a vendor is prohibited by the City's Farmer's Market Vendor Guidelines.

202.     It was on City letterhead and signed by the Stewardship & Community Events Specialist, a woman who served as the City liaison with the Market and its vendors.

203.     After receiving the March 7 letter, Tennes emailed this city official requesting more information.

204.     His email stated, in part:

> I am hoping to clarify whatever misunderstanding may have happened. I reviewed our application that we sent you and was not able to see what you might be referring to regarding our general business practices. Could you be more specific on why we are prohibited from continuing to attend the ELFM? We are not aware of any complaints from our ELFM booth or customers there. Have you received any? We have always enjoyed coming to the ELFM and look forward to doing so in the future.

205.     In response, Tennes received another letter dated March 15, 2017. Ex. 1.

206. That letter was again on City letterhead, signed by the same person and repeated the City's charge that Country Mill violated the Policy requiring all vendors to comply with the Civil Rights Ordinance. Ex. 1.

207. Attached to the letter was a copy of Tennes' December Facebook post as evidence of the Policy violation. Ex. 1.

208. The vendor guidelines containing the Policy and a copy of the Human Relations Ordinance were also attached. Ex. 1.

209. Country Mill was the only vendor barred from the Market by the new Policy.

210. Tennes' December Facebook post was the only reason the City provided for Country Mill's expulsion from the Market.

211. East Lansing never accused Country Mill of violating any guidelines, policies, and City ordinances, including the Human Relations Ordinance, during the time Country Mill participated in the Farmer's Market.

212. Country Mill always complied fully with all laws and policies at the Market.

213. Therefore, Tennes' statement of his religious beliefs about marriage are the only reason Country Mill was excluded from the Market.

214. Notably, the East Lansing Farmer's Market is a public service governed by the Human Relations Ordinance which defines public service as any "public facility . . . owned, operated, or managed by . . . a political subdivision" of the state. East Lansing, Michigan, Mun. Code § 22-35(a).

215. It is a violation of the Human Relations Ordinance to exclude a person from a public service on the basis of religion.

216. The City, therefore, violated the Human Relations Ordinance by excluding Country Mill from the Market based on Tennes' statement of his religious beliefs.

217. At the same time, East Lansing permits and even celebrates speech promoting LGBT issues, including speech promoting same-sex marriage as morally and theologically

equivalent to marriages between one man and one woman– a viewpoint that is directly opposite of what Tennes expressed.

218.    For example, East Lansing interprets the Policy to allow other Farmer's Market vendors to post beliefs in support of LGBT topics, including same-sex marriage.

219.    In 2016, Market vendor Good Bites posted on Facebook its support of the Grand Rapids Pride Festival.

220.    East Lansing took no action against Good Bites for supporting LGBT issues and Good Bites continued to be a vendor at the East Lansing Farmer's Market.

221.    Furthermore, East Lansing itself supports same-sex marriage and uses City resources to promote LGBT topics including same-sex marriage.

222.    The City has designated a Human Relations staff member to be the "designated liaison to the LGBT community" because East Lansing's Ordinance prohibits discrimination on the basis of sexual orientation and the State civil rights laws do not. *Human Relations Commission,* CITYOFEASTLANSING.COM, https://www.cityofeastlansing.com/257/Human-Relations-Commission (last visited May 29, 2017).

223.    In 2015, the City's Arts Commission and Historic District Commission approved the painting of the city steps behind the Market in rainbow colors as a symbol of support for LGBT topics including same-sex marriage.

224.    Plaintiffs support the rights of citizens and other businesses to express their views about marriage.

225.    Plaintiffs simply seek to enjoy the same freedom.

226.    Yet, East Lansing's Policy strips Plaintiffs of their constitutional freedoms, including free speech and the free exercise of religion, by punishing Plaintiffs' viewpoint on marriage, going so far as to prohibit Country Mill from continuing its long history of participating in the Farmer's Market because Plaintiffs publicly stated their sincerely held religious view that marriage is a union between one man and one woman.

## ALLEGATIONS OF LAW

227.    At all times relevant to this Complaint, each and all of the acts alleged here are attributable to Defendant, who acted under color of a statute, regulation, custom, or usage of the State of Michigan.

228.    Plaintiffs currently suffer imminent and irreparable harm because of Defendant's Policy that violates Plaintiffs' constitutional rights.

229.    Plaintiffs have no adequate or speedy remedy at law for the loss of their constitutional rights.

230.    Unless Defendant's conduct is enjoined, Plaintiffs will continue to suffer irreparable injury.

## FIRST CAUSE OF ACTION
### First Amendment: Freedom of Speech

231.    Plaintiffs repeat and reallege each allegation contained in paragraphs 1-230 of this Complaint.

232.    The First Amendment Free Speech Clause protects Plaintiffs' right to freely speak and publish their religious beliefs, including their personal and religious beliefs about marriage.

### Content and Viewpoint Based Discrimination

233.    The First Amendment's Free Speech Clause prohibits laws that regulate protected speech based on its content or viewpoint.

234.    The East Lansing Policy incorporates the language of the Human Relations Ordinance *in toto*.

235.    The Policy is content-based on its face and as it is applied to Plaintiffs' speech because it regulates speech about a handful of topics—specifically "religion, race, color, national origin, age, height, weight, disability, sex, marital status, sexual orientation, gender identity or expression, student status, or because of the use by an individual of adaptive devices or aids"—while leaving unregulated speech on the virtually unlimited number of other topics not listed in the Policy. East Lansing, Michigan, Mun. Code §§ 22-31, 22-35.

236.   For example, the Policy allows citizens to speak freely on the issue of politics because political affiliation is not a protected characteristic but restricts speech like Plaintiffs' statement of their religious beliefs about marriage because sexual orientation is a protected characteristic.

237.   That is a content-based restriction on speech that violates the First Amendment.

238.   The Policy is also viewpoint-discriminatory on its face and as applied because it regulates speech based on the viewpoint expressed.

239.   For example, the Policy prohibits speech that makes anyone feel "unwelcome," "objectionable," "unacceptable," and "undesirable" based on one of the enumerated classifications but allows speech expressing the opposite viewpoint, speech that would make someone feel welcome, accepted, or desired based on one of the enumerated characteristics.

240.   As applied to Plaintiffs, Defendant also interprets and enforces the Policy in a viewpoint-discriminatory manner at least in relation to the topic of marriage.

241.   For example, Defendant excluded Plaintiffs from the East Lansing Farmer's Market because they expressed a religious viewpoint that marriage is exclusively a union between one man and one woman, while other vendors have been allowed to freely express viewpoints in support of LGBT issues, such as same-sex marriage.

242.   Good Bites, another regular vendor at the Market posted statements on Facebook promoting a local Pride Festival and the issues it stands for, which include same-sex marriage.

243.   East Lansing also approved the painting of the steps behind the Market in rainbow colors as a symbol of support for LGBT issues, including same-sex marriage.

244.   East Lansing has also designated a staff member at the Human Relations Commission to be the designated liaison on issues related to sexual orientation and gender identity.

245.   East Lansing, therefore, allows, and even openly supports and puts city resources towards, promoting LGBT issues including same-sex marriage, while punishing Plaintiffs for their viewpoint in favor of biblical marriage.

246.   This is viewpoint discrimination in violation of the First Amendment.

**Overbreadth**

247.    The Policy is also facially unconstitutional under the Free Speech Clause because it is overbroad.

248.    The Policy is overbroad because in many instances it bans protected speech, particularly speech on controversial topics, like Plaintiffs' statement of the religious belief that marriage is a union between one man and one woman.

249.    The Policy requires vendors to comply with the Ordinance in their "general business practice[s]." Ex. 1, Vendor Guidelines p. 3.

250.    The category "general business practice[s]" is constitutionally overbroad.

251.    East Lansing interprets "general business practice[s]" to include business owners' religious statements, beliefs, and practices.

252.    The Policy also requires vendors to comply with East Lansing's "public policy against discrimination." Ex. 1, Vendor Guidelines p. 3.

253.    That public policy includes a bar on harassment based on the list of protected characteristics included in the Ordinance. East Lansing, Michigan, Mun. Code § 22-31.

254.    Harassment is defined to include "physical conduct or communication which refers to an individual protected under this article, when such conduct or communication demeans or dehumanizes and has the purpose or effect of substantially interfering with an individual's employment, public accommodations or public services, education, or housing, or creating an intimidating, hostile, or offensive employment, public accommodations, public services, educational, or housing environment." East Lansing, Michigan, Mun. Code § 22-32.

255.    This definition of harassment is constitutionally overbroad.

256.    The Policy also uses undefined and overbroad terms such as "discriminate," "unwelcome," "objectionable," "unacceptable," and "undesirable" to describe the speech prohibited under the Policy. Ex. 1, Vendor Guidelines p. 3; East Lansing, Michigan, Mun. Code §§ 22-31, 22-35.

257.    Neither the Policy nor the Ordinance contain any guidelines to govern the decisions of the Defendant in applying and enforcing the undefined and overbroad terms, including "general business practice[s]," "harassment," "discriminate," "unwelcome," "objectionable," "unacceptable," and "undesirable," thereby permitting Defendant to use unbounded discretion to punish disfavored speech on marriage and other topics of public concern. *Id.*

258.    Defendant has wielded that unbridled discretion to punish Plaintiffs by barring them from participating in the Farmer's Market because of Plaintiffs' public statement and publication of their religious viewpoint on marriage.

**<u>Speech retaliation</u>**

259.    Defendant's adoption and enforcement of the Policy to prohibit Plaintiffs from participating in the Farmer's Market was also retaliation for engaging in protected speech, which violates the First Amendment.

260.    Plaintiffs' Facebook post stating Plaintiffs' religious belief that marriage is a union between one man and one woman is constitutionally protected speech.

261.    Plaintiffs' statement about marriage was a comment on a matter of public concern to the community– namely the nature of marriage.

262.    Defendant took adverse action against Plaintiffs including adopting and enforcing a Policy specifically designed to exclude Plaintiffs from participating in the Farmer's Market.

263.    This adverse action was taken in response to Plaintiffs' prior statement about marriage and specifically to punish Plaintiffs' statements by excluding Plaintiffs from the Market.

264.    After Defendant excluded Plaintiffs from the Market, Defendant sent Plaintiffs a copy of the Facebook post as the sole reason for Plaintiffs' exclusion.

265.    This exclusion would deter an ordinary person from continuing to exercise his or her free speech rights regarding marriage.

266.    Defendant can point to no interest that could outweigh Plaintiffs' interest in exercising their free speech rights.

267.    Because the Policy violates Plaintiffs' free speech rights for all of the reasons stated above, it must further a compelling interest in a narrowly tailored way.

268.    The application of the Policy to bar Plaintiffs from participating in the Farmer's Market because Plaintiffs stated their religious viewpoint that marriage is a union between one man and one woman does not further any legitimate, rational, substantial, or compelling interest.

269.    Punishing Plaintiffs' speech also does not serve any legitimate government interest in a narrowly tailored way.

270.    Defendant has alternative, less restrictive means to achieve any legitimate interest it may possess rather than forcing Plaintiffs to abandon their free speech rights.

271.    Thus, as applied to Plaintiffs and facially, the Policy violates the Free Speech Clause of the First Amendment to the United States Constitution as incorporated and applied to the States through the Fourteenth Amendment.

## SECOND CAUSE OF ACTION
### First Amendment: Free Press

272.    Plaintiffs repeat and reallege each allegation contained in paragraphs 1-230 of this Complaint.

273.    The Free Press Clause prevents previous restraints upon publication and guarantees each individual the right to make his or her thoughts public before the community.

274.    The Free Press Clause protects against the government imposing economic retribution based on what a citizen chooses to think and publish.

275.    The Free Press Clause protects Plaintiffs' right to discuss their religious beliefs about marriage and other subjects, including on their business website, without fear of government punishment.

276.    Plaintiffs exercised their right to free press when they published their religious belief about marriage on their Facebook page.

277.    Defendant created a Policy designed specifically to ban Plaintiffs' publication of their religious beliefs about marriage.

278.    Defendant then used that Policy to target Plaintiffs for punishment based on the publication of their religious beliefs about marriage by barring them from participating in the East Lansing Farmer's Market.

279.    Defendant's Policy thus violates Plaintiffs' rights to free press.

## THIRD CAUSE OF ACTION
### Unconstitutional Conditions

280.    Plaintiffs repeat and reallege each allegation contained in paragraphs 1-230 of this Complaint.

281.    The unconstitutional conditions doctrine prohibits the government from conditioning the receipt of a government benefit on the relinquishment of a constitutional right.

282.    The government violates this unconstitutional conditions doctrine when it pressures a person to give up constitutional rights in order to obtain a public benefit.

283.    The government also violates this doctrine when it denies a person a benefit because that person exercised his or her constitutional rights.

284.    Defendant has violated the unconstitutional conditions doctrine by pressuring Plaintiffs to give up their constitutional rights to free speech and free exercise of religion by conditioning Plaintiffs' receipt of the benefit of continuing to participate in the East Lansing Farmer's Market on Plaintiffs' willingness to relinquish their free speech, free press, and free exercise of religion by publishing Plaintiffs' religious viewpoint on marriage.

285.    Defendant has also violated the unconstitutional conditions doctrine by denying Plaintiffs the benefit of participating in the Farmer's Market because Plaintiffs exercised their constitutional rights to free speech, free press, and the free exercise of religion.

286.    In August 2016, Plaintiffs publicly stated their religious viewpoint that marriage is a unique union between one man and one woman on Facebook.

287.    When East Lansing became aware of the Facebook post, East Lansing pressured Plaintiffs to relinquish the benefit of participating at the Farmer's Market.

288.    When Plaintiffs did not relinquish this public benefit, which they had long enjoyed, East Lansing created a new Policy designed to condition Plaintiffs' continued participation in the East Lansing Farmer's Market on Plaintiffs' embodiment of the public policy underlying the East Lansing Human Relations Ordinance.

289.    East Lansing interpreted the Policy to prohibit Plaintiffs' statements about their religious beliefs and to prohibit Plaintiffs' exercise of those beliefs.

290.    The City then denied Plaintiffs the benefit of participating in the East Lansing Farmer's Market when Plaintiffs failed to surrender their constitutional rights to free speech, free press, and free exercise of religious beliefs.

291.    It is East Lansing's position that as long as Plaintiffs persist in the exercise of their free speech and religious beliefs, they cannot obtain the public benefit of participating in the Market.

292.    The City indicated it would reconsider Plaintiffs' exclusion from the Farmers Market if Plaintiffs changed their statements and religious beliefs.

293.    Plaintiffs' statements regarding their religious beliefs about marriage and Plaintiffs' exercise of those religious beliefs in the management of their property are completely unrelated to Plaintiffs' participation in the Farmer's Market.

294.    Additionally, by enacting the Policy targeting Plaintiffs for exclusion, the City seeks to coerce a result it cannot command directly.

295.    East Lansing cannot directly enforce its Human Relations Ordinance to regulate Plaintiffs' speech or business in Charlotte, Michigan because Plaintiffs reside outside of East Lansing's geographic jurisdiction.

296.    The Policy therefore violates the unconstitutional conditions doctrine.

## FOURTH CAUSE OF ACTION
### First Amendment: Free Exercise of Religion

297.    Plaintiffs repeat and reallege each allegation contained in paragraphs 1-230 of this Complaint.

30

298.    Plaintiffs' sincerely held religious belief is that marriage is, and ought to be, only the sacramental union of one man and one woman.

299.    Plaintiffs' sincerely held religious belief is that to practice their religion they must express that belief through their public statements and lives.

300.    Plaintiffs' sincerely held religious belief is that to practice their religion they must operate their business in accordance with their religious beliefs.

301.    Plaintiffs would violate their religious beliefs if they retracted their statement of their religious beliefs about marriage.

302.    Plaintiffs would violate their religious beliefs if they celebrated or promoted conceptions of marriage other than biblical marriage between one man and one woman.

303.    Plaintiffs would violate their religious beliefs if they participated in or hosted weddings that celebrated marriages between anyone other than one man and one woman.

304.    Plaintiffs' religious beliefs about marriage, expression, and business practice are based on the Bible and Catholic doctrine.

305.    Business owners may assert their free exercise rights through a closely held for-profit business.

306.    The Policy is not operationally neutral or generally applicable but was specifically targeted to exclude Plaintiffs based on the statement of disfavored religious beliefs.

307.    The First Amendment protects Plaintiffs' rights to believe and profess the religious doctrines of their choice.

308.    The First Amendment prohibits the government from interfering with this right by punishing the profession of a religious belief or imposing special disabilities on the basis of stating disfavored religious views.

309.    The Policy punishes Plaintiffs' profession of a particular religious belief about marriage.

310.    Defendant adopted the Policy because of Plaintiffs' prior statement of religious belief about marriage to exclude them from the Farmer's Market.

311.    The Policy was targeted to exclude Plaintiffs from participating in the Farmer's Market so long as Plaintiffs maintained the disfavored religious views and expression.

312.    The Policy, therefore, imposes special disabilities on Plaintiffs due exclusively to their profession of disfavored religious beliefs about marriage.

313.    The Policy is also not neutral or generally applicable because it contains categorical exemptions.

314.    For example, the Policy, by incorporating the language of the Human Relations Ordinance, provides that it "shall not apply to a private club or other establishment not in fact open to the public . . . ." East Lansing, Michigan, Mun. Code § 22-37.

315.    The Policy is not neutral or generally applicable because it is enforced through a system of individualized assessments under which Defendant assesses the reasons for an exemption and grants exemptions for non-religious reasons.

316.    For example, the Policy contains the undefined, vague, and overbroad terms "general business practices," "discriminate," "unwelcome," "objectionable," "unacceptable," and "undesirable" to describe what the Ordinance prohibits. City officials must determine—without any guidance—whether any of these prohibitions apply in a given case based on their own subjective determinations. Ex. 1, Vendor Guidelines p. 3; East Lansing, Michigan, Mun. Code §§ 22-31, 22-35.

317.    The Policy also violates Plaintiffs' free exercise rights under the hybrid rights doctrine because it implicates free exercise rights in conjunction with other constitutional protections, like the rights to free speech, free press, expressive association, due process and equal protection.

318.    Plaintiffs exercise religion under the First Amendment by stating their sincerely held religious beliefs about marriage.

319.    Defendant's Policy substantially burdens Plaintiffs' religious exercise by excluding Plaintiffs from the East Lansing Farmer's Market because they publicly stated their religious

beliefs about marriage, imposing severe coercive pressure on them to surrender their religious beliefs and expression in order to participate in the Market.

320.    Because the Policy violates Plaintiffs' free exercise rights, it must further a compelling government interest in a narrowly tailored way.

321.    Targeting Plaintiffs for exclusion based on their statement of a disfavored religious view does not further any legitimate, rational, substantial, or compelling government interest.

322.    Nor does it serve any legitimate government interest in a narrowly tailored way.

323.    Defendant has alternative, less restrictive means to achieve any legitimate interests they possess rather than forcing Plaintiffs to abandon their free exercise rights.

324.    Thus, as applied to Plaintiffs, the Policy violates the Free Exercise Clause of the First Amendment to the United States Constitution as incorporated and applied to the States through the Fourteenth Amendment.

## FIFTH CAUSE OF ACTION
### First Amendment: Establishment Clause

325.    Plaintiffs repeat and reallege each allegation contained in paragraphs 1-230 of this Complaint.

326.    The Establishment Clause of the First Amendment requires the government to act with a secular purpose and to neither promote nor inhibit religion.

327.    Defendant's enforcement of its Policy to target and exclude Country Mill lacks any secular purpose in singling out religious speech and belief for exclusion.

328.    Defendant's enforcement of its Policy to target and exclude Country Mill also violates the Establishment Clause by singling out religious speech and belief for hostility.

329.    Defendant's enforcement of the Policy to single out and exclude Plaintiffs based on a disfavored religious view sends a message that religious persons, such as Plaintiffs, are second-class citizens, outsiders, and not full members of the community.

330.    Defendant's Policy forces Plaintiffs to give up their beliefs in order to enjoy the benefits of participating in the Farmer's Market, a policy that inhibits religion and represents the antithesis of neutrality.

331.    No compelling state interest exists to justify the Policy.

332.    Because the Policy violates Plaintiffs' rights under the Establishment Clause, it must further a compelling government interest in a narrowly tailored way.

333.    Targeting Plaintiffs for exclusion based on their statement of a disfavored religious view does not further any legitimate, rational, substantial, or compelling government interest.

334.    Nor does it serve any legitimate government interest in a narrowly tailored way.

335.    Thus, as applied to Plaintiffs, the Policy violates the Establishment Clause of the First Amendment to the United States Constitution as incorporated and applied to the States through the Fourteenth Amendment.

## SIXTH CAUSE OF ACTION
### Fourteenth Amendment: Equal Protection

336.    Plaintiffs repeat and reallege each allegation contained in paragraphs 1-230 of this Complaint.

337.    Under the Equal Protection Clause, the government may not treat someone disparately as compared to similarly situated persons when such disparate treatment burdens the exercise of a fundamental right.

338.    Plaintiffs have a fundamental right to free speech and free press.

339.    Plaintiffs are similarly situated to other vendors at the East Lansing Farmer's Market.

340.    Defendant's Policy treats Plaintiffs' publication of their views differently from those of similarly situated vendors.

341.    For example, Defendant permits East Lansing Farmer's Market vendors like Good Bites to express messages promoting LGBT issues, including same-sex marriage.

342.     Defendant also hosts expression on public property—like the rainbow steps behind the market—that support LGBT issues, such as same-sex marriage.

343.     Yet, Defendant imposed severe penalties on Plaintiffs, including expulsion from the Farmer's Market, because Plaintiffs posted a viewpoint—specifically a statement promoting marriage as exclusively a union between one man and one woman—that is critical of same-sex marriage.

344.     Thus, Defendant treats Plaintiffs differently from similarly situated parties in a manner that infringes Plaintiffs' freedom of speech and right to free press.

345.     When the enforcement of laws, like the East Lansing Ordinance, infringes on a fundamental right, courts presume discriminatory intent.

346.     In this case, the presumption of discriminatory intent is also borne out in Defendant's targeting of Plaintiffs based on their speech and viewpoint.

347.     When Defendant became aware of Plaintiffs' viewpoint on marriage, Defendant took steps to exclude Plaintiffs from the Market, ultimately creating a Policy designed specifically to prohibit Plaintiffs from participating in future Markets.

348.     Defendant excluded Plaintiffs, and only Plaintiffs, pursuant to the Policy.

349.     Defendant does not serve any legitimate, rational, substantial, or compelling interest in treating Plaintiffs differently than similarly situated market vendors based solely on Plaintiffs' exercise of their fundamental rights.

350.     Defendant has many alternative, less restrictive mechanisms available to serve any legitimate interests they possess.

351.     Thus, as applied to Plaintiffs, the Policy violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution as incorporated and applied to the States through the Fourteenth Amendment.

## SEVENTH CAUSE OF ACTION
### Fourteenth Amendment: Due Process

352.    Plaintiffs repeat and reallege each allegation contained in paragraphs 1-230 of this Complaint.

353.    The Due Process Clause of the Fourteenth Amendment prohibits the government from censoring speech or outlawing behavior pursuant to vague standards that grant unbridled discretion to government officials to arbitrarily prohibit some expression and action and that fail to give speakers and actors sufficient notice whether their speech or actions violate the law.

354.    The City's Policy incorporates the Human Relations Ordinance in full.

355.    The Policy uses vague and undefined terms such as "general business practices," "discriminate," "unwelcome," "objectionable," "unacceptable," and "undesirable," thereby permitting Defendant to use their unbounded discretion to punish disfavored speech and viewpoints on marriage and other subjects. Ex. 1, Vendor Guidelines p. 3; East Lansing, Michigan, Mun. Code §§ 22-31, 22-35.

356.    The Policy contains no guidelines to govern the decisions Defendant makes in applying and enforcing these terms, thereby permitting Defendant to use their unbounded discretion to punish disfavored speech and viewpoints.

357.    Defendant has wielded this unbounded discretion to punish Plaintiffs' disfavored speech and religious viewpoint that marriage is a union between one man and one woman by excluding them from participating in the East Lansing Farmer's Market.

358.    Citizens of common intelligence must guess as to whether their desired speech or actions will violate the vague terms of the Policy; thus, the Policy gives insufficient warning and notice as to what expression and actions are prohibited.

359.    Therefore, Plaintiffs' rights and the rights of all citizens turn on the whim of City officials, and Plaintiffs and other businesses and their owners cannot know whether their desired speech and actions violates the Policy.

360.     Thus, as applied to Plaintiffs and facially, the Policy violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution as incorporated and applied to the States through the Fourteenth Amendment.

**EIGHTH CAUSE OF ACTION**
**<u>Michigan Compiled Laws § 117.1 et seq.: Violation of the Home Rule City Act</u>**

361.     Plaintiffs repeat and reallege each allegation contained in paragraphs 1-230 of this Complaint.

362.     It is unlawful under the Michigan Home Rule City Act for a municipal corporation to exercise its power beyond city limits.

363.     A municipal corporation violates this Act when it enforces its laws outside of its geographical jurisdiction.

364.     East Lansing is a municipal corporation.

365.     Plaintiffs reside twenty-two miles outside of East Lansing in Charlotte, Michigan.

366.     East Lansing has no authority to regulate Plaintiffs' speech or their activities where they reside, twenty-two miles outside of East Lansing.

367.     The City recognizes the limitations placed on it by the Home Rule City Act, stating on its Human Relations Commission website and in pamphlets published by the Human Relations Commission that the City's Human Relations Ordinance only applies to incidents within the city's boundaries.

368.     Despite this, East Lansing adopted a Policy that incorporated its Human Relations Ordinance in order to require Plaintiffs to comply with the Ordinance "and the public policy against discrimination . . . while at the [Market] and *as a general business practice*" and exclude Plaintiffs from the Market. Ex. 1, Vendor Guidelines p. 3 (emphasis added).

369.     East Lansing interpreted "as a general business practice" to include regulation of speech and activities that take place outside of East Lansing.

370.    East Lansing enacted and applied the Policy to ban Plaintiffs from participating in the Farmer's Market based on Plaintiffs' statement of their religious beliefs related to Country Mill in Charlotte.

371.    East Lansing never accused Plaintiffs of violating the Policy through any speech or action at the Farmer's Market or anywhere else in East Lansing.

372.    Therefore, the Policy serves only to regulate Plaintiffs' speech and beliefs outside East Lansing's jurisdiction.

373.    This violates the Michigan Home Rule City Act.

**PRAYER FOR RELIEF**

Plaintiffs respectfully request that this Court enter judgment against Defendant and provide Plaintiffs with the following relief:

(A)    Preliminary and permanent injunctive relief to stop Defendant and any person acting in concert with them from enforcing the Policy to bar Plaintiffs from participating as a vendor at the East Lansing Farmer's Market based on Plaintiffs' public statements or the way Plaintiffs run Country Mill, which is located outside of East Lansing, Michigan;

(B)    A declaration that Defendant's Policy facially and as applied to Plaintiffs violates the Michigan Home Rule City Act;

(C)    A declaration that Defendant's Policy facially and as applied to Plaintiffs violates the United States Constitution's Freedom of Speech, Free Exercise of Religion, Equal Protection and Due Process Clauses;

(D)    That this Court adjudge, decree, and declare the rights and other legal relations of the parties to the subject matter in controversy here so that these declarations shall have the force and effect of a final judgment;

(E)    That this Court award nominal damages in the amount of one (1) dollar, and compensatory damages, for the violation of Plaintiffs' constitutional and statutory rights;

(F)    That this Court retain jurisdiction of this matter for the purpose of enforcing its orders;

(G)     That this Court award Plaintiffs costs and expenses of this action, including reasonable attorneys' fees, in accordance with 42 U.S.C. § 1988;

(H)     That this Court issue the requested injunctive relief without a condition of bond or other security being required of Plaintiffs; and

(I)     That this Court grant any other relief that it deems equitable and just in the circumstances.

Respectfully submitted this 31st day of May, 2017.

By:  s/ Katherine L. Anderson
Jeremy D. Tedesco (AZ Bar No. 023497)*
Jonathan A. Scruggs (AZ Bar No. 030505)*
Samuel D. Green (AZ Bar No. 032586)*
Katherine L. Anderson (AZ Bar No. 033104)*
**Alliance Defending Freedom**
15100 N. 90th Street
Scottsdale, Arizona  85260
Telephone:  (480) 444-0020
Fax:  (480) 444-0028
jtedesco@adflegal.org
jscruggs@adflegal.org
sgreen@adflegal.org
kanderson@adflegal.org


David A. Cortman (GA Bar No. 188810)*
Rory T. Gray (GA Bar No. 880715)*
**Alliance Defending Freedom**
1000 Hurricane Shoals Rd. NE
Ste. D-1100
Lawrenceville, GA 30043
Telephone:  (770) 339-0774
Fax:  (770) 339-6744
dcortman@ADFlegal.org
rgray@ADFlegal.org


James R. Wierenga (P48946)
Jeshua T. Lauka (P71958)
**DAVID & WIERENGA, P.C.**
99 Monroe Avenue, N.W., Suite 1210
Grand Rapids, Michigan 49503

Telephone:  (616) 454–3883
Facsimile:  (616) 454–3988
jim@dwlawpc.com
jeshua@dwlawpc.com

ATTORNEYS FOR PLAINTIFFS

*Admitted to this Court

## **VERIFICATION OF COMPLAINT**

I, Stephen Tennes, sole Member of Country Mill Farms, LLC, and a

citizen of the United States and a resident of the State of Michigan, hereby declare

under penalty of perjury pursuant to 28 U.S.C. § 1746 that I have read the foregoing

Verified Complaint and the factual allegations therein, and the facts as alleged are

true and correct.

Executed this 2̲6̲ day of May, 2017, at C̲h̲a̲r̲l̲o̲t̲t̲e̲ , Michigan.

Stephen Tennes, Member
Country Mill Farms, LLC

41

## VERIFICATION OF COMPLAINT

I, Stephen Tennes, a citizen of the United States and a resident of the State of Michigan, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I have read the foregoing Verified Complaint and the factual allegations therein, and the facts as alleged are true and correct.

Executed this 2 6 day of May, 2017, at Charlotte , Michigan.

Stephen Tennes