IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **Country Mill Farms**, **LLC** and **Stephen Tennes**,<br><br>                     Plaintiffs,<br>   v.<br><br>**City of East Lansing**,<br><br>                 Defendant. | **Case No. 1:17-cv-00487-PLM-RSK**<br><br>Honorable Paul L. Maloney<br><br>Memorandum In Support of Plaintiffs' Motion for Preliminary Injunction<br><br>Oral Argument Requested |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

FACTS ............................................................................................................................... 2

ARGUMENT ..................................................................................................................... 6

I.     A Preliminary Injunction Should Issue. ................................................................ 6

II.    Plaintiffs are Likely to Succeed on the Merits Because East Lansing Singled Out Their Religious Viewpoint for Censorship. ................................................................. 6

       A.     The Policy Places Unconstitutional Content and Viewpoint Based Restrictions on Speech. .................................................................................. 7

       B.     The Policy Grants the City Unbridled Discretion to Unconstitutionally Regulate Speech on the Basis of Viewpoint. .................................................. 11

       C.     The Policy Places an Unconstitutional Condition on Plaintiffs' Continued Receipt of a Government Benefit. ............................................................... 13

       D.     The Policy was Adopted and Enforced to Retaliate against Plaintiffs' Speech. .. 15

       E.     The Policy Violates Plaintiffs' First Amendment Right to the Free Exercise of Religion. ................................................................................................. 18

       F.     The Policy Cannot Survive Strict Scrutiny. ........................................................ 20

       G.     The Policy Violates the Michigan State Home Rule City Act. ............................. 22

III.   Plaintiffs Have Suffered Irreparable Harm and Will Continue to Suffer Irreparable Harm Unless the Policy is Enjoined; an Injunction Will Not Pose a Hardship to Others; and Enjoinment of the Unconstitutional Policy is in the Public Interest. ................................ 24

CONCLUSION ................................................................................................................ 25

*Cases:*

*Agency for International Development v. Alliance for Open Society International*,
    133 S. Ct. 2321 (2013) ...........................................................................................14

*Arnett v. Myers*,
    281 F.3d 552 (6th Cir. 2002) ...............................................................................16

*Baird v. State Bar of Arizona*,
    401 U.S. 1 (1971)...................................................................................................14

*Bible Believers v. Wayne County*,
    805 F.3d 228 (6th Cir. 2015) ........................................................1, 10, 11, 20

*Bivens v. Grand Rapids*,
    505 N.W.2d 239 (Mich. 1993)...............................................................................22

*Bloch v. Ribar*,
    156 F.3d 673 (6th Cir. 1998) ...............................................................................16

*Brown v. Entertainment Merchants Association*,
    564 U.S. 786 (2011)...............................................................................................22

*Burson v. Freeman*,
    504 U.S. 191 (1992)...............................................................................................20

*Burwell v. Hobby Lobby Stores, Inc.*,
    134 S. Ct. 2751 (2014)...........................................................................................18

*Center for Bio-Ethical Reform, Inc. v. City of Springboro*,
    477 F.3d 807 (6th Cir. 2007) ...............................................................................16

*Center for Bio-Ethical Reform, Inc. v. Napolitano*,
    648 F.3d 365 (6th Cir. 2011) ...............................................................................16

*Child Evangelism Fellowship of Maryland, Inc. v. Montgomery County Public Schools*,
    457 F.3d 376 (4th Cir. 2006) ...............................................................................11

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
    508 U.S. 520 (1993)..........................................................................................19, 20

*City of Boerne v. Flores*,
    521 U.S. 507 (1997)...............................................................................................20

*City of Duluth v. Orr*,
    132 N.W. 265 (Minn. 1911)...................................................................................23

*City of Eugene v. Nalven*,
    955 P.2d 263 (Or. Ct. App. 1998)........................................................................23

*City of Lakewood v. Plain Dealer Publishing Co.*,
    486 U.S. 750 (1988).............................................................................................11

*City of Riverview v. Sibley Limestone*,
    716 N.W.2d 615 (Mich. Ct. App. 2006) .............................................22, 23, 24

*Déjà vu of Nashville, Inc. v. Metropolitan Government of Nashville & Davidson County*,
    274 F.3d 377 (6th Cir 2001) ...........................................................................25

*Dye v. Office of the Racing Commission*,
    702 F.3d 286 (6th Cir. 2012) ..........................................................................17

*Elrod v. Burns*,
    427 U.S. 347 (1976).................................................................................24, 25

*Employment Division, Department of Human Resources of Oregon v. Smith*,
    494 U.S. 872 (1990).........................................................................................18

*Forsyth County v. Nationalist Movement*,
    505 U.S. 123 (1992)...................................................................................10, 11

*Fritz v. Charter Township of Comstock*,
    592 F.3d 718 (6th Cir. 2010) ..........................................................................16

*G & V Lounge, Inc. v. Michigan Liquor Control Commission*,
    23 F.3d 1071 (6th Cir. 1994) ..........................................................................25

*Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal*,
    546 U.S. 418 (2006).................................................................................20, 21

*GTE Northwest Inc. v. Oregon Public Utility Commission*,
    39 P.3d 201 (Or. Ct. App. 2002).................................................................23, 24

*H.D.V.-Greektown, LLC v. City of Detroit*,
    568 F.3d 609 (6th Cir. 2009) ..........................................................................11

*Heffron v. International Society for Krishna Consciousness, Inc.*,
    452 U.S. 640 (1981).........................................................................................17

*Holt v. Hobbs*,
    135 S. Ct. 853 (2015).......................................................................................21

*Holzemer v. City of Memphis*,
    621 F.3d 512 (6th Cir. 2010) ...............................................................16, 17, 18

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*,
    515 U.S. 557 (1995).........................................................................................21

*Keyishian v. Board of Regents of University of State of New York,*
    385 U.S. 589 (1967)............................................................14

*King v. Zamiara,*
    680 F.3d 686 (6th Cir. 2012) ..............................................16

*Koontz v. St. Johns River Water Management District,*
    133 S. Ct. 2586 (2013)........................................................14

*Perry v. Sindermann,*
    408 U.S. 593 (1972).............................................................13

*Planet Aid v. City of St. Johns,*
    782 F.3d 318 (6th Cir. 2015) ................................................6

*R.A.V. v. City of St. Paul,*
    505 U.S. 377 (1992)...............................................................9

*R.S.W.W., Inc. v. City of Keego Harbor,*
    397 F.3d 427 (6th Cir. 2005) .........................................14, 15

*Reed v. Town of Gilbert,*
    135 S. Ct. 2218 (2015)....................................................7, 8, 9

*Residents of West Side of Wayburn Street v. City of Detroit,*
    311 N.W.2d 765 (Mich. Ct. App. 1981) ..............................22

*Rosenberger v. Rector & Visitors of University of Virginia,*
    515 U.S. 819 (1995)...............................................................9

*Sherbert v. Verner,*
    374 U.S. 398 (1963).............................................................18

*Simon & Schuster, Inc. v. Members of New York State Crime Victims Board,*
    502 U.S. 105 (1991)...........................................................2, 9

*Southern Pacific Co. v. Denton,*
    146 U.S. 202 (1892).............................................................14

*Speiser v. Randall,*
    357 U.S. 513 (1958).............................................................14

*Texas v. Johnson,*
    491 U.S. 397 (1989).............................................................21

*Thaddeus-X v. Blatter,*
    175 F.3d 378 (6th Cir. 1999) .....................................15, 16, 17

*Thomas v. Chicago Park District*,
    534 U.S. 316 (2002) ........................................................................................11, 12

*Toledo Area AFL-CIO Council v. Pizza*,
    154 F.3d 307 (6th Cir. 1998) .....................................................................13

*United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio*
    *Regional Transit Authority*,
    163 F.3d 341 (6th Cir. 1998) ....................................................7, 9, 24, 25

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989) ......................................................................................7

*West Virginia State Board of Education v. Barnette*,
    319 U.S. 624 (1943) ....................................................................................25


**Statutes:**
East Lansing, Michigan, Municipal Code § 22-35(b)(2) (2017) ....................................7

Michigan Compiled Laws § 117.4i(d) (2014) ............................................................23

**INTRODUCTION**

First Amendment protections are at their height when the government targets disfavored speech for punishment. "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Bible Believers v. Wayne Cty.*, 805 F.3d 228, 233 (6th Cir. 2015). East Lansing launched just such an attack on speech when it systematically banned farmer Steve Tennes from its city-run farmers market. The reason: Tennes posted a disfavored message on Facebook stating that he believes in marriage between one man and one woman.

Tennes' Facebook message broke no law or existing market policy. It spoke only to his personal beliefs and operation of his family farm, twenty-two miles outside of East Lansing. Yet, it triggered an abrupt reaction from East Lansing. Due to the Facebook post, East Lansing went from specially inviting Country Mill to participate in the Market for six straight years to telling Country Mill that it was no longer welcome. The City spent the next six months working to expel Country Mill from the Market and ultimately crafted a new Policy designed to exclude Country Mill from the Market on a permanent basis. The Policy conditioned Country Mill's participation in the Farmer's Market on Tennes' surrendering to the City's views on same-sex marriage – i.e., give up the disfavored religious belief and expression or be banned from the Market. Tennes did not surrender his views and the City banned him under its new Policy.

This Policy violates First Amendment guarantees of free speech and free religious exercise. It unconstitutionally conditions Country Mill's participation in the Farmer's Market—a public benefit—on Tennes' recantation and silence. And it ignores the jurisdictional limitations placed on East Lansing by the Home Rule City Act by regulating speech and activities outside of the city limits. Such restraints on Plaintiffs' freedoms do not "comport with the premise of individual

dignity and choice upon which our political system rests." *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991). They should be preliminarily enjoined.

## FACTS

Steve Tennes owns Country Mill Farms, LLC, a second generation family farm in Charlotte, Michigan. Pls.' Verified Am. Compl. ¶¶ 38-40, 43-45, ECF No. 5, PageID.71-72. Since 2010, Country Mill has participated in the East Lansing Farmer's Market, which the city runs through its Parks and Recreation Department. Am. Compl. ¶¶ 88-89, PageID.75. During that time, Country Mill has been the only organic apple grower and was repeatedly praised by East Lansing. Am. Compl. ¶¶ 102-107 PageID.76-77. In fact, from 2011 to 2016 the City expressly invited Country Mill to participate in the Market as an Invitational Vendor because of its exceptional service. *Id.*, PageID.76-77.

This changed abruptly on August 24, 2016, when the City learned, through Facebook, that Tennes holds the millennial-old view that marriage is a sacred union between one man and one woman. Am. Compl. ¶ 108, PageID.77. The message broke no law or existing market policy. Am. Compl. ¶¶ 22, 107, 192, 211-212 PageID.69, 77, 86, 88. Unrelated to the Market, Tennes hosts and participates in some weddings at Country Mill. Am. Compl. ¶¶ 6, 84-85, PageID.67, 75. In response to a customer's question, he posted a message on Facebook stating his personal beliefs about those weddings. Am. Compl. ¶¶ 108-109, 119-120, PageID.77-78. The message and weddings at Country Mill are entirely separate from Country Mill's participation in the Farmer's Market. Am. Compl. ¶¶ 6, 84-85 PageID.67, 75. Yet, when City officials saw the statement on Facebook they immediately began taking action to remove Country Mill from the Market. Am. Compl. ¶¶ 121-123, PageID.78.

First, on August 26, a Parks and Recreation Director called Country Mill and asked Country Mill not to participate in the Market that Sunday, August 28, because of Tennes' religious Facebook statement. Am. Compl. ¶ 124, PageID.78. In support of this request, the Director told Country Mill that because of Tennes' statement (1) the City did not want Country Mill at the August 28 Market, (2) the City had received complaints about Tennes' statement, and (3) protestors would be present at the Market if Country Mill participated on August 28. Am. Compl. ¶ 125 PageID.78. After the initial call, the Director called and emailed repeatedly. Am. Compl. ¶ 126, PageID.78. Under pressure from the City, Tennes decided to suspend booking all weddings on Country Mill. Am. Compl. ¶ 127, PageID.78. He posted that information on Facebook, and informed the City. Am. Compl. ¶ 128, PageID.78. Nonetheless, the Director continued to call over the weekend with the same request: do not come to the Market because of the Facebook statement. Am. Compl. ¶¶ 129-130, Page ID.78.

Having broken no law, Country Mill attended the Market on Sunday. Am. Compl. ¶ 133, PageID.79. No one protested or disrupted the Market. Am. Compl. ¶ 134, PageID.79. Country Mill finished out the two-month Market season, and no protests or disruptions occurred. Am. Compl. ¶ 137, PageID.79. So in December, Tennes decided to start booking weddings again and announced that decision on Facebook. Am. Compl. ¶¶ 139-140, PageID.79-80. The City took notice. Am. Compl. ¶¶ 141-142, PageID.80.

East Lansing officials decided that Tennes' views conflict with the City's views on sexual orientation and same-sex marriage. *Id.*, PageID.80. The City's views are reflected in the City's Human Relations Ordinance and related public policy which adds sexual orientation to the list of protected classifications. Am. Compl. ¶¶ 143, 158-186, PageID.80-86. Country Mill, however, is located twenty-two miles outside of East Lansing, where the City has no authority to enforce its

ordinances. Am. Compl. ¶¶ 144-147, 189-192, PageID.80, 86. The Home Rule City Act prohibits such extra-jurisdictional enforcement action. Am. Compl. ¶¶ 144-147, 180-181, PageID.80, 85.

With no law or policy to justify regulating Tennes' speech or barring him from the Market, the City created one. Am. Compl. ¶¶ 144-157, PageID.80-81. When the City prepared applications for the 2017 Market, it added a new Policy to the Vendor Application and Guidelines that incorporates the City's Human Relations Ordinance in full. *Id.*, PageID.80-81. The Policy was motivated by Tennes' statement and specifically designed to exclude Country Mill for that statement. Am. Compl. ¶¶ 148, 209-210, PageID.81, 88. The Policy stated that vendors must comply—and attest to that compliance—with the Ordinance not only at the Market, but also as a "general business practice." Am. Compl. ¶¶ 149-151, PageID.81. The Human Relations Ordinance prohibits discrimination and harassment on the basis of sexual orientation. Am. Compl. ¶¶ 158-164, PageID.81-83. It also bans speech that could make a person feel "objectionable," "unwelcome," "unacceptable," or "undesirable" based on his or her sexual orientation. *Id.*, PageID.81-83. Neither the Ordinance nor the Policy defines the terms "general business practice," "objectionable," "unwelcome," "unacceptable," or "undesirable." Am. Compl. ¶¶ 151-154, 165-166, 179, PageID.81, 83-84. 2017 Vendors had to attest to their compliance with the Policy in their applications to the Market. Am. Compl. ¶ 150, PageID.81.

In addition to the new Policy, when applications opened in January, the City barred the Market Planning Committee from sending an invitation to Country Mill as it had done for the past six years. Am. Compl. ¶¶ 193-194, PageID.86. The City also instructed the Committee that if Country Mill applied anyway, the Committee must send the application to the City to review it directly. Am. Compl. ¶ 195, PageID.86. These instructions were unique to Country Mill. *Id.*, PageID.86.

When Country Mill did not receive an invitational application, Country Mill applied to the Market through the normal, non-invitational process. Am. Compl. ¶ 197, PageID.87. Tennes saw the new Policy, but having broken no law, believed he complied with the Policy and attested to that. Am. Compl. ¶ 198, PageID.87. Country Mill gladly serves all people at the Market and always complied with city ordinances and market policies. Am. Compl. ¶¶ 22, 107, 192, 211-212, PageID.69, 77, 86, 88.

When the Committee received Country Mill's application, the City reviewed it directly and rejected it based on the new Policy. Am. Compl. ¶¶ 199-202, PageID.87. The City informed Country Mill by letter on March 7 that Country Mill was "prohibited" from the Market for failing to "comply with [the Ordinance]." *Id.*, PageID.87. The letter suggested that if Tennes' religious beliefs and expression changed, the City would reconsider Country Mill's participation in the Market. Am. Comp. ¶ 19, Ex. 2, PageID.69, 129.

After receiving the letter, Tennes emailed the city official "hoping to clarify whatever misunderstanding may have happened." Am. Compl. ¶¶ 203-204, PageID.87. Tennes explained that upon re-reviewing Country Mill's application he did not know what violation the City was referring to. *Id.*, PageID.87. The City responded, repeating the charge that Country Mill had violated the Policy and attaching a copy of Tennes' December Facebook post, stating his religious beliefs, as the Policy violation. Am. Compl. ¶¶ 205-208, Ex. 1, PageID.87-88, 111.

Tennes' religious statements and beliefs about marriage do not align with the City's views. Am. Compl. ¶142, PageID.80. The City was the first Michigan city to add sexual orientation as a protected classification, a classification that is not included in Michigan's state civil rights act. Am. Compl. ¶ 185, PageID.85. Moreover, the City allows vendors to freely post on Facebook in support of LGBT issues and other matters of public concern. Am. Compl. ¶¶ 217-226, PageID.88-

89. For example, 2016 Market vendor Good Bites posted their support for LGBT issues on Facebook, including their excitement over participating in a local pride festival. Am. Compl. ¶ 219, PageID.89. East Lansing took no issue with that post, which agreed with the City's LGBT policies. Am. Compl. ¶ 220, PageID.89. It only took issue with Tennes' post, which voiced an opposing view of marriage. Am. Compl. ¶¶ 210-213, PageID.88. Market vendors also post on a wide-variety of political topics that the City leaves unregulated. Am. Compl. ¶ 224, PageID.89. For example, Owosso Organics posted an interview with Ruth Bader Ginsberg in support of the post-election women's march in Washington, D.C. Am. Compl. ¶ 225, PageID.89. Market vendor Applegarth Honey posts frequently about endangered species of bees. Am. Compl. ¶ 226, PageID.89. Tennes supports the rights of these citizens and other businesses to express their views on marriage and other topics. He simply seeks to enjoy the same freedom.

Tennes' expression and his views have not changed. Am. Compl. ¶¶ 66-87, PageID.73-75. Country Mill remains excluded from the 2017 Market, which started on June 4. Am. Compl. ¶¶ 92, 200-213, PageID.75, 87-88.

## ARGUMENT

## I.     A Preliminary Injunction Should Issue.

To obtain a preliminary injunction, Plaintiffs must show: (1) that they will likely succeed on the merits, (2) that they may suffer irreparable harm, (3) that issuance of an injunction will not cause substantial harm to others, and (4) that an injunction serves the public interest. *Planet Aid v. City of St. Johns,* 782 F.3d 318, 323 (6th Cir. 2015). Plaintiffs can satisfy each of these elements.

## II.    Plaintiffs are Likely to Succeed on the Merits Because East Lansing Singled Out Their Religious Viewpoint for Censorship.

Likely success on any one claim would justify a preliminary injunction. In this case, Plaintiffs will likely succeed on each of their claims.

## A. The Policy Places Unconstitutional Content and Viewpoint Based Restrictions on Speech.

The First Amendment Free Speech Clause guarantees that no government will have the power "to restrict expression because of its message, its ideas, its subject matter, or its content." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015). "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only" by strict scrutiny. *Id.*

A law is content-based on its face if it "draws distinctions based on the message a speaker conveys." *Id.* at 2227. It is content-based in operation if it "cannot be 'justified without reference to the content of the regulated speech,'" or was "adopted by the government 'because of disagreement with the message [the speech] conveys.'" *Id.* (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)); *see also United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 356 (6th Cir. 1998) ("[T]he government nevertheless violates the First Amendment when its stated purpose in reality conceals a bias against the viewpoint advanced by the excluded speakers."). Both types of content-based laws violate free speech protections and must satisfy strict scrutiny. *Reed*, 135 S. Ct. at 2227.

East Lansing's Policy is both facially and operationally content-based. The Policy adopts, in full, the Human Relations Ordinance which regulates speech in a content-based manner by only restricting speech related to a handful of topics—"religion, race, color, national origin, age, height, weight, disability, sex, marital status, sexual orientation, gender identity or expression, or student status or because of the use by an individual of adaptive devices or aids." East Lansing, Michigan, Mun. Code § 22-35(b)(2). This provision leaves speech unregulated on a virtually unlimited number of other topics. It therefore creates different standards for speech based on content. As the

Court stated in *Reed*, that "is a paradigmatic example of content-based discrimination." 135 S. Ct. at 2230.

In *Reed*, the Court examined the City of Gilbert's sign ordinances which imposed different standards on signs based on their subject matter. 135 S. Ct. at 2231. For example, "ideological signs" could be larger and displayed for longer periods of time than "political signs," while "political signs" could be larger and displayed for longer periods of time than "temporary directional signs," such as signs advertising a church service. *Id.* at 2224-25.

Like the City of Gilbert's regulation, the East Lansing Policy burdens some speech, but not others, based on its content. Speech on any topic not listed in the Policy is free and unrestrained. For example, a person may speak freely about politics or political candidates but not about any LGBT issue, because disfavored speech on LGBT issues triggers government punishment. Am. Compl. ¶¶ 120-157, 193-226, PageID.78-81, 86-89. East Lansing's enforcement of the Policy against Country Mill demonstrates this. The City enforced the Policy to bar Country Mill from the East Lansing Farmer's Market based on Tennes' speech about marriage, a topic the City views as controlled by the "sexual orientation" provision. Am. Compl. ¶¶ 193-213, PageID.86-87. The City did not enforce the Policy to stop Market participants from expressing views about a wide variety of other topics. Am. Compl. ¶¶ 218-220, 224-226, PageID.89. Many vendors have active Facebook pages where they regularly post about a wide range of unregulated subjects, such as the post-election women's march in Washington, D.C. and the endangered status of certain bee species. *Id.*, PageID.89. The City has no concern about these posts. *Id.* PageID.89.

In fact, the City's Policy regulates not only the content but the viewpoint a speaker expresses. "Government discrimination among viewpoints—or the regulation of speech based on 'the specific motivating ideology or the opinion or perspective of the speaker'—is a 'more blatant'

and 'egregious form of content discrimination.'" *Reed,* 135 S. Ct. at 2230 (citing *Rosenberger v. Rector & Visitors of Univ. of Va.,* 515 U.S. 819, 829 (1995)). It occurs when the government "favor[s] one speaker over another." *Rosenberger,* 515 U.S. at 828; *see also United Food,* 163 F.3d at 356 (noting that even where a law is facially content and viewpoint neutral, "the government nevertheless violates the First Amendment when its stated purpose in reality conceals a bias against the viewpoint advanced by the excluded speakers"). "The government may not regulate use based on hostility—or favoritism—towards the underlying message expressed." *R.A.V. v. City of St. Paul,* 505 U.S. 377, 386 (1992). Such "[d]iscrimination against speech because of its message is presumed to be unconstitutional." *Rosenberger,* 515 U.S. at 828. This is vital to our ordered society because unchecked viewpoint discrimination allows the government to "effectively drive certain ideas or viewpoints from the marketplace." *Simon & Schuster,* 502 U.S. at 116. It allows government officials to "wield such statutes to suppress disfavored speech," often "'for invidious, thought-control purposes.'" *Reed,* 135 S. Ct. at 2229 (citation omitted).

"[H]ostility . . . towards [Tennes'] underlying message" is exactly what East Lansing's Policy codifies. *R.A.V.,* 505 U.S. at 386. The Policy facially discriminates based on viewpoint by prohibiting only speech that would make someone feel "unwelcome," "objectionable," "unacceptable," or "undesirable" based on an enumerated classification. Am. Compl. ¶¶ 149-153, 161, 165-166, PageID.81-83. In other words, speech conveying a critical viewpoint is prohibited but speech conveying an affirming viewpoint is allowed. Am. Compl. ¶¶ 149-153, 161, 165-166, 213, 219-220, PageID.81-83, 88-89. But the state may not impose "special prohibitions on those speakers who express views on disfavored subjects" without overcoming strict scrutiny. *R.A.V.,* 505 U.S. at 391.

The Policy operates in the same viewpoint-discriminatory way. The City applied its Policy to ban Tennes' speech on marriage because the City viewed that speech as critical of same-sex marriage. Am. Compl. ¶¶ 200-213, PageID.87-88. At the same time, the City is perfectly comfortable with speech affirming same-sex marriage. The City itself engages in such speech and it allows other vendors to do so as well. Am. Compl. ¶¶ 217-223, PageID.88-89. (noting that Vendor Good Bites freely posted about their involvement in a local LGBT pride festival and affirmed the LGBT issues promoted by the event). Tennes affirms Good Bites' right to free speech. Am. Compl. ¶ 227, PageID.89. He simply seeks the same freedom to express his views on matters of public concern like marriage. Am. Compl. ¶¶ 228-229, PageID.89-90.

The City cannot excuse its viewpoint discrimination by categorizing Tennes' speech as offensive. When a city official first contacted Country Mill about the Facebook post in August 2016, the official indicated that the City had received complaints by people claiming to be offended by Tennes' post. Am. Compl. ¶¶ 124-125, PageID.78. The City asked Country Mill to stop participating in the Market, in part, because of those complaints and supposed threats of protests. *Id.* PageID.78. But a listener's "'reaction to speech is not a content-neutral basis for regulation,' or for taking an enforcement action against a peaceful speaker." *Bible Believers*, 805 F.3d at 247 (quoting *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 134 (1992)). This is confirmed in a long line of cases about what the Court terms a "heckler's veto." *Bible Believers*, 805 F.3d at 248 (citing cases and stating that "[a] review of Supreme Court precedent firmly establishes that the First Amendment does not countenance a heckler's veto"). "Punishing, removing, or by other means silencing a speaker due to crowd hostility will seldom, if ever," be constitutional. *Id.* Yet to punish, remove, and silence Tennes' speech was exactly East Lansing's approach. Its actions are unconstitutional. As the Sixth Circuit recently held:

The freedom to espouse sincerely held religious, political, or philosophical beliefs, especially in the face of hostile opposition, is too important to our democratic institution for it to be abridged simply due to the hostility of reactionary listeners who may be offended by a speaker's message. If the mere possibility of violence were allowed to dictate whether our views, when spoken aloud, are safeguarded by the Constitution, surely the myriad views that animate our discourse would be reduced to the standardization of ideas by the dominant political or community groups. Democracy cannot survive such a deplorable result.

*Id.* at 252 (citation omitted).

**B.      The Policy Grants the City Unbridled Discretion to Unconstitutionally Regulate Speech on the Basis of Viewpoint.**

Viewpoint-based discrimination creates such a "deplorable result" that courts require safeguards to prevent it. *Id.* "[V]iewpoint neutrality requires not just that a government refrain from explicit viewpoint discrimination, but also that it provide adequate safeguards to *protect* against the improper exclusion of viewpoints" through the exercise of unbridled discretion. *Child Evangelism Fellowship of Md., Inc. v. Montgomery Cty. Pub. Schs.*, 457 F.3d 376, 384 (4th Cir. 2006) (emphasis in original); *H.D.V.-Greektown, LLC v. City of Detroit*, 568 F.3d 609, 620-21 (6th Cir. 2009) ("[A]n ordinance can vest substantial power in local officials to engage in content-based discrimination . . . by placing unbridled discretion in the hands of a government official or agency."). The danger of viewpoint-based discrimination "is at its zenith when the determination of who may speak and who may not is left to the unbridled discretion of a government official." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 763 (1988).

Laws that "delegate overly broad . . . discretion to a government official" or that allow "arbitrary application" are unconstitutional because "such discretion has the potential for becoming a means of suppressing a particular point of view." *Forsyth Cty.*, 505 U.S. at 130. "To avoid granting such unbridled discretion, ordinances 'must contain precise and objective criteria on which [officials] must make their decisions; an ordinance that gives too much discretion to public officials is invalid.'" *H.D.V.-Greektown*, 568 F.3d at 621; *see also Thomas v. Chi. Park*

*Dist.*, 534 U.S. 316, 324 (2002) (holding that the grounds for official enforcement must be "reasonably specific and objective," "narrowly drawn, reasonable and definite," so as not to "leave the decision to the whim of the administrator").

The City's Policy grants unbridled discretion. The Policy fails to define "unwelcome," "objectionable," "unacceptable," or "undesirable," thus giving officials unbounded discretion to enforce the law as they see fit. Am. Compl. ¶¶ 151-153, 165-166, 179, PageID.81, 83-84. The Policy also fails to define what it means by the term "general business practice[s]." Am. Compl. ¶ 152, PageID.81. Here, officials interpreted the latter term in a vastly overbroad fashion to allow city regulation of *every aspect* of a vending farmer's speech or other activities. Am. Compl. ¶¶ 154-157, PageID.81. The City includes within its purview expression well outside of East Lansing, on the farmer's own farmstead, on topics completely unrelated to the Market. *Id.*, PageID.81. The City's enforcement against Country Mill exemplifies this point. The City barred Country Mill from the Market for violating the Policy based on a statement Tennes made at and about his own farm, twenty-two miles outside of East Lansing, on a subject (marriage) that had nothing to do with Country Mill's participation in the Market. Am. Compl. ¶¶ 157, 200-213, PageID.81, 87-88. This is exactly the kind of invidious viewpoint-based discrimination the unbridled discretion doctrine seeks to avoid. When a city seeks to control the views expressed by a farmer outside of its borders, it crosses into the "thought-control" territory the Supreme Court warned against.

The viewpoint-based nature of the Policy is bolstered by its history. Country Mill was a praised and desired participant at the Market year after year. Am. Compl. ¶¶ 102-106, PageID.76. It complied with every ordinance and policy. Am. Compl. ¶¶ 107, 211-212, PageID.77, 88. Its only perceived fault was a constitutionally-protected and completely unrelated Facebook post about Tennes' religious beliefs. Am. Compl. ¶¶ 200-213, PageID.87-88. That post formed the basis of a

city crusade to remove Country Mill from the Market. Am. Compl. ¶¶ 121-140, Page ID.78-80. The Policy was the necessary end of that crusade to ensure that Country Mill could not access the Market until Tennes surrendered his disfavored religious views. Am. Compl. ¶¶ 141-157, 193-213, PageID.80-81, 86-88.

**C.    The Policy Places an Unconstitutional Condition on Plaintiffs' Continued Receipt of a Government Benefit.**

"For at least a quarter-century, th[e] Court has made clear" that the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). This is true "even if the government has absolute discretion as to whether it will provide the benefit in the first instance." *Toledo Area AFL-CIO Council v. Pizza*, 154 F.3d 307, 320-21 (6th Cir. 1998) (the government cannot "place conditions on the receipt of state-created benefits that have the effect of dissuading people from exercising a constitutional right"). It is "well established in [the Sixth Circuit's] First Amendment jurisprudence." *Id.* at 321.

"The unifying principle behind this body of case law is simple. Allowing the government to decide that it will not give some people a benefit that it gives to others . . . simply because a person has exercised a right guaranteed under the Constitution, amounts to a penalty for exercising such right. Allowing the government to penalize conduct it cannot directly ban raises concerns that the government will be able to curtail by indirect means what the Constitution prohibits it from regulating directly." *Pizza*, 154 F.3d at 321; *see also Perry*, 408 U.S. at 597 ("[I]f the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited.").

Some of the earliest unconstitutional conditions cases concerned loyalty oaths, resulting in a line of cases that rejected government efforts to limit public benefits to those who pledged

ideological and political allegiance to the government's views. *Speiser v. Randall*, 357 U.S. 513, 518, 528-29 (1958) (loyalty oath required for veteran tax exemption); *Baird v. State Bar of Ariz.*, 401 U.S. 1, 6-8 (1971) (loyalty oath required for attorney admissions to the state bar); *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 606-610 (1967) (loyalty oath and associational disclosure required for teachers to affirm no connection to Communism). The Supreme Court later applied the same principles to public employment, finding an unconstitutional condition when a college denied a professor's contract renewal based on his exercise of free speech—in that case public criticism of the Board of Trustees. *Perry*, 408 U.S. at 597-98 ("Such interference with constitutional rights is impermissible."). The Court has applied the doctrine to prohibit speech-infringing conditions on government benefit programs generally. *Agency for Int'l Dev. v. All. for Open Soc'y Int'l*, 133 S. Ct. 2321, 2332 (2013) (finding an unconstitutional condition where an applicant for a government benefit program was denied access for failure to adopt a government mandated policy opposing prostitution).

Most recently, unconstitutional conditions cases have arisen in the arena of licensing and permitting. There, courts repeatedly held that the government may not condition a license on the surrender of constitutional rights. *Koontz v. St. Johns River Water Mgmt. Dist.*, 133 S. Ct. 2586, 2596-97 (2013) (holding that it would be unconstitutional for the government to condition a land use permit on action by the land owner that if required directly would violate the takings clause); *S. Pac. Co. v. Denton*, 146 U.S. 202, 207 (1892) (ruling that a "statute requiring the corporation, as a condition precedent to obtaining a permit to do business within the state, to surrender a right and privilege secured to it by the constitution and laws of the United States, was unconstitutional and void …"); *R.S.W.W., Inc. v. City of Keego Harbor*, 397 F.3d 427, 434-35 (6th Cir. 2005)

(holding that denial of a liquor license based on a condition that violated the due process clause violated the unconstitutional conditions doctrine).

There is an element of these loyalty oath cases here. East Lansing licenses vendors to participate in the Market. Am. Compl. ¶¶ 99-102, PageID.76. The City's new Policy then requires vendors to attest to their compliance with the Policy, which conditions participation in the Market on activity completely unrelated to selling produce. Am. Compl. ¶ 150, PageID.81. Having violated no law, Country Mill attested to its compliance when it completed the 2017 Vendor Application. Am. Compl. ¶ 198, PageID.87. Only upon receipt of the City's letters did Country Mill learn that the City interprets its Policy so broadly that it bans free speech and belief in *all* aspects of Country Mill's business, even on the family farm. Am. Compl. ¶¶ 152-157, 197-213, PageID.81, 87-88. This highlights the danger of the Policy. Like the government actions in the unconstitutional conditions case law, the Policy conditions receipt of a benefit—participation in the Farmer's Market—on surrender of free speech and free exercise. *Id.*, PageID.81, 87-88.

The City's letters confirm this point for they explain that, if the city has "misinterpreted or misunderstood" Tennes' business practices, the City would reconsider his participation in the Market, – i.e., if Tennes changes his beliefs, views, and expression, Country Mill may return to the Market. Am. Compl. ¶¶ 19, 200-201, Ex. 2, PageID.69, 87, 129. Just sign your name and recant your beliefs. Then you can enjoy the economic benefits of citizenship. But so long as Tennes exercises his First Amendment rights, Country Mill is left on the outside. And Tennes is excluded from the City's economic community and financial benefit of the Market. Only those who affirm the City's views may receive this benefit. That is an unconstitutional condition.

### D.    The Policy was Adopted and Enforced to Retaliate against Plaintiffs' Speech.

The government violates the First Amendment when it denies a benefit in retaliation for exercising the right to free speech. *Thaddeus-X v. Blatter*, 175 F.3d 378, 388 (6th Cir. 1999). To

make out a speech retaliation claim, a plaintiff must show that (1) he "engaged in protected conduct," (2) the defendant took "an adverse action . . . against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct," and (3) "there is a causal connection," meaning "the adverse action was motivated at least in part by the plaintiff's protected conduct." *Id.* at 394. Once a prima facie case of retaliation is made, the government carries the burden to show "by a preponderance of the evidence, that it would have taken the same action even in the absence of the protected [speech]." *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002).

First Amendment retaliation occurs most frequently in the public employment context. *Thaddeus-X*, 175 F.3d at 388. But it "arise[s] in any number of contexts." *Id.* at 386-87. For example, Sixth Circuit retaliation cases have involved prisoners, crime victims, non-profit organizations, and private individuals and businesses.[1] These cases confirm that First Amendment retaliation claims can arise "where, as here, private parties challenge governmental action." *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 372 (6th Cir. 2011).

One recent Sixth Circuit precedent, *Holzemer v. City of Memphis*, is particularly informative. 621 F.3d 512 (6th Cir. 2010). In that case, a city official rejected the renewal of a buggy company's taxi permit after the owner complained to a city council member about the licensing official's prior regulation of the company. *Id.* at 516-518. The Sixth Circuit found

---

[1] *King v. Zamiara*, 680 F.3d 686 (6th Cir. 2012) (prisoner claimed he was retaliated against for providing legal assistance to other inmates filing grievances); *Bloch v. Ribar*, 156 F.3d 673 (6th Cir. 1998) (rape victim claimed retaliation for her public criticism of the police department's handling of the investigation); *Ctr. for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807 (6th Cir. 2007) (nonprofit organization claimed retaliation for its public political advocacy); *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718 (6th Cir. 2010) (business owner who operated out of her home claimed she was denied a permit in retaliation for her attendance, comments, and complaints at a local board meeting); *Arnett*, 281 F.3d at 552 (several family members brought retaliation claims over the Tennessee Wildlife Resources Agency's removal of their duck blinds after the family publically criticized the TWRA).

retaliation, *id.* at 527, holding that while the permit may not be guaranteed, a city official cannot deny a permit in retaliation for engaging in protected speech. *Id.* at 525.

The same is true here. Country Mill engaged in constitutionally protected speech in the form of a Facebook message stating Tennes' religious beliefs about marriage. Am. Compl. ¶ 120, PageID.78. Speech about one's religious beliefs is clearly protected. *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981) ("[T]he oral and written dissemination of . . . religious views and doctrines is protected by the First Amendment."). So, too, is one's right to speak about "any matter of political, social, or other concern to the community" like marriage. *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 295 (6th Cir. 2012).

The City took adverse action against Country Mill that "would deter a person of ordinary firmness" from continuing to speak freely about his religious beliefs. *Thaddeus-X*, 175 F.3d at 394. After Country Mill participated in the Market for seven years, the City told Country Mill that it was no longer welcome. Am. Compl. ¶¶ 102-103, 121-126, PageID.76, 78. The City asked Country Mill to leave the 2016 Market mid-season. Am. Compl. ¶¶ 121-126, PageID.78. It then created a new Policy for the 2017 Market, which the City said prohibited Country Mill from participating so long as its statements and beliefs about marriage remained unchanged. Am. Compl. ¶¶ 148-157, 200-213, PageID.81, 87-88.

The adverse action was based solely on Tennes' constitutionally protected speech. The City cited Tennes' Facebook statements as the basis, first for their request that Country Mill leave the Market, and then for the Policy's prohibition on Country Mill's participation in the Market. Am. Compl. ¶¶ 121-126, 200-213, PageID.78, 87-88. The City even sent Country Mill a copy of the Facebook page with Tennes' post as the evidence for barring Country Mill from the Market under the new Policy. Am. Compl. ¶¶ 207, 210, PageID.88.

It is impossible for the City to rebut this prima facie case of retaliation. Its letters state the reason the City denied Country Mill's license to participate in the 2017 Market: The Facebook post, which was attached. *Id.*, PageID.88. The "grounds actually relied upon" are the only grounds a court will consider in determining a retaliation claim. *Holzemer*, 621 F.3d at 527. Any alternate grounds the City raises at this point in time are irrelevant. *Id.*

E.     **The Policy Violates Plaintiffs' First Amendment Right to the Free Exercise of Religion.**

In addition to the free speech violations outlined above, East Lansing's Policy also infringes upon Tennes' right to the free exercise of religion. Individual business owners may assert their free exercise rights through their closely held for-profit businesses. *See Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2768 (2014) (explaining that "protecting the free-exercise rights of corporations . . . protects the religious liberty of the humans who own and control those companies"). Tennes' and Country Mill Farms' free exercise rights are one in this regard.

The Free Exercise Clause protects, "first and foremost, the right to believe and profess whatever religious doctrine one desires." *Emp't Div.*, *Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 877 (1990). Accordingly, the government can never "regulat[e] religious *beliefs* as such." *Id.* (quoting *Sherbert v. Verner*, 374 U.S. 398, 402 (1963) (emphasis in original)). It cannot "punish the expression of religious doctrines it believes to be false," or "impose special disabilities on the basis of religious views." *Smith*, 494 U.S. at 877.

But East Lansing punished Tennes for precisely these reasons. Tennes' publication of his religious views on marriage via a Facebook post is a classic profession of the Catholic Church's millennia-old doctrine on marriage. Am. Compl. ¶¶ 200-213, PageID.87-88. The City adopted a new Policy—and then enforced it—specifically to exclude Country Mill Farms from the Market based on Tennes' public expression of this disfavored religious doctrine. Am. Compl. ¶¶ 148-157,

200-213, PageID.81, 87-88. In other words, East Lansing imposed a special disability on Country Mill Farms based on Tennes' stated religious views about marriage and indicated it would consider readmitting the Farm if Tennes changed his religious beliefs. Am. Compl. ¶ 19, 200-201, Ex. 2, PageID.69, 87, 129. That is a straightforward violation of the Free Exercise Clause.

In addition, the Free Exercise Clause prohibits "government[] hostility which is masked, as well as overt," including laws that are veiled "'religious gerrymanders.'" *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993) (citation omitted). The Supreme Court addressed this type of unconstitutional targeting in *Lukumi*, after a city adopted an ordinance prohibiting animal sacrifice practiced by the Santeria religion. *Id.* at 524, 526-28. The law, although facially neutral, was motivated by the City's distaste for this Santeria ritual. *Id.* It then created a "religious gerrymander[]" with the goal of suppressing the ritual. *Id.* at 534. Such "religious gerrymander[s] . . . impermissibl[y] . . . target . . . religious practices," are not neutral, and are unconstitutional under the Free Exercise Clause. *Id.* at 535.

East Lansing's new Policy creates a religious gerrymander much like the ordinance in *Lukumi*. Like the Santeria ritual, Tennes' religious practices violated no existing policies. Am. Compl. ¶¶ 107, 211-212, PageID.77, 88. So the City created one specifically to suppress Tennes' religious expression and religious practice. Am. Compl. ¶¶ 148-157, PageID.81. The City's path to remove Country Mill from the Farmer's Market began within two days of Tennes' Facebook post. Am. Compl. ¶ 124, PageID.78. The pressure from City officials was constant and ultimately culminated in the adoption of the new Policy for 2017 Vendors and differential treatment during the 2017 application process, all targeted at expelling Country Mill from the Market. Am. Compl. ¶¶ 121-132 141-157, 193-213, PageID.78-81, 86-88. The City then sent Tennes a copy of his Facebook post as the sole Policy "violation." Am. Compl. ¶¶ 207, 210, PageID.88. The Policy was

vaguely written but enforced specifically to ban Tennes from the Market so long as he continues practicing his faith through the weddings he participates in on his farm. Am. Compl. ¶¶ 148-157, PageID.81.

In short, the chain of events makes clear that suppressing Tennes' exercise of his faith was the object of the new Policy. That object is confirmed by the fact that the new Policy's *only* effect was excluding Country Mill Farms from the Market. *See Lukumi*, 508 U.S. at 535 ("[T]he effect of a law in its real operation is strong evidence of its object."). It is doubly confirmed by the Policy's "gratuitous" nature, *id.* at 538, in that the Policy attempts to regulate "general business practice[s]" on Tennes' farm—twenty-two miles outside of the City's limits. Such patent targeting of Tennes' religion for censure violates the Free Exercise Clause.

### F. The Policy Cannot Survive Strict Scrutiny.

Because the City's Policy violates Plaintiffs' fundamental constitutional rights, it must satisfy strict scrutiny, "the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 509 (1997). To satisfy this standard, the City must show that its Policy is "narrowly tailored to be the least-restrictive means available to serve a compelling government interest." *Bible Believers*, 805 F.3d at 248. "[I]t is the rare case in which . . . a law survives strict scrutiny." *Burson v. Freeman*, 504 U.S. 191, 211 (1992).

The Policy incorporates the City's Human Relations Ordinance in order to enforce that Ordinance outside the City's boundaries and regulate Plaintiffs' expression and religious beliefs. Am. Compl. ¶¶ 151-157, PageID.81. Plaintiffs expect the City to claim an interest in eliminating discrimination to justify its discrimination against Country Mill. But such an interest is not compelling in the abstract. To survive strict scrutiny, the City must go beyond "broadly formulated interests" and justify its interest in applying the Policy to Plaintiffs, "the particular claimant[s]" whose constitutional rights are infringed. *Gonzales v. O Centro Espirita Beneficente Uniao Do*

*Vegetal*, 546 U.S. 418, 420 (2006); *Holt v. Hobbs*, 135 S. Ct. 853, 863 (2015) (rejecting argument that a broadly formulated interest suffices and stating instead that "a more focused inquiry" is necessary, one that "requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law to the person—the particular claimant whose sincere exercise of religion is being substantially burdened." (citations omitted)). In other words, the City must justify enforcing its Policy to regulate Tennes' speech and belief, twenty-two miles outside the city at Country Mill. The City cannot accomplish this feat.

As the Supreme Court explained in *Hurley,* applying a public accommodation law to expressive activity does not serve a valid, let alone a compelling, state interest. *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 578-79 (1995). Moreover, the City can point to no alleged discrimination by Country Mill at the Market. Am. Compl. ¶¶ 22, 107, 211-212, PageID.69, 77, 88. Country Mill has always served all people and complied fully with all laws, policies, and Market guidelines. Am. Compl. ¶¶ 22, 107, 211-212, PageID.69, 77, 88. Tennes' personal beliefs and expression at home does not impact the Market in East Lansing. Am. Compl. ¶ 6, PageID.67. The City likewise cannot cite potential protests as its compelling interest. Am. Compl. ¶¶ 134-137, PageID.79. No one protested the Market. *Id.*, PageID.79. Even if they had, banning "offensive or disagreeable" speech serves no compelling interest. *Texas v. Johnson*, 491 U.S. 397, 414 (1989).

The Policy is also far from narrowly tailored. Undefined terms like "general business practice[s]," "objectionable," "unwelcome," "unacceptable," or "undesirable" leave the Policy open to broad and unbridled application by City officials. Am. Compl. ¶¶ 151-154, 165-166, 179, PageID.81, 83-84. Indeed, the City's enforcement against Tennes proves that all speech, belief, and activities of all vendors in all locations, even in their homes well outside of the City's

boundaries, are within the Policy's regulatory scope. Am. Compl. ¶¶ 154-157, 200-213, PageID.81, 87-88. The City cannot demonstrate that such an overbroad Policy is "actually necessary" to solve any "actual problem" as the Constitution requires. *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 799 (2011).

### G. The Policy Violates the Michigan State Home Rule City Act.

In addition to its constitutional infirmity, the Policy also violates state law. Through the Policy, East Lansing seeks to extend the jurisdiction of its Human Relations Ordinance to regulate speech, belief, and activity outside the City's boundaries. That is unlawful and East Lansing knows it. The City has repeatedly conceded that the Ordinance only regulates incidents occurring within East Lansing's boundaries. Indeed, the City's Human Relations website and accompanying pamphlets state exactly that. Am. Compl. ¶¶ 180-183, PageID.85 ("[T]he incident must have occurred within the city's boundaries."). Those limits are placed on the City by state law.

Cities legally operate only under the authority granted to them by the state. *City of Riverview v. Sibley Limestone*, 716 N.W.2d 615, 618 (Mich. Ct. App. 2006); *Bivens v. Grand Rapids,* 505 N.W.2d 239, 241 (Mich. 1993) (cities have no inherent power). Michigan cities are governed by the Home Rule City Act. *Residents of W. Side of Wayburn St. v. City of Detroit*, 311 N.W.2d 765, 767 (Mich. Ct. App. 1981). That Act gives cities the power to "adopt ordinances," but also limits that power by requiring city ordinances to "relat[e] to municipal concerns, property, and government" and to be consistent with state law and with the "express or implied powers conferred by the Home Rule City Act." *Riverview*, 716 N.W.2d at 618.

This has been Michigan law for at least a century. Michigan courts most recently discussed this rule in a 2006 appellate court case that arose after a city cited a rock quarry for blasting without a permit, even though the activities took place outside city limits. *Riverview*, 716 N.W.2d 615. The quarry challenged the citation and permit requirement under the Home Rule City Act and

prevailed. *Id.* As the Michigan Court of Appeals explained, "a municipality's police powers may only be exercised *within its boundaries*, absent statutory or other special authority." *Id.* at 620 (emphasis added). The Court concluded that the Act only grants cities the authority to regulate or prohibit "trades, occupations, and amusements *within city boundaries.*" *Id.* at 619 (quoting Mich. Comp. Laws § 117.4i(d) (2014) (emphasis added)). Concluding that permitting is a form of regulation and that "[a]n absolute prohibition is an extreme form of regulation," the Court found "as a matter of law, that [the Home Rule City Act] does not provide the necessary authority for [the city] to regulate defendant's blasting operation, which is not within [the city's] boundary." *Id.* at 619-20. Such action to "regulate . . . operations outside the city" violates the Home Rule City Act and is invalid. *Id.* at 621.

This decision concurs with courts' interpretations of similar laws in other states. *Riverview,* 716 N.W.2d at 620 ("Legal texts and case authority from other jurisdictions do not support a different interpretation of Michigan law."). For example, the Minnesota Supreme Court found in a challenge to a city ordinance regulating explosive materials both in the city and one mile outside:

> [T]he right given to the people within prescribed territorial limits to adopt a complete municipal code does not warrant the assumption by them of power over territory and people beyond those limits, even though the control of such territory and people would be convenient and gratifying to the people within the city. The practical difficulties involved in the assumption by cities of such power are apparent.

*Riverview*, 716 N.W.2d at 620-21 (quoting *City of Duluth v. Orr*, 132 N.W. 265-66 (Minn. 1911)).

The Oregon Court of Appeals ruled similarly in two cases challenging ordinances compelling residents outside a city to connect to city utilities. *GTE Nw, Inc. v. Or. Pub. Util. Comm'n*, 39 P.3d 201 (Or. Ct. App. 2002); *City of Eugene v. Nalven*, 955 P.2d 263 (Or. Ct. App. 1998). In *Nalven*, the court held that "although municipal authority generally may derive from express or implied grants from the state, the power to act beyond municipal boundaries may not

be implied and instead must be based on an expressed—indeed, on a '*clearly* expressed'—conferral of authority." *Riverview*, 716 N.W.2d at 621 (quoting *Nalven*, 955 P.2d at 265-66). In *GTE Northwest*, the court added that "the concept of extramural power, power outside the walls, is relevant when a city undertakes to assert coercive authority over persons or property outside its boundaries." *Riverview*, 716 N.W.2d at 621 (quoting *GTE Nw.*, 39 P.3d at 208).

These cases confirm the invalidity of East Lansing's action and the City's complete lack of authority to regulate activity outside its boundaries. Yet, that is exactly what the City did through the enactment and enforcement of its new Policy. The City broadly interpreted the "general business practice[s]" provision to regulate and punish Tennes' speech that occurred outside the City and was unrelated to any activity he took within the boundaries of East Lansing. Am. Compl. ¶¶ 200-213, PageID.87-88. At no time did the City ever accuse Country Mill of violating any ordinance, policy, or guideline at the Market or while in East Lansing. Am. Compl. ¶¶ 211-212, PageID.88. Country Mill's only transgression was Tennes' Facebook post, which the City attached to its denial letter, concerning Tennes' personal beliefs and religious expression and practice twenty-two miles outside of East Lansing. Am. Compl. ¶ 213, PageID.88. Thus, it was not enough for the City to enforce its orthodoxy in town. East Lansing has reached far beyond its borders. The Home Rule Act does not allow such overreach.

III. **Plaintiffs Have Suffered Irreparable Harm and Will Continue to Suffer Irreparable Harm Unless the Policy is Enjoined; an Injunction Will Not Pose a Hardship to Others; and Enjoinment of the Unconstitutional Policy is in the Public Interest.**

Because Plaintiffs have shown likely success on the merits, they satisfy the other factors for a preliminary injunction. *See United Food*, 163 F.3d at 363 (noting that likely success on the merits is determinative in First Amendment cases).

This conclusion makes sense because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *id.* at 363 (citing *Elrod v.*

*Burns*, 427 U.S. 347, 373 (1976)), and that harm is always "sufficient to justify injunctive relief." *United Food*, 163 F.3d at 363. Furthermore, where, as here, "the plaintiff shows a substantial likelihood that the challenged law is unconstitutional, no substantial harm to others can be said to inhere in its enjoinment." *Déjà vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cty*, 274 F.3d 377, 400 (6th Cir 2001). "[I]t is [also] always in the public interest to prevent violation of a party's constitutional rights." *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n,* 23 F.3d 1071, 1079 (6th Cir. 1994).

This case is no exception. East Lansing expelled Country Mill from the East Lansing Farmer's Market based only on Tennes' publishing of his religious beliefs on the internet. Am. Compl. ¶¶ 200-213, PageID.87-88. This expulsion was content and viewpoint-based, retaliatory, and violated Plaintiffs' rights to free speech and free exercise of religion. These First Amendment injuries irreparably harm Plaintiffs and will continue to do so as long as the City is allowed to bar Plaintiffs from the Market for unconstitutional reasons. No one will be harmed by remedying these legal violations and it is in the public interest to do so. Protecting Plaintiffs' freedom to speak and live out their beliefs protects everyone's freedom to do the same.

## CONCLUSION

"If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). Plaintiffs ask this Court to enjoin the Policy and stop East Lansing from prescribing what is orthodox regarding marriage and squelching dissent so that Plaintiffs may freely exercise their constitutional rights and still peaceably engage in the benefits of city life.

Respectfully submitted this 9th day of June, 2017,

By: /s/ Katherine L. Anderson

Jeremy D. Tedesco (AZ Bar No. 023497)*
Jonathan A. Scruggs (AZ Bar No. 030505)*
Samuel D. Green (AZ Bar No. 032586)*
Katherine L. Anderson (AZ Bar No. 033104)*
**Alliance Defending Freedom**
15100 N. 90th Street
Scottsdale, Arizona  85260
Telephone: (480) 444-0020
Fax:  (480) 444-0028
jtedesco@adflegal.org
jscruggs@adflegal.org
sgreen@adflegal.org
kanderson@adflegal.org

David A. Cortman (GA Bar No. 188810)*
Rory T. Gray (GA Bar No. 880715)*
**Alliance Defending Freedom**
1000 Hurricane Shoals Rd. NE
Ste. D-1100
Lawrenceville, GA 30043
Telephone:  (770) 339-0774
Fax:  (770) 339-6744
rgray@ADFlegal.org

James R. Wierenga (P48946)
Jeshua T. Lauka (P71958)
**David & Wierenga, P.C.**
99 Monroe Avenue, N.W.
Suite 1210
Grand Rapids, MI 49503
Telephone:  (616) 454–3883
Facsimile:  (616) 454–3988
jim@dwlawpc.com
jeshua@dwlawpc.com

ATTORNEYS FOR PLAINTIFFS

*Admitted to this Court

26

**CERTIFICATE OF SERVICE**

I hereby certify that on June 9, 2017, I electronically filed the foregoing document with

the Clerk of Court and that the foregoing document will be served via private process server with

the Summons to the following participant:

City of East Lansing
City Clerk, Marie Wicks
410 Abbot Road, Room 100
East Lansing, MI 48823

By: s/ Katherine L. Anderson
  Katherine L. Anderson (AZ Bar No. 033104)*
  **Alliance Defending Freedom**
  15100 N. 90th Street
  Scottsdale, Arizona  85260
  Telephone:  (480) 444-0020
  Fax:  (480) 444-0028
  kanderson@adflegal.org


  ATTORNEY FOR PLAINTIFFS