IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

COUNTRY MILL FARMS, LLC and
STEPHEN TENNES,

       Plaintiffs,                      Case No.  1:17-cv-00487-PLM-RSK

v.                                       HON. PAUL L. MALONEY

CITY OF EAST LANSING,

       Defendant.
_____

| | |
|---|---|
| Katherine L. Anderson | Michael S. Bogren (P34835) |
| Attorneys for Plaintiffs | Attorney for Defendant |
| ALLIANCE DEFENDING FREEDOM (AZ) | City of East Lansing |
| 15100 N. 90th St. | PLUNKETT COONEY |
| Scottsdale, AZ  85260 | 950 Trade Centre Way, Suite 310 |
| (480-444-0020) | Kalamazoo, Michigan  49002 |
| kanderson@adrlegal.org | (269-226-8822) |
| | mbogren@plunkettcooney.com |
| | |
| James R. Wierenga | Thomas M. Yeadon |
| Jeshua Thomas Lauka | Attorney for Defendant |
| Attorneys for Plaintiffs | City of East Lansing |
| DAVID & WIERENGA PC | McGINTY HITCH HOUSEFIELD PERSON |
| 99 Monroe Ave., NW, Ste. 1210 |   YEADON & ANDERSON PC |
| Grand Rapids, MI  49503 | 601 Abbott Rd. |
| (616-454-3883) | P.O. Box 2502 |
| jim@dwlawpc.com | East Lansing, MI  48826 |
| jeshua@dwlawpc.com | (517-351-0280) |
| | tomyeadon@megintylaw.com |

**BRIEF IN SUPPORT OF MOTION TO DISMISS**

**STANDARD**

A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of the

complaint. *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996).

Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain

1

statement of the claim showing that the pleader is entitled to relief." To survive a motion to dismiss, a complaint need not contain "detailed factual allegations," but it must contain more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action...." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A complaint does not "suffice if it tenders 'naked assertions' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Twombly*, 550 U.S. at 557).

As the Supreme Court explained in *Iqbal* and *Twombly*, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The plausibility standard "does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]." *Twombly*, 550 U.S. at 556.

In deciding whether the plaintiff has set forth a "plausible" claim, the court must accept the factual allegations in the complaint as true. *Erickson v. Pardus*, 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007). That presumption, however, is not applicable to legal conclusions. *Iqbal*, 556 U.S. at 668. Therefore, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555).

## STATEMENT OF FACTS

The City of East Lansing believes the pertinent facts are relatively few, in spite of the fact the plaintiffs have filed a forty page, nine count, 396 paragraph Amended Complaint.

Country Mill Farms is owned by Steve Tennes. (Amended Complaint, ¶ 3). Country Mill has participated in the East Lansing Farmer's Market since 2010. (Amended Complaint, ¶ 4). The City adopted a Policy for the 2017 Farmers' Market that incorporated the language of the City's Human Relations Ordinance by reference and required all 2017 Farmer's Market vendors to comply with the Ordinance and its "public policy against discrimination . . . while at the [Market]" and in the vendors' "general business practice[s]." (Amended Complaint, ¶ 14). Plaintiffs created the following Facebook post:

"The Country Mill engages in expressing its purpose and beliefs through the operation of its business and it intentionally communicates messages that promote its owners' beliefs and declines to communicate messages that violate those beliefs. . . . lt remains our deeply held religious belief that marriage is the union of one man and one woman and Country Mill has the First Amendment Right to express and act upon its beliefs. For this reason, Country Mill reserves the right to deny a request for services that would require it to communicate, engage in, or host expression that violates the owners' sincerely held religious beliefs and conscience." (Amended Complaint, Ex. 1). The City informed plaintiffs in writing in a letter dated March 15, 2017 that they appeared to be in violation of the Policy. (Amended Complaint, Ex. 1).

When applications opened for the 2017 Market season, the City did not invite Country Mill to apply. (Amended Complaint, ¶ 16). When Country Mill applied through the

non-invitational process the City excluded Country Mill from the Market for violating its Policy. (Amended Complaint, ¶¶ 17, 18).

Further facts, where necessary, will be added in the discussion of the issues.

## INTRODUCTION

In spite of plaintiffs' artful pleading, this case does not present the question of whether plaintiffs are being denied the right to free exercise of their religion, nor does it present the question of whether plaintiffs are being denied their right of free speech, either on City of East Lansing property or off. Rather, this case presents the question of whether a city may be forced to open its property and engage in a commercial transaction with those who participate in discriminatory conduct that contravenes that city's stated policy of prohibiting such discrimination. This is a case where the City's challenged nondiscrimination policy regulates conduct, not religious practices or speech. The City's nondiscrimination policy does not prevent plaintiffs from exercising their First Amendment rights to free exercise of religion or free speech.

"We know one basic fact—that homosexual and bisexual citizens have been part of society from time immemorial. These orientations, like that of heterosexuals, have cut across all diverse classifications—race, sex, national origin, and religion, to name but a few." *Gay Rights Coal. of Georgetown Univ. Law Ctr. v. Georgetown Univ.*, 536 A.2d 1, 33 (D.C. 1987). In spite of this, the LGBTQ community has faced a long history of pernicious, invidious discrimination. This explicitly includes discrimination against couples who identify as members of the LGBTQ community. "[S]ame-gender couples (whether lesbian, gay, bisexual, or transgender, hereinafter 'LGBT') are a discrete group which has been subjected to a history of discrimination and violence . . ." *Griego v. Oliver*, 316 P.3d 865, 871

N.M.S.C. 2013). "The County does not, and could not in good faith, dispute the historical reality that gay and lesbian people as a group have long been the victim of purposeful and invidious discrimination because of their sexual orientation." *Varnum v. Brien*, 763 N.W.2d 862, 889 (Iowa 2009).

This history of invidious discrimination against the LGBTQ community is well-recognized by jurisdictions around the country. See, *Kerrigan v. Comm'r of Pub. Health*, 289 Conn. 135, 175, 957 A.2d 407, 432 (2008)("Gay persons have been subjected to and stigmatized by a long history of purposeful and invidious discrimination that continues to manifest itself in society."); *Glossip v. Missouri Dep't of Transp. & Highway Patrol Employees' Ret. Sys.*, 411 S.W.3d 796, 809 (Mo. 2013)(Teitelman, J. dissenting) ("For decades, indeed centuries, gay men and lesbians have been subjected to persistent, unyielding discrimination, both socially and legally. That shameful history continues to this day."); *Donaldson v. State*, 367 Mont. 228, 248, 292 P.3d 364, 376-377 (2012)(Nelson, J. dissenting)(". . . gay, lesbian, and bisexual people are reviled and demonized in Montana and have suffered a history of invidious and prejudicial treatment . . ."); *Gay Rights Coal. of Georgetown Univ. Law Ctr., supra,* 536 A.2d at 35 ("Despite its irrelevance to individual merit, a homosexual or bisexual orientation invites ongoing prejudice in all walks of life, ranging from employment to education . . .").

This history of discrimination has also been recognized by the federal courts, including the United States Supreme Court. *See, e.g., High Tech Gays v. Defense Indus. Sec. Clearance Office,* 668 F. Supp. 1361, 1369 (1987), *rev'd in part and vacated in part,* 895 F.2d 563 (9th Cir. 1990) ("Lesbians and gays have been the object of some of the deepest prejudice and hatred in American society."); *High Tech Gays v. Defense Indus. Sec. Clearance*

*Office,* 895 F.2d 563, 573 (9th Cir. 1990) (. . . "homosexuals have suffered a history of discrimination"); *Ben-Shalom v. Marsh,* 881 F.2d 454, 465 (7th Cir. 1989) ("Homosexuals have suffered a history of discrimination and still do, though possibly now in less degree."); *Able v. United States,* 968 F. Supp. 850, 854 (E.D.N.Y. 1997), *rev'd on other grounds,* 155 F.3d 628 (2d Cir. 1998) ("gay men and lesbians have endured a long history of discrimination, both official and private"); *Dahl v. Secretary of United States Navy,* 830 F. Supp. 1319, 1324 n. 7 (E.D. Cal. 1993) ("It is undisputed that homosexuals have historically been discriminated against . . .."); *Lawrence v. Texas*, 539 U.S. 558, 575, 123 S. Ct. 2472, 156 L. Ed. 2d 508 (2003) ("When homosexual conduct is made criminal by the law of the State . . . [it] is an invitation to subject homosexual persons to discrimination."); *Romer v. Evans*, 517 U.S. 620, 634-635, 116 S. Ct. 1620, 134 L. Ed. 2d 855 (1996) ("[Colorado's Amendment 2] raise[s] the inevitable inference that . . . [it was] born of animosity. . . . We must conclude that Amendment 2 classifies homosexuals not to further a proper legislative end but to make them unequal to everyone else.").

This history has of discrimination has very recently been remedied by the courts in some measure. See, e.g., *Obergefell v. Hodges*, 135 S. Ct. 2584, 192 L. Ed. 2d 609 (2015)("The limitation of marriage to opposite-sex couples may long have seemed natural and just, but its inconsistency with the central meaning of the fundamental right to marry is now manifest. With that knowledge must come the recognition that laws excluding same-sex couples from the marriage right impose stigma and injury of the kind prohibited by our basic charter."). *Id*. at 2602. However, as the Supreme Court observed: "Outlaw to outcast may be a step forward, but it does not achieve the full promise of liberty." *Id.* at 2600.

In an effort to fulfill the "full promise of liberty" for all its citizens, the City of East Lansing adopted a human rights ordinance and in 1972 became the first city in the nation to include sexual orientation as a protected class. (Amended Complaint, ¶¶ 159, 185). Ordinance § 22-31 is entitled "Public Policy" and states:

> It is hereby declared to be contrary to the public policy of the City of East Lansing for any person to deny any other person the enjoyment of his/her civil rights or for any person to discriminate against any other person in the exercise of his/her civil rights or to harass any person because of religion, race, color, national origin, age, height, weight, disability, sex, marital status, sexual orientation, gender identity or expression, student status, or because of the use by an individual of adaptive devices or aids.

§ 22-31 is a statement of the City's policy; it does not itself mandate or prohibit any conduct. Other sections of the Human Rights Act contain prohibitions and requirements as well as enforcement mechanisms. In this case § 22-35, the section addressing Public Accommodations or Services has been challenged by plaintiffs. § 22-35(a) defines a public accommodation:

> Place of public accommodation means a business, or an educational, refreshment, entertainment, recreation, health or transportation facility, or institution of any kind, whether licensed or not, whose goods, services, facilities, privileges, advantages, or accommodations are extended, offered, sold, or otherwise made available to the public.

§ 22-35(b)(1) and (2) provide:

(b) Prohibited practices. Except where permitted by law, a person shall not:

(1) Deny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service because of religion, race, color, national origin, age, height, weight, disability, sex, marital status, sexual orientation, gender identity or expression, student status, or because of the use by an individual of adaptive devices or aids.

(2) Print, calculate, post, mail, or otherwise cause to be published a statement, advertisement, notice, or sign which indicates that the full and equal enjoyment of the goods, services, facilities, privileges, advantages,

or accommodations of a place of public accommodation or public service will be refused, withheld from, or denied an individual because of religion, race, color, national origin, age, height, weight, sex, disability, marital status, sexual orientation, gender identity or expression, or student status, or because of an individual's use of adaptive devices or aids, or that an individual's patronage of, or presence at a place of public accommodation, is objectionable, unwelcome, unacceptable, or undesirable because of religion, race, color, national origin, age, height, weight, disability, sex, marital status, sexual orientation, gender identity or expression, or student status or because of the use by an individual of adaptive devices or aids."

The City of East Lansing adopted a policy that requires **all** vendors at the 2017 Farmer's Market to comply with the City's Human Relations Ordinance and the City's "public policy against discrimination . . . while at the [market] and as a general business practice." (Amended Complaint, ¶ 149 and Exhibit 1). The Policy incorporates by reference the Human Rights Ordinance as well as the City's "public policy against discrimination" underlying that Ordinance. (Amended Complaint, ¶ 151 and Exhibit 1).

As the court recognized in *Gay Rights Coal. v. Georgetown Univ., supra:* "The government's compelling interests in abolishing sexual orientation discrimination include 'the fostering of individual dignity, the creation of a climate and environment in which each individual can utilize his or her potential to contribute to and benefit from society, and equal protection of the life, liberty and property that the Founding Fathers guaranteed to us all.'" *Id*. at 37. The Supreme Court has recognized that regulations banning sexual orientation discrimination "are well within the State's usual power to enact [if] a legislature has reason to believe . . . that [the] group is the target of discrimination." *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 571-572, 115 S. Ct. 2338, 132 L. Ed. 2d 487 (1995).

Against this history the defendant will now address the specific claims raised in the Amended Complaint. The defendant will address those claims in a logical order rather than in the order they are presented in the Amended Complaint. The plaintiffs present their claims in a manner calculated to send the defendant on a windmill-tilting journey. The defendant declines to participate in that quixotic quest and will instead address the claims as they logically arise from the facts alleged in the Amended Complaint.

I.      **THE PLAINTIFFS' FIRST AMENDMENT CLAIM OF A VIOLATION OF THE FREE EXERCISE CLAUSE FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.**

The Free Exercise Clause of the First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . ." The Free Exercise Clause applies to the States through the Fourteenth Amendment. *Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940).

"A governmental policy or enactment that is neutral on its face and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531, 113 S. Ct. 2217, 2226, 124 L. Ed. 2d 472 (1993). The Free Exercise Clause prohibits Federal, State and local legislation from imposing any restraint on the free exercise of religion. "Its purpose is to secure religious liberty in the individual by prohibiting any invasions thereof by civil authority. Hence it is necessary in a free exercise case for one to show the coercive effect of the enactment as it operates against him in the practice of his religion." *School Dist. of Abington Twp., Pa. v. Schempp*, 374 U.S. 203, 222-223, 83 S. Ct. 1560, 10 L. Ed. 2d 844 (1963).

However, this "does not and cannot imply that incidental effects of government programs, which may make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their religious beliefs, require government to bring forward a compelling justification for its otherwise lawful actions. The crucial word in the constitutional text is 'prohibit': 'For the Free Exercise Clause is written in terms of what the government cannot do to the individual, not in terms of what the individual can exact from the government.' *Sherbert, supra,* at 412, (Douglas, J., concurring)." *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 450-451, 108 S. Ct. 1319, 99 L. Ed. 2d 534 (1988). The Supreme Court has just reiterated this constitutional principle. "In recent years, when this Court has rejected free exercise challenges, the laws in question have been neutral and generally applicable without regard to religion. We have been careful to distinguish such laws from those that single out the religious for disfavored treatment." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, No. 15-577, 2017 WL 2722410, at *7 (June 26, 2017).

Moreover, there is a most important distinction that must be drawn between **belief** and **conduct**. "Our cases have long recognized a distinction between the freedom of individual belief, which is absolute, and the freedom of individual conduct, which is not absolute. . . . The Free Exercise Clause simply cannot be understood to require the Government to conduct its own internal affairs in ways that comport with the religious beliefs of particular citizens." *Bowen v. Roy*, 476 U.S. 693, 699, 106 S. Ct. 2147, 90 L. Ed. 2d 735 (1986).

In this case there can be no doubt that the City's Human Rights Ordinance and the Farmers' Market Policy are facially neutral toward religion and are generally applicable.

These municipal enactments are no different than those upheld by the Sixth Circuit in *Mount Elliott Cemetery Ass'n v. City of Troy*, 171 F.3d 398, 405 (6th Cir. 1999)(zoning ordinances applied to prevent expansion of Catholic cemetery); *Prater v. City of Burnside, Ky.*, 289 F.3d 417, 428 (6th Cir. 2002)("Accordingly, the City's refusal to abandon the dedicated public roadway in favor of the Church [expansion plan] did not, in and of itself, burden the Church's rights under the Free Exercise Clause."); and *Kissinger v. Bd. of Trustees of Ohio State Univ., Coll. of Veterinary Med.*, 5 F.3d 177, 179 (6th Cir. 1993)("Ohio State's curriculum was not intended to prohibit any particular religious practice or belief. The record contains no evidence that Ohio State used its curriculum to attack or exclude any individual on the basis of his or her religious beliefs."). Although the plaintiffs allege the Ordinance and Policy are not neutral, but are targeted to single them out, these are not factual allegations that must be accepted as true, but are legal conclusions. The facts alleged in the Amended Complaint do not support the legal conclusions plaintiffs advance. The **fact** is that the Ordinance and Policy apply to every vendor at the Farmer's Market. (Amended Complaint, Exhibit 1). The **fact** is that the Ordinance and Policy apply to conduct, not beliefs. (Amended Complaint, Exhibit 1). The **fact** is that the Ordinance and Policy do not take into account the rationale for why a vendor engages in the prohibited conduct. (Amended Complaint, Exhibit 1). And finally, unlike the situation in *Church of the Lukumi Babalu Aye, Inc., supra,* the **fact** is that the Ordinance and Policy do not prohibit the plaintiffs from doing anything as it relates to the practice of their religion. There is no allegation that discriminating on the basis of sexual orientation is a part of any religious ceremony of Catholicism. Plaintiffs allege their sincerely held religious beliefs require them to engage in sexual orientation discrimination in conducting their business practices. As

things currently stand under Michigan law, they are free to do so outside of the City of East Lansing. However, the City of East Lansing is not required to allow the plaintiffs to participate in a City sponsored commercial event on City property if the plaintiffs choose to engage in that discriminatory conduct. Actions have consequences. The fact that at the time the plaintiffs filed their Amended Complaint they were the only ones known to the City to be in violation of the Policy does not detract from the fact that the Policy is facially neutral toward religion and is generally applicable.

Nor does the fact the Ordinance contains exceptions alter the outcome. "[Plaintiff] contends that the CSAs [Controlled Substances Acts] are not generally applicable because they exempt the use of alcohol and tobacco, certain research and medical uses of marijuana, and the sacramental use of peyote. General applicability does not mean absolute universality. Exceptions do not negate that the CSAs are generally applicable." *Olsen v. Mukasey*, 541 F.3d 827, 832 (8th Cir. 2008).

Finally, to the extent plaintiffs will attempt to assert an argument that their claims are subject to strict scrutiny because they are "hybrid" claims that implicate multiple rights under the First Amendment, such an argument also fails. "Finally, Plaintiffs argue that the contraceptive mandate is subject to strict scrutiny because it infringes on Plaintiffs' rights of free speech and association, and thus implicates Plaintiffs' 'hybrid' rights. Because the Sixth Circuit has rejected the hybrid rights theory advanced by Plaintiffs, *Kissinger v. Bd. of Trustees of The Ohio State Univ.,* 5 F.3d 177, 180 (6th Cir.1993), this argument must fail." *Michigan Catholic Conference v. Sebelius*, 989 F. Supp. 2d 577, 589 (W.D. Mich. 2013), *aff'd sub nom. Michigan Catholic Conference & Catholic Family Servs. v. Burwell*, 755 F.3d 372 (6th Cir. 2014), *cert. granted, judgment vacated sub nom.* o*n other grounds, Michigan Catholic*

*Conference v. Burwell*, 135 S. Ct. 1914, 191 L. Ed. 2d 760 (2015), and *aff'd sub nom. Michigan Catholic Conference & Catholic Family Servs. v. Burwell*, 807 F.3d 738 (6th Cir. 2015).

The plaintiffs' claims that the City's Ordinances and Policy violate their First Amendment right to free exercise of religion simply cannot withstand scrutiny.[1]  Plaintiffs allege their sincerely held religious beliefs are:

- that marriage is, and ought to be, only the sacramental union of one man and one woman. (Amended Complaint, ¶ 301);

- that to practice their religion they must express that belief through their public statement and lives. (Amended Complaint, ¶ 302);

- that to practice their religion they must operate their business in accordance with their religious beliefs. (Amended Complaint, ¶ 303).

Plaintiffs allege they would violate their religious beliefs:

- if they retracted their statement of their religious beliefs about marriage. (Amended Complaint, ¶ 304);

- if they celebrated or promoted conceptions of marriage other than biblical marriage between one man and one woman. (Amended Complaint, ¶ 305);

- if they participated in or hosted weddings that celebrated marriages between anyone other than one man and one woman. (Amended Complaint, ¶ 306).

---

[1] For purposes of this motion the defendant will assume both Country Mill Farms, LLC and Stephen Tennes have standing to bring these claims. See, *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2768, 189 L. Ed. 2d 675 (2014). However, *Burwell* was a case brought and decided under the Religious Freedom Restoration Act (RFRA), not the First Amendment. The defendant may revisit the issue of standing if this motion to dismiss is not granted.

Plaintiffs allege their religious beliefs about marriage, expression, and business practices are based on the Bible and Catholic doctrine. (Amended Complaint, ¶ 307). Plaintiffs further allege they exercise religion under the First Amendment by stating their sincerely held religious beliefs about marriage. (Amended Complaint, ¶ 321). For purposes of this motion the City will accept those allegations as true. Finally, getting to the crux of the matter, plaintiffs allege that the City's Policy "substantially burdens Plaintiffs' religious exercise by excluding Plaintiffs from the East Lansing Farmer's Market because they publicly stated their religious beliefs about marriage, **imposing severe coercive pressure on them to surrender their religious beliefs and expression in order to participate in the Market**." (Amended Complaint, ¶ 322)(Emphasis added). It is on this last point that plaintiffs' free exercise claim collapses.

First, and most obviously, plaintiffs have not alleged (nor could they) that selling produce at the East Lansing Farmers' Market is in any way related to exercising their religion. That is a secular business pursuit and nothing more. Excluding plaintiffs from the Farmers' Market has exactly zero effect on the plaintiffs' ability to freely exercise their religion.

Additionally, the City of East Lansing's Ordinance and Policy do not regulate **beliefs**, nor do they **seek** to regulate beliefs. The Ordinance and Policy are addressed only to **conduct**. The genesis of the plaintiffs' discriminatory practices is of no concern whatsoever to the City. Whether those beliefs are based on religion, moral compulsion, political dogma, bare bigotry, ignorance or some other rationale is simply of no interest to the City. Indeed, plaintiffs could renounce Catholicism/Christianity and declare themselves to be agnostic or

atheists tomorrow[2] and they still will be precluded from participating in the Farmer's Market if they persist in their **action** of discriminating on the basis of sexual orientation. The fact this discriminatory conduct is based on sincerely held religious beliefs does not insulate that conduct from anti-discrimination laws. This very point was the basis for the Supreme Court's decision in *Employment Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872, 110 S. Ct. 1595, 108 L. Ed. 2d 876 (1990), *overturned due to legislative action* (Nov. 16, 1993): "We have never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate. On the contrary, the record of more than a century of our free exercise jurisprudence contradicts that proposition. . . . The mere possession of religious convictions which contradict the relevant concerns of a political society does not relieve the citizen from the discharge of political responsibilities." *Id.* at 878-879.

Our constitutional history is replete with examples of religiously based **conduct** being subject to regulation by the government. In rejecting a free exercise challenge to anti-polygamy laws in *Reynolds v. United States*, 98 U.S. 145, 25 L. Ed. 244 (1878), the Supreme Court stated: "Laws are made for the government of actions, and while they **cannot interfere with mere religious belief and opinions, they may with practices**. Suppose one believed that human sacrifices were a necessary part of religious worship, would it be seriously contended that the civil government under which he lived could not interfere to prevent a sacrifice?" *Id.* at 166. (Emphasis added). Similarly, in *Chaplinsky v. State of New Hampshire*, 315 U.S. 568, 62 S. Ct. 766, 86 L. Ed. 1031 (1942), the Supreme Court upheld the conviction of a member of the Jehovah's Witnesses for uttering "offensive, derisive or

---

[2] It is not at all clear how an LLC can be a member of a particular religion, but the defendant will leave that incongruity aside for the time being.

annoying word[s] to any other person who is lawfully in any street or other public place." *Id*. at 571. In rejecting a free exercise argument the Court stated: ""But even if the activities of the appellant which preceded the incident could be viewed as religious in character, and therefore entitled to the protection of the Fourteenth Amendment, they would not cloak him with immunity from the legal consequences for concomitant acts committed in violation of a valid criminal statute." *Id.*

*Cox v. State of New Hampshire*, 312 U.S. 569, 61 S. Ct. 762, 85 L. Ed. 1049 (1941), affirmed the convictions of five Jehovah's Witnesses who, with sixty-three others of the same faith, "were convicted in the municipal court of Manchester, New Hampshire, for violation of a state statute prohibiting a 'parade or procession' upon a public street without a special license." *Id*. at 570-571. In rejecting plaintiff's free exercise challenge the Supreme Court held: "The argument as to freedom of worship is also beside the point. No interference with religious worship or the practice of religion in any proper sense is shown, but only the exercise of local control over the use of streets for parades and processions." *Id.* at 578. So too here, there is no interference with plaintiffs' free exercise of religion; there is only the exercise of local control over the discriminatory practices of vendors who seek to make use of the City's property.

More recently, and perhaps most significantly, the Supreme Court held the IRS could disqualify nonprofit private schools that prescribed and enforced racially discriminatory admissions standards on the basis of religious doctrine as tax-exempt organizations under § 501(c)(3) of the Internal Revenue Code. *Bob Jones Univ. v. United States*, 461 U.S. 574, 577, 103 S. Ct. 2017, 76 L. Ed. 2d 157 (1983). The Supreme Court noted that while "[d]enial of tax benefits will inevitably have a substantial impact on the operation of private religious

schools, [it] will not prevent those schools from observing their religious tenets." *Id.*, at 603-604. The Court also stated: "Whatever may be the rationale for such private schools' policies, and however sincere the rationale may be, racial discrimination in education is contrary to public policy. Racially discriminatory educational institutions cannot be viewed as conferring a public benefit within the 'charitable' concept discussed earlier, or within the Congressional intent underlying § 170 and § 501(c)(3). *v. United States Id.* at 595-596.

There can be no constitutionally sound argument that sincerely held religious beliefs would permit a secular business to avoid the prohibitions against racial discrimination or gender discrimination found in Federal, State and local laws. The *Bob Jones Univ.* decision put such an argument to rest. Similarly, other courts have held the gender anti-discrimination provision of Title VII could be constitutionally enforced against religious entities. *E.E.O.C. v. Fremont Christian School*, 781 F.2d 1362, 1369 (9th Cir. 1986)("Because the impact on religious belief or practice is minimal and the interest in equal employment opportunities is high, the balance weighs heavily in favor of upholding Fremont Christian's liability under Title VII for its sexually discriminatory health insurance compensation program."); *E.E.O.C. v. Tree of Life Christian Sch.*, 751 F. Supp. 700, 711 (S.D. Ohio 1990)("However, although the application of the Equal Pay Act would burden Tree of Life's freedom to select the manner in which it will bear witness to the belief that the husband is the head of the household, in the Court's view the burden imposed upon defendant's central religious beliefs would be limited. . . . Congress' purpose to end discrimination is equally if not more compelling than other interests that have been held to justify legislation that burdened the exercise of religious convictions.").

One of the tenets of the religious group Nation of Islam is: "We believe that intermarriage or race mixing should be prohibited." www.noi.org/muslim-program There can be doubt that if a member of that faith ran a business similar to the plaintiffs' business, but instead of refusing to accommodate same sex couples (or in addition to), refused to accommodate interracial couples, such a refusal would be subject to the antidiscrimination laws of the Federal, State and local governments. The other side of that discriminatory coin is found on the website of the White Camelia Knights of the KKK, which is "a Texas based KKK organization composed of White Christian Men and Women dedicated to the advancement and protection of the same Christian beliefs that were the foundation of this once great nation." www.wckkk.org/index.html That group states: "The Klan has always taken a strong stance against interracial marriage. What most people don't understand is it's against our Heavenly Father's law." www.wckkk.org/nature.html Again, an adherent of that particular brand of Christianity who ran a business similar to the plaintiffs' business would not be able to invoke the free exercise clause to avoid the antidiscrimination provisions of Federal, State and local laws that apply to public accommodations if interracial couples were refused service.

Certain imams of the Islamic faith have opined that women may not drive automobiles. Shaykh Ibn 'Uthaymeen was asked to explain that ruling. His lengthy response concluded: "Based on these two principles, the ruling on women driving should be clear, because women driving includes a number of evils . . ." https://islamqa.info/en/45880 If a practitioner of the Islamic faith who was a follower of that rule operated a business that taught driver's education, he could not refuse to accept a

female customer on the basis that doing so would interfere with his right to freely exercise his religion.

None of these propositions are in any way remarkable from a constitutional standpoint. Thus, the plaintiffs' only response to why the City of East Lansing's antidiscrimination policy would not fall within this unremarkable constitutional proposition must be that the subject of the nondiscrimination policy (sexual orientation) is not worthy of the same level of protection as race or gender. Plaintiffs might well believe that – and such a belief might be based on their religion – but those beliefs are certainly no more sincere than the beliefs held by the religious adherents in the prior examples. The plaintiffs' beliefs themselves, or their degree of sincerety, cannot be the deciding factor. Since the Supreme Court has explicitly stated the States (which includes local governments) have the power to enact legislation banning sexual orientation discrimination, *Hurley, supra,* it is difficult to conceive of a viable rationale that would support plaintiffs' position. In point of fact, there is no rationale that supports plaintiff's position. To the contrary, the courts have utterly rejected any suggestion that sexual orientation is not entitled to the same level of protection as other protected classes:

> The Council determined that a person's sexual orientation, like a person's race and sex, for example, tells nothing of value about his or her attitudes, characteristics, abilities or limitations. It is a false measure of individual worth, one unfair and oppressive to the person concerned, one harmful to others because discrimination inflicts a grave and recurring injury upon society as a whole. To put an end to this evil, the Council outlawed sexual orientation discrimination . . .

*Gay Rights Coal. of Georgetown Univ. Law Ctr. v. Georgetown Univ. supra*, 536 A.2d at 32.

"Even if strict scrutiny applied, the Court would find enforcement of the nondiscrimination policy against an organization seeking to exclude individuals on the basis of such criteria as

religion or sexual orientation to be no greater a restriction on that group's free speech or free association rights than necessary to achieve the state's interest in prohibiting discrimination." *Every Nation Campus Ministries at San Diego State Univ. v. Achtenberg*, 597 F. Supp. 2d 1075, 1098 (S.D. Cal. 2009).

Moreover, when the plaintiffs' situation is compared to that of the plaintiff in *Trinity Lutheran, supra*, it is overwhelmingly clear the plaintiffs in this case have failed to state a claim upon which relief can be granted. In *Trinity Lutheran*, Supreme Court invalidated Missouri's prohibition on religious groups being eligible to apply for grants. "[T]he Department's policy puts Trinity Lutheran to a choice: It may participate in an otherwise available benefit program or remain a religious institution. Of course, Trinity Lutheran is free to continue operating as a church, just as McDaniel was free to continue being a minister. But that freedom comes at the cost of automatic and absolute exclusion from the benefits of a public program for which the Center is otherwise fully qualified." *Trinity Lutheran*, No. 15-577, 2017 WL 2722410, at *8.

Here, on the other hand plaintiffs were not "punished" for what they **were** (Catholic), but for what they **did** (discriminate on the basis of sexual orientation). They were not given the "Hobson's choice" of renouncing Catholicism in order to participate in the Farmer's Market. The fact that the discriminatory conduct is based on sincerely held religious beliefs does not insulate that conduct from anti-discrimination laws.

The Supreme Court then explained Trinity Lutheran was not claiming any entitlement to a subsidy, rather it was asserting a right to participate in a government benefit program without having to disavow its religious character. "The 'imposition of such a condition upon even a gratuitous benefit inevitably deter[s] or discourage[s] the exercise

of First Amendment rights.' *Sherbert,* 374 U.S., at 405. The express discrimination against religious exercise here is not the denial of a grant, but rather the refusal to allow the Church—solely because it is a church—to compete with secular organizations for a grant." *Trinity Lutheran,* No. 15-577, 2017 WL 2722410, at *9. In contrast, plaintiffs are not placed at a disadvantage because of their status as Catholic or Christian. They are placed on the same footing – and treated the same way – as every other participant in the Farmer's Market.

The Supreme Court then stated: "Here there is no question that Trinity Lutheran was denied a grant simply because of what it is—a church." *Id.* at *10. In this case plaintiffs were not denied a spot in the Farmer's Market because of who they **were**; they were denied a spot because of what they announced they would **do** – discriminate against same sex couples.

Finally, the Supreme Court stated: "In this case, there is no dispute that Trinity Lutheran *is* put to the choice between being a church and receiving a government benefit. The rule is simple: No churches need apply." *Id.* at *11. That is not at all the situation here. Plaintiffs are not put to the choice between being Catholic and receiving a spot at the Farmer's Market. Their choice is between engaging in discriminatory business practices and a spot at the Farmers' Market. The rule in this case is not: "No Catholics need apply." The rule is: "No discriminators need apply."

'The First Amendment ... gives no one the right to insist that in pursuit of their own interests others must conform their conduct to his own religious necessities.' *Otten v. Baltimore & Ohio R. Co.,* 205 F.2d 58, 61 (CA2 1953)." *Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703, 710, 105 S. Ct. 2914, 2918, 86 L. Ed. 2d 557 (1985). The City of East Lansing is not

constitutionally required to forego enforcement of its policy of nondiscrimination because plaintiffs' religious beliefs inform them to engage in discriminatory conduct. Plaintiffs are free to engage in that discriminatory conduct outside the City of East Lansing. However, the Constitution does not require the City to accommodate that conduct by allowing plaintiffs to use the City's property to sell their produce. The Amended Complaint fails to state a claim upon which relief can be granted on the basis of the Free Exercise Clause.

## II. THE PLAINTIFFS' FIRST AMENDMENT CLAIM OF A VIOLATION OF THE ESTABLISHMENT CLAUSE FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.

"The language of the Establishment Clause is 'at best opaque' and, as the Sixth Circuit has stated, 'far from self-defining.' *ACLU v. DeWeese,* 633 F.3d 424, 430 (6th Cir.2011) (quotation omitted). Rather, '[t]he Clause erects a blurred, indistinct, and variable barrier depending on all the circumstances of a particular relationship.' *Lynch v. Donnelly,* 465 U.S. 668, 679, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (quotation omitted)." *Jones v. Hamilton County, Tenn.*, 891 F. Supp. 2d 870, 876 (E.D. Tenn. 2012), *aff'd sub nom. Jones v. Hamilton County Gov't, Tenn.*, 530 F. App'x 478 (6th Cir. 2013).

"The long-standing (but not always applied) test for determining whether government action violates the Establishment Clause was first articulated in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). Under the *Lemon* test, government action is upheld unless it is shown not to satisfy any of three elements: "First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster an excessive government entanglement with religion. *Id.* at 612-613 (citations and

quotation marks omitted)." *Am. Civil Liberties Union of Kentucky v. Grayson County, Ky.*, 591 F.3d 837, 844 (6th Cir. 2010).

The plaintiffs are apparently proceeding under the first and second prongs of the Lemon test. "Defendant's enforcement of its Policy to target and exclude Country Mill lacks any secular purpose in singling out religious speech and belief for exclusion." (Amended Complaint, ¶ 330). "Defendant's enforcement of its Policy to target and exclude Country Mill also violates the Establishment Clause by singling out religious speech and belief for hostility." (Amended Complaint, ¶ 331). Plaintiffs' **factual** allegations, taken as true, do not meet the requirement that the challenged action lacks a secular purpose, nor do the factual allegations satisfy the interrelated requirement that the challenged action inhibits religion. The plaintiffs essentially advance the same allegations in support of their Establishment Clause claim as they do in support of their Free Exercise Clause claim: the City of East Lansing Ordinance and Policy are allegedly designed to make plaintiffs surrender their religious beliefs. As a result, most of the same arguments that require dismissal of plaintiffs' Free Exercise Clause claim apply and require dismissal of plaintiffs' Establishment Clause claim.

"*Lemon* said that government action must have 'a secular ... purpose,' 403 U.S., at 612, and after a host of cases it is fair to add that although a legislature's stated reasons will generally get deference, the secular purpose required has to be genuine, not a sham . . ." *McCreary County, Ky. v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 864, 125 S. Ct. 2722, 162 L. Ed. 2d 729 (2005). "Purpose is determined from the perspective of an objective observer. *McCreary County,* 545 U.S. at 862. The 'objective observer' is credited with knowledge of 'readily discoverable fact,' including 'the traditional external signs that show

up in the "'text, legislative history, and implementation of the statute'" or comparable official act.' *Id.* (quoting *Santa Fe,* 530 U.S. at 308). The evidence of purpose must be external; it cannot involve 'any judicial psychoanalysis of a drafter's heart of hearts.' *Id.*" *Grayson County, supra,* 591 F.3d at 848. However, the challenged action need not be exclusively secular; all Lemon requires is that the action have **a** secular purpose. *Lynch v. Donnelly*, 465 U.S. 668, 724, n. 6, 104 S. Ct. 1355, 1386, 79 L. Ed. 2d 604 (1984). Stated in terms of the burden placed on the plaintiffs, the Supreme Court has held: "The Court has invalidated legislation or governmental action on the ground that a secular purpose was lacking, but only when it has concluded there was no question that the statute or activity was **motivated wholly** by religious considerations." *Id.* at 680.

When that question is asked in this case, it is clear East Lansing's purpose in adopting the Ordinance and Policy was not to inhibit **religion**, but to inhibit **discrimination**. The City's purpose was clearly not "motivated wholly by religious considerations," nor do the facts alleged support a conclusion that religious considerations were a predominant reason for the City's actions.[3] To state the proposition is to dismiss it as absurd. Plaintiffs' insistence on attributing an anti-religious motivation to the City calls to mind Abraham H. Maslow's observation: "I suppose it is tempting, if the only tool you have is a hammer, to treat everything as if it were a nail." *Toward a Psychology of Being.* (1962). Plaintiffs subjective belief they have been singled out for anti-religious treatment

---

[3] There is dicta in *McCreary County* that suggests the inquiry is whether the government acted with a "predominantly" religious purpose, in spite of quoting the language from *Lynch* that the purpose of the action must be motivated wholly by religious considerations. *See McCreary County,* 545 U.S. at 862, ("predominantly religious purpose"); *Id.* at 863, ("predominant purpose of advancing religion"); *Id.* at 881, ("predominantly religious purpose"); *Id.* at 864, (secular purpose cannot be "merely secondary to a religious objective"). In this case the possible conflict between the two concepts is meaningless as the plaintiffs cannot meet either standard.

dictates they will reach exactly that conclusion regardless of what the facts objectively demonstrate. However, when an "objective observer" reviews the "objective evidence" and the history of the City's anti-discrimination enactments, there is no reasonable conclusion to reach other than that there was a secular purpose for the City's actions.

The City suggests the Ninth Circuit's decisions in *Catholic League for Religious & Civil Rights v. City & Cty. of San Francisco*, 567 F.3d 595, 599 (9th Cir. 2009), *on reh'g en banc,* 624 F.3d 1043 (9th Cir. 2010), are instructive. The City of San Francisco passed a non-binding resolution, Res. No. 168-06, titled: "Resolution urging Cardinal Levada to withdraw his directive to Catholic Charities forbidding the placement of children in need of adoption with same-sex couples." The Resolution provided:

> **Resolution urging Cardinal William Levada, in his capacity as head of the Congregation for the Doctrine of the Faith at the Vatican, to withdraw his discriminatory and defamatory directive that Catholic Charities of the Archdiocese of San Francisco stop placing children in need of adoption with homosexual households.**
>
> WHEREAS, It is an insult to all San Franciscans when a foreign country, like the Vatican, meddles with and attempts to negatively influence this great City's existing and established customs and traditions such as the right of same-sex couples to adopt and care for children in need; and
>
> WHEREAS, The statements of Cardinal Levada and the Vatican that "Catholic agencies should not place children for adoption in homosexual households," and "Allowing children to be adopted by persons living in such unions would actually mean doing violence to these children" are absolutely unacceptable to the citizenry of San Francisco; and
>
> WHEREAS, Such hateful and discriminatory rhetoric is both insulting and callous, and shows a level of insensitivity and ignorance which has seldom been encountered by this Board of Supervisors; and
>
> WHEREAS, Same-sex couples are just as qualified to be parents as are heterosexual couples; and

> WHEREAS, Cardinal Levada is a decidedly unqualified representative of his former home city, and of the people of San Francisco and the values they hold dear; and
>
> WHEREAS, The Board of Supervisors urges Archbishop Niederauer and the Catholic Charities of the Archdiocese of San Francisco to defy all discriminatory directives of Cardinal Levada; now, therefore, be it
>
> RESOLVED, That the Board of Supervisors urges Cardinal William Levada, in his capacity as head of the Congregation for the Doctrine of the Faith at the Vatican (formerly known as Holy Office of the Inquisition), to withdraw his discriminatory and defamatory directive that Catholic Charities of the Archdiocese of San Francisco stop placing children in need of adoption with homosexual households.

*Catholic League,* 567 F.3d at 597-598. The Board passed the resolution in response to a then-recent directive from Prefect Cardinal William Levada, instructing the Archdiocese of San Francisco that Catholic social services agencies should not place children in need of adoption with gay or lesbian couples. *Id.* at 598.

Shortly after the Board adopted the Resolution, the plaintiff filed suit in the Northern District of California, alleging the Resolution violated the Establishment Clause by expressing disapproval of and hostility towards the Catholic Church and Catholic religious tenets. The district court granted the defendants' motion to dismiss, ruling the Resolution did not have a purpose secondary to a predominant religious purpose nor a primary effect of expressing hostility towards the Catholic religion. *Catholic League v. City and County of San Francisco,* 464 F.Supp.2d 938 (N.D.Cal.2006).

On appeal a panel of the Ninth Circuit affirmed, finding the Resolution to be a secular message promoting same-sex adoption. The panel noted courts "have long recognized that certain secular beliefs, views, and positions coincide with religious beliefs, views, and positions. In such cases, government speech or action with respect to a secular issue is not considered endorsement of religion simply because the government's views are

consistent with religious tenets." *Catholic League, supra,* 567 F.3d at 603. Citing *McGowan v. Maryland,* 366 U.S. 420, 442, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961) and *Bowen v. Kendrick,* 487 U.S. 589, 612-613, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988), the panel held that if "mere consistency with religious tenets is insufficient to constitute unconstitutional advancement of religion," inconsistency is not hostility to it. *Catholic League, supra,* 567 F.3d at 603.

The Ninth Circuit heard the case en banc and re-affirmed the district court's ruling dismissing the case pursuant to Rule 12(b)(6). Three members of the en banc court would have reversed on the merits, but even the rationale of their dissent reveals the fatal flaws in the plaintiffs' Establishment Clause claim in this case. The dissent would have held the Resolution had the primary purpose of attacking, or "inhibiting" the Catholic religion:

> The municipality argues that its purpose was not to condemn Catholicism, but rather to foster equal treatment of people who are gay and lesbian. That is indeed a legitimate purpose, but we would not have this case before us if that were all that the resolution said. **The San Francisco government would face no colorable Establishment Clause challenge had they limited their resolution to its fourth 'whereas, that '[s]ame sex couples are just as qualified to be parents as heterosexual couples.'** San Francisco is entitled to take that position and express it even though Catholics may disagree as a matter of religious faith. But the title paragraph, the other five 'whereas' clauses, and the 'resolved' language are all about the Catholic Church, not same-sex couples.

*Catholic League, supra,* 624 F.3d at 1055 (Kleinfeld, J., dissenting)(Emphasis added). The City of East Lansing's Ordinance and Policy have no reference to religion or religious beliefs. The Ordinance is quoted above. The policy provides:

> Complying with the City of East Lansing's Civil Rights ordinances and the public policy against discrimination contained in Chapter 22 of the East Lansing City Code while at the ELFM and as a general business practice. (Appendix B)

(Amended Complaint, Ex. 1, Policy, ¶ 6(m)). Neither the Ordinance nor the Policy mentions religion or religious beliefs. They are what they purport to be by their explicit language:

secular enactments prohibiting discrimination. The Amended Complaint fails as a matter of law to demonstrate the City's purpose in enacting or enforcing the Ordinance and Policy was wholly or predominantly religious.

Also contained within the Establishment Clause is "the principle that the First Amendment forbids an official purpose to disapprove of a particular religion or of religion in general," *Church of the Lukumi Babalu Aye, Inc., supra,* 508 U.S. at 532, because the "First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion." *Epperson v. State of Ark.*, 393 U.S. 97, 104, 89 S. Ct. 266, 270, 21 L. Ed. 2d 228 (1968)(Footnote omitted). The Sixth Circuit has adopted the "endorsement" analysis, first discussed by Justice O'Connor in *Lynch v. Donnelly,* 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984). *Smith v. Jefferson County Bd. of Sch. Comm'rs*, 788 F.3d 580 (6th Cir. 2015), *cert. denied sub nom. Kucera v. Jefferson County Bd. of Sch. Comm'rs*, 136 S. Ct. 1246, 194 L. Ed. 2d 175 (2016). "As Justice O'Connor intended, *Lynch,* 465 U.S. at 688, (O'Connor, J., concurring), the Sixth Circuit 'has treated the endorsement test as a refinement or clarification of the *Lemon* test.' *Granzeier v. Middleton,* 173 F.3d 568, 573 (6th Cir.1999) [Citations omitted]. . . . While the first *Lemon* prong is subjective, the second is objective. It asks 'whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval.' *Id.* If either the purpose or effect of the government activity is to endorse or disapprove of religion, the activity is unconstitutional. *Id.*" *Smith v. Jefferson County Bd. of Sch. Comm'rs, supra,* at 587. This "purpose" or "effect" must be its principal or primary effect. *Id.* at 586-587.

Once again the Amended Complaint fails as a matter of law. There is simply no principled argument that can be advanced that the facts alleged in the Amended Complaint would allow an objective observer to conclude the principal or primary effect of the City of East Lansing's actions was to convey a message of disapproval of religion. The City's correspondence to plaintiffs makes no reference to religion or religious beliefs:

"It was brought to our attention this winter that your facebook post dated December 12, 2016 **outlines a business practice** that would be considered violation of the City of East Lansing Civil Rights Ordinances and our public policy against discrimination contained in Chapter 22 of the East Lansing City Code." (March 15, 2017 Letter from City of East Lansing, Amended Complaint, Ex. 1)(Emphasis added).

The plaintiffs' Facebook post referred to in the City's letter states in part:

"The Country Mill engages in expressing its purpose and beliefs **through the operation of its business** and it intentionally communicates messages that promote its owners' beliefs and declines to communicate messages that violate those beliefs. . . . lt remains our deeply held religious belief that marriage is the union of one man and one woman and Country Mill has the First Amendment Right to express and act upon its beliefs. For this reason, Country Mill reserves the right to deny a request for services that would require it to communicate, engage in, or host expression that violates the owners' sincerely held religious beliefs and conscience."

(December 12, 2016 Facebook Post, Amended Complaint, Ex. 1)(Emphasis added). While the plaintiffs explained the rationale for the discriminatory manner in which they chose to operate their business, the City made no comment on their rationale – only on their actions. Given these facts – coupled with the fact that the City has included sexual orientation as a protected class in its Ordinance since 1974 – no reasonable observer could conclude the principal or primary effect of the City's action was to convey a message of disapproval of religion. As the Sixth Circuit explained in *Satawa v. Macomb Cty. Rd. Comm'n*, 689 F.3d 506 (6th Cir. 2012):

Nor, by the same token, would a reasonable observer find that the Board's action had the purpose or effect of endorsing or disapproving of religion, or that denying the permit created any kind of entanglement. Rather, on this record, a reasonable observer would take Hoepfner at his written, and spoken (at the board meeting), word: he was trying to obey the law. Fear of violating the Constitution, not Satawa's religion, motivated his decision. Nothing about that fear suggests any view about, or involvement with, religion at all, short of a desire simply to act lawfully. The district court was correct to grant summary judgment for the Board on Satawa's Establishment Clause claim.

*Id.* at 528. The plaintiffs' Establishment Clause claim fails as a matter of law.

### III. THE PLAINTIFFS' FIRST AMENDMENT CLAIMS OF VIOLATION OF THE RIGHT OF FREEDOM OF SPEECH AND FREEDOM OF THE PRESS FAIL TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.

Although the plaintiffs have brought two separate claims alleging violation of freedom of speech and freedom of the press, the defendant will address the claims together, as the two claims merge under the facts as alleged in the Amended Complaint. For purposes of this motion the City of East Lansing will assume plaintiff qualifies for protection under the freedom of the press clause of the First Amendment for his Facebook post. While the Supreme Court has not explicitly stated whether the freedom of the press affords greater protections than that of speech or association, two leading First Amendment scholars have opined that the Press Clause provides no greater rights. 2 Rodney A. Smolla, *Smolla and Nimmer on Freedom of Speech,* § 22:10 (2002) ("Does the Press Clause today have jurisdictional significance distinct from the Speech Clause? For the most part, the answer appears to be 'no.' "); *see also* Laurence H. Tribe, *American Constitutional Law* § 12–1, at 785 n. 2 (2d ed.1988). "Part of the problem, as Professor Smolla has observed, is that 'in modern First Amendment jurisprudence, the Press Clause has largely been subsumed into the Speech Clause.' *Id.* at § 22:6." *McConnell v. Fed. Election*

*Comm'n*, 251 F. Supp. 2d 176, 234–235 (D.D.C.), *judgment entered,* 251 F. Supp. 2d 948 (D.D.C. 2003), *aff'd in part, rev'd in par on other grounds,* 540 U.S. 93, 124 S. Ct. 619, 157 L. Ed. 2d 491 (2003), and *aff'd in part, rev'd in part on other grounds,* 540 U.S. 93, 124 S. Ct. 619, 157 L. Ed. 2d 491 (2003). Thus, the analysis of the Speech Clause claims will simultaneously address the Press Clause claim.

The plaintiffs have asserted three distinct claims under the Speech Clause: (1) content and viewpoint based discrimination; (2) overbreadth; and (3) speech retaliation. The City will address those claims in that order.

### A. Content and Viewpoint Based Discrimination

The plaintiffs allege the City's Ordinance and Policy are content-based on their face and as applied to plaintiffs' conduct "because [they] regulate[ ] speech about a handful of topics—specifically 'religion, race, color, national origin, age, height, weight, disability, sex, marital status, sexual orientation, gender identity or expression, student status, or because of the use by an individual of adaptive devices or aids'— while leaving unregulated speech on the virtually unlimited number of other topics not listed in the Policy. East Lansing, Michigan, Mun. Code § 22-31, 22-35." (Amended Complaint, ¶ 238). Plaintiffs go on to allege: "For example, the Policy allows citizens to speak freely on the issue of politics because political affiliation is not a protected characteristic but restricts speech like Plaintiffs' statement of their religious beliefs about marriage because sexual orientation is a protected characteristic." (Amended Complaint, ¶ 239). Plaintiffs then allege: "The Policy is also viewpoint-discriminatory on its face and as applied because it regulates speech based on the viewpoint expressed." (Amended Complaint, ¶ 241), and: "the Policy prohibits speech that makes anyone feel 'unwelcome,' 'objectionable, unacceptable, and undesirable'

based on one of the enumerated classifications but allows speech expressing the opposite viewpoint, speech that would make someone feel welcome, accepted, or desired based on one of the enumerated characteristics." (Amended Complaint, ¶ 242).

Not satisfied with this Kafkaesque rendition of the case, the plaintiffs plunge head-first down the rabbit hole by then alleging: "Defendant excluded Plaintiffs from the East Lansing Farmer's Market because they expressed a religious viewpoint that marriage is exclusively a union between one man and one woman, while other vendors have been allowed to freely express viewpoints in support of LGBT issues, such as same-sex marriage." (Amended Complaint, ¶ 244).

The problem that plaintiffs face is that these conclusory assertions do not comport with the actual facts plaintiffs are forced to acknowledge in their Amended Complaint. The plaintiffs' conclusions are at best fantastic (i.e. "existing in the imagination; imaginary; unreal" – Webster's New World College Dictionary, 4th Ed.) and at worst mendacious. In spite of attaching the Ordinance and Policy to the Amended Complaint, the plaintiffs refuse to acknowledge that neither addresses speech in the constitutional sense; they both address conduct. Plaintiffs have not been denied a spot in the Farmers' Market because of what they **say** (our religion requires us to discriminate), but because of what they **do** (discriminate in the operation of their business). This would be a different case if the plaintiffs did **not** discriminate in their business practices but instead had displayed their religious views at the Farmers' Market and were barred from the Market by the City for posting their views on same-sex marriage. But this is not that case. This is a case where the City is reacting to the plaintiffs' **conduct** – not to their **speech**.

The plaintiffs' attempted legerdemain of turning conduct into speech has been repeatedly rejected by the Supreme Court for decades. In *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 69 S. Ct. 684, 93 L. Ed. 834 (1949), the Supreme Court held that Missouri could apply its antitrade restraint law to labor union activities and could enjoin union members from peaceful picketing carried on as an essential and inseparable part of a course of conduct which is in violation of the state law. In rejecting a claim Missouri's actions violated the First Amendment – similar to the claim plaintiffs assert in this case – the Supreme Court held: "But it has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal **merely because the conduct was in part initiated, evidenced, or carried out by means of language**, either spoken, written, or printed." *Id.* at 502 (Emphasis added).

The Supreme Court followed this holding in *Cox v. State of Louisana*, 379 U.S. 536, 555, 85 S. Ct. 453, 465, 13 L. Ed. 2d 471 (1965): "We reaffirm the statement of the Court in *Giboney v. Empire Storage & Ice Co., supra*, 336 U.S., at 502, that 'it has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.'"

In *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 98 S. Ct. 1912, 56 L. Ed. 2d 444 (1978), the Supreme Court held that banning in-person solicitation of potential clients by attorneys was not a First Amendment violation. The Supreme Court stated:

> Numerous examples could be cited of communications that are regulated without offending the First Amendment, such as the exchange of information about securities, *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833 (CA2 1968), cert. denied, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969), corporate proxy statements, *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970), the exchange of price and production information among

competitors, *American Column & Lumber Co. v. United States,* 257 U.S. 377, 42 S.Ct. 114, 66 L.Ed. 284 (1921), and employers' threats of retaliation for the labor activities of employees, *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 618, 89 S.Ct. 1918, 1942, 23 L.Ed.2d 547 (1969). See *Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 61-62, 93 S.Ct. 2628, 2637, 37 L.Ed.2d 446 (1973). **Each of these examples illustrates that the State does not lose its power to regulate commercial activity deemed harmful to the public whenever speech is a component of that activity**.

*Id.* at 456 (Emphasis added).

The Supreme Court, relying heavily on *Ohralik,* subsequently upheld a state athletic association's rules prohibiting high schools from using "undue influence" in recruiting middle school students for their athletic programs, including direct solicitation by coaches, against a First Amendment challenge. *Tennessee Secondary Sch. Athletic Ass'n v. Brentwood Acad.,* 551 U.S. 291, 298–299, 127 S. Ct. 2489, 168 L. Ed. 2d 166 (2007).

More recently the Supreme Court reiterated these holdings in *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.,* 547 U.S. 47, 126 S. Ct. 1297, 164 L. Ed. 2d 156 (2006), with language directly applicable to this case: "Congress, for example, can prohibit employers from discriminating in hiring on the basis of race. The fact that this will require an employer to take down a sign reading 'White Applicants Only' **hardly means that the law should be analyzed as one regulating the employer's speech rather than conduct**." *Id.* at 62 (Emphasis added).

Most recently in *Expressions Hair Design v. Schneiderman,* 137 S. Ct. 1144, 1150–51, 197 L. Ed. 2d 442 (2017), the Supreme Court again explained:

But § 518 is not like a typical price regulation. Such a regulation—for example, a law requiring all New York delis to charge $10 for their sandwiches—would simply regulate the amount that a store could collect. In other words, it would regulate the sandwich seller's conduct. To be sure, in order to actually collect that money, a store would likely have to put "$10" on its menus or have its employees tell customers that price. Those written or oral communications would be speech, and the law—by determining the

amount charged—would indirectly dictate the content of that speech. **But the law's effect on speech would be only incidental to its primary effect on conduct**, and "it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.,* 547 U.S. 47, 62, 126 S.Ct. 1297, 164 L.Ed.2d 156 (2006) (quoting *Giboney v. Empire Storage & Ice Co.,* 336 U.S. 490, 502, 69 S.Ct. 684, 93 L.Ed. 834 (1949); internal quotation marks omitted); see also *Sorrell v. IMS Health Inc.,* 564 U.S. 552, 567, 131 S.Ct. 2653, 180 L.Ed.2d 544 (2011).

*Id*. at 1150-1151(Emphasis added). The circuit court and district court cases applying this holding are legion. The irrefutable conclusion that must be reached is that plaintiffs have failed to state a claim for relief under the Speech Clause. The City of East Lansing did not, and does not seek to regulate speech – only conduct the City has determined to be injurious to the public welfare. The fact that speech is used as a means of carrying out that conduct does not transmogrify this case into a Speech Clause case.

### B.  Overbreadth

Plaintiffs allege the City's Policy violates the overbreadth prohibition of the First Amendment because "in many instances it bans protected speech, particularly speech on controversial topics, like Plaintiffs' statement of the religious belief that marriage is a union between one man and one woman." (Amended Complaint, ¶ 251). As has just been discussed, the Policy does not ban any speech at all; it is directed at conduct, not speech.

Plaintiffs then allege the Policy is overbroad because it interprets the term "general business practices to include business owners' religious statements, beliefs and practices." (Amended Complaint, ¶ 254). While that conclusion certainly comports with plaintiffs' worldview, it bears no relationship to the actual facts alleged in the Amended Complaint. Conspicuous by its absence is any attempt by plaintiffs to cite any language in either the

Policy or the Ordinance that the City seeks to regulate anyone's religious statements, beliefs or practices. The City cares not a whit about anyone's religious statements, beliefs or practices – as is constitutionally required. What the City cares about is conduct – as is constitutionally permitted.

Plaintiffs then assert the use and definition of the term "harassment" is constitutionally overbroad, but provides not even a hint as to why that is the case.

Finally, plaintiffs go through a litany of terms from the Policy and Ordinance, including "discriminate," "unwelcome," "objectionable," "unacceptable," and "undesirable," and claim that because the terms are undefined the City is given "unbridled discretion" to punish disfavored speech. (Amended Complaint, ¶ 260). It can fairly be said that plaintiffs have "aim[ed] in the general direction of the federal Constitution with buckshot." *Coogan v. City of Wixom*, 820 F.2d 170, 174 (6th Cir. 1987), quoting *Chiplin Enterprises v. City of Lebanon,* 712 F.2d 1524, 1526 (1st Cir.1983). Defendant will attempt to address each of the pellets fired by plaintiffs.

In a First Amendment case, "a law may be invalidated as overbroad if 'a **substantial number** of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *United States v. Stevens*, 559 U.S. 460, 473, 130 S.Ct. 1577, 176 L.Ed.2d 435 (2010) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6, 128 S.Ct. 1184, 170 L.Ed.2d 151 (2008))(Emphasis added); *United States v. Williams,* 553 U.S. 285, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008). "Even in free-speech cases, however, facial invalidation of a statute remains 'strong medicine that is not to be casually employed.'" *Williams,* 128 S.Ct. at 1838 (internal quotation marks omitted)." *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 336 (6th Cir. 2009). "[T]he burden of demonstrating ...

substantial overbreadth" is on the claimant. *Virginia v. Hicks,* 539 U.S. 113, 122, 123 S.Ct. 2191, 156 L.Ed.2d 148 (2003); *Connection Distrib. Co., supra,* 557 F.3d at 336.

"The first step in overbreadth analysis is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." *United States v. Williams, supra*, 553 U.S. at 293. After construing the statute, the Court must determine whether it "criminalizes a substantial amount of protected expressive activity." *See Id.* at 297. This requires comparing the likely number of unconstitutional applications of the statute with the plainly legitimate applications. *United States v. Stevens*, 559 U.S. at 473. "The overbreadth doctrine prohibits the Government from banning unprotected speech if a substantial amount of protected speech is prohibited or chilled in the process." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 255, 122 S. Ct. 1389, 152 L. Ed. 2d 403 (2002).

Plaintiffs do not allege any facts that address their burden of demonstrating the Policy "criminalizes a substantial amount of protected expressive activity." This is probably due to the fact that the Policy does not criminalize, penalize or otherwise address **any** protected activity. As has been repeatedly demonstrated, the policy addresses **conduct**, not **speech**. Moreover, there is no constitutionally protected right to engage in discriminatory practices that conflict with laws prohibiting such practices. *Roberts v. U.S. Jaycees*, 468 U.S. 609, 104 S. Ct. 3244, 82 L. Ed. 2d 462 (1984), construed the Minnesota Human Rights Act, which is strikingly similar to the City of East Lansing's enactments:

"It is an unfair discriminatory practice:

"To deny any person the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of a place of public accommodation because of race, color, creed, religion, disability, national origin or sex." Minn.Stat. § 363.03, subd. 3 (1982).

The term "place of public accommodation" is defined in the Act as "a business, accommodation, refreshment, entertainment, recreation, or transportation facility of any kind, whether licensed or not, whose goods, services, facilities, privileges, advantages or accommodations are extended, offered, sold, or otherwise made available to the public." § 363.01, subd. 18.

*Id.* at 615. The Supreme Court noted that "[o]n its face, the Minnesota Act does not aim at the suppression of speech, does not distinguish between prohibited and permitted activity on the basis of viewpoint, and does not license enforcement authorities to administer the statute on the basis of such constitutionally impermissible criteria." *Id.* at 623. "Instead, as the Minnesota Supreme Court explained, the Act reflects the State's strong historical commitment to eliminating discrimination and assuring its citizens equal access to publicly available goods and services. See 305 N.W.2d, at 766–768. That goal, which is unrelated to the suppression of expression, plainly serves compelling state interests of the highest order." *Id.*, at 624. The Court then held: "As we have explained, acts of invidious discrimination in the distribution of publicly available goods, services, and other advantages cause unique evils that government has a compelling interest to prevent— wholly apart from the point of view such conduct may transmit. Accordingly, like violence or other types of potentially expressive activities that produce special harms distinct from their communicative impact, **such practices are entitled to no constitutional protection**." *Id. at* 628.

When the City of East Lansing's enactments are examined the only answer to the question of "what constitutionally protected expression would be criminalized/banned/impacted by the enactments?" is: none. Contrary to the plaintiffs' rote repetition that the City acted in response to their speech, that contention is demonstrably untrue. The City acted in response to the plaintiffs' stated intent to **act** in

violation of the City's Ordinance and Policy. The City is constitutionally entitled to do so. To demonstrate the fallacy of plaintiffs' argument consider the following situation. The plaintiffs have announced they are unwilling to accommodate same sex couples in their business practices because same sex marriage is contrary to their religious beliefs. Another vendor announces she is unwilling to accommodate same sex couples in her business practices due to her belief that same sex marriage is scientifically unsound and therefor "unnatural." Under the plaintiffs' view of the Constitution the City could apply the Ordinance and Policy to the other vendor, but not to plaintiffs. It simply cannot be the law that when two people discriminate in violation of legislation and one announces he does it for religious reasons that person gains a constitutional safe haven for his conduct while the secular discriminator does not. If this were the law everyone could legally commit discrimination by simply announcing, "God made me do it." (Or in the case of a Satanist, "The devil made me do it.")

The plaintiffs' overbreadth challenge cannot overcome the Supreme Court's decisions in *Roberts v. U.S. Jaycees, supra*, at 630-631, ("The state court's articulated willingness to adopt limiting constructions that would exclude private groups from the statute's reach, together with the commonly used and sufficiently precise standards it employed to determine that the Jaycees is not such a group, establish that the Act, as currently construed, does not create an unacceptable risk of application to a substantial amount of protected conduct."), and *N.Y. State Club Ass'n, Inc. v. City of N.Y.*, 487 U.S. 1, 14, 108 S. Ct. 2225, 101 L. Ed. 2d 1 (1988) ("To succeed in its challenge, appellant must demonstrate from the text of Local Law 63 and from actual fact that a substantial number of instances exist in which the Law cannot be applied constitutionally. Yet appellant has not

identified those clubs for whom the antidiscrimination provisions will impair their ability to associate together or to advocate public or private viewpoints.") The plaintiffs' only allegation regarding other protected conduct is the allegation that "in many instances [the Policy] bans protected speech, particularly speech on controversial topics, like Plaintiffs' statement of the religious belief that marriage is a union between one man and one woman." (Amended Complaint, ¶ 251). But the Policy, of course, does no such thing. It bans no speech at all. It is addressed to conduct.

*Dambrot v. Cent. Michigan Univ.*, 55 F.3d 1177, 1182 (6th Cir. 1995), held Central Michigan University's antidiscrimination policy unconstitutional under the overbreadth doctrine. A comparison of the two enactments demonstrates the City of East Lansing's Ordinance and Policy do not suffer from the infirmities as the CMU policy did. The CMU policy defined racial and ethnic harassment as "any intentional, **unintentional**, physical, **verbal, or nonverbal behavior** that subjects an individual to an intimidating, hostile or offensive educational, employment or living environment by ... (c) **demeaning or slurring** individuals through ... written literature because of their racial or ethnic affiliation; or (d) **using symbols, [epithets] or slogans that infer negative connotations about the individual's racial or ethnic affiliation**." *Id.* at 1182. (Emphasis added). This policy, without any question, was explicitly designed to regulate speech.

In contrast, East Lansing's Ordinance prohibiting discrimination in public accommodations or services, § 22-35, quoted above, prohibits certain practices – that is, conduct. It simply does not address speech. To the extent plaintiffs attempt to argue § 22-35(a)(2) regulates speech, they would once again be wrong. That section provides that a person shall not: "Print, calculate, post, mail, or otherwise cause to be published a

statement, advertisement, notice, or sign which indicates that the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service will be refused, withheld . . ." While at first blush it might appear that section of the Ordinance addresses speech, it does not. It prohibits people from conveying the fact that they engage in discriminatory practices. This is precisely the same example the Supreme Court addressed in in *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc., supra*: "Congress, for example, can prohibit employers from discriminating in hiring on the basis of race. **The fact that this will require an employer to take down a sign** reading 'White Applicants Only' hardly means that the law should be analyzed as one regulating the employer's speech rather than conduct." *Id.*, 547 U.S. at 62 (Emphasis added).

As previously discussed at length, the Ordinance prohibits discriminatory conduct, not protected speech. As also previously discussed, one cannot avoid the effect of discriminatory conduct by announcing the discrimination will take place. In addition to the previous Supreme Court decisions that hold discriminatory conduct is not entitled to constitutional protection, the Supreme Court has also rejected constitutional protection to discriminatory messages in advertising. *See Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 388, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973) (finding that municipal human rights ordinance that prohibited newspaper from classifying employment advertisements on the basis of sex did not violate the First Amendment). In fact, the government is constitutionally permitted to regulate or completely ban speech proposing illegal conduct. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 496, 102 S. Ct. 1186, 71 L. Ed. 2d 362 (1982)("The ordinance is expressly directed at

commercial activity promoting or encouraging illegal drug use. If that activity is deemed 'speech,' then it is speech proposing an illegal transaction, which a government may regulate or ban entirely.") *Kiser v. Kamdar*, 831 F.3d 784, 788 (6th Cir. 2016)("The correct inquiry for determining the illegal-activity exception's applicability is whether the advertised conduct is illegal.") Here, even assuming the Ordinance regulates speech (which it does not), it is a permissible regulation because it prohibits conveying the intent to engage in illegal conduct.

A plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495, 102 S. Ct. 1186, 1191, 71 L. Ed. 2d 362 (1982); *Broadrick v. Oklahoma*, 413 U.S. 601, 608, 93 S. Ct. 2908, 2913–14, 37 L. Ed. 2d 830 (1973) ("Moreover, even if the outermost boundaries of § 818 may be imprecise, any such uncertainty has little relevance here, where appellants' conduct falls squarely within the 'hard core' of the statute's proscriptions . . ."). In this case the plaintiffs' conduct "falls squarely within the hard core of the [Ordinances] proscriptions." As a result, plaintiffs cannot argue the Ordinance is constitutionally overbroad because of how it might affect others.

"Finally, it is irrelevant whether the ordinance has an overbroad scope encompassing protected commercial speech of other persons, because the overbreadth doctrine does not apply to commercial speech. *Central Hudson, supra*, at 565, n. 8." *Village of Hoffman Estates, supra,* 455 U.S. at 496-497. Again, to the extent § 22-35 is found to regulate speech it does so in the context of public accommodations – purely commercial

undertakings. Thus, the plaintiffs are foreclosed from advancing an overbreadth claim based on how the Ordinance might be applied to others.

Plaintiffs have failed to identify unconstitutionally broad applications of the City's Ordinance and Policy, let alone demonstrate that a substantial number of such applications exist. The plaintiffs' overbreadth claim fails to state a claim upon which relief can be granted.

Plaintiffs also assert an overbreadth claim on the basis that various undefined terms give the City "unbounded discretion to punish disfavored speech on marriage and other topics of public concern." (Amended Complaint, ¶ 260). Once again, plaintiffs' claim fails as a matter of law. "'[T]here are limitations in the English language with respect to being both specific and manageably brief, and it seems to us that although the prohibitions may not satisfy those intent on finding fault at any cost, they are set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with, without sacrifice to the public interest.'" *Broadrick v. Oklahoma, supra*, 413 U.S. at 608, quoting *U. S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 413 U.S. 548, 578-579, 93 S. Ct. 2880, 37 L. Ed. 2d 796 (1973). Language is an imperfect medium. See *Grayned v. City of Rockford*, 408 U.S. 104, 110, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) ("Condemned to the use of words, we can never expect mathematical certainty from our language."). Therefore, "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Ward v. Rock Against Racism*, 491 U.S. 781, 794, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (rejecting facial challenge to statute even though standards were "undoubtedly flexible, and the officials implementing them w[ould] exercise considerable discretion").

In this case plaintiffs cannot assert an overbreadth claim on the basis the words "discriminate," "unwelcome," "objectionable," "unacceptable," and "undesirable," are undefined and give the City "unbridled discretion to punish disfavored speech." Since plaintiffs' conduct "falls squarely within the 'hard core' of the [Ordinance's] proscriptions," the plaintiffs may not challenge the Ordinance on its potential application to others. "*Village of Hoffman Estates, supra; Broadrick, supra.* But even if the plaintiffs could challenge the Ordinance, the challenge fails as a matter of law.

It is literally incredible plaintiffs would contend the word "discriminate" is constitutionally infirm. The word has a common-sense meaning that anyone of average intelligence can understand. In the event plaintiffs are confused about its meaning, it is defined as: "to make distinctions in treatment, show partiality (*in favor of*) or prejudice (*against*)." Webster's New World College Dictionary, 4th Ed. See *Mattei v. Mattei*, 126 F.3d 794, 804 (6th Cir. 1997)("The definitions of "discriminate" and "discrimination" relied on by the district court are: "to distinguish; to make distinctions in treatment; show partiality or prejudice" (Webster's New World Dictionary); and "a failure to treat all persons equally where no reasonable distinction can be found between those favored and those not favored" (Black's Law Dictionary). Unlike the district court, we do not find the estate's action to be necessarily outside the dictionary definitions of 'discrimination.'"). The use of the word "discriminate" does not cause the Ordinance to be unconstitutional.

Similarly, the words "unwelcome," "objectionable," "unacceptable," and "undesirable," have a commonly understood meaning. These are not terms or art – they are common words in every-day usage. Although each word conveys a slightly different meaning, the words are all synonymous and should be clearly understood in context. The

Supreme Court has rejected similar disingenuous attempts to create uncertainty and ambiguity where none exists. "In context, however, those meanings are narrowed by the commonsense canon of *noscitur a sociis*—which counsels that a word is given more precise content by the neighboring words with which it is associated." *United States v. Williams*, 553 U.S. 285, 294, 128 S. Ct. 1830, 170 L. Ed. 2d 650 (2008).

The common-sense meaning of the Ordinance is quite simple: One is prohibited from conveying that a customer will not be served because of his or her sexual orientation. It is frankly insulting that plaintiffs would feign ignorance over this language. The plaintiffs' claim of overbreadth fails as a matter of law.

### C. Speech Retaliation

There are three elements to a retaliation claim: (1) the plaintiff was engaged in a constitutionally protected activity; (2) the defendant's adverse action caused the plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) the adverse action was motivated at least in part as a response to the exercise of the plaintiff's constitutional rights. *Jenkins v. Rock Hill Local Sch. Dist.*, 513 F.3d 580, 585–86 (6th Cir. 2008).

The plaintiffs' claims of retaliation fail on the first element: plaintiffs did not engage in a constitutionally protected activity, as discussed at length in the preceding arguments. "Accordingly, like violence or other types of potentially expressive activities that produce special harms distinct from their communicative impact, **such practices are entitled to no constitutional protection**." *Roberts v. U.S. Jaycees, supra*, 468 U.S. at 628.

### IV. THE PLAINTIFFS' CLAIM OF UNCONSTITUTIONAL CONDITIONS FAIL TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.

An overarching principle, known as the unconstitutional conditions doctrine, vindicates the Constitution's enumerated rights by preventing the government from coercing people into surrendering those constitutional rights. *Koontz v. St. Johns River Water Mgmt. Dist.*, 133 S. Ct. 2586, 2594, 186 L. Ed. 2d 697 (2013). The plaintiffs allege that the City "has violated the unconstitutional conditions doctrine by pressuring Plaintiffs to give up their constitutional rights to free speech and free exercise of religion by conditioning Plaintiffs' receipt of the benefit of continuing to participate in the East Lansing Farmer's Market on Plaintiffs' willingness to relinquish their free speech, flee press, and free exercise of religion by publishing Plaintiffs' religious viewpoint on marriage." (Amended Complaint, ¶ 287). The most obvious response to the plaintiffs' contention is the City of East Lansing is not providing a "benefit" to any vendor at the Farmers' Market. It is engaging in a commercial transaction. On that basis alone, the plaintiffs' claim fails.

At the risk of sounding like the proverbial broken record (which is quickly becoming an anachronistic term) the City has not "pressured" the plaintiffs to do anything. The City has no interest in what plaintiffs believe or what plaintiffs say. The City's only concern is compliance with its nondiscrimination policy. Prohibiting a vendor from utilizing City property because the vendor violates the City's nondiscrimination Ordinance does not impose an unconstitutional condition. "The Solomon Amendment neither limits what law schools may say nor requires them to say anything. Law schools remain free under the statute to express whatever views they may have on the military's congressionally mandated employment policy, all the while retaining eligibility for federal funds. . . . **As a general matter, the Solomon Amendment regulates conduct, not speech. It affects what law schools must *do*—afford equal access to military recruiters—not what they**

**may or may not** *say*. *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc. supra,,* 547 U.S. at 60 (Emphasis added).

The plaintiffs continue to misconstrue the nature of the City's actions – and the nature of their own. The City is refusing to enter into a commercial relationship with the plaintiffs because the plaintiffs refuse to comply with the City's nondiscrimination Ordinance. The City is constitutionally permitted to do so. "An exchange of economic benefits such as this franchise represents underlies every commercial contract and the Supreme Court has left no doubt that the Federal Government enjoys power to conclude commercial bargains. Further, it may employ the remedies available to private citizens in enforcing a contract. *Rex Trailer Co., v. United States*, 350 U.S. 148, 76 S.Ct. 219, 100 L.Ed. 149 (1956); *Perkins v. Lukens Steel Co*., 310 U.S. 133, 60 S.Ct. 869, 84 L.Ed. 1108 (1940). The states enjoy a parallel power. *United States v. Bekins*, 304 U.S. 27, 58 S.Ct. 811, 82 L.Ed. 1137 (1938). The doctrine of unconstitutional conditions does not strip state and federal governments of this indispensible and long acknowledged power. *Honolulu Rapid Transit Co. v. Dolim*, 459 F.2d 551, 553 (9th Cir. 1972). *See also Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1007, 104 S.Ct. 2862, 2875, 81 L.Ed.2d 815 (1984) (rejecting the argument that a company was forced into accepting an unconstitutional condition where the company was aware of the conditions and the conditions were rationally related to a legitimate government interest).

As a general matter, if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds. This remains true when the objection is that a condition may affect the recipient's exercise of its First Amendment rights. See, *e.g., United States v. American Library Assn., Inc.,* 539 U.S. 194, 212, 123 S.Ct. 2297, 156 L.Ed.2d 221

(2003) (plurality opinion) (rejecting a claim by public libraries that conditioning funds for Internet access on the libraries' installing filtering software violated their First Amendment rights, explaining that "[t]o the extent that libraries wish to offer unfiltered access, they are free to do so without federal assistance"); *Regan v. Taxation With Representation of Wash.,* 461 U.S. 540, 546, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983) (dismissing "the notion that First Amendment rights are somehow not fully realized unless they are subsidized by the State" (internal quotation marks omitted)). *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 133 S. Ct. 2321, 2328, 186 L. Ed. 2d 398 (2013). Here, no benefit is being withheld from plaintiffs; the City is simply enforcing its Ordinance. The plaintiffs' claim of unconstitutional conditions fails as a matter of law.

## V.   THE PLAINTIFFS' CLAIM OF AN EQUAL PROTECTION VIOLATION FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.

Plaintiffs allege they are similarly situated to other vendors (Amended Complaint, ¶ 342) and they have been treated differently than other vendors, "For example, Defendant permits East Lansing Farmer's Market vendors like Good Bites to express messages promoting LGBT issues, including same-sex marriage." (Amended Complaint, ¶ 344). Plaintiffs are not similarly situated to other vendors. Moreover, plaintiffs have never been prohibited from expressing any message whatever.

"The Equal Protection Clause of the Fourteenth Amendment protects against invidious discrimination among similarly-situated individuals or implicating fundamental rights." *Davis v. Prison Health Servs.*, 679 F.3d 433, 438 (6th Cir. 2012). Contrary to plaintiffs' continued protestations to the contrary, this is not a case implicating fundamental rights. The City's actions were the result of the plaintiffs' conduct of announcing they would discriminate in violation of the City's Ordinance. Committing acts of

discrimination is not protected conduct and does not implicate fundamental rights. *Roberts v. U.S. Jaycees, supra*, 468 U.S. at 628. Indeed, the Sixth Circuit has held the state commits an equal protection violation itself when it practices discrimination on the basis of sexual orientation. *Id.* ("We have previously held that 'the desire to effectuate one's animus against homosexuals can never be a legitimate governmental purpose, [and] a state action based on that animus alone violates the Equal Protection Clause.' *Stemler v. City of Florence,* 126 F.3d 856, 873–74 (6th Cir.1997)").

In typical equal protection cases, plaintiffs "generally allege that they have been arbitrarily classified as members of an 'identifiable group." *Pers. Adm'r of Mass. v. Feeney,* 442 U.S. 256, 279, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979). When plaintiffs do not claim membership in a group the Supreme Court has recognized a "class-of-one" theory of equal protection. *Village of Willowbrook v. Olech,* 528 U.S. 562, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000). In "class-of-one" claims, the plaintiff simply "alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Olech,* 528 U.S. at 564. "'[T]he hallmark of [a 'class-of-one'] claim is not the allegation that *one individual* was singled out, but rather, the allegation of arbitrary or malicious treatment not based on membership in a disfavored class.' *Aldridge v. City of Memphis,* 404 Fed.Appx. 29, 42 (6th Cir.2010)." *Davis v. Prison Health Servs. supra*, 679 F.3d at 441. In order to prevail on a class-of-one claim the plaintiffs must show (1) the City treated them differently from a similarly situated party, and (2) the City had no rational basis to do so. *EJS Properties, LLC v. City of Toledo*, 698 F.3d 845, 864-865 (6th Cir. 2012). "When evaluating whether parties are similarly situated, 'courts should not demand exact

correlation, but should instead seek relevant similarity.' *Perry v. McGinnis,* 209 F.3d 597, 601 (6th Cir.2000)." EJS Properties, 698 F.3d at 866.

The plaintiffs have not identified any similarly situated parties for purposes of the equal protection claim. The plaintiffs are the only vendor that announced it would discriminate in violation of the City's Ordinance. If the plaintiffs could identify another vendor that discriminates but has not been excluded from the Farmers' Market, they might have a colorable claim. However, they have not done so and cannot do so.

Finally, the City has what all courts have recognized to be a compelling interest in prohibiting discrimination on the basis of sexual orientation. The plaintiffs' equal protection claim fails as a matter of law.

## VI. THE PLAINTIFFS' CLAIM OF AN SUBSTANTIVE DUE PROCESS VIOLATION FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.

In language that is directly applicable to this case, the Sixth Circuit in *Kiser v. Kamdar, supra,* held that a substantive due process claim failed as a matter of law:

> To the extent that the Board has limited Kiser's ability to practice dentistry, it has done so on the basis of his advertisement's contents. The Supreme Court has repeatedly held that where a particular amendment "provides an explicit textual source of constitutional protection" against a particular sort of government behavior, "that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing such a claim." *Albright v. Oliver*, 510 U.S. 266, 273, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (quoting *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). Therefore, this case is properly framed as a commercial-speech case, rather than an economic-liberty case.

*Id.* 831 F.3d at 791. The plaintiffs' claims are based on the First Amendment, and they have asserted those claims. They are not allowed to regurgitate them as substantive due process claims. In any event, the claim would fail as a matter of law for the reasons the plaintiffs' overbreadth claim fails.

**VII. THE PLAINTIFFS' CLAIM THE CITY'S ACTIONS VIOLATED THE HOME RULE CITY ACT FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.**

The plaintiffs allege the City's action of enforcing its nondiscrimination Ordinance violated the Home Rule City Act, M.C.L. 117.1, *et. seq.* This claim is based on what the plaintiffs characterize as the limited authority under granted to cities under the Home Rule City Act. Assuming for purposes of this motion the plaintiffs are correct that the City cannot enforce its ordinances outside the geographic boundaries of the City, the plaintiffs' claim still fails as a matter of law. The plaintiffs' claim is based on an unsupportable syllogism: (A) The City cannot legally act outside its geographic boundaries; (B) the plaintiffs' will violate the City's nondiscrimination policy while operating their business outside the City's geographic boundaries; (C) therefore the City has illegally acted outside of its geographic boundaries by enforcing its nondiscrimination policy against the plaintiffs. Once again, while the plaintiffs' syllogism has surface appeal, it is not valid.

The plaintiff's syllogism is based on either one of two false premises: (1) the City's action takes place outside the City's geographic boundaries, or (2) the City cannot take action inside the City for conduct that occurs outside of the City. Both of these premises are false and therefore the plaintiffs' entire syllogism is false. The first alternative premise is false on its face. The City has never taken action outside its geographic boundaries. Presumably the plaintiffs will concede that irrefutable point. That would mean the plaintiffs are relying on the second alternative premise: the City cannot take action inside the City for conduct that occurs outside the City. There is no law to support this contention and common sense and decades of real-life experience refute it. As discussed above, the City can place conditions on its commercial endeavors. One of the conditions the City placed on

the vendors at the Farmers' Market was that they comply with the City's nondiscrimination ordinance in their general business practices. When plaintiffs failed to do so they were not issued a citation by the City; the City did not come to their property; the City did not direct plaintiffs to alter their speech or their beliefs. All the City did was to refuse to allow plaintiffs to make use of the City's property to sell its produce – and at the same time forgo any fee from the plaintiffs for the use of the City's property.

Everything the City has done is constitutional, legal and permissible under Federal and State law. The plaintiffs' claim fails as a matter of law.

**VIII.  THE PLAINTIFFS' CLAIM THE CITY'S ACTIONS VIOLATED THE MICHIGAN CONSTITUTION FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.**

Without repeating the extensive arguments made earlier in this brief, the plaintiffs' claims under the Michigan Constitution fail as a matter of law for the same reasons their claims fail under the United States Constitution. The City does not dispute that "The Michigan Constitution also contains its own guarantee of religious freedom, see Const. 1963, art. 1, § 4, which 'is at least as protective of religious liberty as the United States Constitution.' *People v. DeJonge (After Remand)*, 442 Mich. 266, 273 n. 9, 501 N.W.2d 127 (1993)." *Winkler by Winkler v. Marist Fathers of Detroit, Inc.*, ____ Mich. ____, (No. 152889, 2017 WL 2800040 June 27, 2017) at *6 . However, all of the shortcomings that apply to the plaintiffs' claims under the United States Constitution apply with equal force to the claims under the Michigan Constitution. Simply put: the City of East Lansing was responding to plaintiffs' conduct. It did not attempt to alter plaintiffs' beliefs. It did not regulate plaintiffs' speech. It did not burden plaintiffs' religious practices. It did what the government has

always been empowered to do: enforce its lawfully enacted ordinances and policies for the protection and well-being of its citizens.

Plaintiffs' claims under the Michigan Constitution fail as a matter of law.


## RELIEF REQUESTED

Defendant requests the Court dismiss the plaintiffs' Amended Complaint in its entirety with prejudice pursuant to Fed. R. Civ. P. 12(b)(6) as it fails to state a claim upon which relief can be granted.

Respectfully submitted,

DATED: July 14, 2017                    PLUNKETT COONEY


BY:  /s/Michael S. Bogren
          Michael S. Bogren (P34835)
          Attorney for Defendant

BUSINESS ADDRESS:
950 Trade Centre Way, Suite 310
Kalamazoo, Michigan   49002
(269-226-8822)
mbogren@plunkettcooney.com