UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

COUNTRY MILL FARMS, LLC and          )
STEPHEN TENNES,                      )
                   Plaintiffs,       )
                                     )        No. 1:17-cv-487
-v-                                  )
                                     )        Honorable Paul L. Maloney
CITY OF EAST LANSING,                )
                   Defendant.        )
_____)

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS

Stephen Tennes believes marriage is a sacramental union between one man and one woman.  Tennes promotes his farm, Country Mill, as a place to host weddings.  In conformity with his beliefs, Tennes will not host weddings on his farm between same-sex couples.  He has written about his beliefs on Country Mill's Facebook page, and expressed those beliefs as the policy at County Mill.  Following Tennes's most recent announcement, the East Lansing Farmer's Market declined Tennes's 2017 vendor application.  Tennes then sued the City of East Lansing, alleging that the decision violated his First Amendment rights to Free Speech and Freedom of Religion, among other things.  The City filed a motion to dismiss.  (ECF No. 13).  The Court held a hearing on the motion.  Assuming the allegations are true, the sequence of events permits the inference that the City targeted Tennes's speech and religious beliefs and, therefore, most of Plaintiffs' claims are plausible.

## I.

Under the notice pleading requirements, a complaint must contain a short and plain statement of the claim showing how the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2); *see Thompson v. Bank of America, N.A.*, 773 F.3d 741, 750 (6th Cir. 2014). The complaint need not contain detailed factual allegations, but it must include more than labels, conclusions, and formulaic recitations of the elements of a cause of action. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A defendant bringing a motion to dismiss for failure to state a claim under Rule 12(b)(6) tests whether a cognizable claim has been pled in the complaint. *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir. 1988).

To survive a motion to dismiss, a plaintiff must allege facts sufficient to state a claim for relief that is "plausible on its face" and, when accepted as true, are sufficient to "raise a right to relief above the speculative level." *Mills v. Barnard*, 869 F.3d 473, 479 (6th Cir. 2017) (citation omitted). "The complaint must 'contain either direct or inferential allegations respecting all material elements necessary for recovery under a viable legal theory.'" *Kreipke v. Wayne State Univ.*, 807 F.3d 768, 774 (6th Cir. 2015) (citation omitted). "A claim is plausible on its face if the 'plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 369 (6th Cir. 2011) (quoting *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2007) (citations omitted). When considering a motion to dismiss, a court must accept as true all factual allegations, but need not accept any legal conclusions.

*Ctr. for Bio-Ethical Reform,* 648 F.3d at 369.   Naked assertions without further factual enhancement, formulaic recitations of the elements of a cause of action, and mere labels and conclusions will be insufficient for a pleading to state a plausible claim.  *SFS Check, LLC v. First Bank of Delaware*, 774 F.3d 351, 355 (6th Cir. 2014) (citations omitted).

## II.

Plaintiffs filed their complaint on May 31, 2017.  The complaint alleges nine causes of action.  In Count 1, Plaintiffs allege violations of their right to Free Speech, including an as-applied content and viewpoint discrimination claim, facial and an overbreadth claim, and a claim for retaliation.  In Count 2, Plaintiffs allege violations of their Free Press rights.  In Count 3, Plaintiffs allege a claim for unconstitutional conditions.  Count 4 is Plaintiffs' claim for violations of their Free Exercise of religion.  Count 5 is Plaintiffs' claim for violations of the Establishment Clause.  Count 6 is Plaintiffs' claim for violations of their rights to Equal Protection.  In Count 7, Plaintiffs claim their rights to Due Process were violated.  Count 8 is Plaintiffs' claim for a violation of Michigan's Home Rule City Act.  Finally, in Count 9, Plaintiffs claim that the City has violated Article 1, Section 4 of the Michigan's Constitution. The City seeks dismissal of each of the claims.

For this motion, the Court accepts as true the facts alleged in the complaint.  Some background is necessary to understand the claims brought by Tennes and Country Mill.  The controlling pleading is Plaintiffs' Amended Complaint.  (ECF No. 5 Complaint.)

## A.

In 1972, the City of East Lansing adopted a non-discrimination ordinance.  (ECF No. 5 Compl. ¶¶ 158 and 195.)  The Ordinance declares the public policy of the municipality.

> It is hereby declared to be contrary to the public policy of the City of East Lansing for any person to deny any other person the enjoyment of his/her civil rights or for any person to discriminate against any other person in the exercise of his/her civil rights or to harass any person because of religion, race, color, national origin, age, height, weight, disability, sex, marital status, sexual orientation, gender identity or expression, student status, or because of the use by an individual of adaptive devices or aids.

City of East Lansing, MI., Code § 22-31.  The word "harass" is defined to include both conduct and communication.

> To harass means to have physical conduct or communication which refers to an individual protected under this article, when such conduct or communication demeans or dehumanizes and has the purpose or effect of substantially interfering with an individual's employment, public accommodations or public services, education, or housing, or creating an intimidating, hostile, or offensive employment, public accommodations, public services, educational, or housing environment.

Id. § 22-32.  The City's Code defines "places of public accommodations" and further outlines practices that are prohibited when providing public accommodations.

> (a) Definitions.  As used in this subsection:
>     Place of public accommodation means a business, or an educational, refreshment, entertainment, recreation, health or transportation facility, or institution of any kind, whether licensed or not, whose goods, services, facilities, privileges, advantages, or accommodations are extended, offered, sold or otherwise made available to the public.
> . . .
> (b) Prohibited practices.  Except where permitted by law, a person shall not:
>     (1) Deny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service because of religion, race, color, national origin, age, height, weight, disability, sex, marital status, sexual

orientation, gender identity or expression, student status, or because of the use by an individual of adaptive devices or aids.

     (2) Print, calculate, post, mail, or otherwise cause to be published a statement, advertisement, notice, or sign which indicates that the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodations or public service will be refused, withheld from, or denied because or religion, race, color, national origin, age, height, weight, sex, disability, marital status, sexual orientation, gender identity or expression, or student status, or because of an individual's use of adaptive devices or aids, or that an individual's patronage of, or presence at a place of public accommodation, is objectionable, unwelcome, unacceptable, or undesirable because of religion, race, color, national origin, age, height, weight, disability, sex, marital status, sexual orientation, gender identity or expression, or student status or because of the use by an individual of adaptive devices or aids.

*Id.* § 22-35.  The City's Code contains an enforcement provision, which authorizes the Human Relations Committee to investigate, hold hearings, and issue orders on complaints alleging a violation of the article.  *Id.* 22-38(b).  Convictions for violations of the ordinance may result in a fine of not more than $500 and imprisonment for not more than 90 days or both.  *Id.* § 22-38(h)(11).  When the alleged violator is operating by virtue of a license issued by the City, the license may be suspended or revoked.  *Id.* § 22-38(i).

## B.

Country Mill Farms is located in Charlotte, Michigan (Compl. ¶ 31), about twenty-two miles from East Lansing (*id.* ¶ 11).  Country Mill participated in the East Lansing Farmer's Market (ELFM) since 2010, and was an invited vendor from 2011 through 2016. (*Id.* ¶ 4.)

According to the complaint, in 2014, Tennes was contacted by two women who were seeking to have their wedding ceremony at an orchard (Compl. ¶ 110).  Because "promoting and participating" in a same-sex wedding at Country Mill would violate Tennes's religious

beliefs, he referred the women to another orchard in the area.  (*Id.* ¶ 111.)  On August 22, 2016, one of the women posted a message on Facebook discouraging people from patronizing Country Mill because Tennes had declined to host her wedding.  (*Id.* ¶ 116.)  In the ensuing discussion, questions were posed about Tennes's religious beliefs.  (*Id.* ¶ 119.)

On Wednesday, August 24, 2016, Tennes posted a statement about his religious beliefs on Facebook.[1]  (Compl. ¶ 120.)  Based on his Catholic faith, Tennes believes that marriage is a sacramental union between one man and one woman.  (*Id.* ¶ 5.)  Tennes "honors his religious belief when hosting and participating in weddings at Country Mill." (*Id.*)  Tennes explained that, because of his religious beliefs, he would refer any request to celebrate same-sex wedding ceremonies at Country Mill to another orchard in the area.  (*Id.* ¶ 120.)

Plaintiffs allege that, on Friday, August 26, the Parks and Recreation Director for the City called Country Mill and asked that they agree not to attend the Farmer's Market on Sunday, August 28.  (Compl. ¶ 124.)  Because of the pressure of the City, Tennes decided to temporarily stop booking future weddings at Country Mill.  (*Id.* ¶ 127.)  Tennes posted his decision on Facebook and also informed the City.  (*Id.* ¶ 128.)  Plaintiffs allege the City did not stop asking them to leave the Farmer's Market.  (*Id.* ¶¶ 129–30.)  Country Mill attended the Farmer's Market on Sunday, August 28 (*id.* ¶ 137), and for the rest of the 2016 season (*id.* ¶ 137).

C.

---

[1]      The actual text of this message is not included in the record presented to the Court.

Two significant events occurred after the end of the 2016 season.  First, on December 12, 2016, Tennes posted another message on Country Mill's Facebook page announcing that Country Mill would again host wedding ceremonies, but only ceremonies involving one man and one woman.

> This past fall our family farm stopped booking future wedding ceremonies at our orchard until we could devote the appropriate time to review our policies and how we respectfully communicate and express our beliefs.  The Country Mill engages in expressing its purpose and beliefs through the operation of its business and it intentionally communicates messages that promote its owners' beliefs and declines to communicate messages that violate those beliefs.  The Country Mill family and its staff have and will continue to participate in hosting the ceremonies held at our orchard.  It remains our deeply held religious belief that marriage is the union of one man and one woman and Country Mill has the First Amendment Right to express and act upon its beliefs.  For this reason, Country Mill reserves the right to deny a request for services that would require it to communicate, engage in, or host expression that violates the owners' sincerely held religious beliefs and conscience.  Furthermore, it remains our religious belief that all people should be treated with respect and dignity regardless of their beliefs and background.  We appreciate the tolerance offered to us specifically regarding our participation in hosting wedding ceremonies at our family farm.

(Compl. ¶ 140.)  Second, the City amended the Vendor Guidelines for its Farmer's Market.[2]

A provision was added to Section 6 of the Vendor Guidelines.  The new provision states

> 6) VENDORS WILL EMBODY THE SPIRIT OF THE MARKET BY:
> Multiple factors that affect the success of every vendor are considered.
> . . .
> m.  Complying with the City of East Lansing's Civil Rights ordinances and the public policy against discrimination contained in Chapter 22 of the East Lansing City Code while at the ELFM and as a general business practice.

---

[2]     The record does not establish the date when the amendment occurred.

(ECF No. 5-1 PageID.114-15.).  The Vendor License Agreement requires the applicant to check a box indicating that he or she has read and agrees to all of the 2017 Vendor Guidelines. (*See* Compl. ¶ 150.)

The combination of these two events ultimately led to the denial of Country Mill's vendor application for the 2017 season at the Farmer's Market.  In January 2017, the Market Planning Committee for the Farmer's Market met to identify and invite vendors for the 2017 season.  (Compl. ¶ 193.)  From 2011 through 2016, the Planning Committee had invited Country Mill to participate in the Farmer's Market, eliminating the need for County Mill to apply.  (*Id.* ¶¶ 96–98, 103.)  The City, however, barred the Planning Committee from inviting Country Mill to the Farmer's Market for 2017.  (*Id.* ¶ 194.)  The City further instructed the Planning Committee that, should Country Mill submit a vendor application, the application had to be sent to the City for review.  (*Id.* ¶ 195.)  The Planning Committee did not invite Country Mill to be a vendor.  (*Id.* ¶ 196.)

Country Mill submitted a vendor application, which was reviewed by the City. (Compl. ¶¶ 197 and 199.)  On March 7, 2017, the City sent Diana Tennes a letter denying Country Mill's vendor application.  (*Id.* ¶ 200.)

> It was brought to our attention that The Country Mill's general business practices do not comply with East Lansing's Civil Rights ordinances and public policy against discrimination as set forth in Chapter 22 of the City Code and outlined in the 2017 Market Vendor Guidelines, as such, The Country Mill's presence as a vendor is prohibited by the City's Farmer's Market Vendor Guidelines.

(ECF No. 5-2 PageID.129.)  Steve Tennes emailed the city official who signed the letter asking for clarification about the business practices that were objectionable.  (Compl. ¶ 204.)

The City sent a second letter, this time referencing Tennes's December Facebook post.  (*Id.* ¶ 205.)

> It was brought to our attention this winter that your facebook post dated December 12, 2016 outlines a business practice that would be considered a violation of the City of East Lansing Civil Rights Ordinances and our public policy against discrimination contained in Chapter 22 of the East Lansing City Code.

(ECF No. 5-1 PageID.111.)

### III.

Counts 1 and 2 are Plaintiffs' claims for violations of the First Amendment's Freedom of Speech and Freedom of the Press.[3]

### A.  As Applied

Plaintiffs allege, by incorporating the Ordinance, the policy in the Vendor Guidelines is a content-based regulation and, as-applied to them, is unconstitutional.  For an as-applied challenge, a plaintiff attacks the validity of the law as it has been applied to him or her by focusing on the acts that are the subject of the litigation.  *See Bd. of Trustees of State Univ. of New York v. Fox*, 492 U.S. 469, 482–83 (1989).

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech . . . ."  U.S. Const. Amend. I.  Under the Free Speech Clause, "a government, including a municipal government vested with state authority, 'has no power to restrict expression because of its message, its ideas, its subject matter or its content.'"  *Reed*

---

[3]     Defendant argues that the rights protected by the Free Speech Clause and the Free Press clause are functionally coextensive.  Defendant, accordingly, addresses Counts 1 and 2 at the same time, without distinction.

*v. Town of Gilbert, Arizona*, 135 S. Ct. 2218, 2226 (2015) (quoting *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95 (1972)). "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector and Visitors of Univ. of Virginia*, 515 U.S. 819, 828 (1995). "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed*, 135 S. Ct. at 2227 (citation omitted). "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Rosenberger*, 515 U.S. at 828. "Viewpoint discrimination is thus an egregious form of content discrimination." *Id.* Content-based laws "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 135 S. Ct. at 2226 (citations omitted).

The Sixth Circuit has held that free-speech claims should be analyzed by a three-step inquiry. *Bible Believers v. Wayne Cty., Michigan*, 805 F.3d 228, 242 (6th Cir. 2015) (citing *Cornelius v. NAACP Legal Def. & Ed. Fund, Inc.*, 473 U.S. 788, 797 (1985)). First, a court must consider whether the speech should be afforded constitutional protection. *Id.* Second, the court must examine the nature of the forum where the speech was made. *Id.* And third, the court must assess the whether the government's action in shutting off the speech was legitimate, in light of the applicable standard of review. *Id.* For the first step in the inquiry, if the court concludes that the government has not regulated speech, or that the speech is not entitled to protection, the inquiry ends. *See Cornelius*, 473 U.S at 797 ("To resolve this issue we must first decide whether solicitation in the context of the CFC is speech protected

by the First Amendment, for, if it is not, we need go no further."); *Bailey v. Callaghan*, 715 F.3d 956, 959 (6th Cir. 2013) (explaining the holding in *Cornelius*).

The United States Supreme Court has, on multiple occasions, addressed situations where conduct had to be distinguished from speech when considering whether a government's actions ran afoul of the First Amendment.  The government does not violate the free speech clause by making a course of conduct illegal simply because the conduct was "initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949); *see Ohralik v. Ohio Bar Ass'n*, 436 U.S. 447, 456 (1978) (same and explaining that "[n]umerous examples could be cited of communications that are regulated without offending the First Amendment, such as the exchange of information about securities, corporate proxy statements, the exchange of price and production information among competitors, and employers' threats of retaliation for labor activities of employees.") (internal citations and citations omitted).  Restrictions and regulations directed at commerce and conduct may impose incidental burdens on speech without violating the First Amendment.  *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011) (supporting the proposition by noting that "a ban on race-based hiring may require employers to remove 'White Applicants Only' signs; why 'an ordinance against outdoor fires' might forbid 'burning a flag,'; and why antitrust laws can prohibit 'agreements in restraint of trade[.]'") (internal citations and citation omitted).  And, the Supreme Court has "rejected the view that 'conduct can be labeled speech whenever the person engaging in the conduct intends thereby to express an idea.'"  *Rumsfeld v. Forum for Acad. and Inst. Rights, Inc.*, 547 U.S. 47, 65–66 (2006) (quoting *United States v. O'Brien*, 391 U.S. 367, 376 (1968)).

In *O'Brien*, the criminal defendant, in front of a crowd and on the steps of a courthouse, burned his draft card. He was convicted of violating a federal statute which prohibited persons from knowingly destroying or mutilating the document. O'Brien alleged the statute violated his First Amendment rights, and that the statute was enacted to abridge free speech. Ruling against O'Brien, the Supreme Court rejected the "view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." *O'Brien*, 391 U.S 376.

In *Rumsfeld*, the Court considered whether the Solomon Amendment violated a law school's free speech rights. Law schools had been restricting the access of military recruiters to their students because the schools disagreed with the Government's policy on homosexuals in the military. Congress responded by enacting the Solomon Amendment, which denied certain federal funds to any institution of higher learning that did not provide military recruiters with access equal to that provided to other recruiters. The Court first concluded that the Solomon Amendment regulated conduct, not speech. *Rumsfeld*, 547 U.S. at 60 ("As a general matter, the Solomon Amendment regulates conduct, not speech. It affects what law schools must *do*—afford equal access to military recruiters—not what they may or may not *say*.") The Court later considered, and rejected, the view that any conduct can be considered speech whenever the individual intends to express an idea. The Court noted that "we have extended First Amendment protection only to conduct that is inherently expressive." *Id.* at 66.

The Court then explained why the law schools' conduct was not inherently expressive. Law schools had expressed their disagreement by treating military recruiters differently. The

reason military recruiters conducted interviews on undergraduate campuses, instead of the law school, was not immediately apparent. *Id.*

> The expressive component of a law school's actions is not created by the conduct itself, but by the speech that accompanies it. The fact that such explanatory speech is necessary is strong evidence that the conduct at issue here is not so inherently expressive that it warrants protection under *O'Brien*. If combining speech and conduct were enough to create expressive conduct, a regulated party could always transform conduct into "speech" simply by talking about it. For instance, if an individual announces that he intends to express his disapproval of the Internal Revenue Service by refusing to pay his taxes, we would have to apply *O'Brien* to determine whether the Tax Code violates the First Amendment. Neither *O'Brien* nor its progeny support such a result.

*Id.*

The City is entitled to the dismissal of Plaintiffs' as-applied challenge. Plaintiffs have not pled sufficient facts to establish that, as-applied to them, Ordinance and the Vendor Guidelines are unconstitutional. Although Plaintiffs allege the City discriminated against them based on the content of their speech, the exhibits attached to the complaint, and the timeline of events, contradict that assertion.

The City's reaction to Tennes's August 2016 Facebook post will not support an as-applied challenge. The City's Ordinance did not apply to Plaintiffs in August 2016. The 2016 Vendor Guidelines did not incorporate the City's Ordinance. As pled, after the August post, the City only requested, albeit repeatedly, that Country Mill not attend the ELFM. The City did not deny County Mill access to the ELFM in 2016. Plaintiffs have not identified any authority that government requests, unaccompanied by threats or action, constitute the sort of government action prohibited by the First Amendment. Country Mill participated in the entire 2016 ELFM season.

The City's reaction to Tennes's December 2016 Facebook post will not support an as-applied challenge.  The City did not use its Ordinance or its Vendor Guidelines to regulate Plaintiffs' speech.   The City denied Plaintiffs' vendor application because of Plaintiffs' conduct.  After the 2016 season, the City amended its Vendor Guidelines to incorporate the Ordinance.  The 2017 Vendor Guidelines requires vendors at the ELFM to follow the Ordinance while at the market and also in their general business practices.  The City used the amended Vendor Guidelines to deny the Country Mill's application for the 2017 season. In the letters sent to Plaintiffs', the City identified the reason for denying the vendor application, Country Mill's general business practices.   Country Mill's general business practice is to rent space on the farm for weddings, but only those weddings that involve one man and one woman.  As a general business practice, Country Mill will not rent space to two men for their wedding or two women for their wedding.  Plaintiffs' reasoning, that they were "expelled" from the farmer's market because of their speech, is similar to the argument rejected in *Rumsfeld*.  Under *Rumsfeld*, writing about a prohibited general business practice on Facebook does not transform that conduct into protected speech.

### B.  Facial/Overbroad

Plaintiffs assert both a facial challenge to the Ordinance and Vendor Guidelines and an overbreadth challenge.  Plaintiffs' facial challenge is presented as part of their content and viewpoint as-applied challenge.  (Compl. ¶¶ 238 and 241.)  Plaintiffs' overbreadth challenge is set forth separately.  (*Id.* ¶¶ 250–261.)

1.  Facial Challenge

Plaintiffs argue the Ordinance is unconstitutional on its face because it regulates speech based on content.  In their complaint, Plaintiffs point to the declaration of public policy, Code § 22–31, and also the prohibited practices portion of the public accommodations provision, Code § 22-35(b)(2).  (Compl. ¶ 238.)  In their response to the motion, Plaintiffs also point to the harassment provision, Code 22–32, as an example of content-based regulation of speech.  (ECF No. 31 Pl. Resp. at 5 PageID.277.)  Plaintiffs assert that each of these provisions of the City's code, which have been incorporated into the Vendor Guidelines, on their face violate the constitutional prohibition against content and viewpoint speech regulation.

To succeed on a facial challenge to a statute, the plaintiff must "'establish that no set of circumstances exists under which the Act would be valid.'"  *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1054 (6th Cir. 2015) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)); *see United States v. Stephens*, 559 U.S. 460, 472 (2010) (same).  If successful, a facial challenge invalidates a statute in all of its applications; it would "leave nothing standing," and would "take the law off the books completely."  *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 335 (6th Cir. 2009).  Because facial challenges have significant effects outside the context of the specific lawsuit, the burden placed on the plaintiff is "a daunting one[.]" *Lundergan-Grimes*, 784 F.3d at 1054.

Having carefully reviewed the motion, the Court finds that the City has not articulated a compelling reason to dismiss Plaintiffs' facial challenge to the Ordinance.  In its motion, the City recognizes that Plaintiffs pled a facial challenge.  (ECF No. 14 Def. Br. at 31

PageID.215.) The City's position is that the Ordinance and the Vendor Guidelines address conduct, not speech. (*Id.* at 32–35 PageID.216–19.) The City may be correct that Plaintiffs' application was denied because of their conduct. The City is wrong that the Ordinance regulates only conduct. The Ordinance also regulates speech. Section 22-32 of the Code defines "harass" as including "communication which refers to an individual protected under this article." Section 22-31 prohibits harassment of any person based on a list of characteristics. And, Section 22-35(b)(2) prohibits the printing and publishing of certain statements and signs based on their content.

### 2. Overbroad

In their complaint, Plaintiffs identify three provisions that are overbroad: (1) the general business practice language in the Vendor Guidelines (Compl. ¶¶ 252–254), (2) the harassment portions of the Ordinance (*id.* ¶¶ 255–58), and (3) the public accommodations portion of the Ordinance (*id.* ¶¶ 259–60).

A facial challenge to a statute's constitutionality, when brought under the First Amendment, is an overbreadth challenge. *Speet v. Schuette*, 726 F.3d 867, 872 (6th Cir. 2013) (citing *Connection Distrib.*, 557 F.3d at 335). "The overbreadth doctrine prohibits the Government from banning unprotected speech if a substantial amount of protected speech is prohibited or chilled in the process." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 255 (2002). "Instead of having to prove that *no* set of circumstances exist in which the enforcement of the statute would be constitutional, the plaintiff bears a lesser burden: 'to demonstrate that a substantial number of instances exist in which the law cannot be applied constitutionally.'" *Speet*, 726 F.3d at 872 (quoting *Glenn v. Holder*, 690 F.3d 417, 422 (6th

Cir. 2012)).  The United States Supreme Court stated that, under the First Amendment, "a law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *Stephens*, 559 U.S. at 473 (citation omitted).  And because overbreadth challenges are facial challenges which, if successful, would forbid any enforcement of the statute, application of the overbreadth doctrine is "strong medicine" and should be employed by courts "sparingly and only as a last resort." *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973).

The first step in an overbreadth challenge "is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." *United States v. Williams*, 553 U.S. 285, 293 (2008); *Speet*, 726 F.3d at 873. Once properly understood, the second step is to determine of the statute criminalizes a substantial amount of protected expressive activity.  *Williams*, 553 U.S. at 297; *Speet*, 726 F.3d at 878. "A plaintiff may not 'leverag[e] few alleged unconstitutional applications of the statute into a ruling invalidating a law in all of its applications.'"  *Speet*, 726 F.3d at 878 (quoting *Connection Distrib.*, 557 F.3d at 340).  In any First Amendment facial challenge to a statute, a court must always consider whether the statute "be 'readily susceptible' to a narrowing construction that would make it constitutional[.]"  *Virginia v. American Bookseller Ass'n*, 484 U.S. 383, 397 (1988).  The plaintiff bears the burden of showing substantial overbreadth.  *Speet*, 726 F.3d at 878.

In *Dambrot v. Central Michigan University*, 55 F.3d 1177 (6th Cir. 1995), the Sixth Circuit considered an overbreadth challenge to a university's harassment policy.  The policy defined racial and ethnic harassment as

> any intentional, unintentional, physical, verbal, or nonverbal behavior that subjects and individual to an intimidating, hostile or offensive educational, employment or living environment by . . . (c) demeaning or slurring individuals through . . . written literature because of their racial or ethnic affiliation; or (d) using symbols, [epithets] or slogans that infer negative connotations about the individual's racial or ethnic affiliation.

*Id.* (quoting the Policy). With little discussion, the circuit court found the policy reached a substantial amount of constitutionally protected speech. *Id.* The policy language was "sweeping and seemingly drafted to include as much and as many types of conduct as possible. On its face, the policy reaches 'a substantial amount of constitutionally protected speech.'" *Id.* (citation omitted).

### a. Harassment Provisions

Having carefully reviewed the motion, the Court concludes the City has not identified an ultimately persuasive reason that Plaintiffs' overbroad challenge to the harassment provisions of the Ordinance should be dismissed. Again, the City argues that the Ordinance addresses conduct, not speech. The City is incorrect. As discussed above, Ordinance defines harassment to include communication, not just conduct. The definition does limit the communication covered. For the first step in an overbreadth analysis, the Court must construe the challenged provision. Section 22-32 defines "to harass" as (1) communication (2) that demeans or dehumanizes (3) and has the purpose or effect of (a) interfering with public accommodations or (b) creating an intimidating, hostile or offensive public accommodations environment.[4] Under Section 22-31, harassing communication because of

---

[4]       The Ordinance does not limit harassment to situations involving public accommodations. The provision reaches public services, education and housing. The Court focuses on public accommodations because that is the context in which this challenge arose.

the person's religion, race, color, national origin, age, height, weight, disability, sex, marital status, sexual orientation, gender identity or expression, student status, or use of an adaptive aid or device is against the public policy of the City. The Ordinance would be implicated by negative statements made by ELFM vendors against same-sex couples and interracial couples and negative statements against evangelical Christians and Muslims, to name a few possible verboten topics. The statements would be communicative. The statements could be demeaning. The statements would have the effect of making the ELFM a hostile or intimidating environment. And, the statements would implicate characteristics listed in the Ordinance.

The City argues that its actions were directed at Plaintiffs' conduct, not Plaintiffs' speech. But, for the overbreadth challenge, courts consider not just the relevant as-applied conduct, but all of the applications of the statute. *See Speet*, 726 F.3d at 873. Statute may be invalidated by an overbreadth challenge "to prevent a 'chilling effect,' whereby speakers self-censor protected speech to avoid the danger of possible prosecution." *Lundergan-Grimes*, 784 F.3d at 1054.

### b. General Business Practice

Having carefully reviewed the motion, the Court concludes the City has not identified an ultimately persuasive reason that Plaintiffs' overbroad challenge to the general business practice language in the Vendor Guidelines should be dismissed. That phrase is not defined in the Vendor Guidelines. Plaintiffs have pled that the City interprets the phrase "to include business owners' religious statements, beliefs, and practices." (Compl. ¶ 254.) For this motion, the Court accepts this factual assertion. And, because the Court must accept the

assertion that the City interprets the phrase to include religious statements, it addresses speech and not just conduct.

### c. Public Accommodations

The Court agrees with the City that the prohibitions within the public accommodation provisions of the Ordinance are not overbroad. In subpart (b)(1), the prohibited practices portion of the public accommodation provision of the Ordinance identifies prohibited conduct, i.e., the denial of public accommodations or services because of a listed characteristic. In subpart (b)(2), the Ordinance prohibits published statements which indicate either that public accommodations or services will be denied because of a listed characteristic or that an individual's patronage or presence would be unwelcome because of a listed characteristic. Subpart (b)(2) thus prohibits statements about conduct which is prohibited by subpart (b)(1). The relevant law was discussed above. Where a governmental entity can prohibit conduct, incidental burdens on speech about that conduct are permissible. *See Sorrell*, 564 U.S. at 567; *Rumsfeld*, 547 U.S. at 62 ("Congress, for example, can prohibit employers from discriminating in hiring on the basis of race. The fact that this will require an employer to take down a sign reading 'White Applicants Only' hardly means that the law should be analyzed as one regulating the employers' speech rather than conduct.").

### C. Retaliation

Plaintiffs allege the incorporation of the Ordinance into the Vendor Guidelines, and subsequent the denial of their application, was retaliation for the messages expressed on Facebook.

For a claim for retaliation in violation of the First Amendment, a plaintiff must show he or she (1) was engaged in a constitutionally protected activity, (2) the defendant's adverse action caused the plaintiff an injury that would deter or chill a person of ordinary firmness from continuing to engage in that activity, and (3) a causal connection such that the adverse action was motivated at least in part as a response to the exercise of the plaintiff's constitutional rights. *Jenkins v. Rock Hill Local Sch. Dist.*, 513 F.3d 580, 586–87 (6th Cir. 2008); *Thaddeas-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999). Courts consider the totality of the circumstances, including temporal proximity between the protected conduct and the adverse action, when determining whether to draw an inference of a retaliatory motive. *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 401 (6th Cir. 2010). If the plaintiff can establish a prima facie case, the burden shifts to the defendant to show that it would have taken the same action the absence of the protected activity. *Thaddeas-X*, 175 F.3d at 399. If the defendant can establish that it would have acted in the same manner, the defendant would prevail on a motion for summary judgment. *Id.*

Plaintiffs have pleaded a plausible claim for First Amendment retaliation. The August and the December Facebook posts are protected speech as both messages contained expressions of religious beliefs. After the August message, the City made repeated requests for the Plaintiffs to stay away from the ELFM. At the end of the 2016 season, the City then amended the Vendor Guidelines for the following 2017 ELFM season. The City directed the ELFM Planning Committee not to invite Country Mill, as it had in the past. The City further directed the Committee to forward Country Mill's application to it. The City denied the vendor application, an adverse action. The causal relationship can be inferred based on

these circumstances.  The denial of the vendor application excludes Country Mill from the ELFM, and thus cuts off an income stream.  This adverse action would deter a person of ordinary firmness from otherwise engaging in constitutionally protected discussion of religious beliefs.

## IV.

Plaintiffs allege that the Ordinance, and the incorporation of it through the Vendor Guidelines, imposes restrictions on the free exercise of their religion.  Plaintiffs allege a sincerely held religious belief that marriage is a sacramental union of one man and one woman.  (Compl. ¶ 301.)  Plaintiffs further allege that, to practice their religion, they must operate their business in accordance with their religious beliefs.  (*Id.* ¶ 303.)

The Free Exercise Clause of the First Amendment to the United States Constitution applies to the States through the Fourteenth Amendment.  *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 510, 531 (1993).  "The free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires."  *Emp't Div., Dep't of Human Resources of Oregon v. Smith*, 494 U.S. 872, 877 (1990) *overruled by statue* (1993).  "The Free Exercise Clause 'protects religious observers against unequal treatment' and subjects to the strictest scrutiny laws that target the religious for 'special disabilities' based on their 'religious status.'"  *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012 (2017).  In its Free Exercise cases, the Supreme Court has "long recognized a distinction between the freedom of individual belief, which is absolute, and the freedom of individual conduct, which is not."  *Bowen v. Roy*, 476 U.S. 693, 699 (1986).  Following this principle, the Free Exercise Clause "cannot be understood to require

the Government to conduct its own internal affairs in ways that comport with the religious beliefs of particular citizens." *Id.*

The Free Exercise Clause is implicated "if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." *City of Hialeah*, 508 U.S. at 532; *Prater v. City of Burnside, Kentucky*, 298 F.3d 417, 427 (6th Cir. 2002) ("This Clause protects not only the right to hold a particular religious belief, but also the right to engage in conduct motivated by that belief.") (citing *Smith*, 494 U.S. at 822). In its opinions addressing the free exercise of religion, the Supreme Court has established the "general proposition that a law that is neutral and of general applicability need not be justified by a compelling government interest even if that law has the incidental effect of burdening a particular religious practice." *City of Hialeah*, 508 U.S. at 531; *see, e.g., Bob Jones Univ. v. United States*, 461 U.S. 574, 604 (1983) (denying a free exercise claim brought by a private religious university that prohibited interracial dating for religious reasons and was denied tax exempt status because the government's interest in eradicating racial discrimination in education was compelling). In *Trinity Lutheran*, the Court noted that "[i]n recent years, when this Court has rejected free exercise challenges, the laws in question have been neutral and generally applicable without regard to religion." *Trinity Lutheran*, 137 S. Ct. at 2020. But, when "the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral, and is invalid unless it is justified by a compelling interest and is narrowly tailored to advance that interest." *City of Hialeah*, 508 U.S. at 532 (internal citation omitted).

The Sixth Circuit summarized the limits of the Free Exercise Clause in *Ward v. Polite*, 667 F.3d 727 (6th Cir. 2012).

> Under this guarantee, public authorities may enforce neutral and generally applicable rules and may do so even if they burden faith-based conduct in the process. That is why Oregon could deny unemployment benefits to two members of a Native American tribe found guilty of using a proscribed drug, peyote, even when they used the substance for sacramental purposes. *Employment Div. v. Smith*, 494 U.S. 872, 890 (1990). The rule comes with an exception. If the law appears to be neutral and generally applicable on its face, but in practice is riddled with exemptions or worse is a veiled cover for targeting belief or a faith-based practice, the law satisfies the First Amendment only if it "advance[s] interests of the highest order and [is] narrowly tailored in pursuit of those interests." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993). That is why the City of Hialeah (Florida) could not enforce ordinances that purported to be neutral and generally applicable on their face—regulating the keeping and killing of animals—but in practice targeted the adherents of one faith (the Santeria religion) and the actions of one faith (animal sacrifices). *Id.* at 524–25, 533–35, 113 S. Ct. 2217.

*Id.* at 738. The circuit has applied these principle to deny free exercise claims brought against neutral and generally applicable laws. *E.g., Mount Elliott Cemetery Ass'n v. City of Troy*, 171 F.3d 398, 405 (6th Cir. 1999) (in a claim brought by a non-profit cemetery association that owned and operated four Catholic cemeteries, affirming the City's refusal to rezone property for use as a Catholic cemetery because the evidence in the record established that the construction and operation of a cemetery was not an exercise of religion and the law was neutral and of general enforceability).

Plaintiffs have alleged sufficient facts to state a plausible claim for a violation of their rights under the Free Exercise Clause.[5] Plaintiffs have pleaded facts to support a claim that

---

[5] In the motion to dismiss, the City argues that, to the extent Plaintiffs intend to assert a "hybrid" claim under the First Amendment, the Sixth Circuit has rejected the theory. (ECF No. Def. Br. at 12 PageID.196.) In their response, Plaintiffs concede that this Court must follow the

the City enacted a generally applicable and neutral policy, which was then used to target Plaintiffs' religiously-motivated conduct.  The Ordinance did not apply to Plaintiffs in 2016. After the City learned that Plaintiffs would not hold same-sex weddings on their farms because of Plaintiffs' religious beliefs, the City amended the Vendor Guidelines to incorporate the neutral and generally applicable law and applied it to Plaintiffs.  As pled, the City's action is a "veiled cover for targeting belief or a faith-based practice."  *Ward*, 667 F.3d at 738.

V.

Plaintiffs contend that the City's enforcement of the Ordinance, through the Vendor Guidelines, violates the Establishment Clause.

The Establishment Clause of the First Amendment to the United States Constitution does not merely prohibit the establishment of a religion by the government, it prohibits the government from making a law "respecting the establishment of religion."  U.S. Const., Amend. I.  The "touchstone" for evaluating Establishment Clause cases "is the principle that the 'First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion."  *McCreary Cty, Kentucky v. ACLU of Kentucky*, 545 U.S. 844, 859 (2005).

The Supreme Court has described the language of the Establishment Clause as "at best opaque."  *Lemon v. Kurtzman*, 403 U.S. 602, 612 (1971).  "The First Amendment contains no textual definition of 'establishment,' and the term is certainly not self-defining."

---

Sixth Circuit's holding.  (ECF No. 21 Pl. Resp. at 16 PageID.288.)  Plaintiffs state that they preserve the argument for appeal.

*McCreary Cty.*, 545 U.S. at 874–75.  As a result of the less than precise language used, each "inquiry calls for line drawing; no fixed, *per se* rule can be framed."  *Lynch v. Donnelly*, 465 U.S. 668, 678 (1984).  When forced to draw lines between acceptable government action and prohibited government action, courts should keep in mind "the three main evils against which the Establishment Clause was intended to afford protection: 'sponsorship, financial support, and active involvement of the sovereign in religious activity.'"  *Lemon*, 403 U.S. at 612 (quoting *Walz v. Tax Comm'n*, 397 U.S. 664, 668 (1970)).  In each case, the court should consider whether the challenged law or conduct has a secular purpose, whether its principle or primary effect is to advance or hinder religion, and whether it creates an excessive entanglement of government with religion.  *Lynch*, 465 U.S. at 678; *Lemon*, 403 U.S. at 612–13.

In the years since *Lemon*, the Supreme Court has refined the first two prongs.  *ACLU of Ohio Found., Inc. v. DeWeese*, 633 F.3d 424, 431 (6th Cir. 2011).  The first prong in *Lemon* is now "the predominant purpose test."  *Id.* (citing *ACLU of Kentucky v. Mercer Cty., Kentucky*, 432 F.3d 624, 635 (6th Cir. 2005)); *see McCreary Cty.*, 545 U.S at 860 ("When the government acts with the ostensible and predominant purpose of advancing religion, it violates that Establishment Clause value of official religious neutrality, there being no neutrality when the government's ostensible object is to take sides."); *Satawa v. Macomb Cty. Rd. Comm'n*, 689 F.3d 506, 636 (6th Cir. 2012) ("Under today's *Lemon* test, we ask: (1) whether the government's predominant purpose was secular . . . .").  For this inquiry, "we generally accept the government's stated rationale for its action."  *Satawa*, 689 F.3d at 526.  But, the court has a duty to determine whether the stated secular reason is genuine or a mere

sham. *Id.* For the predominant purpose test, the court held that "[p]urpose is determined from the perspective of an objective observer, who is "credited with knowledge of 'readily discoverable fact,' including 'the traditional external signs that show up in the text, legislative history, and implementation of a statute, or comparable official act.'" *ACLU of Kentucky v. Grayson Cty., Kentucky*, 591 F.3d 837, 848 (6th Cir. 2010) (internal quotation marks omitted) (quoting *McCreary Cty.*, 545 U.S. at 862). When considering purpose, the history and context of the government's action are significant. *DeWeese*, 633 F.3d at 432.

In the second prong of the *Lemon* test, the court considers the primary effect of the government's action. *American Atheists, Inc. v. City of Detroit Downtown Devel. Auth.*, 567 F.3d 278, 291–94 (6th Cir. 2009). The court should consider "whether 'the challenged governmental action is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices.'" *Grayson Cty.*, 591 F.3d at 854 (quoting *Cty. of Allegheny v. ACLU Greater Pittsburgh Chapter*, 492 U.S. 573, (198) *abrogated by Town of Greece, New York v. Galloway*, 134 S. Ct. 1811 (2014)). Where purpose considers the intended effect, the second inquiry of the *Lemon* test considers the actual effect. *Id.* (citing *Adland v. Russ*, 307 F.3d 471, 484 (6th Cir. 2002)). The second inquiry also uses the standard of an objective observer. *Id.* "'If context, history, and the act itself sends the unmistakable message of endorsing religion, then the act is unconstitutional.'" *Id.* (quoting *Mercer Cty.*, 432 F.3d at 637).

Plaintiffs have pled sufficient facts to state a plausible claim under the Establishment Clause. The facts in the complaint allow the Court to infer that the predominant purpose of

the changes to the Vendor Guidelines was motivated by the disapproval of Plaintiffs' religious beliefs.  Specifically, the changes to the Vendor Guidelines were intended to target Plaintiffs' religiously-motivated choices.  For this claim and this motion, the Court considers only the complaint.  As pled, an objective observer could plausibly view the context of events and consider any secular purpose of the changes to the Vendor Guidelines a sham.  For the same reason, an objective observer could plausibly perceive the actual effect of those changes as discouraging the religious belief that marriage should only be between one man and one woman.  The facts pled support the conclusion that the City did not allow the Planning Committee to consider Plaintiffs' application and the City made the determination to deny Plaintiffs' application based on Plaintiffs' religiously-motivated choices.

## VI.

Plaintiffs allege the City has violated the doctrine of unconstitutional conditions.  First, in 2016, the City pressured Plaintiffs to stop attending the ELFM after Plaintiffs' August 2016 Facebook post.  (Compl. ¶ 287.)  Second, in 2017, the City denied Plaintiffs' application to participate in the ELFM because Plaintiffs exercised their constitutionally protected rights under the First Amendment.  (*Id.* ¶ 288.)

Generally, the "overarching principle" of the unconstitutional conditions doctrine "vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up."  *Koontz v. St. Johns River Water Mgt. Dist.*, 133 S. Ct. 2586, 2594 (2013).  The doctrine applies whether the government approves a benefit that comes with a condition or whether the government denies a benefit because the applicant refuses to meet the condition.  *Id.* at 2595.  The Tenth Circuit explained how the doctrine operates

prospectively and retrospectively. *See Planned Parenthood Assoc. of Utah v. Herbert*, 828 F.3d 1245, 1258 (10th Cir. 2016) (quoting *Planned Parenthood of Kansas v. Moser*, 747 F.3d 814, 838–39 (10th Cir. 2014)). Prospectively, the doctrine prohibits the government from conditioning a benefit on an agreement that the recipient refrain from exercising constitutional rights. *Herbert*, 828 F.3d at 1258; *see G & V Lounge, Inc. v. Michigan Liquor Control Comm'n*, 23 F.3d 1071, 1077 (6th Cir. 1994) (noting a "well established Supreme Court precedent to the effect that a state actor cannot constitutionally condition the receipt of a benefit, such as a liquor license or an establishment permit, or an agreement to refrain from exercising one's constitutional rights, especially one's right to free expression."). Put another way, the government cannot indirectly penalize that which the Constitution otherwise prohibits the government from regulating directly. *Toledo Area AFL-CIO Council v. Pizza*, 154 F.3d 307, 321 (6th Cir. 1998). Retrospectively, the doctrine prohibits discretionary government action that terminates a government benefit in retaliation for the exercise of a constitutional right. *Herbert*, 828 F.3d at 1258; *see Bd. of Cty. Comm'rs v. Umbehr*, 518 U.S. 668, 674–75 (1996).

Plaintiffs' unconstitutional conditions claim overlaps substantially with their speech retaliation claim.[6] The Court has already addressed the speech retaliation claim, and considered the entire circumstances starting with the August 2016 Facebook post through

---

[6]     The doctrine of unconstitutional conditions and the speech retaliation doctrine involve related inquiries. *See O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 718–19 (1996) (discussing *Branti v. Finkel*, 445 U.S. 507 (1980) as an unconstitutional conditions case and stating that "[o]ur cases call for a different, though related, inquiry where a government employee takes adverse action on account of an employee or service provider's right of free speech."); *Blaisdell v. Frappiea*, 729 F.3d 1237, 1242 (9th Cir. 2013) (calling a retaliation claim "an aspect of the unconstitutional conditions doctrine[.]").

the decision to deny Plaintiffs' vendor application.  For Plaintiffs' unconstitutional conditions claims, the Court considers only whether the City denied Plaintiffs a benefit based on Plaintiffs' religious beliefs.

The facts in the complaint do not allege sufficient facts to state a plausible retrospective unconstitutional conditions claim based on Plaintiffs' exercise of their religious freedoms.  The City did not terminate an existing benefit.  In 2016, the City only requested Plaintiffs not attend the ELFM.  But, the 2016 vendor license was never rescinded and Plaintiffs attended the ELFM for the entire season.  Plaintiffs were not entitled to or awarded a license in 2017, so the City could not terminate any existing benefit in 2017.

The facts in the complaint allege sufficient facts to state a plausible prospective unconstitutional conditions claim based on Plaintiffs' religious freedoms.  As explained above, the Court has concluded that Plaintiffs have pled sufficient facts to show that the City reacted to protected conduct, conduct motivated by Plaintiffs' religious beliefs.  As pled, Plaintiffs must give up their religiously-motivated conduct in order to obtain a vendor license.  For the purpose of this motion, the Court has assumed that the City could not deny a vendor's license to a farmer operating a farm in the City's boundaries if that farmer refused to perform same-sex weddings at his or her farm.

## VII.

Plaintiffs assert that the City violated the Equal Protection Clause by treating similarly-situated vendors differently.  Plaintiffs claim other vendors have used speech to promote LGBT issues, including same-sex marriages.  (Compl. ¶ 344.)  Plaintiffs contend they were excluded from the ELFM because they wrote a message on Facebook expressing the belief

that marriage was between one man and one woman.  (*Id.* ¶ 346.)  Plaintiffs claim this different treatment violates the Equal Protection Clause.  Plaintiffs do not assert an Equal Protection claim for treatment based on different religious beliefs.  (*Id.* ¶¶ 339–54.)

The Equal Protection Clause of the Fourteenth Amendment demands that a state shall treat alike all similarly-situated persons.  *Plyler v. Doe*, 457 U.S. 202, 216 (1982).  "The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest."  *City of Cleburne, Texas v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985) (noting strict scrutiny for race, alienage, national origin classifications and heightened scrutiny for gender classifications). When legislative classifications "impinge upon the exercise of a 'fundamental right,'" courts have treated the classifications as "presumptively invidious."  *Plyler*, 457 U.S. at 216–17; *Clark v. Jeter*, 486 U.S. 456, 461 (1988) ("Classifications based on race or national origin, and classifications affecting fundamental rights, are given the most exacting scrutiny.") (internal citations omitted); *see, e.g., Mosley*, 408 U.S. at 99–100 (finding unconstitutional under the Equal Protection Clause an anti-picketing ordinance that generally prohibited picketing around schools while the schools were in session but exempted peaceful picketing of any school involved in a labor dispute).

Plaintiffs have not alleged sufficient facts to state a claim for a plausible violation of the Equal Protection Clause.  This claim fails for the similar reasons that Plaintiffs' as-applied challenge fails.  For the as-applied challenge and for this claim, Plaintiffs contend they were excluded from the 2017 market because they exercised their freedom of speech.  But, as explained above, the letters sent to Plaintiffs explaining why their vendor application was

denied flatly contradicts Plaintiffs' allegation.  Plaintiffs' application was denied because of Plaintiffs' conduct at their farm, not their speech.  Furthermore, this conduct undermines Plaintiffs' allegation that they are similarly-situated to other vendors.  Plaintiffs have not alleged that any other vendors refuse to permit same-sex wedding ceremonies on their farms.

## IX.

Plaintiffs allege that the decision to deny their application violates the Due Process Clause.  Plaintiffs assert that the Vendor Application relies on vague standards which grants unbridled discretion to government officials.  Plaintiffs reason that the lack of guidelines permits the City to arbitrarily deny access to the ELFM when the City disagrees with an applicant's speech or religious viewpoint.

"A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).  The void-for-vagueness doctrine addresses two due process concerns: (1) regulated parties should know what is required of them so they can conduct themselves appropriately, and (2) precision and guidance are necessary so that those enforcing the law do not act in an arbitrary and discriminatory manner.  *Id.*; *see Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) (denying a void-for-vagueness challenged to an anti-noise ordinance).  "When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *Fox Television*, 567 U.S. at 253.  "Due process requires that we hold a state enactment void for vagueness if its prohibitive terms are not clearly defined such that a person of ordinary intelligence can readily identify the applicable standard for inclusion and

exclusion." *United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Reg'l Transit Auth.*, 163 F.3d 341, 358–59 (6th Cir. 1998).

Plaintiffs have pled sufficient facts to state a plausible claim for violations of their Due Process rights. In their motion, the City's only argument for dismissal of this claim in the motion was that the substantive due process clause does not apply. (ECF No. 14 Def. Br. at 50 PageID.235.) Plaintiffs have pled a claim for violation of procedural due process. In its reply, the City argues that the claim should fail because the statutory term applies only to conduct. This is a new argument raised for the first time in a reply, and Plaintiffs have not been afforded an opportunity to respond.

## X.

Plaintiffs allege that by denying their vendor application because of conduct that occurred outside of the City of East Lansing, the City violated Michigan's Home Rule City Act.

In Michigan, municipal corporations have no inherent power; cities are created by the state and derive their authority from the state. *Bivens v. Grand Rapids*, 505 N.W.2d 239, 241 (Mich. 1993); *see Home Owners' Loan Corp. v. City of Detroit*, 290 N.W. 888, 890 (Mich. 1940). Municipal ordinances are valid only when consistent with the powers conferred by the state, and if the ordinance falls within the scope of authority provided by the city's charter. *Bivens*, 505 N.W.2d at 241. Under the Michigan Constitution, cities and villages "have the power to adopt resolutions and ordinances relating to its municipal concerns, property and government, subject to the constitution and law." Mich. Const. 963, art. 7, § 22. The Michigan Constitution further states that the constitutional provisions and

law concerning townships, cities and villages "shall be liberally construed in their favor." *Id.* art. 7, § 34.

By statute, municipal corporations may regulate "trades, occupations, and amusements within city boundaries, if the regulations are not inconsistent with state or federal law, and the prohibition of trades, occupations, and amusements that are detrimental to the health, morals, or welfare of the inhabitants of that city." Mich. Comp. Laws § 117.4i(d). The provision "only authorizes the regulation of a trade within a city's boundaries." *City of Riverview v. Sibley Limestone*, 716 N.W.2d 615, 619 (Mich. Ct. App. 2006). The Michigan Court of Appeals noted that the "general rule appears to be that a municipality's police powers may only be exercised within its boundaries, absent statutory or other special authority." *Id.* at 620.

Plaintiffs have not pled sufficient facts to state a plausible claim for a violation of the Home Rule City Act. The Home Rule City Act does not prohibit the City from considering Plaintiffs' conduct outside the geographic boundaries of the East Lansing when determining which vendors will be granted a license. The vendor selection process certainly falls within the scope of the City's authority. Plaintiffs have not identified any authority suggesting that consideration of extra-territorial conduct is not permitted. The City may consider the extra-territorial factor or conduct of the applicant, so long as some other law does not forbid consideration of that factor or conduct.

Both parties generally agree that the City cannot issue citations to Plaintiffs for their conduct on the farm in Charlotte, Michigan. *See City of Riverview*, 716 N.W.2d at 619–21. But, this is not what the City has done. The City has not criminalized conduct outside the

City; the City has not issued Plaintiffs a citation, has not imposed a monetary fine, and has not subjected Plaintiffs to time in prison. Denying a vendor license is not the functional equivalent of a criminal or civil sanction.

## XII.

Plaintiffs allege the City's enforcement of the Ordinance, through the Vendor Guidelines, violates Michigan's Constitution, Article 1, Section 4. Plaintiffs contend that Michigan's Constitution provides broader protections for religious freedoms than the Free Exercise Clause in the federal constitution.

Article 1, Section 4 of the Michigan Constitution contains a conscience or worship clause, a free exercise clause and an establishment clause.

> Every person shall be at liberty to worship God according to the dictates of his own conscience. No person shall be compelled to attend, or, against his consent, to contribute to the erection or support of any place of religious worship, or to pay tithes, taxes or other rates for the support of any minister of the gospel or teacher of religion. No money shall be appropriated or drawn from the treasury for the benefit of any religious sect or society, theological or religious seminary; nor shall property belonging to the state be appropriated for any such purpose. The civil and political rights, privileges, and capacities of no person shall be diminished or enlarged on account of his religious beliefs.

Mich. Const. 1963, art. 1, § 4. The federal and Michigan Establishment Clauses and Free Exercise Clauses are subject to similar interpretations. *Scalise v. Boy Scouts of America*, 692 N.W.2d 858, 868 (Mich. Ct. App. 2005). Michigan courts have acknowledged that the provision also protects a person's freedom to worship according to his or her conscience, a liberty protected by the first and last sentence. *Champion v. Sec'y of State*, 761 N.W.2d 747, 752–53 (Mich. Ct. App. 2008).

Under Michigan law, religious freedom claims brought under Article 1, Section 4 of the state constitution are analyzed using the compelling state interest test announced in *McCready v. Hoffius*, 586 N.W.2d 723 (Mich. 1998).  *Champion*, 761 N.W.2d at 753; *Reid v. Kenowa Hills Pub. Schs.*, 680 N.W.2d 62, 68-69 (Mich. Ct. App. 2004).  The court considers five factors: (1) whether a defendants' belief, or conduct motivated by belief, is sincerely held; (2) whether a defendant's belief, or conduct motivated by belief, is religious in nature; (3) whether a state regulation imposes a burden on the exercise of such belief or conduct; (4) whether a compelling state interest justified the burden imposed upon a defendant's belief or conduct; and (5) whether there is a less obtrusive form of regulation available to the state.  *Reid*, 680 N.W.2d at 68-69.

Plaintiffs have pled sufficient facts to state a plausible claim for violations of the Michigan Constitution.  In their motion, Defendants argue the State Constitution claim fails for the same reasons that Plaintiffs' Free Exercise and Establishment Clause violations fail.  (ECF No. 14 Def. Br. at 52-53 PageID.236-37.)   Because the Free Exercise and Establishment clause claims are not dismissed, the same claims brought under the Michigan Constitution will not be dismissed.

## XII

While the City insists that its Ordinance addresses only conduct, and its decisions were motivated only by conduct, the pleadings plausibly state otherwise.  The City is entitled to dismissal of a few of Plaintiffs' claims.  First, Plaintiffs' as-applied challenge is dismissed.  The letters sent to Plaintiffs explain that the decision to deny the vendor license was made because of Plaintiffs' conduct, not Plaintiffs' speech.   Second, Plaintiffs' overbreadth

challenge to the public accommodation's portion of the Ordinance is dismissed.  That portion of the City's Code addresses speech that identifies prohibited conduct.  Third, Plaintiffs' Equal Protection claim is dismissed.  Plaintiffs have not pled sufficient facts to show that similarly situated vendors were treated differently.  No other vendors excluded same-sex weddings from their property.  Finally, Plaintiffs' Home Rule City Act claim is dismissed. The City has not exercised its authority outside of its boundaries.

## ORDER

For the reasons provided in the accompanying Opinion, Defendant's motion to dismiss (ECF No. 13) is **GRANTED IN PART and DENIED IN PART.**

**IT IS SO ORDERED.**

Date:   November 16, 2017                                      /s/ Paul L. Maloney
                                                              Paul L. Maloney
                                                              United States District Judge