IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

COUNTRY MILL FARMS, LLC and
STEPHEN TENNES,

       Plaintiffs,                            Case No.  1:17-cv-00487-PLM-RSK

v.                                          HON. PAUL L. MALONEY

CITY OF EAST LANSING,

       Defendant.
_____

**BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**PROCEDURAL HISTORY**

The plaintiffs' Amended Complaint asserts nine causes of action. The City filed a motion to dismiss pursuant to Rule 12(b)(6). This Court granted the City of East Lansing's motion to dismiss in part and denied it in part:

> First, Plaintiffs' as-applied challenge is dismissed. The letters sent to Plaintiffs explain that the decision to deny the vendor license was made because of Plaintiffs' conduct, not Plaintiffs' speech. Second, Plaintiffs' overbreadth challenge to the public accommodation's portion of the Ordinance is dismissed. That portion of the City's Code addresses speech that identifies prohibited conduct. Third, Plaintiffs' Equal Protection claim is dismissed. Plaintiffs have not pled sufficient facts to show that similarly situated vendors were treated differently. No other vendors excluded same-sex weddings from their property. Finally, Plaintiffs' Home Rule City Act claim is dismissed. The City has not exercised its authority outside of its boundaries.

*Country Mill Farms, LLC v. City of E. Lansing,* 280 F. Supp. 3d 1029, 1056 (W.D. Mich. 2017).

At the same time, the Court granted the plaintiffs' motion for preliminary injunction, ordering the City to allow plaintiffs to participate in the East Lansing Farmers' Market. The

plaintiffs have participated as a vendor at the Farmers' Market for the 2017 and 2018 seasons.

The parties have engaged in discovery. The City now brings this motion for summary judgment on the plaintiffs' remaining claims.

## STANDARD OF REVIEW

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories and admissions, together with any affidavits, show there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c); *Payne v. Novartis Pharmaceuticals Corp.*, 767 F.3d 526, 530 (6th Cir. 2014). The burden is on the moving party to show that no genuine issue of material fact exists; however that burden may be discharged by pointing out the absence of evidence to support the nonmoving party's case. Fed. R. Civ. P. 56(c)(1); *Hollis v. Chestnut Bend Homeowners Ass'n*, 760 F.3d 531, 543 (6th Cir. 2014). The facts established by the record evidence, and the inferences drawn from them, must be viewed in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In resolving a motion for summary judgment, the court may not weigh the evidence and determine the truth of any matter. Rather, the court only determines if a genuine issue of fact exists for resolution at trial. *Anderson*, *Id.* at 249. The question is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-252.

## STATEMENT OF FACTS

### COUNTRY MILL FARMS. LLC

 Stephen Tennes is the sole member of Country Mill Farms, LLC. (Deposition of Stephen Tennes [Dep. Tennes], p. 5). (Cited portions of Stephen Tennes' deposition are attached as **Exhibit A**). Country Mill Farms is an agritourism business that grows food and provides a "farm experience" for patrons at its location. (Dep. Tennes, p. 8). Country Mill has been attending farmers' markets as a vendor for approximately ten years. (Dep. Tennes, p. 13). The revenue generated from sales at all farmers' markets is less than twenty five percent of the revenue generated by the business. (Dep. Tennes, p. 14). Country Mill uses its Facebook account to communicate with its customers and the public in general. (Dep. Tennes, p. 55).

### WEDDINGS AT COUNTRY MILL FARMS

 In addition to conducting an agritourism business, Country Mill Farms is available to be rented for wedding ceremonies on a seasonal basis, from May through November. (Dep. Tennes, p. 25). There are two different sites on the farm used for wedding ceremonies – the Orchard Barn site and the Winery Barn and Pond site. (Dep. Tennes, p. 41). The cost to rent the Orchard site is $3,000.00 on a Saturday and $2,000.00 on a Sunday or weekday; the cost to rent the Winery Barn and Pond site is $2,000.00. (*Id*.) (**Exhibit B**)

 The Complaint alleged Tennes "participates" in the weddings held at Country Mill, (Dep. Tennes, p. 24). However, that "participation" consists of planning the layout for the ceremony, setting up the site, mowing the grass, making signs and being prepared to move the ceremony indoors if the weather is unfavorable for an outdoor ceremony. (Dep. Tennes, p. 31). In other words, his "participation" consists of fulfilling his obligations as the owner

of a business premises that is rented out; he does not "participate" in the actual wedding ceremonies. Tennes is Roman Catholic (Dep. Tennes, p. 22), and believes marriage is a covenant between one man and one woman. (Dep. Tennes, p. 24). Tennes feels compelled by his Catholic faith to promote that image of marriage. (*Id*.). Tennes testified that "based on his religious beliefs, [he] can only promote, participate in, and facilitate weddings at Country Mill between one man and one woman." (Dep. Tennes, p. 31). Country Mill Farms does not allow or host same-sex weddings. (Dep. Tennes, p. 36).

## FARMERS' MARKET PARTICIPATION

Tennes testified that when participating in farmers' markets the vendor and the market enter into an agreement: "We pay, they give us a space." (Dep. Tennes, p. 48). Country Mill pays a fee to participate in all of the farmers' markets it attends. (Dep. Tennes, p. 49). Country Mill paid a fee to participate in the East Lansing Farmers' Market in 2017 and 2018. (Dep. Tennes, p. 50). Country Mill has been a vendor at the East Lansing Farmers' Market since about 2010 and has paid a fee to the City every year. (*Id*.)

## 2016 EAST LANSING FARMERS' MARKET

Heather Surface is the Community Events Coordinator for the City of East Lansing. (Deposition of Heather Surface [Dep. Surface], p. 7). (Cited portions of Heather Surface's deposition are attached as **Exhibit C**). The East Lansing Farmers' Market falls under her authority. (*Id*.) The Market is conducted at Valley Court in the City of East Lansing and has stalls for 24 vendors. (Dep. Surface, p. 15). Tim McCaffrey is her direct supervisor. (Dep. Surface, p. 41). Surface was contacted by another City employee, Amy Schlusler in the late August 2016 about Country Mill's participation at the Farmers' Market. (Dep. Surface, pp.

58, 61). Ms. Surface was on vacation at the time and contacted her supervisor, Tim McCaffrey about the situation. (*Id*.).

Timothy McCaffrey has been the Director of the City of East Lansing's Parks and Recreation Department since 1999, (Deposition of Timothy McCaffrey [Dep. McCaffrey], p. 9). (Cited portions of Timothy McCaffrey's deposition are attached as **Exhibit D**). Heather Surface reports to him. (Dep. McCaffrey, p. 11). McCaffrey gets involved with the Farmers' Market if Heather Surface contacts him about issues that arise. (*Id*.) McCaffrey reports to the City Manager; he does not report to the City Council. (Dep. McCaffrey, p. 13). McCaffrey first became aware of Country Mill's policy on weddings on August 25, 2016 (a Thursday) when a citizen contacted the City and inquired whether the policy violated the City's nondiscrimination ordinance. (Dep. McCaffrey, p. 21). Heather Surface forwarded McCaffrey an e-mail from Dr. Sara Dupuis. (Dep. McCaffrey, p. 23). (See also **Exhibits E and F**). The Dupuis e-mail states in part: "I have a concern regarding the Country Mills farm stand at the EL Farmer's market. Country Mills has recently provided a public statement disallowing gay marriages at their venue. . . . it would seem that were the City of East Lansing to continue to permit the participation of a vendor at the EL Farmer's Market that openly discriminates against the LGBT community thru its business model, such a position would appear to conflict with the City's own ordinance (Chapter 22 of the City Code) . . ." (**Exhibit E**). McCaffrey contacted Dr. Dupuis after he received her e-mail to discuss her concerns. (Dep. McCaffrey, p. 24).

McCaffrey then spoke to the City Manager George Lahanas about the situation. (Dep. McCaffrey, p. 25). Country Mill shortly thereafter published an announcement that they would not hold any weddings at all at the farm. (Dep. McCaffrey, p. 26). That announcement

was made on Country Mill's Facebook page on Friday [August 26, 2016]. (Dep. Tennes, p. 55). McCaffrey testified that after discussions with the City Manager, a decision was made to request that Country Mill not attend the market that weekend due to concerns about potential community reaction, but Country Mill would not be prohibited from attending. (Dep. McCaffrey, p. 26). McCaffrey sent an e-mail to the vendors at the Farmer's Market on Saturday, August 27, 2016, informing them protestors might be at the market on Sunday, August 28, 2016, and there would be an increased presence from the East Lansing Police Department. (Dep. McCaffrey, p. 35). The City had experienced "heated protests" the prior year at a folk festival and wanted to be prepared. (Deposition of George Lahanas [Dep. Lahanas], p. 36). (Cited portions of George Lahanas' deposition are attached as **Exhibit G**). Tennes testified the City requested Country Mill not attend the Farmers' Market session on August 28, 2016 due to the Country Mill policy regarding same-sex weddings. (Dep Tennes, pp. 52 – 53). No one instructed Country Mill it could not attend. (Dep. Tennes, p. 53). Country Mill did attend and continued to attend throughout the 2016 season. (Dep. Tennes, pp. 53 – 54). The City made no request to Country Mill not to attend the market after August 28, 2016. (Dep. Tennes, p. 61).

### DECEMBER 2016 FACEBOOK POST AND REVISIONS TO VENDOR GUIDELINES

Tennes decided Country Mill would again begin hosting weddings at the farm, but would not host same-sex weddings. (Dep. Tennes, pp. 59 – 62). In December 2016 the change in the business policy was communicated to patrons and the public through the Country Mill Facebook page. (Dep. Tennes, pp. 61 – 62). Tennes testified the business of Country Mill is conveyed to the public through the website and through the Facebook page. (Dep. Tennes, p. 64).  When asked whether the point of the website and Facebook page was

to make the public aware of Country Mill's business activities, Tennes answered: "Generally speaking. To communicate with the public, yes." (*Id*.)  Tennes agreed the December 2016 Facebook post was to announce to the public Country Mill would resume hosting weddings but only weddings between one man and one woman. (Dep. Tennes, p. 65).

Heather Surface testified the City first became aware of Country Mill's decision and Facebook post when a community member, Sarah Comstock, pasted the Country Mill post onto the Farmer's Market Facebook page. (Dep. Surface, p. 70). Surface testified she responded on the Facebook page by stating "Thank you for bringing this to our attention." (Dep. Surface, p. 71). Surface then shared the Facebook post from Ms. Comstock with Tim McCaffrey. (Dep. Surface, p. 72). McCaffrey testified after he became aware of the issue there was an internal discussion about the announced change in Country Mill's business practice and it was concluded the practice of not hosting same-sex marriages would be a violation of the City's ordinance. (Dep. McCaffrey, pp. 40 – 41). McCaffrey testified there had been discussions in January or February 2017 about updating the Farmers' Market Vendor Guidelines to ensure they incorporated the City's antidiscrimination ordinance. (Dep. McCaffrey, pp. 41 – 42). The 2017 Guidelines (**Exhibit H**), added a new Section 6(m) which required all vendors to comply with the City's Civil Rights ordinances and specifically the antidiscrimination ordinances in Chapter 22 of the East Lansing City Code. McCaffrey testified the City "wanted to ensure that we prevented a situation like happened with the misunderstanding with The Country Mill regarding our ordinance for now and into the future and that's why we clarified the guidelines." (Dep. McCaffrey, p. 43). McCaffrey testified he had discussion with the City Manager, with Heather Surface and received input from the City Attorney before the revisions were made. (Dep. McCaffrey, pp.

43 – 44). The actual language of Section 6(m) was drafted in conjunction with the City Attorney. (Dep. McCaffrey, p. 48). McCaffrey spoke to the City Manager about the revisions and was told whatever language the City Attorney wanted should be the language used. (Dep. McCaffrey, p. 49); (Dep. Lahanas, pp. 58 – 59). The City Manager testified the changes to the Vendor Guidelines were consistent with the City's requirements for all of its vendors and contractors in terms of nondiscrimination policies. (Dep. Lahanas, pp. 61 – 66).

Heather Surface was also involved in the revisions to the Vendor Guidelines. (Dep. Surface, p. 77).  Surface testified the language in Section 6(m) was added because "[w]e realized that the guidelines did not hold the farmer's market vendors to the same standards that the people who contract with the City are held to per ordinance. Chapter 22 of the civil rights ordinance." (Dep. Surface, p. 77). Surface testified she and McCaffrey reviewed the guidelines and consulted with the City Attorney. As a result of those discussions the guidelines were revised. (Dep. Surface, p. 78). Surface testified the Country Mill situation was the catalyst for reviewing the Guidelines. (Dep. Surface, pp. 78 – 79). The actual language for Section 6(m) came from discussions with the City Attorney. (Dep. Surface, p. 79).

## COUNTRY MILL'S 2017 FARMER'S MARKET APPLICATION

When the City became aware of Country Mill's decision to hold weddings again, but not same-sex weddings, McCaffrey had conversations with the City Manager, the City Attorney and Heather Surface and a decision was made that Country Mill would not receive an automatic invitation to participate in the 2017 Farmer's Market as a vendor, but could apply to be a vendor. (Dep. McCaffrey, pp. 51 – 53). Surface testified Country Mill did not receive an automatic invitation but did receive a postcard from the City inviting them to

apply. (Dep. Surface, p. 81). Surface has notes from a meeting with the Farmers' Market Committee in January 2017 that state refer to Country Mill and state in part: "Can't invite. Is welcome to apply but it would be a discussion for lawyer." (*Id*.)

Country Mill did in fact apply to vend for the 2017 season. (*Id*.) When Surface received the application from Country Mill she went to McCaffrey and asked him how to proceed. He said he would take the issue to the City Attorney. (Dep Surface, p. 82). When Surface brought the Country Mill application to McCaffrey he testified it appeared Country Mill was in violation of the City's antidiscrimination ordinance based on their announced change in the business policy related to weddings. If they were in violation they might not be invited to participate in the 2017 market. (Dep. McCaffrey, p. 54). As a result, Heather Surface sent a letter to Country Mill dated March 7, 2017 (**Exhibit I**), stating in part that Country Mill's general business practices did not comply with the City's ordinances and Vendor Guidelines and as a result Country Mill would was prohibited from being a vendor. The letter further stated if the City misinterpreted or misunderstood Country Mill's business practices "we are certainly willing to discuss the Country Mill's participation in the City of East Lansing's Farmer's Market." (*Id*.); (Dep. Surface, p. 86). The letter was written after consultation with the City Attorney. (Dep. Surface, pp. 86 – 87). ) In response to the March 7, 2017 letter, Tennes sent an e-mail to Surface dated March 13, 2017. (Dep. Surface, p. 95); (**Exhibit J**). The e-mail asked for clarification on why Country Mill was prohibited from participating in the Market. (*Id*.) In response to that e-mail Surface sent another letter to Tennes dated March 15, 2017, explaining Country Mill's business practice of not allowing same-sex weddings constituted a violation of the City's antidiscrimination ordinances. (Dep. Surface, p. 100); (**Exhibit K**). Included with the letter were copies of the

Facebook post announcing Country Mill's business practice, the 2017 Vendor Guidelines and the Civil Rights Ordinance. (*Id.*)

Plaintiffs filed this litigation after being informed they would not be permitted to be a vendor for the 2017 East Lansing Farmers' Market.

Further facts, where necessary, will be included in the Argument portion of this Brief.

## SUMMARY OF ARGUMENT

"Our society has come to the recognition that gay persons and gay couples cannot be treated as social outcasts or as inferior in dignity and worth. For that reason the laws and the Constitution can, and in some instances must, protect them in the exercise of their civil rights. The exercise of their freedom on terms equal to others must be given great weight and respect by the courts." *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719, 1727 (2018). "When it comes to weddings, it can be assumed that a member of the clergy who objects to gay marriage on moral and religious grounds could not be compelled to perform the ceremony without denial of his or her right to the free exercise of religion. . . . Yet if that exception were not confined, then a long list of persons who provide goods and services for marriages and weddings might refuse to do so for gay persons, thus resulting in a community-wide stigma inconsistent with the history and dynamics of civil rights laws that ensure equal access to goods, services, and public accommodations." *Id.*

The question at the heart of this case that must be answered is this: can a commercial enterprise open to the public avoid the effects of a facially neutral, generally applicable antidiscrimination ordinance on the basis that complying with the ordinance would offend the owner's sincerely held religious beliefs?  Whether this question is

analyzed as a free speech claim, a free exercise claim, an establishment clause claim, an unconstitutional conditions claim or a due process claim, the result is the same: Supreme Court precedent does not allow the plaintiffs to succeed in this litigation. The Constitution does not require the City of East Lansing to engage in a business relationship with a commercial enterprise that refuses to provide its services to members of a class of persons the City has chosen to protect in its antidiscrimination ordinance. The plaintiffs are free to say and believe whatever they choose. The City has no interest in dictating the plaintiffs' beliefs or in censoring their speech. However, once that commercial enterprise has announced that it will not serve a particular class of people – essentially posting a sign stating "No Gay Couples Allowed" – the City is not constitutionally required to do business with it.

## ARGUMENT

### I.   THE CITY OF EAST LANSING IS ENTITLED TO SUMMARY JUDGMENT ON THE PLAINTIFFS' FREE SPEECH AND FREE PRESS CLAIMS.

#### A.  Facial Challenge and Overbreadth.

The plaintiffs brought a facial challenge alleging the Ordinance is unconstitutional on its face because it regulates speech based on content. "In their complaint, Plaintiffs point to the declaration of public policy, Code § 22–31, and also the prohibited practices portion of the public accommodations provision, Code § 22–35(b)(2). (Compl. ¶ 238.) In their response to the motion, Plaintiffs also point to the harassment provision, Code 22–32, as an example of content-based regulation of speech." *Country Mill Farms, LLC*, 280 F. Supp. 3d at 1045. The plaintiffs also "identify three provisions that are overbroad: (1) the general business practice language in the Vendor Guidelines (Compl. ¶¶ 252–254), (2) the

harassment portions of the Ordinance (*id.* ¶¶ 255–58), and (3) the public accommodations portion of the Ordinance (*id.* ¶¶ 259–60)." *Id.*

The City of East Lansing amended the ordinance at its January 22, 2019 Council meeting.

(http://eastlansing.granicus.com/GeneratedAgendaViewer.php?view_id=2&clip_id=1091

Item #25 and **Exhibit L**). The amendments define General Business Practice as:

> General business practice means the typical, standard or usual manner in which a person or entity performs or habitually engages in the operation of a particular aspect ot its business, or the customary action a person or entity takes in the operation of its business.

The amendments also amended the definition of "harass" to clarify that harassment under the ordinance means conduct or communication that has the purpose or effect of denying or substantially interfering with a person's protected civil rights. Finally, the amendments revised Sec. 22-35. The only "communications" prohibited under the ordinance are those that convey that persons within a protected class will be denied a public accommodation. The amended ordinance, therefore, does not regulate speech based on content or viewpoint. The ordinance is not overly broad as its application would not be unconstitutional in relation to its plainly legitimate sweep. *United States v. Stevens*, 559 U.S. 460 (2010). Plaintiffs' challenges must therefore be dismissed as moot. *Fialka-Feldman v. Oakland Univ. Bd. of Trustees*, 639 F.3d 711, 713 (6th Cir. 2011).

### B.  Retaliation.

The Court denied the City's motion to dismiss the retaliation claim, ruling the plaintiffs had pled a plausible claim of First Amendment retaliation. *Country Mill Farms, LLC*, 280 F. Supp. 3d at 1048. The record does not support a claim of retaliation.

The Court previously enunciated the standard for a First Amendment retaliation claim.

> For a claim for retaliation in violation of the First Amendment, a plaintiff must show he or she (1) was engaged in a constitutionally protected activity, (2) the defendant's adverse action caused the plaintiff an injury that would deter or chill a person of ordinary firmness from continuing to engage in that activity, and (3) a causal connection such that the adverse action was motivated at least in part as a response to the exercise of the plaintiff's constitutional rights. *Jenkins v. Rock Hill Local Sch. Dist.*, 513 F.3d 580, 586–87 (6th Cir. 2008); *Thaddeus–X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999). Courts consider the totality of the circumstances, including temporal proximity between the protected conduct and the adverse action, when determining whether to draw an inference of a retaliatory motive. *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 401 (6th Cir. 2010). If the plaintiff can establish a prima facie case, the burden shifts to the defendant to show that it would have taken the same action the absence of the protected activity. *Thaddeus–X*, 175 F.3d at 399. If the defendant can establish that it would have acted in the same manner, the defendant would prevail on a motion for summary judgment. *Id.*

*Country Mill Farms, LLC*, 280 F. Supp. 3d at 1048.

The initial question is whether the plaintiffs engaged in protected activity. Plaintiffs allege the December 2016 Facebook post constituted protected action. However, the Court has already rejected this claim in dismissing the plaintiffs' as-applied First Amendment challenge:

> The City's reaction to Tennes's December 2016 Facebook post will not support an as-applied challenge. The City did not use its Ordinance or its Vendor Guidelines to regulate Plaintiffs' speech. The City denied Plaintiffs' vendor application because of Plaintiffs' conduct. . . . Plaintiffs' reasoning, that they were 'expelled' from the farmer's market because of their speech, is similar to the argument rejected in *Rumsfeld*. **Under *Rumsfeld*, writing about a prohibited general business practice on Facebook does not transform that conduct into protected speech.**

*Country Mill Farms, LLC*, 280 F. Supp. 3d at, 1044–1045. (Emphasis added). That reasoning applies to the August 2016 Facebook post as well as the December 2016 post. This is no different from plaintiffs posting a sign stating "No Gay Couples Allowed."

13

The Supreme Court has repeatedly made clear that such activity is not protected. *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490 (1949), held Missouri could apply its antitrade restraint law to labor union activities and could enjoin union members from peaceful picketing carried on as an essential and inseparable part of a course of conduct which is in violation of the state law. In rejecting a claim Missouri's actions violated the First Amendment – similar to the claim plaintiffs assert in this case – the Supreme Court held: "But it has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal **merely because the conduct was in part initiated, evidenced, or carried out by means of language**, either spoken, written, or printed." *Id*. at 502 (Emphasis added).

The Supreme Court has consistently followed this holding. *Cox v. State of Louisana*, 379 U.S. 536, 555 (1965); *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447 (1978). As this Court recognized, the Supreme Court reiterated these holdings in *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47 (2006), with language directly applicable to this case: "Congress, for example, can prohibit employers from discriminating in hiring on the basis of race. **The fact that this will require an employer to take down a sign reading 'White Applicants Only' hardly means that the law should be analyzed as one regulating the employer's speech rather than conduct**." *Id*. at 62 (Emphasis added).

Most recently in *Expressions Hair Design v. Schneiderman*, 137 S. Ct. 1144, 1150–1151 (2017), the Supreme Court again explained:

> But § 518 is not like a typical price regulation. Such a regulation—for example, a law requiring all New York delis to charge $10 for their sandwiches—would simply regulate the amount that a store could collect. In other words, it would regulate the sandwich seller's conduct. To be sure, in order to actually collect that money, a store would likely have to put "$10" on its menus or have its employees tell customers that price. **Those written or**

14

> **oral communications would be speech, and the law—by determining the amount charged—would indirectly dictate the content of that speech. But the law's effect on speech would be only incidental to its primary effect on conduct**, and "it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.,* 547 U.S. 47, 62, 126 S.Ct. 1297, 164 L.Ed.2d 156 (2006) (quoting *Giboney v. Empire Storage & Ice Co.,* 336 U.S. 490, 502, 69 S.Ct. 684, 93 L.Ed. 834 (1949); internal quotation marks omitted); see also *Sorrell v. IMS Health Inc.,* 564 U.S. 552, 567, 131 S.Ct. 2653, 180 L.Ed.2d 544 (2011).

*Id.* at 1150-1151(Emphasis added). See also, *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011). The irrefutable conclusion that must be reached is that plaintiffs' retaliation claim under the Free Speech Clause fails as the plaintiffs did not engage in protected activity. When a business establishes a policy of discrimination the fact that communicative conduct ("speech") is used as a means of carrying out that conduct is both inescapable and constitutionally irrelevant.

In this case Tennes testified Country Mill uses its Facebook page to convey to customers and potential customers what its business is, and what its business practices are. (Dep. Tennes, pp. 61 – 62, 64, 65). "Posting language on a website telling potential customers that a business will discriminate based on sexual orientation is part of the act of sexual orientation discrimination itself; as conduct carried out through language, this act is not protected by the First Amendment." *Telescope Media Group v. Lindsey*, 271 F. Supp. 3d 1090, 1112 (D. Minn. 2017), citing *Rumsfeld, supra* and *Giboney, supra*. Plaintiffs have failed to meet the first element of a retaliation claim as they did not engage in constitutionally protected conduct. As the Supreme Court precedent repeatedly demonstrates, the First Amendment does not exempt discriminatory conduct from scrutiny because the actor communicates what its actions will be. If that were so, every discriminator could avoid

antidiscrimination laws by simply announcing it will engage in discrimination. The plaintiffs' act of communicating their business decision to refuse to host same-sex weddings ("No Gay Couples Allowed") is constitutionally no different than the "White Applicants Only" sign. It is simply not protected by the Free Speech Clause of the First Amendment.[1]

## II.   THE CITY OF EAST LANSING IS ENTITLED TO SUMMARY JUDGMENT ON THE PLAINTIFF'S FREE EXERCISE CLAIM.

In denying the City's motion to dismiss the Court ruled: "Plaintiffs have pleaded facts to support a claim that the City enacted a generally applicable and neutral policy, which was then used to target Plaintiffs' religiously-motivated conduct. The Ordinance did not apply to Plaintiffs in 2016. After the City learned that Plaintiffs would not hold same-sex weddings on their farms because of Plaintiffs' religious beliefs, the City amended the Vendor Guidelines to incorporate the neutral and generally applicable law and applied it to Plaintiffs. As pled, the City's action is a 'veiled cover for targeting belief or a faith-based practice.'" *Country Mill Farms, LLC supra*, 280 F. Supp. 3d at 1050. The record established in this case does not support the plaintiff's Free Exercise claim, nor does it create a factual dispute allowing plaintiffs to avoid summary judgment.

An analysis of a Free Exercise claim is controlled primarily by two Supreme Court cases: *Employment Division, Department of Human Resources of Oregon v. Smith,* 494 U.S. 872 (1990) and *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520 (1993). *Smith* and *Lukumi* reflect the opposite ends the Free Exercise spectrum. In *Smith*, the

---

[1] As it did in its Motion to Dismiss, the City contends the plaintiff's Free Press claim is subsumed by its Free Speech claim. ". . . the Press Clause has largely been subsumed into the Speech Clause. *McConnell v. Fed. Election Comm'n*, 251 F. Supp. 2d 176, 235 (D.D.C.), *judgment entered*, 251 F. Supp. 2d 948 (D.D.C. 2003), *aff'd in part, rev'd in part*, 540 U.S. 93 (2003).

Supreme Court upheld denial of unemployment benefits to two members of a Native American tribe found guilty of using a proscribed drug, peyote, even when they used the substance for sacramental purposes. "[Our] decisions have consistently held that the right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'" *Smith*, at 879.

Conversely, *Lukumi* held that a law is not neutral if the law's objective is to infringe upon or restrict certain conduct because of its religious motivation, or if the purpose of the law is the suppression of religion or religious conduct. *Lukumi*, 508 U.S. at 533. In order to meet this standard the challenger must prove the laws were "'enacted because of, not merely in spite of their suppression [of religion].' *Lukumi*, 508 U.S. at 541. The Sixth Circuit described the test as follows: "A law is not neutral 'if the object of [the] law is to infringe upon or restrict practices **because of their religious motivation**,' or **if 'the purpose of [the] law** is the suppression of religion or religious conduct.' *Lukumi*, 508 U.S. at 533, 113 S.Ct. 2217." *New Doe Child #1 v. Cong. of United States*, 891 F.3d 578, 591 (6th Cir. 2018). (Emphasis added; footnote omitted).

Factors relevant to the assessment of neutrality, in addition to the plain language of the enactment, "include 'the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decision-making body.'" *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719, 1731 (2018). The general applicability requirement prohibits the government from "in a selective manner impos[ing] burdens only on conduct motivated by

religious belief." *Lukumi,* 508 U.S. at 543. It "protect[s] religious observers against unequal treatment, and inequality [that] results when a legislature decides that the governmental interests it seeks to advance are worthy of being pursued only against conduct with a religious motivation." *Id.* at 542–543. A law is not generally applicable if it is substantially under inclusive because it regulates religious conduct while failing to regulate secular conduct that is at least as harmful to the legitimate government interests purportedly justifying it. *Id.* at 535–538. "At some point, an exception-ridden policy takes on the appearance and reality of a system of individualized exemptions, the antithesis of a neutral and generally applicable policy and just the kind of state action that must run the gauntlet of strict scrutiny. *See Smith,* 494 U.S. at 884; *Lukumi Babalu,* 508 U.S. at 537. A double standard is not a neutral standard." *Ward v. Polite*, 667 F.3d 727, 740 (6th Cir. 2012). However, as the Supreme Court has clearly stated: "When followers of a particular sect enter into commercial activity as a matter of choice, the limits they accept on their own conduct as a matter of conscience and faith are not to be superimposed on the statutory schemes which are binding on others in that activity." *United States v. Lee*, 455 U.S. 252, 261 (1982).

With these standards in mind, a review of the record evidence demonstrates the City of East Lansing is entitled to summary judgment. There is simply no evidence the City's objective in revising the Guidelines was to restrict plaintiffs' conduct **because of** its religious motivation or to suppress religion or religious conduct. First, the language of the Ordinances and the Vendor Guidelines on their face are neutral and generally applicable. Historically, the City of East Lansing has recognized sexual orientation as a protected class in its antidiscrimination ordinances for over forty years. (Dep. Lahanas, pp. 104 – 105).

While it is true the Vendor Guidelines did not explicitly incorporate the antidiscrimination ordinances in 2016, it is not true the antidiscrimination ordinances did not apply to plaintiffs (or any other vendor at the Market) in 2016. The complaint by Dr. Dupuis in 2016 was based on plaintiffs' refusal to allow same-sex couples to rent their business for a wedding ceremony. (Dep. McCaffrey, pp. 21 – 23; Exhibits E and F). The Dupuis e-mail states in part: ". . . it would seem that were the City of East Lansing to continue to permit the participation of a vendor at the EL Farmer's Market that openly discriminates against the LGBT community thru its business model, such a position would appear to conflict with the City's own ordinance (Chapter 22 of the City Code) . . ." (**Exhibit E**). McCaffrey then spoke to the City Manager George Lahanas about the situation. (Dep. McCaffrey, p. 25). Country Mill shortly thereafter published an announcement that they would not hold any weddings at all at the farm. (Dep. McCaffrey, p. 26). McCaffrey testified he believed there was an agreement reached with Country Mill that they could continue to vend at the Market in 2016 "because they would not be in violation of the City's ordinance at that point." (Dep. McCaffrey, pp. 40 – 41).

In December 2016 Country Mill posted on its commercial Facebook page that it would again start renting out its premises for weddings, but would not allow same-sex weddings. (Dep. Tennes, pp. 61 – 62). Heather Surface testified the City first became aware of Country Mill's decision and Facebook post when a community member, Sarah Comstock, pasted the Country Mill post onto the Farmer's Market Facebook page. (Dep. Surface, p. 70). Surface then shared the Facebook post from Ms. Comstock with Tim McCaffrey. (Dep. Surface, p. 72). McCaffrey testified after he became aware of the issue there was an internal discussion about the announced change in Country Mill's business practice and it was

concluded the practice of not hosting same-sex marriages would be a violation of the City's ordinance. (Dep. McCaffrey, pp. 40 – 41). McCaffrey testified there had been discussions in January or February 2017 about updating the Farmers' Market Vendor Guidelines to ensure they incorporated the City's antidiscrimination ordinance. (Dep. McCaffrey, pp. 41 – 42). McCaffrey testified the changes were made because "[w]e wanted to ensure that we prevented a situation like happened with the misunderstanding with The Country Mill regarding our ordinance for now and into the future and that's why we clarified the guidelines." (Dep. McCaffrey, p. 43). The City Manager testified the changes to the Vendor Guidelines were consistent with the City's requirements for all of its vendors and contractors in terms of nondiscrimination policies. (Dep. Lahanas, pp. 61 – 66).

Heather Surface was also involved in the revisions to the Vendor Guidelines. (Dep. Surface, p. 77). Surface testified the language in Section 6(m) was added because "[w]e realized that the guidelines did not hold the farmer's market vendors to the same standards that the people who contract with the City are held to per ordinance. Chapter 22 of the civil rights ordinance." (Dep. Surface, p. 77). Surface testified she and McCaffrey reviewed the guidelines and consulted with the City Attorney. As a result of those discussions the guidelines were revised. (Dep. Surface, p. 78). Surface testified the Country Mill situation was the catalyst for reviewing the Guidelines. (Dep. Surface, pp. 78 – 79).

That the Country Mill situation was the catalyst for revisions to the Vendor Guidelines is not surprising because until the Country Mill situation arose, there had not been a situation where a vendor was violating, or had been accused of violating, the antidiscrimination ordinances. (Dep. Lahanas, p. 77; Dep. Surface, p. 41; Dep. McCaffrey, pp. 47 – 48). In the absence of a claim or evidence of discriminatory conduct, there would have

been no reason to review the Guidelines. In and of itself a revision to the policies is not evidence of discrimination. Rather, it is the plaintiffs' burden to establish evidence of religious animus based on a specific series of events leading to the official policy in question. *Masterpiece Cakeshop, supra*.

The "series of events" and administrative history leading to revision of the Guidelines was the City becoming aware the Guidelines did not explicitly incorporate the antidiscrimination ordinances and revising them to make the Guidelines consistent with the City's treatment of other vendors. As the City Manager testified:

> It [the civil rights ordinance]provides all of the civil rights protections that you'd expect to see, age, weight, disability, national origin, ethnicity, and also because we're the City of East Lansing we have the right as a city to provide other protected categories. We protect sexual orientation, we protect student status as well, being significant differences from the state, for instance. We also have an ordinance more specifically -- that's the general ones, saying you can't discriminate based on someone's sexual orientation. We also have an ordinance that says if we're contracting with you, if you're a vendor of ours, that you -- and the price I think is over a $20,000 vending purchase, that you must in all of your employment practices not discriminate based on someone's sexual orientation, in particular to the provision of benefits.

(Dep. Lahanas, p. 62). Finally, there are no contemporaneous statements from the decision-makers evidencing any religious animus. The decision-makers in the situation were members of the City's administration – specifically the Community Events Coordinator Heather Surface, the Director of the Parks and Recreation Department Tim McCaffrey and the City Manager George Lahanas in consultation with the City Attorney. (Dep. McCaffrey, pp. 43 – 44; Dep. Lahanas, pp. 58 – 59). There are no contemporaneous statements from any of these individuals that reflect any religious animus or intent to revise the Guidelines in order to suppress religion or religious conduct.  Heather Surface testified at her deposition:

**Q** I'm wondering what it is that you think about Steve Tennes's religious beliefs?

**A** I don't think that's my right to say. I don't have an opinion on his religious beliefs.

**Q** You don't have any opinion on his religious beliefs. Do you have any opinion about how he practices those beliefs?

**A** I think that everybody interprets the Bible in a different way and it is their right. (Dep. Surface, p. 147).

Tim McCaffrey testified at his deposition:

**Q** Okay. So what do you think about Steve Tennes's religious beliefs?

**A** I don't think about Steve Tennes's religious beliefs. I mean, that's his business. That's what he wants to do. I mean, whatever his religious beliefs are are his religious beliefs.

**Q** How do you -- what do you think about how he practices those on his farm?

**A** Its not -- it's none of my responsibility to think about that or determine how he practices what he does on his farm. (Dep. McCaffrey, p. 89).

City Manager George Lahanas testified:

**Q** No. Well, except that that's the -- that's the City's understanding of what happened in this case, correct, that was Steve -- just help me understand the City's position again on what the objection is to what Steve Tennes or Country Mill did.

**A** Yeah. So the issue isn't what he said, the issue isn't his beliefs, because you can't control someone's beliefs, wishes, or what they say. They can say whatever they want. Free speech. The issue is he has a barn venue that he opens for people to get married and he will rent it to opposite-sex couples to get married but he will not rent it to same-sex couples. So his venue is not available for same-sex couples, and to me that's the discrimination and that's

22

the business practice that we are most concerned with and that's the one that got him excluded from the farmer's market. And even still, if he said what he was saying, that's fine. If he goes back to the other business practice and doesn't have that business practice we would have no problem with him coming back to the market and, in fact, we did back in that August. He still -- his pronouncement that he's against gay marriage in some way, that didn't matter.

The City Manager, George Lahanas, gave further testimony about the basis for the City's actions in this case:

Q No. Well, except that that's the -- that's the City's understanding of what happened in this case, correct, that it was Steve -- just help me understand the City's position again on what the objection is to what Steve Tennes or Country Mill did.

**A Yeah. So the issue isn't what he said, the issue isn't his beliefs, because you can't control someone's beliefs, wishes, or what they say. They can say whatever they want. Free speech. The issue is he has a barn venue that he opens for people to get married and he will rent it to opposite-sex couples to get married but he will not rent it to same-sex couples. So his venue is not available for same-sex couples, and to me that's the discrimination and that's the business practice that we are most concerned with and that's the one that got him excluded from the farmer's market.** And even still, if he said what he was saying, that's fine. If he goes back to the other business practice and doesn't have that business practice we would have no problem with him coming back to the market and, in fact, we did back in that August. **He still -- his pronouncement that he's against gay marriage in some way, that didn't matter.** What mattered was that he was stopping all weddings so there wasn't going to be discrimination. So, yes, that's an accurate statement of the whole issue.

Q So you understand that Steve has a religious belief and because of that religious belief he cannot participate in a same-sex ceremony. Does -- how does the City deal with that?

**A If he was a priest and this was a religious -- like they were a religious entity like a church then I would see it differently if he says I'm not going to perform a marriage ceremony.** But he's an orchard renting a

barn, so I don't see him participating in anything. I see him opening a barn for rental and saying -- I mean, you could -- to me it's no different from saying I'm going to exclude Africans because I don't think African Americans by my view of the Bible are equal to me. You could say something that objectionable, and if someone based it on religious beliefs it wouldn't matter to me. It's still unlawful discrimination, and that's the issue for us. **It's not his religious belief. He can think whatever he wants, free religion, and he can say it, free speech. But once he discriminates and doesn't allow people to have the same accommodation it's no different than if he said to gay people you can't buy apples at my -- which I have no reason to think he did, but you can't buy apples at my farm. It's the same thing.** He rents a barn, so saying he participates in the wedding I don't even -- I don't know what that means. I understand that this is like renting a hall. Renting like a Legion hall or, you know -- it's a barn. So I don't know what -- I don't know what means, his religious belief that he participates. I see this as renting a hall and no different.

(Dep. Lahanas, pp. 108 – 110) (Emphasis added). He succinctly summarized the City's position and rationale:

Q Well, you understand that there are circumstances where a business owner in the course of their business they have to make business decisions to be aligned with their religious beliefs. So if that comes in conflict with a City ordinance how does the City propose that the business owner deal with that?

**A Yeah. Well, it's the same thing for us, we're a business. It's like we're a business, and our ordinance says you can't discriminate against someone based on their sexual orientation and if you do that you can't do business with us. So I don't have any reason to doubt he's doing what he thinks is right or -- but that's not my issue. My issue is he's discriminating against people that we particularly and specifically protect, and he can't do that and come and do business with us.**

(Dep. Lahanas, pp. 110 – 111). Under the framework established by *Lukumi*, the City's policy is neutral and generally applicable. The contrast between the facts of this case and cases where regulations have been struck down are stark. The City did not target a specific action that was unique to a particular religion as was the case in *Lukumi* and *Central*

*Rabbinical Cong. of U.S. & Canada v. New York City Dep't of Health & Mental Hygiene*, 763 F.3d 183, 193–194 (2d Cir. 2014). This case is also completely dissimilar from *Ward v. Polite*, 667 F.3d 727 (6th Cir. 2012), where the Sixth Circuit held questions of fact existed as to whether Eastern Michigan University's decision to expel a student violated the Free Exercise Clause. The court relied primarily on inconsistent application of University policies and particularly focused on comments made by members of the review board that expelled plaintiff. One of the members "offered her 'professional opinion' that [plaintiff] was 'selectively using her religious beliefs in order to rationalize her discrimination against one group of people' because [plaintiff] said that she could 'set aside her religious values' and counsel clients about things such as 'abortion, child abuse, and murder' but 'could not set aside her religious values in order to effectively counsel non-heterosexual clients.' [Record citation omitted]. This line of inquiry suggests a distinction between secular values and spiritual ones, with a preference for the former over the latter." Id. at 737. These are the same type of comments the Supreme Court found improper in the *Masterpiece Cakeshop* case. Here, in contrast, there are no such comments and no such actions. The City has never questioned the basis or sincerity of Tennes' beliefs nor has any comment been made that could even remotely be considered to demonstrate religious animus. The City simply announced the same antidiscrimination policy would apply to the Farmers' Market vendors as had long applied to other vendors.

The City's decision was neutral and generally applicable and is subject to rational basis review. *American Atheists, Inc. v. City Of Detroit Downtown Dev. Auth.*, 567 F.3d 278, 302 (6th Cir. 2009). The City's decision to revise the Guidelines and exclude plaintiffs from the Market readily satisfies rational basis review. Refusing to enter into a business

relationship with an entity that discriminates against a class of persons the City has chosen to protect from discrimination is essential to accomplishing the goal of ending discrimination. Antidiscrimination laws provide "protections against exclusion from an almost limitless number of transactions and endeavors that constitute ordinary civic life in a free society." *Romer v. Evans*, 517 U.S. 620, 631 (1996). The Supreme Court recognized "that 'no action is more contrary to the spirit of our democracy and Constitution—or more rightfully resented by a Negro citizen who seeks only equal treatment—than the barring of that citizen from restaurants, hotels, theatres, recreational areas and other public accommodations and facilities.'" *Daniel v. Paul*, 395 U.S. 298, 306 (1969)(quoting President Kennedy's Special Message to the Congress on Civil Rights and Job Opportunities, June 19, 1963). This applies with equal force to the member of any class of persons who have suffered historical discrimination. Thus, prohibiting discrimination against a protected class is rationally related to a legitimate state interest. *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 571-572 (1995)(Banning sexual orientation discrimination is "well within the State's usual power to enact [if] a legislature has reason to believe . . . that [the] group is the target of discrimination.")

Moreover, the City submits that its actions in this case would survive strict scrutiny even if the Court were to employ that standard of review. Antidiscrimination laws serve a compelling governmental interest. "As we have explained, acts of invidious discrimination in the distribution of publicly available goods, services, and other advantages cause unique evils that government has a compelling interest to prevent—wholly apart from the point of view such conduct may transmit. Accordingly, like violence or other types of potentially expressive activities that produce special harms distinct from their communicative impact,

such practices are entitled to no constitutional protection." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 628 (1984). *Bd. of Directors of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 549 (1987)(recognizing "the State's compelling interest in eliminating discrimination against women.")

Anti-discrimination laws are also narrowly tailored to achieve the government's interest. "In prohibiting such practices, the Minnesota Act therefore 'responds precisely to the substantive problem which legitimately concerns' the State and abridges no more speech or associational freedom than is necessary to accomplish that purpose." *Roberts, supra,* 468 U.S. at 628 – 629. Finally, the City's actions were the least restrictive means available to advance that interest. Simply put, there are no gradations with respect to discrimination – either it is allowed or it is prohibited. If it is, enforcement is the least restrictive means available to accomplish the interest. "Ohio has an interest in preventing minors from potentially harmful materials and, as the statute applies only to personally directed communication between an adult and a person that the adult knows or should know is a minor, the statute is the least restrictive means of promoting this interest." *American Booksellers Found. for Free Expression v. Strickland*, 601 F.3d 622, 628 (6th Cir. 2010). The same is true in this case. East Lansing has a compelling interest in preventing discrimination against groups it has chosen to protect. The only effective way it can promote its interest in this situation is by refusing to enter into a business relationship with the offending entity. If plaintiffs' business were located in the City limits other options might be available to the City. However, when the plaintiffs' only tie to the City is when it rents a stall and sells its goods at the Farmers' Market, the only way the City can enforce its policy is to refuse to continue that business relationship.

III.   **THE CITY OF EAST LANSING IS ENTITLED TO SUMMARY JUDGMENT ON THE PLAINTIFF'S FIRST AMENDMENT ESTABLISHMENT CLAUSE CLAIM.**

In denying the City's motion to dismiss the Establishment Clause claim the Court ruled: "The facts in the complaint allow the Court to infer that the predominant purpose of the changes to the Vendor Guidelines was motivated by the disapproval of Plaintiffs' religious beliefs. Specifically, the changes to the Vendor Guidelines were intended to target Plaintiffs' religiously-motivated choices." *Country Mill, supra*, 280 F. Supp. 3d at 1051 – 1052. The record does not support the plaintiffs' Establishment Clause claim and the City is entitled to summary judgment.

The Court has set out the test for an Establishment Clause claim in ruling on the motion to dismiss, *Id.* at 1051, and the City will not repeat it here The record evidence does not support the plaintiffs' claim that the predominant purpose of the City's actions was motivated by the disapproval of plaintiffs' religious beliefs. As discussed at length in the preceding Free Exercise Clause argument, there is not a shred of evidence the City was motivated in any way by the plaintiffs' religious beliefs. The record establishes the City was motivated by the plaintiffs' act of refusing to serve same-sex couples at its wedding site business. Without restating the citations to the record contained in the Free Exercise argument, that evidence also demonstrates the City did not target the plaintiffs' religiously motivated choices. The City responded to the plaintiffs' actions.

The plaintiffs cannot immunize themselves from antidiscrimination laws by announcing their discriminatory actions were **motivated** by religious beliefs. The Supreme Court called "patently frivolous" the contention that the Civil Rights Act "was invalid because it 'contravenes the will of God' and constitutes an interference with the 'free

exercise of the Defendant's religion.'" *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 403, n. 5, (1968).

Moreover, adopting the plaintiffs' position that their religious beliefs immunize them from the City's antidiscrimination laws would itself violate the Establishment Clause. "The principle that government may accommodate the free exercise of religion does not supersede the fundamental limitations imposed by the Establishment Clause." *Lee v. Weisman*, 505 U.S. 577, 587 (1992). *Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703, 703 (1985), held a Connecticut statute violated the Establishment Clause by providing Sabbath observers with an absolute and unqualified right not to work on their chosen Sabbath.

> This unyielding weighting in favor of Sabbath observers over all other interests contravenes a fundamental principle of the Religion Clauses, so well articulated by Judge Learned Hand:
>
>> "The First Amendment ... gives no one the right to insist that in pursuit of their own interests others must conform their conduct to his own religious necessities." *Otten v. Baltimore & Ohio R. Co.,* 205 F.2d 58, 61 (CA2 1953).
>
> As such, the statute goes beyond having an incidental or remote effect of advancing religion.

*Id.* at 710. Allowing a religious exemption to a neutral and generally applicable antidiscrimination policy would adversely affect those who would otherwise be protected by the policy and would constitute favoring the religious beliefs of one person (or group) over others. The Constitution does not permit that result. The City is entitled to summary judgment on the plaintiffs' Establishment Clause claim.[2]

---

[2] For the same reasons, the plaintiffs' Michigan Constitution claims must be dismissed as the standards are the same as the standards to decide the federal constitutional claims. *People v. DeJonge (After Remand)*, 442 Mich. 266, 273 n. 9, 501 N.W.2d 127 (1993). *Cf*, *Winkler by Winkler v. Marist Fathers of Detroit, Inc.*, 500 Mich. 327, 343, 901 N.W.2d 566, 576 (2017)

#### IV.     THE CITY OF EAST LANSING IS ENTITLED TO SUMMARY JUDGMENT ON THE PLAINTIFFS' UNCONSTITUTIONAL CONDITIONS CLAIM.

The unconstitutional conditions doctrine vindicates the Constitution's enumerated rights by preventing the government from coercing people into surrendering those constitutional rights. *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013). In denying the motion to dismiss the plaintiffs' prospective unconstitutional conditions claim (the Court dismissed the retrospective unconstitutional conditions claim), the Court stated: "The facts in the complaint allege sufficient facts to state a plausible prospective unconstitutional conditions claim based on Plaintiffs' religious freedoms. . . . For the purpose of this motion, the Court has assumed that the City could not deny a vendor's license to a farmer operating a farm in the City's boundaries if that farmer refused to perform same-sex weddings at his or her farm." *Country Mill, supra,* 280 F. Supp. 3d at 1053. The record does not support plaintiffs' Unconstitutional Conditions claim and the City is entitled to summary judgment.

Initially, there is nothing in the record to support the contention the City could not – or would not – deny a vendor's license to a farm located in the City of East Lansing that refused to perform same-sex weddings. As described above, the testimony is all consistent that the City applies its antidiscrimination policies to all vendors. There is no evidence the City has ever done business with a person or entity it knows was discriminating against a class of persons protected under the City's antidiscrimination ordinances.

The plaintiffs are not being required to surrender a constitutional right in exchange for the stall at the Market. As has been discussed, there is no constitutional right to discriminate, *Roberts, supra*, and there is no constitutional right to be exempted from antidiscrimination laws due to religious beliefs. *Newman v. Piggie Park, supra.* As the

Supreme Court in *Rumsfeld, supra*, explained, the First Amendment claims and the unconstitutional conditions claims tend to merge. *Rumsfeld,* 547 U.S. at 59–60. The City has not imposed an unconstitutional condition on plaintiffs. It is demanding from plaintiffs the same thing it demands from other vendors: compliance with the antidiscrimination policies. For the same reasons plaintiffs' Free Exercise claim fails their unconstitutional conditions claim must fail. The City is entitled to summary judgment.

**V.     THE CITY OF EAST LANSING IS ENTITLED TO SUMMARY JUDGMENT ON THE PLAINTIFFS' PROCEDURAL DUE PROCESS CLAIM.**

In denying the motion to dismiss on the due process claim the Court ruled the plaintiffs were advancing a procedural due process claim rather than substantive due process. "Plaintiffs have pled a claim for violation of procedural due process." *Country Mill, supra,* at 1054.

The plaintiffs' procedural due process challenge is based on a "void for vagueness" claim. (Complaint, ¶¶ 356, 358, 361). Plaintiff alleges the terms "general business practices," "discriminate," "unwelcome," "objectionable," "unacceptable," and "undesirable" are undefined and do not allow citizens of common intelligence to know whether particular conduct will violate the ordinance.

The first point to be made is the terms the plaintiff focuses on have either been defined or eliminated from the City's ordinances by recent amendment. (**Exhibit L**). Plaintiffs' challenge is therefore moot. *Fialka-Feldman v. Oakland Univ. Bd. of Trustees*, 639 F.3d 711, 713 (6th Cir. 2011).

Even assuming plaintiffs' claim is not moot, the as-applied claim is foreclosed by the Supreme Court's decision in *Holder v. Humanitarian Law Project*, 561 U.S. 1, 21 (2010), where the Court held: "the dispositive point here is that the statutory terms are **clear in**

**their application to plaintiffs' proposed conduct**, which means that plaintiffs' vagueness challenge must fail." The City's Ordinance and policy clearly apply to plaintiffs' conduct of refusing to allow same-sex marriages at their place of business. Thus, the plaintiffs' due process challenge must fail. The plaintiffs' overbreadth challenge also fails because the City does not ban **any** speech, and there is no constitutionally protected right to engage in discriminatory practices that conflict with laws prohibiting such practices. *Roberts, supra.*

The plaintiffs' facial challenge fails because the plaintiffs have not described instances where the alleged overbreadth would arise. *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450 (2008)("We generally do not apply the "'strong medicine'" of overbreadth analysis where the parties fail to describe the instances of arguable overbreadth of the contested law.")

Finally, the terms similar to the terms plaintiffs challenge here have been upheld against vagueness challenges. "Plaintiff also challenges the descriptors 'unwelcome, objectionable, not acceptable, or not solicited' within Iowa Code section 216.7(1)(b) and Des Moines City Code section 62-136 as subjective. . . . Initially, each of these terms does seem to leave room for a certain amount of subjectivity. However, considering them together within the context of the laws in question—laws aimed at preventing discrimination—the provisions are not so standardless as to lead to seriously discriminatory enforcement. Though not perfect, the terms sufficiently describe messages of limited access to a public accommodation's goods or services based on membership in a protected class." *Fort Des Moines Church of Christ v. Jackson*, 215 F. Supp. 3d 776, 799 (S.D. Iowa 2016).

The City is entitled to summary judgment on the plaintiffs' due process challenge.

## RELIEF REQUESTED

The City of East Lansing respectfully requests the Court grant its motion for summary judgment pursuant to Rule 56(c) and enter final judgment in its favor.

Respectfully submitted,

DATED:  January 24, 2019                    PLUNKETT COONEY


BY:   /s/Michael S. Bogren_____
            Michael S. Bogren (P34835)
            Attorney for Defendant
BUSINESS ADDRESS:
950 Trade Centre Way, Suite 310
Kalamazoo, Michigan   49002
(269-226-8822)
mbogren@plunkettcooney.com


Open.26408.72010.21444155-1

33