## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| **Country Mill Farms**, **LLC** and **Stephen Tennes**, | **Case No. 1:17-cv-00487-PLM-RSK** |
| Plaintiffs, | Honorable Paul L. Maloney |
| v. | **Memorandum in Support of Plaintiffs Country Mill Farms, LLC's and Stephen Tennes's Motion for Summary Judgment** |
| **City of East Lansing**, | |
| Defendant. | Oral Argument Requested |

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

FACTS .............................................................................................................................. 3

ARGUMENT .................................................................................................................... 12

I.    Tennes is entitled to summary judgment as a matter of law to stop the
City from violating his constitutional freedoms of religion and speech. .......... 12

        A.    The City violated the federal Free Exercise Clause when it targeted
Tennes for exclusion from the Farmer's Market because of his
religious beliefs, practices, and identity. .................................................... 12

                1.    The City targeted Tennes for unequal treatment and publicly
stated its hostility towards his religious beliefs and practices. . 13

                2.    The City denied Tennes access to a public benefit because of
his religious identity. .......................................................... 16

                3.    The City enforced the Policy against Tennes alone through a
system of individualized assessments that violate the Free
Exercise Clause. .................................................................. 19

                4.    The City violated the hybrid-rights doctrine by violating both
Tennes's free exercise and his free speech rights. ....................... 20

        B.    The Policy was both created and enforced to retaliate against Tennes
for his speech and religious practices in violation of the Free Speech
Clause. .......................................................................................................... 21

        C.    The Policy's predominant purpose and primary effect are to punish
Tennes for his disfavored religious beliefs and practices, in violation
of the Establishment Clause. ....................................................................... 24

        D.    The City's application of the Policy conditions Tennes's ability to
participate in the Farmer's Market on surrender of his Free Exercise
rights, in violation of the unconstitutional conditions doctrine. ............. 26

        E.    The City's actions do not serve a compelling interest in a narrowly
tailored way. ................................................................................................ 28

        F.    The Policy language, including the terms "general business practice"
and "harassment," are constitutionally overbroad, vague, and grant the

City unbridled enforcement discretion which it used to violate Tennes's constitutional rights. .................................................................. 30

G. The City violated the Michigan Constitution when it targeted Tennes and excluded him from the Farmer's Market for his religious beliefs, practices, and identity. ................................................................. 34

II. Tennes will suffer irreparable harm absent a permanent injunction and there is no other adequate remedy at law. ........................................... 35

III. Tennes is entitled to damages, attorney fees, and costs for violation of his constitutional rights............................................................................. 36

CONCLUSION............................................................................................ 37

# TABLE OF AUTHORITIES

*Cases:*

*ACLU of Kentucky v. Grayson County,*
    591 F.3d 837 (6th Cir. 2010) ...................................................................... 24, 25

*ACLU of Ohio Foundation, Inc. v. DeWeese,*
    633 F.3d 424 (6th Cir. 2011) ...................................................................... 24, 25

*Armstrong v. District of Columbia Public Library,*
    154 F. Supp. 2d 67 (D.D.C. 2001) ............................................................. 32, 33

*Arnett v. Myers,*
    281 F.3d 552 (6th Cir. 2002) ............................................................................ 22

*Axson-Flynn v. Johnson,*
    356 F.3d 1277 (10th Cir. 2004) ................................................................. 20, 21

*Bible Believers v. Wayne County,*
    805 F.3d 228 (6th Cir. 2015) ............................................................................ 28

*Brown v. Entertainment Merchants Association,*
    564 U.S. 786 (2011) ......................................................................................... 30

*Champion v. Secretary of State,*
    761 N.W.2d 747 (Mich. Ct. App. 2008) ........................................................... 34

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
    508 U.S. 520 (1993) ...................................................................... 12, 13, 14, 19

*City of Boerne v. Flores,*
    521 U.S. 507 (1997) ......................................................................................... 28

*Cornerstone Christian Schools v. University Interscholastic League,*
    563 F.3d 127 (5th Cir. 2009) ............................................................................ 20

*Dambrot v. Central Michigan University,*
    55 F.3d 1177 (6th Cir. 1995) ............................................................................ 32

*Dye v. Office of the Racing Commission,*
    702 F.3d 286 (6th Cir. 2012) ............................................................................ 22

*Eckerman v. Tennessee Department of Safety,*
    636 F.3d 202 (6th Cir. 2010) ..................................................................... 21, 22

*Elrod v. Burns,*
    427 U.S. 347 (1976) ......................................................................................... 36

*Employment Division, Department of Human Resources of Oregon v. Smith*,
  494 U.S. 872 (1990), *overruled by statute (1993)* ..................................... 12, 18

*Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal*,
  546 U.S. 418 (2006) ........................................................................................ 28

*Heffron v. International Society for Krishna Consciousness, Inc.*,
  452 U.S. 640 (1981) ........................................................................................ 22

*Holt v. Hobbs*,
  135 S. Ct. 853 (2015) ................................................................................ 28, 29

*Holzemer v. City of Memphis*,
  621 F.3d 512 (6th Cir. 2010) .................................................................... 21, 22

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*,
  515 U.S. 557 (1995) ........................................................................................ 29

*Janus v. American Federation of State, County, and Municipal Employees, Council 31*,
  138 S. Ct. 2448 (2018) .................................................................................... 29

*Kissinger v. Board of Trustees of Ohio State University, College of Veterinary Medicine*,
  5 F.3d 177 (6th Cir. 1993) .............................................................................. 20

*Kolender v. Lawson*,
  461 U.S. 352 (1983) ........................................................................................ 30

*Lemon v. Kurtzman*,
  403 U.S. 602 (1971) ........................................................................................ 24

*Lynch v Donnelly*,
  465 U.S. 668 (1984) ........................................................................................ 24

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*,
  138 S. Ct. 1719 (2018) ............................................................. 2, 13, 14, 16, 33

*Matal v. Tam*,
  137 S. Ct. 1744 (2017) .............................................................................. 33, 34

*McCready v. Hoffius*,
  586 N.W.2d 723 (Mich. 1998) ....................................................................... 34

*McCreary County v. ACLU of Kentucky*,
  545 U.S. 844 (2005) ........................................................................................ 24

*Miller v. Reed,*
    176 F.3d 1202 (9th Cir. 1999) ........................................................................ 20

*Obergefell v. Hodges,*
    135 S. Ct. 2584 (2015) .................................................................................... 4

*Packingham v. North Carolina,*
    137 S. Ct. 1730 (2017) .................................................................................. 22

*Perry v. Sindermann,*
    408 U.S. 593 (1972) ...................................................................................... 26

*Prater v. City of Burnside,*
    289 F.3d 417 (6th Cir. 2002) ........................................................................ 12

*Reid v. Kenowa Hills Public Schools,*
    680 N.W.2d 62 (Mich. Ct. App. 2004) ......................................................... 34

*Satawa v. Macomb County Road Commission,*
    689 F.3d 506 (6th Cir. 2012) ........................................................................ 24

*Saxe v. State College Area School District,*
    240 F.3d 200 (3d Cir. 2001) ......................................................................... 32

*Speiser v. Randall,*
    357 U.S. 513 (1958) ................................................................................ 26, 27

*Thaddeus-X v. Blatter,*
    175 F.3d 378 (6th Cir. 1999) ..................................................................... 2, 21

*Toledo Area AFL-CIO Council v. Pizza,*
    154 F.3d 307 (6th Cir. 1998) ........................................................................ 26

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
    137 S. Ct. 2012 (2017) .............................................................. 2, 12, 13, 16, 17

*United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio
    Regional Transit Authority,*
    163 F.3d 341 (6th Cir. 1998) ............................................................. 30, 31, 36

*United States v. Miami University,*
    294 F.3d 797 (6th Cir. 2002) ................................................................... 35, 36

*Ward v. Polite,*
    667 F.3d 727 (6th Cir. 2012) ................................................................... 12, 19

*Statutes:*

42 U.S.C. § 1983 ................................................................................................ 36

42 U.S.C. § 1986 ................................................................................................ 36

*Rules and Regulations:*

Fed. R. Civ. P. 56(a) ......................................................................................... 12

*Other Authorities:*

Michigan Constitution article I § 4 .................................................................. 34

# INTRODUCTION

Steve Tennes operates his orchard and cider mill, Country Mill, in Charlotte, consistent with the tenets of his Catholic faith.[1] The business's mission statement is "To glorify God by facilitating 'family fun on the farm' and feeding families," and Steve takes that mission seriously. Declaration of Stephen Tennes, ¶ 6. Steve has donated thousands of pounds of apples to local food banks, shared the Gospel with thousands of customers and visiting school children, and fought bureaucrats for the right to build first-rate housing for migrant workers. *Id.* at 7, 9.

For years, Country Mill was a popular vendor at the City of East Lansing Farmer's Market—until City officials learned that Steve had posted on Facebook his Catholic belief "that marriage is the union of one man and one woman," and that he intends to practice that belief when hosting weddings at the farm. Ex. 17. The City promptly disinvited Country Mill from the market, then barred Country Mill altogether until this Court entered its preliminary injunction.

The City's response is a paradigm of religious discrimination. In a public debate, a city council member called Steve's Catholic beliefs "bigot[ed]," "ridiculous, horrible, [and] hateful things." Ex. 38. The mayor castigated Steve for translating his "Catholic view on marriage" into a business practice, Ex. 29, suggesting the farmer published his beliefs to make more money. Ex. 30. Other officials repeatedly advanced the view that Steve's Catholic belief in marriage is "the same" as the views that defended post-slavery racism. Ex. 58 (Lahanas Dep. 112:8-13), Ex. 34-36.

---

[1] Tennes and Country Mill are used in this Memorandum to refer to both Plaintiffs.

And the City's public position was consistently coercive: Tennes's religious speech and actions regarding weddings must "change," and the City will "take a firm stand" to make sure they do. Ex. 34, 36, 38, Ex. 60 (Beier 40:18-21, 25).

The City's condemnation of Steve's Catholic beliefs, and its demand that he change his beliefs to access the Farmer's Market, violates the U.S. Constitution in multiple ways. The government "cannot impose regulations that are hostile to the religious beliefs of affected citizens" or "act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices." *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719, 1731 (2018). It cannot deny a public benefit to an individual based on his religious character. *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2021 (2017). And it cannot retaliate against its citizens for speech or religious practices. *Thaddeus-X v. Blatter*, 175 F.3d 378, 388 (6th Cir. 1999). East Lansing has done all three. And these violations will persist until this Court intervenes.

Accordingly, Steve and Country Mill respectfully request that the Court grant summary judgment and enter a permanent injunction that prohibits the City's religious discrimination.

## FACTS

*Steve Tennes and his family farm*. Steve Tennes is a man of deep faith. A Roman Catholic since birth, he strives to live his life consistent with his religious beliefs. Tennes Decl. ¶¶ 7-8. That includes how he runs his family farm. *Id.*

In 2003, Steve took over the family farm he grew up on in Charlotte, Michigan and began expanding Country Mill Farms while retaining the heart and mission his mother began a generation ago: to feed families and "[t]o conduct all business dealings so that a Christian philosophy is evident." *Id.* at ¶¶ 2, 6. It is with that commission that Steve grew the farm to a 158-acre property and orchard. *Id.* at ¶¶ 5, 7. And for the same reason, Steve endeavors to treat all of his employees and customers with dignity and respect, as Christ commands. *Id.* at ¶¶ 8, 32.

*Country Mill begins hosting weddings*. As the farm grew, customers asked to hold events and weddings at the orchard. *Id.* at ¶ 12. After much prayerful consideration, Steve and his wife decided to open their backyard and orchard to weddings. *Id.* at ¶ 12. They began hosting approximately 44 weddings a year and found it to be a beautiful way to promote and support marriages. *Id.* at ¶ 13.

As Roman Catholics, Steve and his wife follow the Church's teaching that marriage is a God-ordained, lifelong, sacrificial and sacramental covenant between one man and one woman with profound spiritual and societal implications. *Id.* at ¶ 14. They became intimately engaged in the weddings they held on the farm, and they were excited to promote the Church's teachings on marriage. *Id.* at ¶¶ 15-16.

3

When same-sex marriage became legal after *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015), Steve and his wife prayed, met with their priest, consulted the Bible and Catechism of the Catholic Church, and concluded that because of their Catholic faith, they would be unable to host same-sex weddings. Tennes Decl. ¶ 17. Doing so would violate their deepest convictions about the nature of humanity, the relationship between God and man, and marriage's divine purpose. *Id.*

So, in August 2016, when someone posted on Country Mill's Facebook page asking Steve and his wife their beliefs regarding marriage, the Tenneses gave an honest, heartfelt answer.  Ex. 4. They had no idea that answer would offend city officials 22 miles away in East Lansing. But it did. Less than 24 hours later, East Lansing Mayor Mark Meadows emailed city employees: "Does Country Mill in Charlotte have a space at the farmer's market?" Ex. 5.

<u>*Tennes is asked to leave the 2016 Farmer's Market*</u>. Country Mill had been a Farmer's Market vendor since 2010. Tennes Decl. ¶¶ 21-22. The City celebrated that fact less than three weeks earlier, posting on its market Facebook page, "We love the Country Mill. Their already-picked berries will be at the market on Sunday. But if you feel the pull to pick your own, go and check them out!" Ex. 1.

During its time at the market, Country Mill served all customers. Tennes Decl. ¶¶ 8, 23, 32. Country Mill was well-liked, complied with all city laws and market guidelines, and never garnered a single complaint. *Id.* at ¶ 23, Ex. 14, Ex. 56 (Surface 49:13-50:11), Ex. 58 (Lahanas 45:16-46:22). None of that mattered once the City learned that Steve held the Catholic view of marriage. Ex. 6.

4

Following the August 2016 Facebook post, Parks and Recreation Director
Tim McCaffrey called the Tennes family. He confirmed their religious practices
related to weddings, then asked Country Mill to voluntarily leave the market.
Tennes Decl. ¶¶ 24-25. The Tennes family asked for some time to think about it. *Id.*
McCaffrey then called the Tenneses five times over the next two days, leaving three
voice mails, and sent three emails with the same request to avoid "controversy" over
their views. Ex. 9-13, Tennes Decl. ¶ 25.

Facing this pressure and with a truck-load of perishable produce ready for
the market, Tennes concluded that he must stop hosting weddings or lose his
vendor license. Tennes Decl. ¶ 26. He announced this via Facebook and to the City.
Ex. 4. Based on this announcement, McCaffrey and City Manager George Lahanas
decided that Country Mill could stay at the market unless the city council objected.
Ex. 6-7.

But the city council did object. Mayor Meadows didn't care that Country Mill
would withdraw from the wedding-hosting business; he was focused on the "*public
statement* that their religion does not permit them to allow same sex couples to be
married at their farm." Ex. 6 (emphasis added). Others wanted "more direct
assurances" from Country Mill. Ex. 7. Following these instructions from council,
Lahanas and McCaffrey maintained the request that Country Mill no longer
participate in the City's market. Ex. 8.

Eventually, the City correctly determined that it had no legal basis to expel
Country Mill from the 2016 market. Ex. 14. The City confirmed that Country Mill

serves all customers—"Yes, they have assured us that they will serve all customers regardless of sexual orientation. To our knowledge, they have *always* served any customer at our farmer's market." *Id.* (emphasis added). So, the City allowed Country Mill to finish the 2016 season where it served all customers without incident. *Id.*, Tennes Decl. ¶ 29. This was the calm before the storm.

*The City creates a new policy for the 2017 Farmer's Market.* In December 2016, after more prayerful consideration, Steve decided that to live his life and run his business in accord with his religious beliefs, he must continue to promote the Church's marriage view by publicly stating his beliefs and again participating in these weddings on his farm. Tennes Decl. ¶ 30. He used Facebook to explain this decision to the public. Ex. 17.

East Lansing officials saw Tennes's Facebook post and responded immediately with a new market policy ("the Policy") designed to exclude Country Mill. Ex. 16, Ex. 56 (Surface 79:2-5) ("Country Mill was the catalyst" for the "amendments to the guidelines."), Ex. 34 ("Yeadon [the city attorney] told us the ordinance was specifically written to respond to the vendor… ."). The Policy required vendors to "[c]omply[] with the City of East Lansing's Civil Rights ordinances and the public policy against discrimination contained in Chapter 22 of the East Lansing City Code while at the ELFM and as a general business practice." Ex. 21 (Section m). The Policy did not define general business practices or provide any enforcement parameters. *Id.* It also lacked any jurisdictional boundaries. *Id.*

In January 2017, the City met with the Market Vendor Selection Committee, an *ad hoc* committee of vendors who run the Farmer's Market. Ex. 19-20. At that meeting, city employee and market manager Heather Surface directed the committee to "approve" the new Policy for inclusion in the 2017 vendor guidelines. *Id.* She also instructed the committee that it could not invite Country Mill to vend in 2017, as it had in every previous year, and that if Country Mill did apply, the committee could not review or accept the application. Ex. 19, Ex. 56 (Surface 76:14-77:1), Ex. 57 (McCaffrey 51:17-20); *see also* Ex. 3. The City itself would review any Country Mill application, *id.*, a procedure that the City had never before imposed on a vendor. Ex. 57 (McCaffrey 47:19-48:5). The committee did as it was told.

<u>*The City rejects Tennes's 2017 market application*</u>. When Country Mill did not receive its normal invitation to vend, it applied to the market through the non-invitational process. Tennes Decl. ¶¶ 31-32. As planned, the City pulled the application and reviewed it internally. Ex. 56 (Surface 82:14:25). The city rejected the application based solely on Steve's December 2016 Facebook post. Ex. 26, Ex. 56 (Surface 85:22-87:5), Ex. 57 (McCaffrey 55:12-19). Surface testified that the problem words were Steve's commitment to follow his Catholic faith: "For this reason, Country Mill reserves the right to deny a request for services that would require it to communicate, engage in, or host expression that violates the owner's sincerely held religious beliefs and conscience." Ex. 56 (Surface 120:15-121:11).

During this process, the City never met with or spoke to any Country Mill representative. Ex. 57 (McCaffrey 55:2-4), Ex. 58 (Lahanas 53:14-17). It did not

review any other policies or conduct any investigation beyond the Facebook posting. Ex. 56 (Surface 150:21-23). Based on the post alone, the City drafted its rejection letter to Country Mill, Ex. 24, the only vendor that the new Policy excluded. Ex. 57 (McCaffrey 47:19-48:5).

Lahanas asked his assistant to send the draft letter to the city council for approval. Ex. 22-23. The two council members who responded agreed that Country Mill should not vend. *Id.* Mayor Meadows initially asked why a letter was being sent to Country Mill; after learning that Country Mill had applied to the market, the Mayor approved the letter. Ex. 22.

Country Mill received the March 7, 2017, letter with alarm and confusion. Tennes Decl. ¶ 33, Ex. 24. Steve believed he complied with the vendor guidelines, including the new Policy, and he had attested as much in the application. *Id.* at ¶ 32. After all, while Tennes cannot participate in every religious event, he happily serves all customers, regardless of any protected characteristics. *Id.* at ¶ 32. Steve emailed Surface seeking clarification as to "whatever misunderstanding may have happened." Ex. 25. Surface consulted with her superiors, then responded with a letter that referenced Steve's December 2016 Facebook post, the new Policy, and the City's Human Relations Ordinance as the sole bases for the City's decision. Ex. 25-26.

Country Mill had no choice but to file this lawsuit, resulting in the Court's injunction that allowed Country Mill to return to the Market in the fall of 2017 and the full 2018 season. Ex. 45. But city officials testified that absent the Court's order,

Country Mill would be excluded from the Market unless Steve abandoned his Catholic beliefs about marriage. Ex. 58 (Lahanas 114:22-115:2).

_The City's statements about Tennes's religious beliefs and practices_. The City has not been bashful about publicly expressing the reasons for Country Mill's exclusion. In August 2016, Mayor Meadows told City employees that "the issue" with Country Mill was Steve's "public statement that their religion does not permit them to allow same sex couples to be married at their farm." Ex. 6. He reiterated this on his Facebook page: "Country Mills lost its spot at the Farmers Market because Steve's firmly held 'Catholic views on marriage' were not just his views. He made it his corporation's views and translated it into a business practice instead of free speech." Ex. 29. Mayor Meadows also questioned whether Country Mill's policy was truly "the result of a sincerely held religious belief" or instead a stunt to improve Country Mill's wedding business. Ex. 30.

The Mayor published at least one op-ed and he emailed with citizens about the case. Ex. 28, 33. In this correspondence, the Mayor called Tennes a "discriminator[]" and explained that the City's decision was no mere oversight or mistake. "It was intentional…Comply or we don't do business with you is the message given." Ex. 33.

City councilmembers were equally blunt. Councilmember Ruth Beier resorted to name calling at a public debate:

"We don't doubt you're allowed to be a *bigot*. You're allowed to say whatever you want. You can say it on Facebook. *You can say ridiculous, horrible, hateful things*. What we said is if you actually do discriminate in your business by … not allowing same-sex couples to marry on your farm, *then we don't want you in East Lansing*." Ex. 38 (emphasis added).

Beier explained that she supports the City's actions because "I don't think change happens unless cities take a firm stand and we have." Ex. 38. Councilmember Susan Woods agreed, adding that the City is "liberal", "highly educated" and "highly inclusive . . . . So what we did with Country Mill is just an extension" of the City's stance on inclusion. *Id.*

Both Beier and City Manager George Lahanas slandered Steve's Catholic beliefs about marriage as "the same" as views promoting post-slavery racism and expressed their sincere hope that Steve would change his views. Beier emailed a citizen: "I disagree that the views held by people like this vendor [are] not likely to change. It was not that long ago that a farm like this one might have prohibited interracial marriage. That commonly held view changed. *This one will too*." Ex. 35 (emphasis added), Ex. 34, 36 (similar). When asked about these statements in deposition, Beier explained that she "mean[t] as we evolve as human beings, I believe that we will come to a place where gay people are accepted as being able to marry, just like black and white people are accepted as being able to marry." Ex. 60 (Beier 39:19-22). She said she also "hope[s] that Mr. Tennes's views" on this subject "change, too." Ex. 60 (Beier 40:25).

As for the City Manager, he told local news outlets: "They can have any belief they want, but if they're excluding people, that's the difference." Ex. 41-42. He

explained that "if they allow same-sex couples or stop holding weddings altogether again, they'd be welcomed back" to the market. Ex. 39. Until then, their presence is unacceptable. *See* Ex. 40.

City Manager Lahanas repeated this sentiment in deposition:

Q: But the City's position is that if a Catholic like Steve is going to host weddings on his farm he has to host weddings for same-sex couples?

A: If he wants to do business…with the City of East Lansing he would need to do that, yes.

Q: Even though his religious belief dictates that he cannot?

Counsel: Objection, asked and answered.

A: I would say it's the same thing if you would have talked 60 years ago against African Americans. People can say my religious belief makes me say that I can't provide service to African Americans and they can cite the Bible for it. It doesn't make it true. It doesn't make it right. It's still wrong. It's the same thing here.

Lahanas Dep. Tr. 112:1-13; *see also* Ex. 58 (Lahanas 109:18-110:5, 111:19-25) (testifying similarly).

Having characterized Steve's Catholic faith as hateful, bigoted, akin to racism, and subject to change under sufficient government pressure, the City of East Lansing now asks this Court to rubber stamp their decision to exclude Country Mill from the Market.

# ARGUMENT

**I.    Tennes is entitled to summary judgment as a matter of law to stop the City from violating his constitutional freedoms of religion and speech.**

This case presents no dispute of material fact. Therefore, judgment as a matter of law is proper. Fed. R. Civ. P. 56(a). On the law and these undisputed facts, the Court should grant summary judgment in Plaintiffs' favor, declare that the City's actions violate the Constitution, issue a permanent injunction to stop unconstitutional enforcement, and award damages and reasonable attorney fees and costs for the City's civil rights violation.

**A.    The City violated the federal Free Exercise Clause when it targeted Tennes for exclusion from the Farmer's Market because of his religious beliefs, practices, and identity.**

The Free Exercise Clause ensures not only "the right to believe and profess" religious doctrine, *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872, 877 (1990), *overruled by statute (1993)*, but "the right to engage in conduct motivated by that belief." *Prater v. City of Burnside,* 289 F.3d 417, 427 (6th Cir. 2002) (citing *Smith*, 494 U.S. at 877); *see also Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993). Government action that "single[s] out the religious for disfavored treatment," *Trinity Lutheran*, 137 S. Ct. at 2020, "infringe[s] upon or restrict[s] practices because of their religious motivation," *Lukumi*, 508 U.S. at 533, or is "a veiled cover for targeting a belief or a faith-based practice," *Ward v. Polite*, 667 F.3d 727, 738 (6th Cir. 2012), violates the Free Exercise Clause absent a compelling government interest.

12

The City has violated these free-exercise principles in three distinct ways. The City acted with "clear and impermissible hostility" towards Steve's religious beliefs, contrary to the Supreme Court's recent decision in *Masterpiece*. 138 S. Ct. at 1729. The City deprived Steve of access to a generally available government benefit because of his religious identity, contrary to the Supreme Court's decision in *Trinity Lutheran*. 137 S. Ct. at 2021. And the City accomplished these exclusionary goals by application of a policy written to be enforced through a system of individualized exceptions, contrary to the Supreme Court's holding in *Lukumi*. 508 U.S. at 537. Each one of these violations is independently dispositive on the merits.

        **1.**    **The City targeted Tennes for unequal treatment and publicly stated its hostility towards his religious beliefs and practices.**

As the Supreme Court reaffirmed in *Masterpiece*, "the government … cannot impose regulations that are hostile to the religious beliefs of affected citizens and cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices." *Masterpiece,* 138 S. Ct. at 1731. To guard against these evils, courts must carefully review government policies and actions for evidence of hostility, both "masked" and "overt." *Lukumi*, 508 U.S. at 534. Even "*subtle* departures from neutrality" on matters of religion are unconstitutional because the Constitution places a "high duty" on government officials "to proceed in a manner neutral toward and tolerant of … religious beliefs." *Masterpiece*, 138 S. Ct. at 1731 (quoting *Lukumi*, 508 US. at 534) (emphasis added).

In *Masterpiece*, the Court reviewed such intolerance towards Colorado baker Jack Phillips, who allegedly violated state law when he respectfully declined to

create a custom cake to celebrate a same-sex wedding based on his sincere religious convictions. The Court vacated the Colorado Civil Rights Commission's determination that Phillips had violated a public-accommodations law because the Commission's treatment of the case had "some elements of a clear and impermissible hostility toward the sincere religious beliefs that motivated [Phillips'] objection." 138 S. Ct. at 1729. In so holding, the Court looked to the decision's "historical background," the "events leading to the … official policy," and the "statements made by members of the decisionmaking body." *Id.* at 1731 (quoting *Lukumi*, 508 U.S. at 540). "[E]ven slight suspicion" of "animosity to religion or distrust of its practices" was too much. *Id.* (quoting *Lukumi*, 508 U.S. at 547).

In Phillips's case, the Commissioners made public statements opposing his views. They described Phillips' faith as "despicable," compared his beliefs to those that "defend[ed] … slavery and the Holocaust," and suggested that if he wanted to do business in Colorado, he must change his religious practices. *Id.* at 1729. The Commissioners also treated the complaint against Phillips differently than similar complaints that alleged religious discrimination against other bakeries. *Id.* at 1731-32. The Court held that the combination of the Commission's unequal treatment and hostile public statements violated the free exercise clause *per se*, with no need to engage in a strict-scrutiny analysis. *Id.* at 1731-32.

The record here is more egregious than in *Masterpiece*. First, the City treated Steve differently because of his religious beliefs as the history and series of events show. Steve was a valued member of the Farmer's Market—right up until the

14

moment the City learned of Steve's Catholic view of marriage. Ex. 5-6. The City immediately began pressuring Tennes to leave the market, and when that did not work, the City created a new market Policy specifically designed to keep Country Mill out of the market as long as Steve practices only one man, one woman weddings. Tennes Decl. ¶¶ 24-26, Ex. 56 (Surface 79:2-5) ("Country Mill was the catalyst" for the "amendment to the guidelines."), Ex. 34 ("Yes, but Yeadon [the city attorney] told us the ordinance was specifically written to respond to the vendor…"), Ex. 39 ("[I]f they allow same-sex couples or stop holding weddings altogether again, they'd be welcomed back.").

This Policy was a targeted policy-for-one that extended the reach of the City Human Relations Ordinance to vendors' "general business practice[s]" many miles outside the City's boundaries. Ex. 21. The City had no concern that Steve was violating any ordinance at their Market, or even in the City itself. To expel him, the City had to extend its regulatory authority 22 miles outside the City, to Steve's farm. So, the City created a "religious gerrymander" to get there. *Lukumi*, 508 U.S. at 535 (stating a "religious gerrymander" is "an impermissible attempt to target petitioners and their religious practices").

The City then treated Steve differently than any other vendor when, in the 2017 market application process, it barred only Steve from receiving an invitation and further barred the market committee from considering Steve's application when he applied. Ex. 19-20, Ex. 56 (Surface 76:14-77:1), Ex. 57 (McCaffrey 51:17-20). The City rejected Steve's application and cited his religious statements about the

Catholic view of marriage on Facebook as the *sole* basis for his expulsion. Ex. 26, Ex. 56 (Surface 120:18-121:11).

It gets worse. The City's Mayor and city council members publicly castigated Steve's beliefs as "bigot[ed]," "ridiculous, horrible, hateful," and "wrong," Ex. 38, Ex. 58 (Lahanas 107:11-108:7; 112:12-13), and akin to the beliefs of those who supported blatant racial discrimination and the denial of service to all African Americans in the Jim Crow south. Ex. 58 (Lahanas 112:8-13), Ex. 35. The City made it clear that if Steve wanted to return to the City's Farmer's Market, he would have to change his beliefs and host weddings for same-sex couples at his family farm. Ex. 58 (Lahanas 112:2-5); *see also* Ex. 38 (If you do "not allow[] same-sex couples to marry on your farm, then we don't want you in East Lansing.").

The City's hostility towards Steve's religious beliefs, unequal treatment, and religious targeting are actually worse than the Colorado Civil Rights Commission's conduct and actions in *Masterpiece*, 138 S. Ct. at 1729. Like the Supreme Court, this Court should invalidate the City's actions as a Free Exercise violation.

>    **2.      The City denied Tennes access to a public benefit because of his religious identity.**

The Free Exercise Clause also prohibits the government from excluding an organization from a public benefit based solely on its religious beliefs. In *Trinity Lutheran*, the Supreme Court rejected Missouri's decision to exclude a church-operated preschool and daycare from a playground-safety grant program because of its religious nature. 137 S. Ct. at 2025. The government may not require an organization "to renounce its religious character in order to participate in an

otherwise generally available public benefit program, for which it is fully qualified." *Id.* at 2024. Such denial "solely on account of religious identity imposes a penalty on the free exercise of religion that can be justified only by a state interest of the highest order." *Id.* at 2019 (cleaned up).

Like in *Masterpiece*, the Court in *Trinity* held that such identity-based exclusion violates the Free Exercise Clause per se, without any analysis of the government's interest. *Id.* Indeed, the government has no interest in excluding citizens based on their religious identity.

Yet, that is precisely what the City did here. The City conditioned Country Mill's ability to sell apples at the Farmer's Market on Steve's willingness to violate his Catholic beliefs about marriage or give up his wedding business altogether. Ex. 58 (Lahanas 112:1-5), Ex. 38. Yet, that business was how Steve practiced his beliefs about marriage. Tennes Decl. ¶ 30. A business practice that sprung from customer demand turned into a way for Steve, his wife, and children to live out their faith regarding marriage as a God-ordained, lifelong, sacrificial and sacramental covenant between one man and one woman. *Id.* at ¶¶ 13-14. Steve and his family were able to share their beliefs, promote their understanding of marriage, and participate in an event that, for them, was holy. *Id.* at ¶¶ 15-16.

In response, the City tried to parse Steve's beliefs from his actions, but the law recognizes no such distinction. *Trinity Lutheran*, 137 S. Ct. at 2025; *see also id.* at 2026 (Gorsuch, J., concurring) ("I don't see why it should matter whether we describe the benefit, say, as closed to Lutherans (status) or closed to people who do

Lutheran things (use). It is free exercise either way."). Rather, the First Amendment "guarantees the free *exercise* of religion, not just the right to inward belief (or status)." *Id.* (citing *Smith*, 494 U.S. at 877). And that makes good sense. What purpose would a protection over the mind and heart serve if there is no concomitant protection over religious practice?

Yet, that is the City's theory behind its actions. Steve can believe what he wants, but if he tries to bring his faith to his family business, he will be punished. Ex. 29. ("Country Mills lost its spot at the Farmers Market because Steve's firmly held 'Catholic views on marriage' were not just his views. He made it his corporation's views and translated it into a business practice instead of free speech."); *see also* Ex. 58 (Lahanas 109:24, 108:3-7) (explaining that Tennes "can think whatever he wants, free religion" and he can "say whatever [he] want[s] hateful, horrible stuff, it's free speech, and that's great," but if he acts on those beliefs "then we have an issue").

The City's position is nothing less than religious-identity discrimination. The City is essential saying that Catholics need not apply if their business involves the issue of marriage in any way, shape, or form, because unless the business and its owners bow to the City's beliefs about marriage, the City will refuse them the same opportunity offered to other qualified businesses. As in *Trinity Lutheran*, the City's discriminatory denial of access based on religious beliefs violates the Free Exercise Clause and cannot be allowed to continue.

18

### 3. The City enforced the Policy against Tennes alone through a system of individualized assessments that violate the Free Exercise Clause.

The City had the power to apply the Policy to violate Steve's rights because officials wrote it to allow broad enforcement discretion, enough discretion to target Steve specifically because of his Catholic marriage views. This discretion is indistinguishable from the government policy in *Lukumi*, which likewise involved "a system of individualized governmental assessment of the reasons for the relevant conduct." *Lukumi*, 508 U.S. at 537 (cleaned up); *see also Ward*, 667 F.3d at 740 ("[A] system of individualized exemptions [is] the antitheses of a neutral and generally applicable policy."). The government may not refuse to extend a system of individualized exemptions "to cases of religious hardship without compelling reason." *Lukumi*, 508 U.S. at 537 (cleaned up). If they do, their actions must withstand strict scrutiny review. *Id.*

The City's application of the Policy here is just as biased and case-specific as that of the *Lukumi* enforcement officials. In *Lukumi*, the Court recognized that the law was written not only with numerous exemptions for secular activity, but with an enforcement mechanism that allowed for case-by-case decisions that led to targeting. *Lukumi*, 508 U.S. at 536-38. Indeed, in *Lukumi*, the individualized assessments resulted in enforcement against only one entity and practice—the Santerians and their religious sacrifices that the city council wanted to stop. *Id.*

So too here. The Policy's language is broad and invites individualized assessments. Ex. 26. Words including "general business practice[s]" are undefined, while others like "harassment" are so oddly defined that no one quite knows what

19

they mean. When asked, city officials testified to widely varying interpretations. *See* Section I.F. Some officials indicated that the Policy would apply to *any* word or conduct by a business that, for example, "diminish[es] your humanity," makes a person feel "unwelcome," "unvalued or less valued than average," or even just "hurts somebody's feelings." Ex. 60 (Beier 53:4-5, 18-22), Ex. 59 (Meadows 33:10-12).

With no enforcement parameters, City officials had wide discretion to determine compliance on a discriminatory basis. The City candidly acknowledged that the Policy's enforcement is complaint driven and that there are no set procedures for evaluating a complaint—the city is only "obligated to make—you know, to follow up on the situation." Ex. 57 (McCaffrey 46:7-11), Ex. 56 (Surface 123:15-124:12). Without set procedures, the City could—and did—target a single vendor, the one whose marriage views did not align with those of the City's officials. As in *Lukumi*, the City's Policy and enforcement violated the Free Exercise Clause.

### 4. The City violated the hybrid-rights doctrine by violating both Tennes's free exercise and his free speech rights.

The discriminatory Policy also violates the hybrid-rights doctrine because it infringes Steve's freedom to practice his religious beliefs and his freedom of speech. While the Sixth Circuit rejected this doctrine in *Kissinger v. Board of Trustees of Ohio State University, College of Veterinary Medicine*, 5 F.3d 177, 180 (6th Cir. 1993), other Circuits apply it to reach strict scrutiny when there is a "colorable claim" that a companion right has been violated. *E.g., Cornerstone Christian Schs. v. Univ. Interscholastic League*, 563 F.3d 127, 136 n.8 (5th Cir. 2009); *Miller v. Reed*, 176 F.3d 1202, 1207 (9th Cir. 1999); *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1295-

97 (10th Cir. 2004). Here, the City punished Steve and his business for Steve's publishing of a statement of his marriage beliefs on Facebook. That is at least a "colorable" violation of his First Amendment rights, triggering the hybrid-rights doctrine.

Although Plaintiffs recognize that this Court must follow the Sixth Circuit rule, they include this claim to preserve it for appeal.

**B.    The Policy was both created and enforced to retaliate against Tennes for his speech and religious practices in violation of the Free Speech Clause.**

The government violates the Free Speech Clause when it denies a benefit in retaliation for exercising free speech rights. *Thaddeus-X*, 175 F.3d at 388. This includes a denial of a non-guaranteed permit, if the denial was based on retaliatory motives. *Holzemer v. City of Memphis*, 621 F.3d 512, 525-527 (6th Cir. 2010) (rejecting the city's denial of a discretionary permit to operate a buggy service company because city officials withheld the permit in retaliation for the company owner's speech).

To establish retaliation, a plaintiff must show (1) he engaged in protected activity, (2) the defendant's actions would deter or chill a person of ordinary firmness from continuing to engage in that protected activity, and (3) there is a causal connection such that the defendant's actions were motivated at least in part as a response to the plaintiff's exercise of his constitutional rights. *Thaddeus-X*, 175 F.3d at 394. Both direct and circumstantial evidence can establish causation, "including showing temporal proximity between engaging in protected activity and suffering an adverse … action" which, based on the totality of circumstances, can "create an

inference of causation." *Eckerman v. Tenn. Dep't of Safety*, 636 F.3d 202, 209 (6th Cir. 2010); *see also Holzemer*, 621 F.3d at 526-27. Once a plaintiff has established a prima facie case, the burden shifts to the defendant to show "by a preponderance of the evidence, that it would have taken the same action even in the absence of the protected [activity]." *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002).

These elements are satisfied here. First, Steve's Facebook post was constitutionally protected speech about his Catholic beliefs on marriage. *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981) ("[T]he oral and written dissemination of … religious views and doctrines is protected by the First Amendment."); *Packingham v. N.C.*, 137 S. Ct. 1730, 1735-36 (2017) (recognizing First Amendment protections for social media); *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 295 (6th Cir. 2012) (recognizing protection for speech on matters of "public concern" such as "speech relating to any matter of political, social or other concern to the community," like marriage) (cleaned up).

Second, the City's actions deterred Steve from exercising his constitutional rights—as they would any person of ordinary firmness. Steve was a desired vendor at the market up to the day he stated his religious beliefs on Facebook. Ex. 1. As soon as the City saw his religious statements, he received phone calls, voice mails, and emails pressuring him to leave the market. Ex. 5-6. Then, Steve received no invitation to the market, as he had every year prior, and when he applied, his application was rejected. Tennes Decl. ¶¶ 31-33. The City told Steve it was because of his statement about his religious views on marriage that was the problem. Ex. 26.

The City's actions would deter any person of ordinary intelligence from continuing to state or practice his beliefs—especially a farmer with a perishable crop poised to lose his most profitable farmer's market if he does not comply. Tennes Decl. ¶ 26.

Third, there is no reasonable dispute that the City's actions were motivated in part by Steve's exercise of his Free Speech rights. Ex. 6. When the City saw Steve's words about his Catholic marriage beliefs, officials pressured him to leave the market, then created a Policy to disqualify his future participation. When Steve applied, the City then rejected the application and, when he asked, told him it was *because of* his Facebook statements. Ex. 26.

Indeed, the City's 30(b)(6) witnesses testified that the Policy was created in response to Tennes's Facebook post. Ex. 57 (McCaffrey 41:10-25). The City wrote the Policy specifically for Country Mill. Ex. 34. The City rejected Steve's 2017 market application because of his Facebook speech. Ex. 56 (Surface 120:16-121:11). And there was no investigation or review before the City denied Steve's application beyond simply Steve's Facebook post. Ex. 57 (McCaffrey 55:2-4), Ex. 58 (Lahanas 53:14-17), Ex. 56 (Surface 150:13-23).

Based on the totality of these facts, Steve has easily proven his *prima facie* case. And the City cannot rebut it because it has admitted the Policy was created for Tennes alone and applied only because of his speech. Ex. 57 (McCaffrey 41:10-25), Ex. 58 (Lahanas 45:21-22), Ex. 56 (Surface 150:13-23), Ex. 25-26.

In sum, Steve has proven an irrebuttable claim that the City retaliated against him and his business for his speech. This is a violation of the Free Speech Clause and is therefore unconstitutional.

**C.    The Policy's predominant purpose and primary effect are to punish Tennes for his disfavored religious beliefs and practices, in violation of the Establishment Clause.**

The Establishment Clause prohibits government policies that show either favoritism or hostility toward a religious belief. *McCreary Cty. v. ACLU of Ky.*, 545 U.S. 844, 859 (2005). It "affirmatively mandates accommodation" of religion and "forbids hostility toward [it]." *Lynch v Donnelly*, 465 U.S. 668, 673 (1984) (cleaned up). The government cannot, as it did here, "take sides" or "send[] the message" to one side of a religious debate "that they are outsiders [or] not full members of the … community." *McCreary Cty.,* 545 U.S. at 860 (cleaned up).

The Sixth Circuit has refined the traditional establishment clause test from *Lemon v. Kurtzman*, 403 U.S. 602, 612 (1971), to ask whether the government action has a predominantly secular purpose and whether its primary principle or effect is to advance or hinder religion. *ACLU of Ohio Found., Inc. v. DeWeese*, 633 F.3d 424, 430-435 (6th Cir. 2011); *Satawa v. Macomb Cty. Rd. Comm'n*, 689 F.3d 506, 527 (6th Cir. 2012).  If the government action lacks neutrality toward religious belief, and the predominant purpose or primary effect is to hinder religion, strict scrutiny applies. *Id.*

In considering the predominant purpose, courts in the Sixth Circuit examine the government action "from the perspective of an objective observer" who is "credited with knowledge of readily discoverable fact, including the traditional

external signs that show up in the text, legislative history, and implementation of [an] … official act." *ACLU of Ky. v. Grayson Cty.,* 591 F.3d 837, 848 (6th Cir. 2010) (cleaned up). The history and context of the government action is significant. *DeWeese*, 633 F.3d at 432. When considering the primary effect, the court considers "whether the challenged governmental action is sufficiently likely to be perceived" as approving or disapproving of "individual religious choices." *Grayson Cty.*, 591 F.3d at 854 (cleaned up). Again, the objective observer test is used, and where "context, history, and the act itself send the unmistakable message" that religion is either endorsed or disapproved, the action is unconstitutional. *Id.* (cleaned up). Therefore, both tests are violated when the government acts with hostility towards religious beliefs or otherwise fails its duty of neutrality towards religion as the City did here.

The history and context is dispositive of this claim here. Within a day of Steve's first statement of his Catholic marriage beliefs on Facebook, the City began pressuring him to voluntarily leave the market. Ex. 5-6. When Steve stopped doing weddings, effectively halting his religious practices, he was allowed to continue vending. Tennes Decl. ¶¶ 27-29, Ex. 14. When he reinstated these practices, the City created the Policy to encompass Steve's practices—22 miles outside the City limits—and then applied the Policy solely against Steve to reject his market application. Ex. 57 (McCaffrey 41:10-25). The City's predominant purpose was to single out and disfavor Steve for his religious beliefs.

25

Such disfavor was also the Policy's primary effect. City officials vehemently disapproved of Steve's Catholic beliefs and practices.  The "issue" was his statement of his religious beliefs. Ex. 6. And it was the only rationale given for the new Policy. Ex. 56 (Surface 79:2-5). It was also the only basis for the Policy's application. Ex. 26, Ex. 57 (McCaffrey 55:12-19), Ex. 56 (Surface 120:15-121:11). Steve was the only vendor disqualified.

Backing these events are the City's public statements opposing Steve's Catholic views on marriage. City officials labeled those beliefs "bigot[ed]," "ridiculous, horrible, hateful" and "wrong." Ex. 38, Ex. 58 (Lahanas 112:12-13). They "hope[d]" these views "would change," Ex. 60 (Beier 40:25), if the City took a "strong stance." Ex. 38. That strong stance violated the Establishment Clause.

**D.    The City's application of the Policy conditions Tennes's ability to participate in the Farmer's Market on surrender of his Free Exercise rights, in violation of the unconstitutional conditions doctrine.**

The unconstitutional conditions doctrine prohibits the government from "deny[ing] a benefit to a person on a basis that infringes his constitutionally protected interests." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). This is true "even if the government has absolute discretion as to whether it will provide the benefit in the first instance." *Toledo Area AFL-CIO Council v. Pizza*, 154 F.3d 307, 321 (6th Cir. 1998). This is because "[a]llowing the government to decide that it will not give some people a benefit that it gives to others … simply because a person has exercised a right guaranteed under the Constitution, amounts to a penalty for exercising such right." *Pizza*, 154 F.3d at 321; *Speiser v. Randall*, 357 U.S. 513, 526

(1958) ("In practical operation" such action "produce[s] a result which the State could not command directly."). Such coercion is unconstitutional.

The City conditioned the benefit of Steve's 2017 Market participation on surrender of constitutional rights. Steve could stop hosting weddings entirely, host same-sex weddings in violation of his Catholic beliefs, or do no business with the City. Ex. 58 (Lahanas 112:1-5), Ex. 38. Period. And the City's condition stands for all future markets. Ex. 58 (Lahanas 115:1-2) ("If they continued to not host weddings for gay couples they would be excluded.").

Yet, as a Catholic, Steve practices his religious beliefs about marriage by hosting and promoting marriage on his farm. Tennes Decl. ¶¶ 12-17, 30. It is through these weddings that Steve and his family can participate in what they deem a holy event and practice their belief that marriage is a gift from God for one man and one woman. *Id.* at ¶¶ 14-16. Forcing Steve to participate in an event that promotes a conflicting view of marriage violates his core convictions and would be confusing to his children. *Id.* at ¶¶ 16-17 (explaining the impact on his conscience and family). In the same way, requiring him to give up his wedding business means he must surrender his religious practice of promoting the Catholic view of marriage. Either way, the condition extorts the loss of constitutional freedoms.

This extortion is made worse by the fact that in this case, the City's specific goal was to force Steve to surrender his religious beliefs. City officials figured if they put enough pressure on Steve, he would bend to the officials' marriage views. Ex. 60

(Beier 40:25), Ex. 35, 37-38. That compulsion is precisely what the unconstitutional conditions doctrine is supposed to prevent. The City's actions were unconstitutional.

### E. The City's actions do not serve a compelling interest in a narrowly tailored way.

This Court can enter judgment as a matter of law in Steve's favor without reaching any scrutiny analysis. In fact, that is the very approach the Supreme Court took in both *Masterpiece* and *Trinity Lutheran*. In both cases, the government's constitutional violation was so severe that no government interest could overcome it. *See* Sections I.A.1 and I.A.2.

If the Court chooses to address Steve's other constitutional claims, strict scrutiny applies because the City has violated Steve's fundamental rights. The City cannot withstand this scrutiny, which is "the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 509 (1997). It requires that the law be "narrowly tailored to be the least-restrictive means available to serve a compelling government interest." *Bible Believers v. Wayne Cty.*, 805 F.3d 228, 248 (6th Cir. 2015). The Policy and the City's actions meet none of these demands.

The City must show a compelling interest that goes beyond "broadly formulated interests" and is justified as to "the particular claimant[s]" whose constitutional rights are infringed. *Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal*, 546 U.S. 418, 420 (2006); *Holt v. Hobbs*, 135 S. Ct. 853, 863 (2015) (rejecting argument that a broadly formulated interest suffices and stating instead that "a more focused inquiry" is necessary, one that "requires the Government to

demonstrate that the compelling interest test is satisfied through application of the challenged law to the person—the particular claimant whose sincere exercise of religion is being substantially burdened") (cleaned up). In other words, the City must show a compelling government interest to exclude Steve from the Farmer's Market in East Lansing for hosting weddings on his farm in Charlotte in accord with his religious beliefs. The City cannot do so.

The only interest the City has cited is the general governmental interest in eliminating discrimination. But Steve does not discriminate against anyone. He serves everyone on his farm and at the market with no regard for their sexual orientation, marital status, or other characteristic. Tennes Decl. ¶¶ 8, 23. That does not mean he and his family can or must participate in events that violate his religious beliefs, including same-sex wedding celebrations on his farm. And that distinction makes all the difference. As the Supreme Court explained in *Hurley*, applying a public accommodation law to expressive activity does not serve a valid, let alone compelling, state interest. *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 578-79 (1995). Similarly, compelling someone to violate their deepest convictions is "always demeaning." *Janus v. Am. Fed'n of State, Cty., and Mun. Emps., Council 31*, 138 S. Ct. 2448, 2464 (2018).

The Policy is also far from narrowly tailored. Terms like "general business practice" and "harassment" give city officials boundless discretion to enforce the laws. City officials testified that "general business practice" includes all "day-to-day decisions made in the course of running a business," Ex. 61 (Altmann 33:8-9), and

"harassment" includes within its purview speech and conduct that makes a "person feel unvalued," "unwelcome," or "hurts [their] feelings." Ex. 60 (Beier 53:4, 18-22); *see also infra* Section I.F.

Under those definitions, the City has *carte blanche* to roam the countryside and internet reviewing every detail of any vendor's speech or religious beliefs. This places all vendor speech, belief, and activity at all locations—even their homes— within the Policy's control. That is not "actually necessary" to solve any "actual problem" in a narrow way as the Constitution requires. *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 799 (2011). For the same reasons, it is not the least-restrictive means. A better alternative is for the City to stop illegal conduct taking place in the City and leave people outside the City free to express and exercise their beliefs.

> **F. The Policy language, including the terms "general business practice" and "harassment," are constitutionally overbroad, vague, and grant the City unbridled enforcement discretion which it used to violate Tennes's constitutional rights.**

Under the First and Fourteenth Amendments, a law is unconstitutional if it is overbroad, vague, or gives enforcement officials "unbridled discretion" to restrict speech without "objective criteria." *United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 359 (6th Cir. 1998); *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). These principles exist to prevent laws that "invite[] abuse" or "trap the innocent by not providing fair warning." *United Food*, 163 F.3d at 359.

Overbroad laws create "danger that the statute … will significantly compromise recognized First Amendment protections." *Id.* at 360-61 (cleaned up).

Vague laws lack the definition necessary to allow "a person of ordinary intelligence" to understand what is required of them. *Id.* at 358-59 (cleaned up). And laws that grant unbridled enforcement discretion allow constitutional violations through arbitrary and discriminatory enforcement. *Id.* at 359.

The Policy suffers from overbreadth, vagueness, and unbridled discretion because it does not define a host of terms, including "general business practice[s]," and defines one term—"harassment"—so strangely that the City can restrict speech and conduct for any reason whatsoever.

*General Business Practices.* The Policy provides no parameters for defining or enforcing the term "general business practice." Even the City witnesses did not know what this phrase meant. Six City witnesses were asked the meaning of "general business practice" in the Policy. Each gave a different answer ranging from "the way that someone conducts their business" to "what a business does…as it's doing its business" to "day-to-day decisions made in the course of running a business." Ex. 56 (Surface 149:7), Ex. 60 (Beier 51:18-21), Ex. 61 (Altmann 33: 8-9); *see also* Ex. 57 (McCaffrey 45:7-9) ("The way you operate your business on a day-to-day basis. Your policies, your—your decision making and what you have."), Ex. 58 (Lahanas 61:19-20) ("I would take that to mean in their normal operation. The normal way they do business."), Ex. 59 (Meadows 31:16-18) ("Well, I would say that the general business practice of any organization would be usual and ordinary way that they conduct business.").

Not only do the definitions differ, they encompass virtually anything a business says or does, anywhere in the world. And they have no specific meaning. When a definition is entirely subjective, the terms can too easily be used, as they were here, to restrict any criticism about the beliefs, associations, or actions of protected class members any time a business communicates. The words are so elastic that they create confusion, as seen with these witnesses, and can be applied to any viewpoint or activity city officials dislike. They prohibit too much the First Amendment protects.[2]

*Public Policy/Harassment Clause.* The same problems plague the law's public policy which, among other things, bans harassment. While the ordinance defines "harassment," the definition rests on undefined terms and phrases like "demean," "dehumanize," "intimidating, hostile, or offensive" and "substantially interfering." Courts have routinely rejected such language. For example, in *Dambrot v. Central Michigan University*, the Sixth Circuit invalidated a policy with substantially similar language. 55 F.3d 1177, 1182-84 (6th Cir. 1995); *see also Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 215 (3d Cir. 2001) (invalidating harassment policy as overbroad because it banned "any unwelcome verbal … conduct which offends");

---

[2] On January 14, 2019, the City produced a new memorandum from City Attorney Tom Yeadon recommending revisions to the Human Relations Ordinance to, among other things, add a definition of "general business practice" and remove the terms "demean" and "dehumanize" and the provision banning speech that would indicate a person's "patronage or presence … is objectionable, unwelcome, unacceptable, or undesirable…." Ex. 49. The City gave no indication that the Human Relations Ordinance will adopt any changes. Even if they do, the proposed changes do not remedy the problem. The proposed definition remains broad and leaves it to the City's unbridled discretion to decide, for example, what constitutes a "typical, standard, or usual manner" of doing business, and what determines a "customary action [by] a person or entity … in the operation of business." *Id.* The City also has not proposed any remedy to the Court's concern about the phrase "substantially interfering."

*Armstrong v. D.C. Pub. Library*, 154 F. Supp. 2d 67, 77-80 (D.D.C. 2001) (invalidating policy on "objectionable appearance" as overbroad).

The problem, again, is that no one knows what these terms include and what they exclude. Mayor Meadows testified that the terms "demean" and "dehumanize" cover any "means by which I diminish your humanity by an action of harassment." Ex. 59 (Meadows 33:10-12). Councilmember Beier testified that "to demean a person is to make that person feel unvalued or less valued than average," and "[t]o dehumanize a person would be to make a person feel like they are less deserving of basic human decency and … rights." Ex. 60 (Beier 53:4-8). She also explained that "an intimidating action is anything that makes somebody else feel afraid or unwelcome," "[h]ostile would be something that makes somebody feel afraid or unwelcome or in danger," and "[o]ffensive would be something that *hurts somebody's feelings*." Ex. 60 (Beier 53:18-22) (emphasis added). As for councilmember Erik Altmann, he threw up his hands and candidly conceded that the phrase "substantially interfering" and several other terms "would need to be litigated" to be defined. Ex. 61 (Altmann 40:20, 40:16, 40:25-41:7).

Altmann's testimony proves the constitutional violation. If a law must be litigated for an ordinary person to know its meaning, then the law is too vague and too likely to lead to abusive enforcement (as here) to be constitutional.

Equally important, it is not the duty of government "officials to prescribe what shall be offensive." *Masterpiece*, 138 S. Ct. at 1731; *accord, e.g., Matal v. Tam*, 137 S. Ct. 1744, 1763 (2017) ("Giving offense is a viewpoint" and "[w]e have said

time and again that the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers.") (cleaned up). Statutory language like "demean," "dehumanize," "intimidate," "hostile," and "offensive" are so subjective that they (unconstitutionally) do just that.

### G.     The City violated the Michigan Constitution when it targeted Tennes and excluded him from the Farmer's Market for his religious beliefs, practices, and identity.

The Michigan Constitution, which includes a free exercise clause, an establishment clause, and a freedom of conscience and to worship clause, provides broader religious protections than its federal counterpart. Mich. Const. art. I § 4; *Champion v. Sec'y of State*, 761 N.W.2d 747, 753 (Mich. Ct. App. 2008). Alleged violations of the Michigan Constitution are evaluated using a five-factor compelling-interest test that asks: (1) whether plaintiff's belief, or conduct motivated by belief, is sincerely held; (2) whether that belief or conduct is religious; (3) whether belief or conduct is burdened by state action; (4) whether that burden is justified by a compelling state interest; and (5) whether the state could satisfy its interest through a less obtrusive regulation. *Id.* (citing *McCready v. Hoffius*, 586 N.W.2d 723, 728-729 (Mich. 1998)); *Reid v. Kenowa Hills Pub. Schs.*, 680 N.W.2d 62, 68-69 (Mich. Ct. App. 2004). So, if government action burdens sincere religious beliefs, it must pass strict scrutiny. *Id.* at 70. The City fails the requirements here.

As to the first two elements, the City concedes the sincere and religious nature of Steve's beliefs about marriage. Ex. 56 (Surface 147:7-9) ("I don't have an opinion on his religious beliefs ... I think that everybody interprets the Bible in a different way and it is their right."), Ex. 58 (Lahanas 109:24-25) ("It's not his

religious belief. He can think whatever he wants, free religion…."). Plaintiffs have already shown the fourth and fifth elements—that the City lacks a compelling interest and has not used the less obstructive form of the regulation. *See supra* Section I.E. Thus, only the third element remains—whether the City's actions burden Tennes's religious beliefs and practices. They undeniably do.

The City has forced Steve to choose between his beliefs and his market participation. If he and his family continue to participate in weddings on his farm in accord with their religious beliefs, Steve will not be allowed to sell apples at the Farmer's Market—or be welcome to do business in the City at all. Ex. 58 (Lahanas 112:1-5), Ex. 38. This places Tennes on unequal footing with other vendors. He is uniquely pressured to surrender his beliefs because the City thinks the Catholic Church's marriage teachings are bigoted and akin to racial discrimination. Ex. 35-36, 38, Ex. 58 (Lahanas 112:8-13).

As noted above, the City created a Policy expressly to target Tennes. It applied the Policy only to Tennes based on his religious practices. Ex. 26. And along the way, city officials made known their opposition to Tennes's beliefs through public statements about his religious practices. *See supra* Section I.A. These actions violated Michigan's guarantees of free exercise, freedom from establishment of religious belief, and freedom to worship.

## II. Tennes will suffer irreparable harm absent a permanent injunction and there is no other adequate remedy at law.

To obtain a permanent injunction, Plaintiffs "must demonstrate that failure to issue the injunction is likely to result in irreparable harm" and that "there is no

other adequate remedy at law." *United States v. Miami Univ.*, 294 F.3d 797, 816

(6th Cir. 2002). Because Plaintiffs have shown success on the merits of their First

Amendment claims, they also satisfy these factors. *United Food*, 163 F.3d at 363

(likely merits success is determinative of an injunction in First Amendment cases).

 The City stripped Steve of his First Amendment rights to religious freedom

and free speech. And "[t]he loss of First Amendment freedoms, for even minimal

periods of time, unquestionably constitutes irreparable injury." *United Food*, 163

F.3d at 363 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). That harm is always

"sufficient to justify injunctive relief." *United Food*, 163 F.3d. at 363 (citation

omitted).

 In fact, where the injury is the ongoing infringement of Steve's constitutional

freedoms, nothing *but* injunctive relief will suffice. No amount of money will cure an

ongoing irreparable injury. *Miami Univ.*, 294 F.3d at 819 ("[I]rreparable" harm is

"by definition, not compensable."). And the City will not stop violating Steve's rights

absent court order. Ex. 58 (Lahanas 114:22-115:2). Accordingly, entry of an

injunction is appropriate and absolutely necessary.

## III. Tennes is entitled to damages, attorney fees, and costs for violation of his constitutional rights.

 Any party deprived of their "rights, privileges, or immunities secured by the

Constitution" is entitled to damages, attorney fees, and costs. 42 U.S.C. §§ 1983,

1988. The City deprived Steve of his First and Fourteenth Amendment rights when

it targeted his religious beliefs, retaliated against him for religious speech, acted

with open hostility towards his faith, conditioned his future market participation on

surrender of his religious convictions, and created and used an overbroad and vague policy to disqualify his market application for activity occurring 22 miles away on his farm.

As a direct result of the City's actions, Steve lost profits from the Farmer's Market, from weddings when he halted his wedding business in fall 2016, and from supplier agreements that were cancelled because of the City's attack on his reputation. *See* Ex. 64 (Expert Report of Rodney L. Crawford, CPA-ABV, CFF, CFE, CIRA). Steve also incurred increased advertising costs and countless other tangible and intangible damages. *Id.*, Tennes Decl. ¶¶ 38-44, Ex. 62 (Tennes 98:17-99:24).

Accordingly, the Court should award Plaintiffs their damages, attorney fees, and costs, including expert fees, in amounts to be determined by separate motion.

## CONCLUSION

The principles presented in this case have far-reaching consequences. If a City can create policies to target someone's religious speech and conduct—while publicly opposing and disparaging his views—then there really is no limit to what civil rights that City can excise. That is why the Constitution protects religious freedom and free speech. And it is why Courts have "jealously guarded" these rights for two centuries, including several recent Supreme Court decisions.

Plaintiffs respectfully ask this Court for an injunction and damages to stop the City's intolerance for a faithful farmer's religious beliefs, and to prevent the City from excluding religious believers who do business in the City when those believers speak about and act upon their faith outside the City's limits.

Respectfully submitted this 24th day of January, 2019,

By:  s/ Katherine L. Anderson

Jeremy D. Tedesco (AZ Bar No. 023497)*
Jonathan A. Scruggs (AZ Bar No. 030505)*
Samuel D. Green (AZ Bar No. 032586)*
Katherine L. Anderson (AZ Bar No. 033104)*
Ryan J. Tucker (AZ Bar No. 034382)*
**Alliance Defending Freedom**
15100 N. 90th Street
Scottsdale, AZ  85260
Telephone: (480) 444-0020
Fax:  (480) 444-0028
jtedesco@adflegal.org
jscruggs@adflegal.org
sgreen@adflegal.org
kanderson@adflegal.org

David A. Cortman (GA Bar No. 188810)*
Rory T. Gray (GA Bar No. 880715)*
**Alliance Defending Freedom**
1000 Hurricane Shoals Rd. NE
Suite D-1100
Lawrenceville, GA 30043
Telephone:  (770) 339-0774
Fax:  (770) 339-6744
dcortman@adflegal.org
rgray@ADFlegal.org

James R. Wierenga (P48946)
Jeshua T. Lauka (P71958)
**David & Wierenga, P.C.**
99 Monroe Avenue, N.W.
Suite 1210
Grand Rapids, MI 49503
Telephone:  (616) 454–3883
Facsimile:  (616) 454–3988
jim@dwlawpc.com
jeshua@dwlawpc.com

John Bursch (P57679)
**Bursch Law PLLC**
9339 Cherry Valley Avenue, SE
Suite 78
Caledonia, MI 49316
Telephone:  (616) 450-4235
jbursch@burschlaw.com

*Admitted to this Court

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief contains 9,961 words as defined by and in compliance with W.D. Mich. LCivR 7.2(b)(i), according to the word count of Microsoft Office Professional Plus 2013 which was used to create this brief.

By: s/ Katherine L. Anderson

Katherine L. Anderson
AZ Bar No. 033104*
**Alliance Defending Freedom**
15100 N. 90th Street
Scottsdale, Arizona  85260
Telephone:  (480) 444-0020
Fax:  (480) 444-0028
kanderson@adflegal.org

ATTORNEY FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I hereby certify that on January 24, 2019, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following counsel of record who are registered users of the ECF system:

Michael S. Bogren
Plunkett Cooney
950 Trade Centre Way, Ste. 310
Kalamazoo, MI 49002
269-226-8822
mbogren@plunkettcooney.com

Audrey J. Forbush
Plunkett Cooney
111 E Court St, Ste. 1B
Flint, MI 48502
810-342-7014
aforbush@plunkettcooney.com

Thomas M. Yeadon
McGinty Hitch Housefield Person
Yeadon & Anderson PC
601 Abbott Rd.
P.O. Box 2502
East Lansing, MI 48826
517-351-0280
tomyeadon@mcgintylaw.com

By: s/ Katherine L. Anderson
Katherine L. Anderson
AZ Bar No. 033104*
**Alliance Defending Freedom**
15100 N. 90th Street
Scottsdale, Arizona  85260
Telephone:  (480) 444-0020
Fax:  (480) 444-0028
kanderson@adflegal.org

ATTORNEY FOR PLAINTIFFS

40