UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

COUNTRY MILL FARMS, LLC and )
STEPHEN TENNES, )
               Plaintiffs, )
 )     No. 1:17-cv-487
-v- )
 )     Honorable Paul L. Maloney
CITY OF EAST LANSING, )
              Defendant. )

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART CROSS MOTIONS FOR SUMMARY JUDGMENT

Many of the claims and defenses in this lawsuit attempt to distinguish between belief and conduct and between conduct and expression, concepts not readily conducive to easy categorization. Stephen Tennes owns and operates Country Mill Farms. This civil rights lawsuit arose when Plaintiff Stephen Tennes posted his religious beliefs about marriage on Country Mill Farms' Facebook page. In addition to discussing his religious beliefs, Tennes also stated that he would no longer rent his farm for weddings ceremonies that would violate his religious beliefs. Because of the Facebook post, the City of East Lansing denied Country Mill Farms' vendor application for the City's farmers market. Tennes and Country Mill Farms sued. For their motion for summary judgment, Tennes and Country Mill Farms focus almost exclusively on Tennes' statement concerning his religious beliefs. For the City's motion for summary judgment, it focuses almost exclusively on Tennes' statement that he would not rent his property for same-sex weddings. Because the parties generally decline to

engage the arguments advanced by the other side, the Court finds genuine issues of material facts for many of the outstanding claims.

## I.

A trial court should grant a motion for summary judgment only in the absence of a genuine dispute of any material fact and when the moving party establishes it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the burden of showing that no genuine issues of material fact exist. *Celotex Crop. v. Catrett*, 477 U.S. 317, 324 (1986). To meet this burden, the moving party must identify those portions of the pleadings, depositions, answers to interrogatories, admissions and any affidavits and other evidence in the record, which demonstrate the lack of genuine issue of material fact. Fed. R. Civ. P. 56(c)(1); *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627-28 (6th Cir. 2018). The moving party may also meet its burden by showing the absence of evidence to support an essential element of the nonmoving party's claim. *Holis v. Chestnut Bend Homeowners Ass'n*, 760 F.3d 531, 543 (6th Cir. 2014). When faced with a motion for summary judgment, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." *Pittman*, 901 F.3d at 628 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). The court must view the facts and draw all reasonable inferences from those facts in the light most favorable to the nonmoving party. *Maben v. Thelen*, 887 F.3d 252, 263 (6th Cir. 2018) (citing *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In resolving a motion for summary judgment, the court does not weigh the evidence and determine the truth of the matter; the court determines only if there exists a genuine issue for trial. *Tolan v. Cotton*, 572 U.S. 650, 656

(2014) (quoting *Anderson*, 477 U.S. at 249). The question is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-252.

## II.

## A.

Underlying this dispute are ordinances and guidelines promulgated by the City of East Lansing.[1] In 1972, the City of East Lansing adopted a nondiscrimination ordinance. The Ordinance declares the public policy of the municipality.

> It is hereby declared to be contrary to the public policy of the City of East Lansing for any person to deny any other person the enjoyment of his/her civil rights or for any person to discriminate against any other person in the exercise of his/her civil rights or to harass any person because of religion, race, color, national origin, age, height, weight, disability, sex, marital status, sexual orientation, gender identity or expression, student status, or because of the use by an individual of adaptive devices or aids.

City of East Lansing, MI., Code § 22-31. In 2016 when the events giving rise to this lawsuit transpired, the City's ordinances defined the word "harass" to include both conduct and communication.

> To harass means to have physical conduct or communication which refers to an individual protected under this article, when such conduct or communication demeans or dehumanizes and has the purpose or effect of substantially interfering with an individual's employment, public accommodations or public services, education, or housing, or creating an intimidating, hostile, or offensive employment, public accommodations, public services, educational, or housing environment.

*Id.* § 22-32.

---

[1]    The controlling pleading is Plaintiffs' amended complaint. (ECF No. 5 Complaint.) Defendants filed an answer. (ECF No. 31 Answer.)

The City operates the East Lansing Farmer's Market (ELFM).  Vendors are selected by invitation and by application.  (Compl. ¶ 95–98 PageID.76; Answer ¶¶ 95-98 PageID.438-39.)  The City issues licenses to the vendors so that they may participate in the ELFM.  (Compl. ¶ 99 PageID.67; Answer ¶ 99 PageID.439.)  Without a license, vendors are not permitted at the ELFM.  (Compl. ¶ 101 PageID.76; Answer ¶ 101 PageID.439.)  Country Mill was a vendor at the ELFM from 2010 through 2016 and was invited by the City from 2011 through 2016.  (Compl. ¶¶ 101-102 PageID.76; Answer ¶¶ 101-102 PageID.439; ECF No. 71-1 Tennes Aff. ¶¶ 21-22 PageID.831.)

In order to secure a license for the ELFM, vendors must pay a fee and must agree to follow the ELFM Vendor Guidelines.  The events giving rise to this lawsuit occurred in 2016.  Tim McCaffrey, the Director of Parks and Recreation for the City of East Lansing, testified that in January and February 2017 the City began to discuss the need to reference or incorporate the City's nondiscrimination ordinance in the ELFM Vendor Guidelines.  (ECF No. 68-4 McCaffrey Dep. at 41-41 PageID.730-31.)  Heather Surface is the Community Events Coordinator for the City and, as part of her job, she coordinates the ELFM.  (ECF No. 68-3 Surface Dep. at 7 PageID.710.)  Surface testified that she and McCaffrey reviewed the Vendor Guidelines and consulted with the City's attorney.  (*Id.* at 78 PageID.716.)

The 2017 ELFM Vendor Guidelines were amended to add subsection m to Section 6, to incorporate the nondiscrimination ordinance by reference.

> 6) VENDORS WILL EMBODY THE SPIRIT OF THE MARKET BY:
> Multiple factors that affect the success of every vendor are considered.
> . . .

    m.  Complying with the City of East Lansing's Civil Rights ordinances and the public policy against discrimination contained in Chapter 22 of the East Lansing City Code while at the ELFM and as a general business practice.

(ECF No. 5-1 PageID.114-15.).  The Vendor Application requires the applicant to check a box indicating that he or she has read and agrees to all of the ELFM 2017 Vendor Guidelines. (*See* Compl. ¶ 150 PageID.81; Answer ¶ 150 PageID.449.)  When the City made the addition to the Vendor Guidelines, the phrase "general business practice" was not defined. Surface thought that the situation involving Country Mill was the "catalyst" for the review of the Vendor Guidelines.  (Surface Dep. at 78-79 PageID.716.)  The change was necessary because the vendors at the ELFM were not being held to the same standards as were City contractors.  (*Id.* at 78.)  McCaffrey testified that the City does not look for violations of the Vendor Guidelines but it will enforce the guidelines and the ordinances if situations are brought to the City's attention.  (McCaffrey Dep. at 46-47 PageID.732.)

## B.

    Generally, the parties do not dispute the various acts that occurred.  On occasion, one party identifies acts that occurred of which the other party would have no knowledge. The parties do offer competing inferences from the various occurrences and also dispute the legal significance of those occurrences and inferences.

    Steve Tennes is a parishioner at St. Mary's Catholic Church in Charlotte, Michigan. (ECF No. 68-1 Tennes Dep. at 22 PageID.697.)  Tennes believes the Catholic "Church's teaching that marriage is a God-ordained, lifelong, sacrificial, and sacramental covenant between one man and one woman, with profound spiritual and societal implications." (ECF No. 71-1 Tennes Dec. ¶ 14 PageID.829.)

Tennes is the owner and operator of Country Mill Farms, LLC.  (Tennes Dec. ¶ 2 PageID.826.)  The mission statement for Country Mill Farms is "to glorify God by facilitating family fun on the farm and feeding families."  (*Id.* ¶ 6 PageID.827.)  Tennes "sees it as his calling to run [the] family farm . . . while honoring [his] Roman Catholic faith."  (*Id.* ¶ 7 PageID.827.)  Tennes and his family host as many as 44 weddings a year and "discovered it was a beautiful way to promote and support our beliefs about marriage."  (*Id.* ¶ 13 PageID.829.)

Tennes and his family are "intimately involved" in the weddings.  (Tennes Dec. ¶ 15 PageID.829.)  He helps plan and layout the venue.  (Tennes Dep. at 31-32 PageID.698.) The family meets and communicates with the couple, they help plan the event, they assist in staging the event, and they drive guests from the parking lot to the venue.  (Tennes Dec. ¶ 16 PageID.829-30.)  Tennes does not inquire about the religious beliefs of the couples who seek to rent Country Mill.  (Tennes Dep. at 38 PageID.700.)  Although Tennes is aware that the Catholic Church requires the Church to annul a prior marriage, Tennes does not inquire about the prior marital status of any individual seeking to rent Country Mill for a wedding ceremony.  (*Id.* at 46-47 PageID.701.)

Country Mill Farms has a webpage on the internet site Facebook which it uses to communicate with the public.  (ECF No. 68-1 Tennes Dep. at 64 PageID.705.)  The events leading to this lawsuit began around August 24, 2016 with a post on County Mill's Facebook page.  An individual wrote that she "heard you're not welcoming of LGBT Groups" and asked if "someone could please make a statement regarding this?"  (ECF No. 71-7 PageID.865.)  Tennes responded as follows:

> Thank you for inquiring about our family farm.  We do host weddings on our farm.  We have had same sex couples inquire about getting married at our orchard.  Due to our personal religious beliefs, we do not participate in the celebration of a same sex union.  We have and will continue to respectfully direct wedding inquiries to another mid-Michigan orchard that has more experience in hosting same sex weddings.  We welcome all customers for our other activities and products on the farm.  We have friends, family and business associates in the LBGT community.  We respect other people's beliefs and we can only hope that others will respect ours.  We have always tried our best to be respectful in this area.  Thank you for your understanding.

(*Id.* PageID.866; Tennes Dec. ¶ 18 PageID.830.)

The City became aware of Tennes' Facebook post the next day.  On August 25, 2016, an individual sent an email about the August 24 Facebook posts to Heather Surface.  (ECF No. 68-5 PageID.737-38.)  Surface forwarded the email to McCaffrey, her supervisor.  (*Id.*; Surface Dep. at 41 PageID.712.))  McCaffrey testified that he had conversations with the City's manager and others about "how to move forward."  (McCaffrey Dep. at 24 PageID.727.)

On Friday, August 26, the City asked Country Mill to agree not to attend the ELFM on Sunday, August 28.[2]  (Tennes Dec. ¶ 24 PageID.832.)  McCaffrey expressed concern about "protesters, adverse media attention, and possible negative impacts on your business and the business of other vendors."  (ECF No. 71-15 Email PageID.883.)  Tennes decided to temporarily stop booking all weddings at Country Mills.  (Compl. ¶ 127 PageID.79; Tennes Dec. ¶ 26 PageID.832.)  Tennes attended the ELFM on August 28, despite the

---

[2]      McCaffrey made several attempts to speak with Country Mill.  (McCaffrey Dep. at 25 PageID.727.)  He telephoned Diane Tennes several times and left voicemail messages.  (*Id.*; ECF No. 71-13 Transcripts PageID.877-79.)  He also sent several emails.  (ECF No. 71-14 PageID.881; ECF No. 71-15 PageID.882-84; ECF No. 71-16 PageID.885-86.)

City's continued requests not to attend.[3]  (Tennes Dec. ¶ 29 PageID.833.)  Country Mill participated at the ELFM for the remainder of the 2016 season.  (*Id.*; Answer ¶ 137 PageID.446.)

In December 2016, Tennes decided that he would again rent Country Mill Farms for weddings.  (Tennes Dec. ¶ 30 PageID.833.)  On December 12, 2016, Tennes posted the announcement on Country Mill's Facebook page.

> This past fall our family farm stopped booking future wedding ceremonies at our orchard until we could devote the appropriate time to review our policies and how we respectfully communicate and express our beliefs.  The Country Mill engages in expressing its purpose and beliefs through the operation of its business and it intentionally communicates messages that promote its owners' beliefs and declines to communicate messages that violate those beliefs.  The Country Mill family and its staff have and will continue to participate in hosting the ceremonies held at our orchard.  It remains our deeply held religious belief that marriage is the union of one man and one woman and Country Mill has the First Amendment Right to express and act upon its beliefs.  For this reason, Country Mill reserves the right to deny a request for services that would require it to communicate, engage in, or host expression that violates the owners' sincerely held religious beliefs and conscience.  Furthermore, it remains our religious belief that all people should be treated with respect and dignity regardless of their beliefs and background.  We appreciate the tolerance offered to us specifically regarding our participation in hosting wedding ceremonies at our family farm.

(ECF No. 5-1 PageID.112.)  Like the August 2016 message, Surface and McCaffrey became aware of the December 2016 through members of the community.  The same day Tennes posted his message, December 12, a member of the community posted comments about his

---

[3]      McCaffrey testified that the City asked Tennes not to come to the ELFM that weekend, but "if you're going to vend, go ahead.  I mean, we're not going to take that right away from you." (McCaffrey Dep. at 26 pageID.728.)  Tennes acknowledges the City's request was for voluntary action.  (Tennes Dec. ¶ 24 PageID.832.)  Tennes testified that the City "did not say that we could not come."  (Tennes Dep. at 53 PageID.702.)

announcement on the ELFM's Facebook page.  (Surface Dep. at 70 PageID.714; ECF No. 71-21 PageID.893.)

In January 2017, the Market Planning Committee for the ELFM met to identify and then invite vendors for the 2017 ELFM.   (Compl. ¶ 193 PageID.86; Answer ¶ 193 PageID.460.)  Surface testified that McCaffrey informed her that the Committee was not to issue an invitation to Country Mill for the 2017 ELFM.  (ECF No. 75 Surface Dep. II at 76-77 PageID.1502-03; ECF No. 71-22 Meeting Agenda PageID.894.)  McCaffrey testified that "a number of people" were involved in the decision, including himself, the City's manager, the City's attorney, and possibly the City's mayor.  (McCaffrey Dep. at 51-52 PageID.733.)  Surface testified that McCaffrey said if Country Mill submitted a vendor application, the City would deal with it.  (Surface Dep. II at 76-77 PageID.1502-03.)  The Committee did not invite Country Mill to be a vendor.  (Tennes Dec. ¶ 31 PageID.834.)

Country Mill submitted a vendor application, which was reviewed by the City.  (Compl. ¶¶ 197 and 199 PageID.86; Answer ¶¶ 197 and 199 PageID.461.)  When the Committee received County Mill's application, Surface "walked it straight over to Tim McCaffrey." (Surface Dep. at 82 PageID.717.)  Surface denied being involved in the decision to deny Country Mill's application.  (ECF No. 78-5 Surface Dep. III at 148 PageID.1693.)  A letter was drafted denying the application, which McCaffrey edited and Surface signed.  (ECF No. 71-60 McCaffrey Dep. II at 57-59 PageID.1123-25; Surface Dep. at 86-88 PageID.718.)  George Lahanas, the City Manager, testified that under normal practices a letter like this one would be drafted by McCaffrey, which Lahanas would then review and finalize.  (ECF No. 71-61 Lahanas Dep. at 58-59 PageID.1180-81.)  By email, the letter was

circulated to "Council," which included at least the mayor and City Councilmember Erik Altman, both of whom responded.   (ECF No. 71-25 PageID.922; ECF No. 71-26 PageID.925.)

Surface sent Diana Tennes the letter denying Country Mills's vendor application.[4] (Tennes Dec. ¶ 33 PageID.834.)  The letter reads

> It was brought to our attention that The Country Mill's general business practices do not comply with East Lansing's Civil Rights ordinances and public policy against discrimination as set forth in Chapter 22 of the City Code and outlined in the 2017 Market Vendor Guidelines, as such, The Country Mill's presence as a vendor is prohibited by the City's Farmer's Market Vendor Guidelines.

(ECF No. 5-2 PageID.129.)  Steve Tennes emailed Surface asking for clarification about the business practices that were objectionable.   (Tennes Dec. ¶ 34 PageID.834.)   Surface forwarded the email to McCaffrey, along with a proposed response.  (Surface Dep. at 95 PageID.719; ECF No. 71-28 Email PageID.925.)  Surface signed and sent a letter to Steve Tennes referencing his December Facebook post as outlining an objectionable business practice.  (Tennes Dec. ¶ 34 PageID.834.)

> It was brought to our attention this winter that your facebook post dated December 12, 2016 outlines a business practice that would be considered a violation of the City of East Lansing Civil Rights Ordinances and our public policy against discrimination contained in Chapter 22 of the East Lansing City Code.

(ECF No. 5-1 PageID.111.)

---

[4]      The letter is dated March 7.  The emails were exchanged on March 8.  The Court infers that the letter was not sent on March 7 because the initial email uses future tense and states that the McCaffrey and Surface "will be sending" the letter.  (PageID.925.)

C.

Plaintiffs identify a number of statements made by city officials to show that the actions were made because of Tennes' religious beliefs and to show the officials' animosity towards religion.  All of the statements were made after Plaintiffs filed this lawsuit.

### 1.  Mayor Mark Meadows

On June 1, 2017, the Mayor of East Lansing, Mark Meadows, posted an on-line comment about the Country Mill lawsuit.

> It will be interesting to see what discovery turns upon when and how the lawsuit was formulated, . . . , and whether the decision to ban same sex marriages from the marriage part of the business is the result of a sincerely held religious belief or an attempt to improve the marriage business portion of the company's activities.  I don't doubt the sincerity of the owners of the company.  But our local law is clear and its application is also clear.  The participation in the Farmer's Market is not a right, it is a privilege.  To qualify, one must agree to comply with the East Lansing Civil Rights Ordinance while operating there and while operating elsewhere.  In fact, Country Mill's application indicated that the 2017 guidelines were read and agreed to.  Obviously, that representation would be false.  Country Mill Farm . . . in fact was going to operate a discriminatory marriage business and thus could not comply with the guidelines.  The decision to reject the application thus had nothing to do with the personal beliefs or expression of those beliefs by one of the owners of the company.

(ECF No. 71-33 PageID.951.)

On September 9, 2017, the Detroit News published an editorial by Ingrid Jacques defending Steve Tennes.  Mayor Meadows posted a response to the editorial.

> . . . .  East Lansing does not have a problem with Steve's religious beliefs.  It has a problem with the business practices of his corporation, . . . .  Steve is not hosting weddings, Country Mill Farms, Inc. does.  . . .  When the corporation made its application to be a vendor at the East Lansing Farmer's Market, it was provided a copy of the updated participation rules.  It still submitted its application and checked the box indicating it had read the rules and would

comply with them.  It did not intend to when asked, it confirmed that it would not.  It was not provided a space at the market as a result.

(ECF No. 71-32 PageID.947.)  Meadows then addressed the author's assertion that the City's

actions violated the First Amendment.

> I think she is forgetting that Country Mills lost its spot at the Farmers Market because Steve's firmly held 'Catholic views on marriage' were not just his views. He made it his corporation's views and translated it into a business practice instead of free speech.  Same sex couples have a right to be married.  County Mill offers a public accommodation that discriminates against same sex couples. . . .  Ingrid says Steve (actually the corporation) had no option but to sue.  In fact it did have another option.  It could have stopped discriminating against same sex couples.

(*Id.*)

## 2.  City Council Member Ruth Beier

City Council Member Ruth Beier participated in a City Council Debate hosted by a

Michigan State University student association on September 20, 2017.  The topic to which

she responded was the City's decision not to appeal this Court's preliminary injunction.  Beier

stated, in part:

> We're hoping when we can actually make our case we will prevail because the substance of the injunction said that the city was discriminating against Country Farms based on something that they said, and that is not the case.  We don't doubt you're allowed to be a bigot.  You're allowed to say whatever you want. You can say it on Facebook.  You can say ridiculous, horrible, hateful things. What we said is if you actually do discriminate in your business by not allowing - - not allowing same-sex couples to marry on your farm, then we don't want you in East Lansing.  It's nothing to do with what they said.  So I think when we make the case, we will prevail.

(ECF No. 71-41 Transcript at 3-4 PageID.971-72.)  The same day, Beier sent an email

response to a community member.  Beier wrote

> Thank you for your reasoned response.  You make good points.

> I disagree that the views held by people like this vendor or [sic] not likely to change. It was not that long ago that a farm like this one might have prohibited interracial marriage. That commonly held view changed. This one will too.

(ECF No. 71-38 PageID.964.) Beier was asked about this email at her deposition. She explained she was "making an analogy between disagreeing with gay marriage and disagreeing with interracial marriage." (ECF No. 71-63 Beier Dep. at 38 PageID.1235.) She clarified that she "was talking not about his religion. I was talking about his discrimination against people. The discrimination against a group of people who are gay, I was making an analogy to discrimination against a group of people who are black, or black and white." (*Id.* at 39 PageID.1236.) She also explained that she believed "that we will come to a place where gay people are accepted as being able to marry, just like black and white people are accepted as being able to marry." (*Id.*) And, she "would hope that Mr. Tennes's views would change too." (*Id.* at 40 PageID.1237.)

### 3. City Manager George Lahanas

The City Manager George Lahanas was quoted in several articles. The first article appeared in the Huffington Post. Lahanas offered a defense of the decision to reject Country Mill's application. "It's because of their business practice of excluding people, [that's] the issue. . . . They can have any belief they want, but if they're excluding people, that's the difference." (ECF No. 71-44 PageID.979) (alteration in original.) In a second article published on a Jackson, Michigan new channel's website (WILX), Lahanas is quoted as saying "It's got nothing to do with their free speech it has to do with their business practice." (ECF No. 71-42 PageID.795.) According to the article, Lanahas stated that "if they allow same-sex couples or stop holding weddings altogether again, they'd be welcomed back." (*Id.*)

In another article published by WLNS TV, Lahanas is quoted as saying "If the same thing were held where they were excluding people because of their race or religion from purchasing products at their facility in another city then wanted to sell at our farmers market and say but we're not discriminating here . . . that to us isn't acceptable." (ECF No. 71-42 PageID.977.)

Plaintiffs also identify some of the statements Lanahas made at his deposition. When asked whether he agreed with Beier's statements, Lahanas said

> She maybe said it different than I would have said it. I mean, the City of East Lansing's job is enforcing all the laws, ordinances, in the US, including protecting people's free speech. We would work to protect everybody's free speech. We had some of the most objectionable speech ever come to East Lansing and we spent time and money - - if I can think of the name of the group. The Westboro Baptist Church people came and told us they were coming and we set up barricades and we protected them because it's their free speech rights. Nobody agrees with their - - I mean, I don't think anybody agrees with what they say, and I certainly do not. It's horrible, hateful stuff. But our police still protected them because its our job to protect free speech. So we all take very seriously, me most of all, that that is the people's constitutional right and it's protected. So I would agree with that. Yes, you can say whatever you want, hateful, horrible stuff, its free speech, and that's great. But if you act on it and discriminate against somebody then we have an issue.

(Lahanas Dep. at 107-08 PageID.1208-09.)  Lahanas was then asked to clarify the City's objections to Tennes' or Country Mill's conduct.

> So the issue isn't what he said, the issue isn't his beliefs, because you can't control someone's beliefs, wishes or what they say. They can say whatever they want. Free speech. The issue is he has a barn venue that he opens for people to get married and he will rent it to opposite-sex couples to get married but he won't rent it to same-sex couples. So his venue is not available for same-sex couples, and to me that's the discrimination and that's the business practice that we are most concerned with and that's the one that got him excluded from the farmer's market. And even still, if he said what he was saying, that's fine. If he goes back to the other business practice and doesn't have that business

practice we would have no problem with him coming back to the market and, in fact, we did back in that August.  He still - - his pronouncement that he's against gay marriage in some way, that didn't matter.  What mattered was that he was stopping all weddings so there wasn't going to be discrimination.  So, yes, that's an accurate statement of the whole issue.

(*Id.* at 108-09 PageID.1607-08.)  Lahanas was pressed on how the City would address the matter if Tennes' religious beliefs dictate that he cannot participate in same-sex weddings.

I would say it's the same the thing if you would have talked 60 years ago against African Americans.  People can say my religious belief makes me say that I can't provide service to African Americans and they can cite the Bible for it. It doesn't make it true.  That doesn't make it right.  It's still wrong.  It's the same thing here.

(*Id.* at 112 PageID.1611.)

At their depositions, City officials were asked about the City Council's authority and the role the Council played in the amendment to the Vendor Guidelines and the decision to deny Country Mill from the 2017 ELFM.  The citizens of East Lansing elect the individual members of the City Council.  (Lahanas Dep. at 11 PageID.1135.)  The City Council hires the City's attorney and the City's manager.  (*Id.*)  As City Manager, Lahanas functions as the chief personnel officer and he has the authority to hire and fire City employees, other than the City Attorney.  (Lahanas Dep. at 12 PageID.1136.)

The mayor is a member of the City Council; the elected members of the City Council choose the mayor from its members.  (ECF No. 71-62 Meadows Dep. at 13 PageID.1218; ECF No. 71-64 Altmann Dep. at 12 PageID.1254.)  The mayor sets the agenda for City Council meetings, but otherwise the mayor's role is not distinct from the role of other councilmembers.  (Meadows Dep. at 13 PageID.1218.)  The City Council is a decision-

making body and it does make decisions about the City of East Lansing.  (Altmann Dep. at 13 PageID.1255.)

As City Manager, Lahanas carried out the "standard and administrative functions" of the City.  (Altmann Dep. at 12 PageID.1254.)  Lahanas met each week with Meadows before the City Council meeting to plan the agenda.  (Lahanas Dep. at 15 PageID.1139.)  Lahanas would meet with the other councilmembers individually about once every two weeks.  (*Id.* at 16 PageID.1140.)  Formal directions from the Council to Lahanas would occur during City Council meetings.  (*Id.* at 17 PageID.1141.)  With other smaller, non-policy issues, Lahanas would take action based on his meetings with individual councilmembers.  (*Id.* at 19-20 PageID.1143-44.)  If the City Council disagreed with a course of action taken by Lahanas, the Council could vote to change the City's policy, like amending ordinances or passing other legislation.  (ECF No. 78-4 Altmann Dep. II at 35 PageID.1686.)

For purposes of interacting with the media, Lahanas speaks for the City.  (Lahanas Dep. at 94 PageID.1195.)  For a councilmember to speak for the City or for the City Council, there should be a motion to the City Council or some official action.  (*Id.*)  Of course, as elected officials, councilmembers often speak to the media on their own, in which case they speak for themselves.  (*Id.*)

Members of the City Council were aware of constituent concerns about the policy at Country Mills at least by August 2016 when Country Mill decided to stop booking weddings.  (Lahanas Dep. at 31-33 PageID. 1155-57.)  Meadows circulated at least one email about the situation and copied all members of the City Council.  (*Id.* at 32-33 PageID.1156-57.)

The amendments to the Vendor Guidelines did not involve members of the City Council. While Lahanas might have been aware that Surface and McCaffrey were making changes to the Vendor Guidelines, Lahanas did not draft any of the amendments. (Lahanas Dep. at 42-45 PageID.1166-67.) Lahanas did not recall that the City Council approved the amendments to the Vendor Guidelines. (*Id.* at 43 PageID.1167.) Because Surface oversaw the ELFM, policy changes would have been made by Surface and McCaffrey. (*Id.* at 43 PageID.1166.) Lahanas admitted that he would have had the final approval for any amendments to the Vendor Guidelines. (*Id.* at 49 PageID.1173.)

Members of the City Council were made aware of the decision to deny Country Mill's 2017 application to vend at ELFM. Lahanas confirmed that the email chain was circulated to the council members. (Lahanas Dep. at 55 PageID.1177 and 56-57 PageID.1178-79.) In August 2016, an email was sent to councilmembers suggesting that the City drop its opposition to Country Mill coming to the ELFM because Country Mill decided to stop hosting weddings. (Lahanas Dep. at 34 PageID.1158.) Altmann disagreed and indicated the City should continue to request that Country Mill not come to the ELFM. (*Id.*; Altmann Dep. at 16 PageID.1257.) Lahanas then informed councilmembers that "after further discussions with Tim McCaffrey and Tom Yeadon [the City Attorney] we decided to maintain our request that Country Mill voluntarily elect not to attend the market tomorrow." (Lahanas Dep. at 35 PageID.1159.)

## III.

Throughout the complaint and in their motion, Plaintiffs identify the source of their injury as the City of East Lansing's "Policy." Plaintiffs describe that Policy as the

incorporation of the nondiscrimination ordinance into the Vendor Guidelines.  (Compl. ¶¶ 13-14, 148-49.)

## A.  Free Speech

For Count I, Plaintiffs claim several different violations of their freedom of speech. The parties have moved for summary judgment on some of the causes of action arising under the general category of freedom of speech.

### 1.  Facial Challenge / Overbreadth

Plaintiffs request summary judgment on their overbreadth claim.[5]  The City moves for summary judgment on Plaintiffs' overbreadth claim, which it addresses as a facial challenge.[6]

The City argues Plaintiffs' overbreadth challenges to the ordinances are moot and should be dismissed.  Since the lawsuit was filed, the disputed language has been amended and the term "general business practice" has been defined.

On January 16, 2019, the Human Relations Committee for the City of East Lansing voted to recommend the City Council approve Ordinance 1447, which amends several provisions of the Code of the City of East Lansing.[7]  (ECF No. 68-12 Memo PageID.770.)

Among the changes, the City amended § 22-32, to add a definition of "general business practice," which now means

---

[5]     Plaintiffs § I.F.  In this section of their brief in support, Plaintiffs discussion both their overbreadth claim and their Due Process claim.  The Court addresses the Due Process claim below.
[6]     Defendant § 1.A
[7]     The website for the City of East Lansing contains a list of recently adopted ordinances, including Ordinance No. 1447, which have been adopted by the City Council and are waiting to be integrated into the City Code in its next Code update.

the typical, standard or usual manner in which a person or entity performs or habitually engages in the operation of a particular aspect of its business; or the customary action a person or entity takes in the operation of its business.

(ECF No. 68-12 Ordinance PageID.771.)  The City also amended the portion of § 22-32 which defined "to harass."  The harassment provision was amended to eliminate the words "demeans or dehumanizes and."

To harass means to have physical conduct or communication which refers to an individual protected under this article, when such conduct or communication demeans or dehumanized and has the purpose or effect of substantially interfering with an individual's employment, public accommodations or public services, education, or housing, or creating an intimidating, hostile, or offensive employment, public accommodations, public services, educational, or housing environment.

(Ordinance PageID.772.)

The City also revised portions of § 22-35, the provision outlining "prohibited practices" that was part of the ordinance concerning public accommodations or services.  (*Id.* PageID.773.)  The passage below contains the new words (underlined) and the deleted words (strike through).

(b) Prohibited practices.  Except where permitted by law, a person shall not:
(1) ...
(2) Print, calculate circulate, post, mail, or otherwise cause to be published a statement, advertisement, notice, or sign which indicates that the full and equal enjoyment of goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service  will be refused, withheld from or denied an individual because of religion, race, color, national origin, age, height, weight, sex, disability, marital status, sexual orientation, gender identity or expression, or student status, or because of an individual's use of adaptive devices or aids, or that an individual's patronage of or presence at a place of public accommodation, is objectionable, unwelcome, unacceptable, or undesirable because of religion, race, color, national origin, age, height, weight, disability, sex, marital status, sexual orientation, gender identity or expression, or student status or because of the use by an individual of adaptive devices or aids.

(*Id.*)

With these amendments in mind, the Court considers the law concerning free speech. The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech . . . ."  U.S. Const. Amend. I.  Under the Free Speech Clause, "a government, including a municipal government vested with state authority, 'has no power to restrict expression because of its message, its ideas, its subject matter or its content.'"  *Reed v. Town of Gilbert, Arizona*, 135 S. Ct. 2218, 2226 (2015) (quoting *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95 (1972)).  "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys."  *Rosenberger v. Rector and Visitors of Univ. of Virginia*, 515 U.S. 819, 828 (1995).  "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed."  *Reed*, 135 S. Ct. at 2227 (citation omitted).  "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant."  *Rosenberger*, 515 U.S. at 828.  "Viewpoint discrimination is thus an egregious form of content discrimination."  *Id.*  Content-based laws "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests."  *Reed*, 135 S. Ct. at 2226 (citations omitted).

Ordinarily, the individual challenging the constitutionality of a statute must have had that statute applied to him or her, and courts do not consider challenges to a statute on the ground that it might be applied unconstitutionally to others.  *See Broadrick v. Oklahoma*,

413 U.S. 601, 610 (1973).  One exception to this traditional rule of standing arises in the area of the First Amendment.  *Id.* at 611–12.  Litigants may challenge overly broad statutes "not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression."  *Id.* at 612; *see Virginia v. Hicks*, 539 U.S. 113, 119 (2003).

On a facial challenge, a law may be invalidated as overbroad "if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'"  *United States v. Stevens*, 559 U.S. 460, 472 (2010) (quoting *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 n.6 (2008)); *see Broadrick*, 413 U.S. at 615 ("To put the matter another way, particularly where conduct and not merely speech is involved, we believe that the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep.").  Because overbreadth challenges are facial challenges, which, if successful, would forbid any enforcement of the statute, application of the overbreadth doctrine is "strong medicine" and should be employed by courts "sparingly and only as a last resort."  *Broadrick*, 413 U.S. at 613.

The first step in an overbreadth challenge "is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers."  *United States v. Williams*, 553 U.S. 285, 293 (2008); *Speet v. Schuette*, 726 F.3d 867, 873 (6th Cir. 2013).  Once properly understood, the second step is to determine if the statute criminalizes a substantial amount of protected expressive activity.  *Williams*, 553

U.S. at 297; *Speet*, 726 F.3d at 878.  In any First Amendment facial challenge to a statute, a court must always consider whether the statute "be 'readily susceptible' to a narrowing construction that would make it constitutional[.]"  *Virginia v. American Bookseller Ass'n*, 484 U.S. 383, 397 (1988).  The plaintiff bears the burden of showing substantial overbreadth. *Speet*, 726 F.3d at 878.

> A plaintiff "'must demonstrate from the text of the statute and from actual fact that a substantial number of instances exist in which the law cannot be applied constitutionally.'"  *United States v. Coss*, 677 F.3d 278, 289 (6th Cir. 2012) (quoting *Am. Booksellers Found. For Free Expression v. Strickland*, 601 F.3d 622, 627 (6th Cir. 2010)).  A plaintiff may not "leverage a few alleged unconstitutional applications of the statute into a ruling invalidating a law in all of its applications."  *Connection Distrib.* [*Co. v. Holder*], 557 F.3d [321,] 340 [(6th Cir. 2009 ) (en banc)].

*Id.*

In 2001, then Judge and now Justice Alito reviewed a district court's decision to grant a motion to dismiss where plaintiffs challenged a public school's anti-harassment policy on the basis that the policy interfered with their religiously-motivated speech.  The Third Circuit panel conducted an overbreadth analysis and found that the policy violated the First Amendment.  *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200 (3d Cir. 2001).  The school's policy defined harassment broadly to mean "verbal or physical conduct based one actual or perceived race, religion, color, national origin, gender, sexual orientation, or other personal characteristics and which has the purpose or effect of substantially interfering with a student's educational performance or creating an intimidating, hostile, or offensive environment."  *Id.* at 202.  The policy included examples of harassment.

> Harassment can include unwelcome verbal, written or physical conduct which offends,  denigrates  or  belittles  an  individual  because  of  any  of  the

> characteristics described above.  Such conduct includes, but is not limited to, remarks, jokes, demeaning comments or behaviors, slurs, mimicking, name calling, graffiti, innuendo, gestures, physical contact, stalking, threatening bullying, extorting or the display or circulation of written material or pictures.

*Id.* at 202–03 (quoting the school's Policy).  Judge Alito acknowledged that physically harassing conduct is "entirely outside the ambit of the free speech clause." *Id.* at 206. But, for oral and written expression of ideas, "however detestable the views expressed may be, we cannot turn a blind eye to the First Amendment implications." *Id.* When anti-discrimination laws are applied to harassment claims "founded solely on verbal insults, pictorial or literary matter," the law constitutes viewpoint restrictions on speech. *Id.* (quoting *DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 596–97 (5th Cir. 1995)).

The Third Circuit found the harassment policy overbroad.  First, the policy prohibited harassment on the basis of categories not protected by federal laws ("other personal characteristics").  *Id.* at 210.  Second, the policy's prohibitions extended beyond harassment that objectively denied equal access to a school's educational resources.  The policy extended to speech where the purpose was harassment, rather than considering the systemic effect of the speech on an educational program or activity.  *Id.* at 210–11.

This Court grants, in part, Plaintiffs' motion for summary judgment on their overbreadth claim.  As potential vendors at the ELFM, Plaintiffs must comply with all of the City's nondiscrimination ordinances.  Accordingly, Plaintiffs have standing to challenge aspects of those ordinances, even if the ordinance was not the reason Plaintiffs' application to vend was denied.  Plaintiffs have demonstrated that the nondiscrimination ordinance, combined with the definition of the word "harass," reaches a substantial amount of protected

expression.  And, the ordinances are not readily susceptible to a limiting or narrowing construction.  The City's definition of "harass" specifically covers communication, which would include both speech and expressive conduct.

The City's prohibition on harassment suffers the same problems identified in *Saxe*. First, like the policy in *Saxe*, the City's nondiscrimination policy covers topics that are not protected by similar federal statutes.   The City's policy extends nondiscrimination protections beyond sex, race, color, national origin, age, and disability.  *See Saxe*, 240 F.3d at 210.   Second, like the policy in *Saxe*, the City's definition of "harass" addresses communication that has "the purpose" of interfering with public accommodations or creating a hostile environment.  *See id.* at 210-11.  The ordinance thus regulates speech based on the intent of the speaker, without consideration of any actual consequences.

Third, because ordinance fails to limit what constitutes an "intimidating, hostile, or offensive" environment, "it could conceivably be applied to cover any speech about some enumerated personal characteristics the content of which offends someone." *Id.* at 217.  In his concurrence in *Masterpiece Cakeshop*, Justice Thomas emphasized this point.  "States cannot punish protected speech because some group finds it offensive, hurtful, stigmatic, unreasonable, or undignified."  *Masterpiece Cakeshop*, 138 S. Ct. at 1746 (Thomas, J. concurring).  By defining harassment as communication that has the effect of creating an offensive environment, the City has criminalized protected speech.  These three aspects of

the ordinances assure a substantial amount of protected expression fall under what the City has prohibited.[8]

The Court also grants, in part, the City's motion for summary judgment on Plaintiffs' overbreadth claim. Except for the overbreadth problem with the City's definition of "harass," Plaintiffs have not established a genuine issue of material fact concerning their burden described in *Speet*. The City amended its ordinances to eliminate the other words in the definition of "harass" to which Plaintiffs' objected, including the words "demean" and "dehumanize." Since the lawsuit was filed, the City has defined the term "general business practice." For that term, Plaintiffs have not met the burden outlined in *Speet*. Similarly, the City is entitled to summary judgment on any overbreadth claim arising from the terms identified in the complaint found in the public accommodation portion of the ordinance. The City has amended that ordinance to eliminate the terms identified in the complaint. Legislative amendments typically moot overbreadth challenges. *Kentucky Right to Life, Inc. v. Terry*, 108 F.3d 637, 644 (6th Cir. 1997). In this case, the City no longer defends the previous wording of its ordinances. The record contains no evidence from which this Court

---

[8]     The Court finds it difficult to reconcile the City's prohibition on harassment as a form of discrimination with the comments made by Councilwoman Beier and the City Manager. The City's ordinance prohibits Tennes from making "horrible, hateful" statements, which would include the statement that his religious beliefs limit marriage as a union between one man and one woman. Focusing on the third concern only, and illustrating the overbreadth problem by way of example, while selling apples at the ELFM, Tennes could not profess his religious beliefs to his customers that a marriage is between one man and one woman if one of his customers found that message to be offensive. Vendors who use the term "handicapped" instead of "disabled" might create an offensive environment at the ELFM for some patrons. The City's ordinance prohibits harassment based on gender identity and gender expression, categories not explicitly covered by federal statute. Combining the first and third concerns outlined in *Saxe*, patrons of the ELFM with gender dysphoria could claim that a vendor using pronouns and colloquialisms typically associated with one sex or the other, such as him or her or sir or ma'am, create an intimidating environment.

could infer an intent by the City to legislatively reenact the challenged ordinances. *See id.* at 645.

### 2. Retaliation

As part of Count 1, Plaintiffs allege the amendment to the Vendor Guidelines and the subsequent enforcement of the amended guidelines constituted retaliation for engaging in protected speech.  (Compl. ¶¶ 262-274 PageID.93-94.)  Both parties move for summary judgment on Plaintiffs' retaliation claims.[9]

For their speech retaliation claim, Plaintiffs argue Tennes' expression of his religious beliefs is protected speech.  The City insists its actions were based on statements made that do not constitute protected speech.  The City focuses on Tennes' comments that he would not rent his farm for same-sex weddings.

To establish a claim for retaliation in violation of the First Amendment, a plaintiff must show he or she (1) was engaged in a constitutionally protected activity, (2) the defendant's adverse action caused the plaintiff an injury that would deter or chill a person of ordinary firmness from continuing to engage in that activity, and (3) a causal connection such that the adverse action was motivated at least in part as a response to the exercise of the plaintiff's constitutional rights. *Jenkins v. Rock Hill Local Sch. Dist.*, 513 F.3d 580, 586–87 (6th Cir. 2008); *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999).  If the plaintiff

---

[9]     Plaintiffs § I.B; Defendant § 1.B.

can establish a prima facie case, the burden shifts to the defendant to show that it would have taken the same action in the absence of the protected activity. *Thaddeus-X*, 175 F.3d at 399.

"[T]he First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. Int'l Soc. For Krishna Consciousness, Inc.,* 452 U.S. 640, 647 (1981). Messages conveying religious views and doctrines are generally protected speech. *See id.* And, "inherently expressive" conduct has been afforded protection under the First Amendment. *See Rumsfeld v. Forum for Acad. and Inst. Rights, Inc.,* 547 U.S. 47, 66 (2006). On the other hand, governmental bodies may impose incidental burdens on speech through valid restrictions and regulations directed at commerce and conduct. *See Sorrell v. IMS Health Inc.,* 564 U.S. 552, 567 (2011) (collecting cases). "[W]hen 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." *United States v. O'Brien,* 391 U.S. 367, 376 (1968). And, where conduct is not inherently expressive, a speaker cannot avoid the government regulations simply by explaining the conduct and demanding the protection of the First Amendment. *Rumsfeld,* 547 U.S. at 66 ("If combining speech and conduct were enough to create expressive conduct, a regulated party could always transform conduct into 'speech' simply by talking about it."). At least one federal district court has held that posting social media messages about business practices involving the refusal to assist in same-sex marriages is not protected speech. *See Telescope Media Group v. Lindsey,* 271 F. Supp.3d 1090, 1112 (D. Minn. 2017) ("Posting language on a website telling potential customers that a business will discriminate based on sexual orientation is part of the act of

sexual orientation discrimination itself; as conduct carried out through language, this act is not protected by the First Amendment.").

In earlier opinions, the Court reached two conclusions relevant here. First, the Court dismissed Plaintiffs' as-applied challenge to the Policy as a content-based speech regulation. (Opinion Dismissing Claims at 9-14 PageID.383-88.) The Ordinance did not apply to Plaintiffs in August 2016 when the first message was posted. (*Id.* at 13 PageID.387.) For the December 2016 message, the City sent letters explaining the decision to deny the vendor application for the 2017. In those letters, the City referenced Plaintiffs' general business practices: their conduct not their expressions of their religious beliefs. (*Id.* at 14 PageID.388.) The City's ordinance, as applied to Plaintiffs, did not regulate speech.

Second, the Court declined to dismiss Plaintiffs' retaliation claim. For the retaliation claim, this Court concluded Plaintiffs pled a plausible claim because the Facebook posts contained both protected and nonprotected speech. (*Id.* at 21 PageID.395.) In the Opinion and Order granting Plaintiffs' motion for a preliminary injunction, the Court noted that it "had not considered whether the City excluded Plaintiffs because of unprotected conduct, as that argument would address the causation element, which the City did not raise in its response." (Opinion Granting Injunction at 11 n.4 PageID.369.)

The Court will deny Plaintiffs' motion for summary judgment on its retaliation claim. In their complaint, Plaintiffs focus on the portion of the Facebook post concerning Tennes' Catholic beliefs. (Compl. ¶¶ 262-274.) In their response to the City's motion, Plaintiffs contend that the entire Facebook post is protected speech. Plaintiffs describe the second part of the December Facebook post as "a reservation of First Amendment rights." Country

Mill "reserves the right to deny a request for services that would require it to communicate, engage in, or host expression that would violate the owner's sincerely held religious beliefs and conscience."  But, under existing Supreme Court precedent, writing about conduct (denying a request for services) does not transform that conduct into expressive conduct protected by the First Amendment.  Similarly, claiming that the operation of a business is expression does not make it so.  Country Mill has not identified any authority or established any basis for this Court to conclude that the Tennes' family activities identified in the record constitute "expressive conduct."  The family meets with the couple to plan the event and the family helps stage the event.  Taking the evidence in the light most favorable to Defendants, coordinating the logistics of the event—the placement of tables and chairs, lighting, sound systems, parking, etc.—does not constitute the sort of expressive conduct protected by the First Amendment.

The Court will also deny the City's motion for summary judgment on Plaintiffs' retaliation claim.  In its motion, the City generally ignores the portion of December Facebook post that expresses Plaintiffs' religious beliefs.  Instead, the City again insists that statements about conduct are not protected speech and, therefore, the retaliation claim fails.  The City's reasoning fails because the December Facebook post does contain protected speech.  The retaliation claim must therefore address the question of causation, an element the City does not address, again.

The Court finds the majority opinion in *Masterpiece Cakeshop, Limited v. Colorado Civil Rights Commission*, 138 S. Ct. 1719 (2018) controlling here.  While religious and philosophical objections to same-sex weddings are protected by the First Amendment, "it is

a general rule that such objections do not allow business owners and other actors in the economy and in society to deny protected persons equal access to goods and services under a neutral and generally applicable public accommodations law." *Id.* at 1727. At the same time, Plaintiffs are entitled to "neutral and respectful consideration," *id.* at 1729, of their beliefs by the City of East Lansing. The timing of the amendments Vendor Guidelines and the subsequent enforcement of those amendments "cast doubt on the fairness and impartiality," *id.* at 1730, of the decisionmakers. Accordingly, genuine issues of material fact remain whether it was the protected speech or the unprotected speech that caused the City to act in the manner it did. For this reason, neither side is entitled to summary judgment on the speech retaliation claim.

## B.   Unconstitutional Conditions

As their third cause of action, Plaintiffs allege the City violated the prohibition against unconstitutional conditions. Plaintiffs argue the City conditioned the benefit of participating in the ELFM as a vendor on the surrendering of Plaintiffs' free speech and free exercise of their religion. The City argues Plaintiffs have no constitutional right to discriminate or to be exempt from antidiscrimination laws because of their religious beliefs. Both parties request summary judgment on Plaintiffs' unconstitutional conditions claim.[10]

The doctrine of unconstitutional conditions prohibits the government from coercing people to give up their constitutional rights in exchange for some government benefit. *Koontz v. St. Johns River Water Mgt. Dist.*, 570 U.S. 595, 604 (2013); *see G & V Lounge,*

---

[10]      Plaintiffs § I.D; Defendant § IV.

*Inc. v. Michigan Liquor Control Comm'n,* 23 F.3d 1071, 1077 (6th Cir. 1994) (noting a "well established Supreme Court precedent to the effect that a state actor cannot constitutionally condition the receipt of a benefit, such as a liquor license or an establishment permit, or an agreement to refrain from exercising one's constitutional rights, especially one's right to free expression."). The doctrine prevents the government from producing a result which it "could not command directly." *Perry v. Sindermann,* 408 U.S. 593, 597 (1972) (citation omitted). As a corollary, the government cannot withhold a benefit because someone refuses to give up his or her constitutional rights, even when the person would not be entitled to the benefit. *Koontz,* 570 U.S. at 608; *see Bd. of Cty. Comm'rs Wabaunsee Cty, Kansas v. Umbehr,* 518 U.S. 668, 674 (1996) (quoting *Perry,* 408 U.S. at 597). "Allowing the government to decide that it will not give some people a benefit that it gives to others, even though it is not required to provide such benefit to anyone, simply because a person has exercised a right guaranteed under the Constitution, amounts to a penalty for exercising such right." *Toledo Area AFL-CIO Council v. Pizza,* 154 F.3d 307, 321 (6th Cir. 1998). Simply put, the government cannot "penalize conduct it cannot directly ban" because it "raises concerns that the government will be able to curtail by indirect means what the Constitution prohibits it from regulating directly." *Id.*

The same factual dispute that exists for the retaliation claim also prevents this Court from granting either party summary judgment on the unconstitutional conditions claim. For Plaintiffs' motion, the Court views the evidence in the light most favorable to Defendants. In that light, the record supports the conclusion that the City denied the vendor application because of Plaintiffs' conduct, conduct which is not protected by our Constitution. For the

City's motion, the Court views the evidence in the light most favorable to Plaintiffs. In that light, the record supports the conclusion that the City denied the vendor application because of Plaintiffs' religious beliefs, beliefs which are protected by our Constitution.

## C. Free Exercise

As their fourth cause of action, Plaintiffs allege a violation of the Free Exercise Clause. Plaintiffs assert that their sincerely held religious beliefs require them to express their beliefs through their public statements and that they must operate their business in accordance with those beliefs. (Compl. ¶¶ 302 and 303.) Both parties move for summary judgment on the Free Exercise claim.[11]

In their motion, Plaintiffs contend the City violated the Free Exercise Clause three ways. Each of the three theories is based on a different Supreme Court opinion. First, the City acted with unmistakable hostility toward Plaintiffs' religious beliefs. Plaintiffs rely on the holding in *Masterpiece Cakeshop*. Second, the City denied Plaintiffs' a public benefit because of their religious beliefs. Plaintiffs rely on the holding in *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012 (2017). Third, the City enforced the Policy against Plaintiffs through an individualized assessment. Plaintiffs rely on the holding in *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 510, 531 (1993).

---

[11] Plaintiffs § IA; Defendants § II.

For its motion, the City argues the Policy is generally applicable and is neutral on its face. The City also argues that its actions were based entirely on Tennes' conduct and not on his religious beliefs.

The Free Exercise Clause of the First Amendment to the United States Constitution applies to the States through the Fourteenth Amendment. *City of Hialeah*, 508 U.S. at 531. "The free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires." *Emp't Div., Dep't of Human Resources of Oregon v. Smith*, 494 U.S. 872, 877 (1990) *overruled by statue* (1993). "The Free Exercise Clause 'protects religious observers against unequal treatment' and subjects to the strictest scrutiny laws that target the religious for 'special disabilities' based on their 'religious status.'" *Trinity Lutheran*, 137 S. Ct. at 2019. In its Free Exercise cases, the Supreme Court has "long recognized a distinction between the freedom of individual belief, which is absolute, and the freedom of individual conduct, which is not." *Bowen v. Roy*, 476 U.S. 693, 699 (1986). Following this principle, the Free Exercise Clause "cannot be understood to require the Government to conduct its own internal affairs in ways that comport with the religious beliefs of particular citizens." *Id.*

In addition to protecting religious beliefs from government regulation, the Free Exercise Clause also protects religiously motivated conduct. The Free Exercise Clause is implicated "if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." *City of Hialeah*, 508 U.S. at 532; *Prater v. City of Burnside, Kentucky*, 298 F.3d 417, 427 (6th Cir. 2002) ("This Clause protects not only the right to hold a particular religious belief, but also the right to

engage in conduct motivated by that belief.") (citing *Smith*, 494 U.S. at 822).  In its opinions addressing the free exercise of religion, the Supreme Court has established the "general proposition that a law that is neutral and of general applicability need not be justified by a compelling government interest even if that law has the incidental effect of burdening a particular religious practice." *City of Hialeah*, 508 U.S. at 531; *see, e.g., Bob Jones Univ. v. United States*, 461 U.S. 574, 604 (1983) (denying a free exercise claim brought by a private religious university that prohibited interracial dating for religious reasons and was denied tax exempt status because the government's interest in eradicating racial discrimination in education was compelling).  In *Trinity Lutheran*, the Court noted that "[i]n recent years, when this Court has rejected free exercise challenges, the laws in question have been neutral and generally applicable without regard to religion." *Trinity Lutheran*, 137 S. Ct. at 2020. But, when "the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral, and is invalid unless it is justified by a compelling interest and is narrowly tailored to advance that interest." *City of Hialeah*, 508 U.S. at 532 (internal citation omitted).

The Sixth Circuit summarized the limits of the Free Exercise Clause in *Ward v. Polite*, 667 F.3d 727 (6th Cir. 2012).

> Under this guarantee, public authorities may enforce neutral and generally applicable rules and may do so even if they burden faith-based conduct in the process.  That is why Oregon could deny unemployment benefits to two members of a Native American tribe found guilty of using a proscribed drug, peyote, even when they used the substance for sacramental purposes. *Employment Div. v. Smith*, 494 U.S. 872, 890 (1990).  The rule comes with an exception.  If the law appears to be neutral and generally applicable on its face, but in practice is riddled with exemptions or worse is a veiled cover for targeting belief or a faith-based practice, the law satisfies the First Amendment

> only if it "advance[s] interests of the highest order and [is] narrowly tailored in pursuit of those interests." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993). That is why the City of Hialeah (Florida) could not enforce ordinances that purported to be neutral and generally applicable on their face---regulating the keeping and killing of animals—but in practice targeted the adherents of one faith (the Santeria religion) and the actions of one faith (animal sacrifices). *Id.* at 524–25, 533–35, 113 S. Ct. 2217.

*Id.* at 738. The circuit has applied these principles to deny free exercise claims brought against neutral and generally applicable laws. *E.g., Mount Elliott Cemetery Ass'n v. City of Troy*, 171 F.3d 398, 405 (6th Cir. 1999) (in a claim brought by a non-profit cemetery association that owned and operated four Catholic cemeteries, finding the City's refusal to rezone property for use as a Catholic cemetery did not violate the free exercise clause because the evidence in the record established that the construction and operation of a cemetery was not an exercise of religion and the laws were neutral and of general enforceability).

1. *Masterpiece Cakeshop* (religious hostility / neutral decisionmaker)

For this Free Exercise theory, Plaintiffs assert the decisionmakers were hostile to their religious expression and religious beliefs. The opinion in *Masterpiece Cakeshop* was issued after this Court resolved the City's motion to dismiss. The lawsuit was filed in federal court by a baker, Phillips, who declined to create a wedding cake for a same-sex wedding. At the time he refused to make the cake, Colorado did not recognize same-sex marriages. The Supreme Court held that the Free Exercise Clause requires governmental neutrality when adjudicating disputes involving free exercise claims. *Masterpiece Cakeshop*, 138 S. Ct. at 1729. The Court identified statements made by members of the Colorado's Civil Rights

Commission during the hearings which evidenced hostility towards the baker's religious beliefs. *Id.* Of relevance here, "[o]ne commissioner suggested that Phillips can believe 'what he wants to believe,' but cannot act on his religious beliefs 'if he wants to do business in the state.'" *Id.* The Court noted that some of the comments were "susceptible of different interpretations." *Id.* The Court then identified additional statements which were more disparaging, including a comparison between the baker's invocation of his religious beliefs to defenses of slavery and the Holocaust. *Id.*

Based on the disparaging statements made by the Commissioners, the Court found that the Commission had abdicated its "solemn responsibility of fair and neutral enforcement of Colorado's antidiscrimination law." *Masterpiece Cakeshop*, 138 S. Ct. at 1729. The Court concluded that "the Commission's treatment of Phillips' case violated the State's duty under the First Amendment not to base laws or regulations on hostility to a religion or religious viewpoint." *Id.* at 1731. The Commission was "obligated under the Free Exercise Clause to proceed in a manner neutral toward and tolerant of Phillips' religious beliefs." *Id.*

The Court provided some guidelines when determining governmental neutrality. Courts should consider (1) the historical background of the challenged decision, (2) the specific series of events leading to the decision or official policy in question, and (3) any legislative or administrative history, including contemporaneous statements made by the decisionmakers. *Masterpiece Cakeshop*, 138 S. Ct. at 1731 (quoting *City of Hialeah*, 508 U.S. at 540). The Court cautioned that "even 'subtle departures from neutrality'" are barred by the Free Exercise Clause. *Id.* (quoting *City of Hialeah*, 508 U.S. at 534). The Court unequivocally declared "that government has no role in deciding *or even suggesting* whether

the religious ground for [a] conscience-based objection is legitimate or illegitimate." *Id.*
(emphasis added).

The Court denies Plaintiffs' motion on this Free Exercise theory because the record
permits inferences that demonstrate neutrality by the decisionmakers. The statements by
Meadows and Lahanas can be interpreted as expressing concern about Tennes' conduct
rather than his religious beliefs; the statements are "susceptible of different interpretations."
And, the statements were not made contemporaneous with the amendments to the vendor
guidelines or the decision to deny Country Mill's application to the 2017 ELFM. Neither
were the statements made during an adjudicatory hearing or review. Finally, the record
permits the inference that Beier did not participate in the decision to deny Country Mill's
application. She is not a listed recipient. And, even if she received the email, the record
does not establish that she read the email before the March 7 letter was sent.

The Court also denies the City's motion on this Free Exercise claim because the
record permits the inference that the decisionmakers did not operate with the required
neutrality. The record establishes that several city officials, including Mayor Meadows and
City Manager Lahanas, were involved in the decision to amend the Vendor Guidelines after
the 2016 Farmer's Market and in advance of the 2017 Farmer's Market. The record permits
the inference that Country Mill was the reason for the amendment. Both Meadows and
Lahanas made statements similar to the statements the Supreme Court characterized as
"susceptible of different interpretations." *Masterpiece Cakeshop*, 138 S. Ct. at 1729. Their
statements can be interpreted as demonstrating hostility to Tennes' religious beliefs. The
statements were made as defenses to the decision to deny Country Mill access to the ELFM

and "cast doubt on the fairness and impartiality," *see id.* at 1730, of these decisionmakers. More problematic for City are the statements by Councilmember Ruth Beier. The Court infers Baier, as a member of the Council, was at least consulted about the decision to deny Country Mill's 2017 application when the initial letter was circulated by email on March 8. Baier's statements defending the City's decision are much closer to the sort of disparaging statements the Supreme Court admonished in *Masterpiece Cakeshop*. *See id.* at 1729. Although none of the statements were made prior to or as part of the amendment process and the denial of Country Mill's application, nothing in the statements suggest that any hostility developed after the lawsuit was filed. The Court record supports an inference of hostility during the decision-making process requiring trial on the merits.

2. *Trinity Lutheran* (public benefit / forced choice)

For this Free Exercise theory, Plaintiffs contend the City excluded them from receiving a public benefit on the basis of their religious beliefs. *Trinity Lutheran* involved a policy of the Missouri Department of Natural Resources (MDNR) which disqualified churches from receiving grants from playground resurfacing program. *Trinity Lutheran*, 137 S. Ct. at 2017. The MDNR established a grant program that awarded money to eligible entities to purchase rubber playground surfaces which were made from recycled tires. Trinity Lutheran Church Child Learning Center was a non-profit preschool and daycare which merged with Trinity Lutheran Church and operated on church property. It applied for one of the competitive grants and scored high enough to be awarded one. However, because of a provision in the Missouri Constitution, MDNR officials categorically excluded Trinity Lutheran.

The Court found a violation of the Free Exercise Clause. *Trinity Lutheran*, 137 S. Ct. at 2021. The Court began by outlining some of the basic principles protected by the Free Exercise Clause: laws targeting "religious status" and "religious identity" are subject to strict scrutiny. *Id.* at 2019 (citations omitted). The Court explained that the "policy expressly discriminates against otherwise eligible recipients by disqualifying them from a public benefit solely because of their religious character." *Id.* The Court further explained the choice Trinity Lutheran faced: "participate in an otherwise available benefit program or remain a religious institution." *Id.* at 2021-22. "The express discrimination against religious exercise here is not the denial of a grant, but rather the refusal to allow the Church—solely because it is a church—to participate with secular organizations for a grant." *Id.* at 2022.

The Court distinguished the grant process from the scholarship program in *Locke v. Davey*, 540 U.S. 712 (2004), where the Court concluded that Washington could restrict recipients of a state scholarship from using the funds to obtain a degree in devotional theology. The Court explained that "Davey was not denied a scholarship because of who he *was*; he was denied a scholarship because of what he proposed to *do*—use the funds to prepare for the ministry." *Trinity Lutheran*, 137 S. Ct. at 2023 (italics in original). Because the MDNR policy required Trinity Lutheran to walk away from its "religious character" in order to participate in a public benefit program, the "condition imposes a penalty on the free exercise of religion that must be subjected to the 'most rigorous' scrutiny." *Id.* at 2024 (citation omitted). Missouri's interest, separating the church and state, was "'already ensured under the Establishment Clause of the Federal Constitution . . . [which] is limited by the Free Exercise Clause.'" *Id.* (quoting *Widmar v. Vincent*, 454 U.S. 263, 276 (1981)).

The Court will grant the City's motion on this Free Exercise Claim and will deny Plaintiffs' motion on this Free Exercise claim.  First, neither Country Mill nor Tennes is categorically disqualified from applying to vend at the ELFM.  The violation of the Free Exercise Clause in *Trinity Lutheran* occurred when Trinity Lutheran was disqualified, "deemed categorically ineligible," *Trinity Lutheran*, 137 S. Ct. at 2018, because it was a church.  The City has not imposed any similar condition.  Second, the *Trinity Lutheran* opinion does not clearly extend beyond religious institutions.  In a footnote, the four of the justices explicitly limited the holding in *Trinity Lutheran* to "express discrimination based on religious identity" and did "not address religious uses of funding or other forms of discrimination."[12]  *Trinity Lutheran*, 137 S. Ct. at 2024 n.3.  Country Mill is not a religious institution.  This past term, the Supreme Court listed *Trinity Lutheran* as one of five cases in a category where the Court "upheld government benefits and tax exemptions that go to religious organizations[.]"  *American Legion v. American Humanist Assoc.*, 139 S. Ct. 2067, 2092-93 (2019).  In light of the facts in *Trinity Lutheran*, the language used in the opinion, and footnote 3, as well as the characterization of *Trinity Lutheran* in *American Legion*, this Court limits the application of the relevant holding in *Trinity Lutheran* as applying to only religious organizations.  In the absence of any circuit authority, this Court will not extend the relevant holding in *Trinity Lutheran* to all organizations and individuals with religious beliefs.

      3.  *City of Hialeah* (individualized assessment / targeting religion)

---

[12]    Chief Justice Roberts wrote the majority opinion and was joined by Justices Kennedy, Alito, Kagan, Thomas and Gorsuch.  Justices Thomas and Gorsuch, however, did not join this particular footnote.

For their third theory of a Free Exercise claim, Plaintiffs contend the City targeted them because of their religious beliefs.  Plaintiffs also contend the Policy permits subjective enforcement (individualized assessments).

In *City of Hialeah*, the Supreme Court considered whether three ordinances enacted by the City of Hialeah violated the Free Exercise Clause.  In April 1987, the Church of Lukumi Babalu Aye leased land in the City and announced plans to establish a house of worship, a school, and a community center.  The Church and its congregation practice Santeria, a belief system that fused African religion and Roman Catholicism.  Santeria requires ritual animal sacrifices.  Over several months, the City held several meetings and requested an opinion from the State's Attorney General.  Then, in September 1987, the city council adopted three ordinances addressing religious animal sacrifice.

The Court held that the ordinances were neither neutral nor of general applicability. First, the Court discussed whether the ordinances were neutral.  The record established that the object of the ordinances was "the suppression of the central element of the Santeria worship service."  *City of Hialeah*, 508 U.S at 534.  The manner in which the ordinances were drafted meant that "few if any killings of animals [were] prohibited other than Santeria sacrifice."  *Id.* at 236.  And, the events leading to the enactment of the ordinances, including the statements made by the decisionmakers and the community, established "significant hostility . . . toward the Santeria religion and its practice of animal sacrifice."  *Id.* at 541.

Turning to the question of general applicability, the Court also found the ordinances problematic.  The City asserted that the ordinances advanced two interests: protecting the

public health and preventing cruelty to animals. *Id.* at 543. The Court explained with the ordinances were underinclusive for both stated interests. *Id.* at 543-45.

The Court will deny Plaintiffs' motion on this Free Exercise theory. The Vendor Guidelines incorporate a generally applicable and neutral ordinance which prohibits discrimination in places of public accommodation. To qualify as a vendor at the ELFM, a business must agree to conduct its business practices consistent with that generally applicable and neutral ordinance. The ordinance applies to religious and secular businesses. The amendments to the City's ordinances largely eliminate the City's ability to selectively or individually enforce the Policy. Viewing the evidence in the light most favorable to the City, there remain genuine issues of material fact concerning the motivation for the amendment to the Vendor Guidelines and the decision to deny Country Mill's 2017 application. While Country Mill might have been the "catalyst" for various decisions, the catalytic impetus could be the practice at the farm and not the religious beliefs. The decisionmakers testified generally that Tennes' motivation for the practice at Country Mill was not relevant to the denial of the application. What mattered was the practice at Country Mill.

The Court will also deny the City's motion on this Free Exercise theory. Viewing the facts in the light most favorable to Plaintiffs, genuine issues of material fact remain. A trier of fact could find that the City targeted Tennes and Country Mills because of his religious practices. A trier of fact could find that the Vendor Guidelines were changed because Tennes made the December 2016 announcement that Country Mill would again book wedding, but only for ceremonies between one man and one woman. And, a trier of fact could find that that the City's decision to deny Country Mill's application was motivated by

Plaintiffs' religious beliefs.  A trier of fact could choose not to believe the explanation provided by the decisionmakers.

### D.  Establishment Clause

For Count 5, Plaintiffs assert a violation of the Establishment Clause of the First Amendment.  Plaintiffs reason that the City's enforcement of its Policy lacks a secular purpose and singles out religious speech and beliefs for hostility and exclusion.  Both parties move for summary judgment on Plaintiffs' Establishment Clause claim.[13]  The Establishment Clause applies to the States through the Fourteenth Amendment by incorporation.  *Conlon v. InterVarsity Christian Fellowship*, 777 F.3d 829, 863 (6th Cir. 2015).

The Establishment Clause of the First Amendment to the United States Constitution does not merely prohibit the establishment of a religion by the government, it prohibits the government from making a law "respecting the establishment of religion."  U.S. Const., Amend. I.  The "touchstone" for evaluating Establishment Clause cases "is the principle that the 'First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion."  *McCreary Cty, Kentucky v. ACLU of Kentucky*, 545 U.S. 844, 859 (2005).

The Supreme Court has described the language used in the Establishment Clause as "at best opaque."  *Lemon v. Kurtzman*, 403 U.S. 602, 612 (1971).  "The First Amendment contains no textual definition of 'establishment,' and the term is certainly not self-defining."  *McCreary Cty.*, 545 U.S. at 874–75.  As a result of the less than precise language used, each

---

[13]      Plaintiffs § IC; Defendant § III.

"inquiry calls for line drawing; no fixed, *per se* rule can be framed." *Lynch v. Donnelly*, 465 U.S. 668, 678 (1984). When forced to draw lines between acceptable government action and prohibited government action, courts should keep in mind "the three main evils against which the Establishment Clause was intended to afford protection: 'sponsorship, financial support, and active involvement of the sovereign in religious activity.'" *Lemon*, 403 U.S. at 612 (quoting *Walz v. Tax Comm'n*, 397 U.S. 664, 668 (1970)). In each case, the court should consider whether the challenged law or conduct has a secular purpose, whether its principle or primary effect is to advance or hinder religion, and whether it creates an excessive entanglement of government with religion. *Lynch*, 465 U.S. at 678; *Lemon*, 403 U.S. at 612–13.

In the years since *Lemon*, the Supreme Court has refined the first two prongs. *ACLU of Ohio Found., Inc. v. DeWeese*, 633 F.3d 424, 431 (6th Cir. 2011). The first prong in *Lemon* is now "the predominant purpose test." *Id.* (citing *ACLU of Kentucky v. Mercer Cty., Kentucky*, 432 F.3d 624, 635 (6th Cir. 2005)); *see McCreary*, 545 U.S at 860 ("When the government acts with the ostensible and predominant purpose of advancing religion, it violates that Establishment Clause value of official religious neutrality, there being no neutrality when the government's ostensible object is to take sides."); *Satawa v. Macomb Cty. Rd. Comm'n*, 689 F.3d 506, 636 (6th Cir. 2012) ("Under today's *Lemon* test, we ask: (1) whether the government's predominant purpose was secular . . . ."). For this inquiry, "we generally accept the government's stated rationale for its action." *Satawa*, 689 F.3d at 526. But, the court has a duty to determine whether the stated secular reason is genuine or a mere sham. *Id.* For the predominant purpose test, the court held that "[p]urpose is determined

from the perspective of an objective observer, who is "credited with knowledge of 'readily discoverable fact,' including 'the traditional external signs that show up in the text, legislative history, and implementation of a statute, or comparable official act.'" *ACLU of Kentucky v. Grayson Cty., Kentucky*, 591 F.3d 837, 848 (6th Cir. 2010) (internal quotation marks omitted) (quoting *McCreary Cty.*, 545 U.S. at 862). When considering purpose, the history and context of the government's action are significant. *DeWeese*, 633 F.3d at 432.

In the second prong of the *Lemon* test, the court considers the primary effect of the government's action. *American Atheists, Inc. v. City of Detroit Downtown Devel. Auth.*, 567 F.3d 278, 291–94 (6th Cir. 2009). The court should consider "whether 'the challenged governmental action is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices.'" *Grayson Cty.*, 591 F.3d at 854 (quoting *Cty. of Allegheny v. ACLU Greater Pittsburgh Chapter*, 492 U.S. 573, (198) *abrogated by Town of Greece, New York v. Galloway*, 134 S. Ct. 1811 (2014)). Where purpose considers the intended effect, the second inquiry of the *Lemon* test considers the actual effect. *Id.* (citing *Adland v. Russ*, 307 F.3d 471, 484 (6th Cir. 2002)). The second inquiry also uses the standard of an objective observer. *Id.* "'If context, history, and the act itself sends the unmistakable message of endorsing religion, then the act is unconstitutional.'" *Id.* (quoting *Mercer Cty.*, 432 F.3d at 637).

The Court will deny Plaintiffs' motion on their claim under the Establishment Clause. The same genuine issue of material fact remains—the motivation behind the purpose of the City's actions are in dispute. The various decisionmakers and other city officials generally

testified that they thought Tennes' decision not to permit Country Mill to be used as a venue for same-sex weddings violated the City's nondiscrimination ordinance, regardless of Tennes' motivations.  Viewing the evidence in the light most favorable to City an objective observer could conclude that the primary purpose of amendment to the Vendor Guidelines and the denial of Country Mill's 2017 application was the enforcement of the nondiscrimination ordinance, a secular purpose.  An objective observer could also conclude the same evidence establishes the actual effect was the same.  The effect was to bar from the ELFM all of the vendors who were known to the City to act in a manner inconsistent with the nondiscrimination ordinance.

The Court will also deny the City's motion on Plaintiffs' Establishment Clause claim. Viewing the evidence in the light most favorable to Plaintiffs, an objective observer could infer that the primary purpose of the Policy was a reaction to Tennes's announcement about his religious beliefs.  An objective observer could conclude that the only effect of the Policy was to prevent Country Mill from participating in the 2017 ELFM.  Based on the current record, no city official had knowledge that any same-sex couples had actually sought to rent the farm after the Tennes made his announcement on Facebook.

### E.  Due Process

For their seventh cause of action, Plaintiffs argue the City violated the Due Process Clause in the Fourteenth Amendment.  Plaintiff contend the nondiscrimination ordinance contains a number of vague and undefined terms which grant the City unbridled discretion to arbitrarily censure expression the City disfavors.  In the complaint, Plaintiffs explicitly identity the terms "general business practices," "discriminate," "unwelcome,"

"objectionable," "unacceptable," and "undesirable."  In their motion for summary judgment, Plaintiffs focus on the term "general business practices" and the harassment provision of nondiscrimination ordinance.  Plaintiffs further contend the City used its discretion to punish Plaintiffs' speech.

Both parties request summary judgment for Plaintiffs' due process claim.[14]  In their motions and responses, the parties generally do not attempt to distinguish Plaintiffs' claims for damages and their claims for prospective relief.

"A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required."  *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).  "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined."  *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1982).  The void-for-vagueness doctrine addresses two due process concerns: (1) that regulated parties should know what is required of them so they conduct themselves appropriately, and (2) precision and guidance are necessary so that those enforcing the law do not act in an arbitrary and discriminatory manner.  *Fox Television Stations*, 567 U.S. at 253; *Grayned*, 408 U.S. at 108. Where vague terms risk chilling protected speech, courts should carefully scrutinize statutes to ensure they meet the requirements of due process.  *See Fox Television*, 567 U.S. at 253.  "Due process requires that we hold a state enactment void for vagueness if its prohibitive terms are not clearly defined such that a person of ordinary intelligence can readily identify the applicable

---

[14]     Plaintiffs § I.F.; Defendant § V.  Plaintiffs combine the discussion of their overbreadth claim and their Due Process claim.

standard for inclusion and exclusion." *United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Reg'l Transit Auth.*, 163 F.3d 341, 358–59 (6th Cir. 1998).

Federal courts exercise authority over cases and controversies, which "must exists not only 'at the time the complaint is filed,' but through 'all stages' of the litigation." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90-91 (2013) (citation omitted).  A claim becomes moot when "the issues present are no longer 'live' or parties lack a legally cognizable interest in the outcome." *Cty. of Los Angeles v. Davis*, 440 U.S. 625, 631 (1978).  Where a claimant seeks prospective relief, the repeal or amendment of an ordinance while a case is pending will ordinarily moot the claim.  *See Terry*, 108 F.3d at 644.  Where a claimant seeks damages, however, legislative repeal or amendment will not moot the claim.  *Ermold v. Davis*, 855 F.3d 715, 719-20 (6th Cir. 2017).

For portions of the due process claim, Plaintiffs' motion will be denied and the City's motion will be granted.

First, Plaintiffs' claims for prospective relief based on the alleged vagueness the phrase "general business practice" has been rendered moot.  Since this lawsuit was initiated, the City has amended its ordinances to define the phrase "general business practice."  Although Plaintiffs assert the added definition does not resolve the problem, their reasoning is unpersuasive.  As the term is now defined, the City no longer has unbridled discretion to determine what constitutes a "general business practice."  The practice must be typical, usual, habitual or customary for the regulated entity.  The persons regulated would have some idea which aspects of their own business practices would be typical, usual, standard and habitual.  The definition, therefore, provides sufficient clarity to inform those regulated and the

regulators.  Plaintiffs' evidence on this issue relies on questions asked to various officials about the meaning of "general business practices" before the City amended the ordinances to define the phrase.  Any request for prospective relief based on a vagueness challenge to the phrase "general business practice" term is moot.

Plaintiffs contend that Defendant could still decline to allow Tennes a license at the farmers market should he criticize, in a business communication, the beliefs, associations or actions of protected class members.  Perhaps.  But, the amendments place Tennes and other potential vendors on notice that such criticism, as a general business practice, would have consequences.  Accordingly, Plaintiffs may have a different claim, but they do not have due process void-for-vagueness claim arising from the phrase "general business practice."

Second, Plaintiffs' claims for prospective relief based on the terms "objectionable," "unwelcome," "unacceptable," and "undesirable" in § 22-35(2) are moot.  The City amended its ordinance and deleted the portion of the last sentence that contained all of the allegedly vague terms.  The Ordinance now reads as follows:

(b) *Prohibited practices.*  Except where permitted by law, a person shall not:
. . .
(2) Print, circulate, post, mail , or otherwise cause to be published a statement, advertisement, notice, or sign which indicates that the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service will be refused, withheld from, or denied to an individual because of religion, race, color, national origin, age, height, weight, sex, disability, marital status, sexual orientation, gender identity or expression, or student status, or because of an individual's use of adaptive devices or aids.

(City of East Lansing, MI. Code § 22-35.)

Third, neither party is entitled to summary judgment on any claim for damages arising from denial of Country Mill's 2017 vendor application.  The City denied Country Mill's 2017 application because of Country Mill's general business practices.  To the extent Country Mill has a vagueness claim for damages based on the, at the time, undefined term, Plaintiffs have not requested summary judgment.  To the extent the phrase "general business practice" must be interpreted in the context of other City ordinances, Plaintiffs' claim would arise from the ordinances before they were amended.  Furthermore, the City has not established that the ordinance was "clear in their application to plaintiffs' proposed conduct." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 21 (2010).  Section 6(m), the addition to the Vendor Guidelines, does not clearly inform potential vendors that their conduct outside of the City's jurisdiction can be used as a reason to deny the application.[15]

Finally, for one portion of Plaintiffs' due process claim, Plaintiffs' motion will be granted and the City's motion denied.  While the City amended the ordinance defining the word "harass" to remove the words "demean" and "dehumanize," the words "intimidating" and "offensive" remain in the ordinance.  The Sixth Circuit previously found void for

---

[15]     Plaintiffs insist, on several occasions in their briefs and at the hearing, that Tennes "does not discriminate against anyone.  He serves everyone on his farm and at the market with no regard for their sexual orientation, marital status, or other characteristic."  (ECF No. 71 Pl. Br. at 29 PageID.814.)  The record supports the conclusion that Tennes and Country Mill do not discriminate at the ELFM.  At the ELFM, Plaintiffs will sell their goods to everyone.  Tennes and Country Mill, however, do make distinctions or differentiate between opposite sex couples and same sex couples for the purpose of renting Country Mill for wedding ceremonies.  As recognized by the Sixth Circuit, dictionaries define the word "discriminate" as "to distinguish; to make distinctions in treatment[.]" *White v. Burlington Northern & Sante Fe R. Co.*, 364 F.3d 789, 798 n.4 (6th Cir. 2004) (citation omitted).  At Country Mill, Plaintiffs will not rent the venue to everyone.

vagueness a university policy using similar words.  *See Dambrot v. Central Michigan Univ.*, 55 F.3d 1177, 1184 (6th Cir. 1995).  The Sixth Circuit found that "to determine what conduct will be considered 'negative' or 'offensive' by the university, one must make a subjective reference."  *Id.*  The court reasoned, the "necessity of subjective reference" did not provide "fair notice of what speech would violate the policy."  *Id.*  The same is true here.  The ordinance provides no mechanism for objectively evaluating when a message is "intimidating" or "offensive."  The definition of "harass" provides too broad a delegation of authority to restrict communication based on the subjective effect on people who hear the message.

### F.  Hybrid Rights

Plaintiffs raise this argument as part of their motion for summary judgment solely to preserve it for appeal.[16]  The claim has already been dismissed based on Plaintiffs' concession that the Court must follow binding precedent.  As part of their Free Exercise claim, Plaintiff assert their rights under the hybrid-rights doctrine were violated.  (Compl. ¶ 320.)  The City moved to dismiss any claim based on the hybrid-rights doctrine, citing *Kissinger v. Board of Trustees of the Ohio State* University, 5 F.3d 177, 180 (6th Cir. 1993).  In their response to the motion to dismiss, Plaintiffs concede this Court must follow *Kissinger*.  (ECF No. 21 Pl. Resp. to Mot. Dismiss at 16 PageID.288.)   In their motion for summary judgment, Plaintiffs again concede this Court must follow *Kissinger*.  Plaintiffs' hybrid-rights claim has already

---

[16]       Plaintiffs § I.A.4.

been dismissed based on Plaintiffs' concession.  (ECF No. 28 Opinion and Order at 24-25 n. 5 PageID.398-99.)

### G.  Michigan Constitution

In Count 9 of the Complaint, Plaintiffs assert violations of Article 1, § 4 of Michigan's Constitution.  Plaintiffs contend Michigan's Constitution provides broader protections for religious beliefs that its federal counterparts.  Plaintiffs request summary judgment on this claim[17], relying on a five-part test.  *See Champion v. Sec'y of State*, 761 N.W.2d 747, 753 (Mich. Ct. App. 2008) (citing *McCready v. Hoffius*, 586 N.W.2d 723, 728-29 (Mich. 1998)); *Reid v. Kenowa Hills Pub. Schs.*, 680 N.W.2d 62, 68-69 (Mich. Ct. App. 2004)).   The City argues the state constitutional law claims should be subject to the same analysis as the federal constitutional claims.  *See Scalise v. Boy Scouts of America*, 692 N.W.2d 858, 868 (Mich. Ct. App. 2006) (citing *In re Legislature's Request for an Opinion on the Constitutionality of Chapter 2 of the Amendatory Act No. 100 of Public Acts of 1970*, 180 N.W.2d 265, 274 (Mich. 1970) (stating that the Establishment and Free Exercise Clauses in the state and federal constitutions are "subject to similar interpretation.")).

The Michigan Supreme Court and the Michigan Court of Appeals have provided confusing guidance for how trial courts should evaluate challenges arising under Michigan's constitutional protections for religious freedoms.  The Michigan Constitution, Article 1, § 4, protects religious freedoms.  Article 1, § 4 contains a free exercise and an establishment clause.  *In re Legislature's Request*, 180 N.W.2d at 274.  The same provision protects an

---

[17]     Plaintiffs § I.G.

individual's freedom to worship according to his or her own conscience.  *Champion*, 761 N.W.2d at 752-53.  In 1970, the Michigan Supreme Court offered an advisory opinion indicating that Michigan's protections for religious freedoms should be evaluated in the same manner as parallel federal claims.  *In re Legislature's Request*, 180 N.W.2d at 274 (holding that Michigan's Establishment and Free Exercise Clauses are "an expanded and more explicit statement" of the same clause in the Federal Constitution and "are, accordingly, subject to similar interpretation.").

After *In re Legislature's Request,* the United States Supreme Court issued two important opinions interpreting the Free Exercise Clause.  First, in 1972, the United States Supreme Court decided *Wisconsin v. Yoder*, 406 U.S. 205 (1972).  *Yoder* involved a free-exercise challenge to Wisconsin's compulsory school-attendance law, which required children to attend either private or public school until the age of 16.  Two plaintiffs were members of the Old Order Amish religion and another plaintiff was a member of the Conservative Amish Mennonite Church.  Members of those faiths did not send children to school beyond the eighth grade.  Evidence introduced at trial established the plaintiffs believed that sending children to school after the eighth grade was inconsistent with the tenets of the Old Order Amish communities in general and was contrary to the Amish religion and way of life.  *Id.* at 209.  The evidence at trial also established that plaintiffs believed that sending their children to high school "would not only expose themselves to the danger of the censure of the church community," but also "endanger their own salvation and that of their children."  *Id.*  Finally, experts testified that Old Order Amish communities held a fundamental belief that "salvation requires life in a church community separate and apart

from the world and worldly influences." *Id.* at 210.  The Court found that the "impact of the compulsory-attendance law on respondents' practice of the Amish religion is not only severe, but inescapable, for the Wisconsin law affirmatively compels them, under threat of criminal sanction, to perform act undeniably at odds with fundamental tenets of their religious beliefs." *Id.* at 218.  The Court also found that Wisconsin's interest in enforcing the law—the importance of education to our political system and the preparation of self-reliant individuals—was not so compelling as to overcome the plaintiffs' religious beliefs.  *Id.* at 221-29.  The Court struck down the law, finding that the First and Fourteenth Amendments prevented Wisconsin from compelling the Amish to send their sixteen-year old children to high school.  *Id.* at 234.

Eighteen years later, in *Employment Division, Department of Human Resources of Oregon v. Smith*, the Court considered a free exercise challenge to a federal law criminalizing peyote.  The two Native American plaintiffs were fired after using peyote, a controlled substance prohibited by Oregon law, for sacramental religious purposes.  They filed a lawsuit when their request for unemployment compensation was denied.  The Court held that the plaintiffs did not have a Free Exercise claim because an individual's religious beliefs do not excuse him or her from complying "with an otherwise valid law prohibiting conduct that the State is free to regulate."  *Smith*, 494 U.S. at 879.  The Court distinguished *Yoder* and other cases which involved a neutral, generally applicable law that implicated not only the Free Exercise clause, but also "other constitutional protections, such as . . . , the right of parents, . . . , to direct the education of their children . . . ."  *Id.* at 881.

Eight years after *Smith*, the Michigan Supreme Court considered a claim arising under Michigan's Civil Rights Act brought by unmarried couple. *McCready*, 586 N.W.2d at 724-25 (*McReady I*). Michigan's Civil Rights Act prohibited discrimination based on marital status. *Id.* at 725. One of the defendant landlords explained that he would not rent apartment units to the plaintiffs because "unmarried cohabitation violated his religious beliefs." *Id.* at 725. The defendants raised defenses under both the Michigan Constitution and the First Amendment to the United States Constitution. *Id.* at 728. The Michigan Supreme Court analyzed the landlords' federal defense by applying the *Smith* test. *Id.* The Court concluded the Michigan Civil Rights Act was a generally applicable law which had no religious motivation and, therefore, did not violate the Free Exercise Clause of the First Amendment. *Id.*

For the landlords' defense under Article I, Section 4 of the Michigan Constitution, the Court applied the compelling state interest test from *Yoder*. *Id.* at 729. The Court outlined a five-part test: (1) the claimant's belief or conduct motivated by belief, was sincerely held, (2) his or her belief or conduct motivated by belief was sincere in nature, (3) whether the state regulation imposed a burden on the exercise of the belief or conduct, (4) whether a compelling state interest justifies the burden imposed and (5) whether a less obtrusive form of regulation was available. *Id.* at 729 (citing *Yoder*, 406 U.S. at 214-230). The court determined that Michigan's "need to provide equal access to such a fundamental need as housing outweighs defendant's religious beliefs[.]" *Id.* The court also concluded that the act did not require the landlord to violate his sincerely held religious belief, explaining that "if they wish to participate in the real estate market by offering housing for rent, they must

comply with the Civil Rights Act.  The burden placed on the defendant's religious beliefs affects their commercial activities sooner than their beliefs."  *Id.* (citations omitted).

Four months later, on a motion for rehearing, the Michigan Supreme Court vacated its earlier opinion.  *McCready v. Hoffius*, 593 N.W.2d 545 (Mich. 1999) (table opinion) (*McCready II*).  The court specifically vacated "that portion of the December 22, 1998 opinion of the Court which holds that the Civil Rights Act does not violate the Free Exercise Clause of the First Amendment of the United States Constitution or Article 1, § 4 of the Michigan Constitution."  *Id.*  The matter was remanded to the Jackson County Circuit court for "further consideration of that issue[.]"  *Id.*

Panels of the Michigan Court of Appeals have reached different conclusions about the significance of the *McCready* opinions.  In *Reid*, 680 N.W.2d at 68-69, the court evaluated a free exercise challenge using the compelling state interest test from *McCready* and *Yoder.*  The plaintiffs were parents who home schooled their children for religious reasons and they filed the lawsuit because the Michigan High School Athletic Association (MHSAA) required enrollment in order for students to participate in extracurricular athletic programs.  The court concluded that the MHSAA's requirement did violate the Michigan Constitution.  *Id.* at 69.  Notably, the court found that the desire to have the children participate in extracurricular athletic events ran counter to the plaintiffs' stated religious reason for homeschooling the students.  *Id.*

In contrast to *Reid*, two other panels, both involving Establishment Clause challenges, cited *In re Legislature's Request* for the proposition that state courts should evaluate both Free Exercise and Establishment challenges under the State's Constitution with the same

criteria as used for challenges under the Federal Constitution.  *See Weishuhn v. Catholic Diocese of Lansing*, 756 N.W.2d 463, 488 n.10 (Mich. Ct. App. 2008); *Scalise*, 692 N.W.2d at 868.

For this lawsuit, the Court will evaluate Plaintiffs' state constitutional claims in the same manner as Plaintiffs' federal constitutional claims.  The relevant holding in *McCready I*, which suggested a different analysis for state Free Exercise claims, was subsequently vacated.  The state court of appeals has not been consistent with its treatment of religious freedom claims brought under state law.  Complicating any analysis of this state law claim, the parties have not identified any Michigan courts that have considered the nuances outlined by Plaintiffs in their three different theories for their First Amendment Free Exercise claim. And, because Plaintiffs have a federal cause of action for the same rights protected by the Michigan Constitution, Plaintiffs cannot have a damages remedy against the City for their Michigan Constitution claims.  *See Jones v. Powell*, 612 N.W.2d 423, 426-27 (Mich. 2000); *see also Leaphart v. City of Detroit*, No. 271050, 2007 WL 914306, at *2 (Mich. Ct. App. Mar. 27, 2007) (citing *Jones*) ("Our Supreme Court has declined to infer a damage remedy for a violation of the state constitution by a municipality or individual government employee since other remedies are available against such defendants."); *Fifield v. City of Lansing*, No. 221755, 2001 WL 1134607, at *5 (Mich. Ct. App. Sept. 21, 2001) (same).

## IV.

Plaintiffs used Facebook to announce both their religious beliefs and their business practices.  The City reacted to the Facebook post, culminating in the denial of Country Mill's application to participate in the East Lansing Farm's Market.  The parties disagree whether

City's actions were because of Plaintiffs' statement about their religious beliefs or whether the City's actions were because of Plaintiffs' statement about their business practices. Because the record contains evidence from which the finder of fact could conclude that the City reacted to Plaintiffs' statements about their religious beliefs, the cross motions for summary judgment must be denied for many of the claims.   The trier of fact must decide what the City's motivation was.

ORDER

For the reasons contained in the accompanying Opinion, Plaintiffs' motion for summary judgment (ECF No. 70) is **GRANTED IN PART and DENIED IN PART**, and Defendant's motion for summary judgment (ECF No. 67) is **GRANTED IN PART and DENIED IN PART.  IT IS SO ORDERED.**

Date:   December 18, 2019                          /s/ Paul L. Maloney
                                                   Paul L. Maloney
                                                   United States District Judge