UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

COUNTRY MILL FARMS, LLC and
STEPHEN TENNES,

    Plaintiffs,                             Case No.  1:17-cv-00487-PLM-RSK

v.                                         HON. PAUL L. MALONEY

CITY OF EAST LANSING,

    Defendant.

_____

### DEFENDANT CITY OF EAST LANSING'S BRIEF IN RESPONSE TO PLAINTIFFS' "MOTION FOR PARTIAL DIRECTED VERDICT"

### INTRODUCTION

The Plaintiffs brought an oral motion for "partial directed verdict" after the close of proofs at trial. Fed. R. Civ. P. 52(c) states that in a nonjury trial if a party "has been fully heard on an issue" and the court "finds against the party on that issue, the court may enter judgment against a party on a claim or defense that, under controlling law, can be maintained or defeated only with a favorable finding on that issue." Rule 52(c) requires such a judgment to "be supported by findings of fact and conclusions of law as required by Rule 52(a)."

The Plaintiffs seek judgment on "the individualized-assessments portion of their Free Exercise Claim in Count IV," (ECF No. 134, PageID 2844), based on the Supreme Court's recent decision in *Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021). For the reasons that follow the Plaintiffs' motion should be denied.

### ARGUMENT

**I.    Judgment in favor of the Plaintiffs is not warranted where the Plaintiffs were not engaged in conduct associated with the practice of their religion.**

The Plaintiffs' entire argument presupposes that they were engaged in a religious exercise when they rented their business venue for non-Catholic weddings but refused to rent their business venue for same-sex weddings. Plaintiffs argue that because their actions were based on sincerely held religious beliefs it is immunized from the City's antidiscrimination policies. However, the Plaintiffs were not engaged in a religious exercise when they rented their business venue for non-Catholic weddings. Their argument overstates the level of protection given to conduct that may be motivated by religious belief but is not associated with the practice of their religion.

### A. Supreme Court treatment of the exercise of religion.

Supreme Court precedent does not treat every "exercise" of religion with the same degree of deference or protection. The decisions draw a clear line between conduct that is truly part of the exercise of one's religion and conduct that might be motivated by religious **beliefs** but is not part of the exercise of one's religion. Beginning with *Reynolds v. United States*, 98 U.S. 145 (1878), the Supreme Court has upheld the regulation of conduct in the face of free exercise challenges. In *Reynolds*, the Court upheld a bigamy conviction even though the defendant claimed the Free Exercise Clause insulated his conduct from governmental intrusion because his religion believed the practice to be "of divine origin." *Id*. at 161.  In rejecting the claim, the Court first stated: "The word 'religion' is not defined in the Constitution. We must go elsewhere, therefore, to ascertain its meaning, and nowhere more appropriately, we think, than to the history of the times in the midst of which the provision was adopted. The precise point of the inquiry is, what is the religious freedom which has been guaranteed." *Id*. at 162. Citing to the record of the adoption of the Constitution and the Bill of Rights the Court concluded: "Congress was deprived of all legislative power over mere

2

opinion, but was left free to reach actions which were in violation of social duties or subversive of good order." *Id*. at 164.

The opinion/belief and conduct/action dichotomy has long been the touchstone of the Free Exercise Clause. The Free Exercise Clause was applied to the states through the Fourteenth Amendment in *Cantwell v. State of Connecticut*, 310 U.S. 296 (1940). The Supreme Court held:

> Freedom of conscience and freedom to adhere to such religious organization or form of worship as the individual may choose cannot be restricted by law. On the other hand, it safeguards the free exercise of the chosen form of religion. Thus the Amendment embraces two concepts,—freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be. **Conduct remains subject to regulation for the protection of society**."

*Id*. at 303 – 304. (Emphasis added). *Bowen v. Roy*, 476 U.S. 693, 699 (1986), similarly held: "Our cases have long recognized a distinction between the freedom of individual belief, which is absolute, and the freedom of individual conduct, which is not absolute."

The Supreme Court has also clearly identified certain conduct that is squarely within the Free Exercise Clause. "But the 'exercise of religion' often involves not only belief and profession but the performance of (or abstention from) physical acts: assembling with others for a worship service, participating in sacramental use of bread and wine, proselytizing, abstaining from certain foods or certain modes of transportation." *Employment Div., Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872, 877 (1990), "[T]he right to the free exercise of religion unquestionably encompasses the right to preach, proselyte, and perform other similar religious functions ..." *McDaniel v. Paty*, 435 U.S. 618, 626 (1978). *McDaniel* held unconstitutional a Tennessee statute that prohibited members of the clergy from serving in the legislature or as a delegate to a constitutional convention. The Court subjected the statute

3

to strict scrutiny, citing *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972): "The essence of all that has been said and written on the subject is that only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion." Although the statute in *McDaniel* was subject to strict scrutiny, it appears it would not have even survived rational basis review: "There is no occasion to inquire whether promoting such an interest is a permissible legislative goal, however, see post, at 1333-1336, for Tennessee has failed to demonstrate that its views of the dangers of clergy participation in the political process have not lost whatever validity they may once have enjoyed." *Id.* at 628.

*Wisconsin v. Yoder* itself is also instructive. The Supreme Court held that Wisconsin's compulsory education law was unconstitutional as applied to the Old Order Amish.

> [T]he traditional way of life of the Amish is not merely a matter of personal preference, but one of deep religious conviction, shared by an organized group, and intimately related to daily living. That the Old Order Amish daily life and religious practice stem from their faith is shown by the fact that it is in response to their literal interpretation of the Biblical injunction from the Epistle of Paul to the Romans, 'be not conformed to this world . . ..' This command is fundamental to the Amish faith. Moreover, for the Old Order Amish, religion is not simply a matter of theocratic belief. As the expert witnesses explained, the Old Order Amish religion pervades and determines virtually their entire way of life, regulating it with the detail of the Talmudic diet through the strictly enforced rules of the church community.

*Wisconsin v. Yoder*, 406 U.S. at 216. The Court concluded that allowing the law to be applied to the Old Order Amish "would gravely endanger if not destroy the free exercise of respondents' religious beliefs." *Id.* at 218.

But the Court made another statement that is particularly apt to this case and draws the very distinction that the Defendant is making: "Although a determination of what is a 'religious' belief or practice entitled to constitutional protection may present a most delicate question, **the very concept of ordered liberty precludes allowing every person to make**

4

**his own standards on matters of conduct in which society as a whole has important interests**." *Id*. at 215 – 216. (Emphasis added; footnote omitted). The Plaintiffs in this case are attempting to obtain the highest level of constitutional protection for what the Supreme Court precluded in *Yoder*. The Plaintiffs openly acknowledge that fact in their Brief: "But the evidence here was replete at trial that the Tenneses, too view their business as having a religious mission. …the whole enterprise exists to give glory to God." (ECF no. 134, PageID 2851). If that is the state of the law, then any and all conduct that is based on a sincerely held religious belief is insulated from governmental regulation regardless of whether it is actually part of the practice of a particular religion. There would be no limitation to what constitutes the exercise of religion. Belief would be all-encompassing and conduct would be moot.

The Plaintiffs address this issue by citing *Braunfeld v. Brown*, 366 U.S. 599 (1961), *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014), and *Masterpiece Cakeshop, Ltd. V. Colorado Civil Rights Commission*, 138 S. Ct. 1719 (2018). None of these cases support the Plaintiffs' position. Start with *Burwell*. *Burwell* is not a First Amendment case at all. *Burwell* involved a challenge brought under the Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. § 2000bb *et seq.*, to a U.S. DHHS requirement that employers provide health-insurance coverage for certain methods of contraception. The RFRA provides that "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability." § 2000bb–1(a). The *Burwell* Court explicitly distinguished the First Amendment concept of "free exercise of religion" from the statutory definition:

> RLUIPA amended RFRA's definition of the 'exercise of religion.' See § 2000bb–2(4) (importing RLUIPA definition). Before RLUIPA, RFRA's definition made reference to the First Amendment. See § 2000bb–2(4) (1994 ed.) (defining 'exercise of religion' as 'the exercise of religion under the First Amendment').

5

> **In RLUIPA, in an obvious effort to effect a complete separation from First Amendment case law, Congress deleted the reference to the First Amendment** and defined the 'exercise of religion' to include 'any exercise of religion, whether or not compelled by, or central to, a system of religious belief.' § 2000cc–5(7)(A). And Congress mandated that this concept 'be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution.' § 2000cc–3(g).

*Id.* at 696. (Emphasis added). Thus, the entire. The *Burwell* Court itself acknowledged its decision had no bearing on the question of what constitutes the exercise of religion in a First Amendment setting: "By enacting RFRA, Congress went far beyond what this Court has held is constitutionally required." *Id.* at 706. *Burwell* provides no assistance to the Plaintiffs.

*Braunfeld* does not help the Plaintiffs either. The Plaintiffs assert that the Supreme Court recognized "the free-exercise rights of Jewish merchants who were adversely affected by Sunday closing laws." (ECF No. 134, PageID 2851). That is not an accurate description of the Court's plurality opinion. The Court specifically rejected the argument that the merchants were engaged in a religious exercise:

> But, again, this is not the case before us because **the statute at bar does not make unlawful any religious practices of appellants**; **the Sunday law simply regulates a secular activity** and, as applied to appellants, operates so as to make the practice of their religious beliefs more expensive. …
>
> To strike down, without the most critical scrutiny, legislation which imposes only an indirect burden on the exercise of religion, i.e., **legislation which does not make unlawful the religious practice itself**, would radically restrict the operating latitude of the legislature.

*Id.* at 605 – 606. (Emphasis added). *Braunfeld* provides direct support for the Defendant's position; it provides no support for the Plaintiffs' position.

Plaintiffs then cite *Masterpiece Cakeshop* and argue that since *Masterpiece Cakeshop* relied on *Lukumi, supra*, the fact that the Plaintiff in *Lukumi* was a church is of no consequence, because the Plaintiff in *Masterpiece Cakeshop* was a baker. (ECF No. 134,

6

PageID 2851). But the Plaintiffs are mixing apples and oranges. *Masterpiece Cakeshop* relied on *Lukumi* for the proposition that the government "cannot impose regulations that are hostile to the religious beliefs of affected citizens and cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices." *Masterpiece Cakeshop*, 138 S. Ct. at 1731. That is not the issue presented in the Plaintiffs' current motion.

### B. Application of *Fulton* to this case.

As a preliminary point, the City will address the Court's question raised in the oral argument as to whether CSS was a religious entity. It is. The CSS website identifies itself as "Catholic Social Service, Archdiocese of Philadelphia." www.cssphiladelphia.org/identity/ The website also has a page titled "Our Catholic Identity" which states in part: "**Catholic Social Services** (CSS) is unwavering in its commitment to our Catholic identity and the social mission of the Catholic Church in all of our programs and services." (**Exhibit A**). The website of the Archdiocese of Philadelphia lists Catholic Social Services as one of its "Offices." http://archphila.org/administration/ More to the point, the Complaint in Fulton explicitly identified CSS as a religious entity closely affiliated with the Catholic Church. (Exhibit A, ¶ 13). In contrast, Mr. Tennes testified that Country Mill Farms, LLC, is a for-profit corporate entity created under Michigan law. It is not affiliated with the Catholic Church. Catholic religious services are not held at the Farm. There has never been a Catholic wedding at the farm. Holding non-Catholic weddings at the Farm is not an obligation the Plaintiff must undertake as part of the exercise of his Catholic faith. Simply put, renting the farm is a secular undertaking, not an exercise of the Catholic faith.

7

In addition to the fact that the Plaintiffs in this case were not a religious entity carrying out a core religious mission, the *Fulton* decision does not apply for other reasons. George Lahanas testified at trial that he made the decision to exclude Country Mill from the 2017 ELFM and would be the person who would make such a decision in the future. He also testified unequivocally that he considered compliance with the City's nondiscrimination policy to be a "make or break" issue. If a vendor was not in compliance, that vendor would not be allowed to participate in the Market. That is a far cry from the policy the Supreme Court found problematic in Fulton, which allowed "a system of individual exemptions, made available in this case at the 'sole discretion' of the Commissioner." *Fulton*, 141 S. Ct. at 1878. Lahanas's testimony demonstrates that the City's application of the nondiscrimination policy is no different than the Plaintiffs' example of a zoning law that requires buildings to be set back 20 feet from a property line. (ECF No. 134, PageID 2852).

But the Plaintiffs' argument misses the mark for a more fundamental reason. The Plaintiffs seem to argue that the mere existence of the possibility of exemptions invalidates governmental regulation as a matter of law. That is not the holding of *Fulton* nor is such a position consistent with the Supreme Court cases upon which *Fulton* relies. The missing part of the Plaintiffs' analysis is that it does not include a link between the religious conduct at issue and the governmental regulation. *Fulton* relies heavily on *Sherbert v. Verner*, 374 U.S. 398 (1963). *Sherbert* held that the state could not disqualify an applicant for unemployment benefits because she was not available for Saturday work because her religion forbade her to work on the Sabbath – which it deemed to be Saturday. "[A]ppellant's declared ineligibility for benefits derives solely from the practice of her religion …" *Id*. at 404. This would be a different case if Mr. Tennes were a minister who refused to perform a same-sex ceremony,

8

or the pastor of a church that refused to allow same-sex weddings to be held at its property and then sought to participate in the ELFM. But that is not this case. Mr. Tennes operates a business, and while his religious beliefs do not recognize same-sex marriages, he need not rent out his business property for weddings in order to practice his faith. Fulton also relied on *Lukumi* and cited the Court's holding that the challenged regulations prohibited animal sacrifice, an integral part of the Santeria worship service, but did not regulate hunters' disposal of their kills or improper garbage disposal by restaurants. This demonstrated the necessary link between religious exercise and governmental regulation. *Fulton*, 141 S. Ct. at 1877.

*Fulton* recognized the need for this link. "The contractual non-discrimination requirement imposes a burden on CSS's religious exercise **and** does not qualify as generally applicable." *Id*. at 1881. (Emphasis added). The religious exercise was the placement of foster children, which the Supreme Court identified as part of CSS's religious mission. *Id*. at 1876. Again, that link is missing in this case. The Plaintiffs in this case are not religious entities and are not carrying out the mission of the Catholic Church. If their secular business practices can be immunized from governmental regulation because those business practices are informed by the Plaintiffs' religious beliefs, then there is no limit to what can be immunized from governmental regulation based purely on belief. The Supreme Court did not authorize that result in *Fulton* nor in any other case. The City's decision is subject to rational basis review and passes that test without difficulty.

**C.     Even assuming strict scrutiny applies, exclusion of the Plaintiffs from the ELFM is justified.**

9

The testimony in this case demonstrates that the City excluded Country Mill from the ELFM because it considered it (and all other participants of the ELFM) one of its vendors; that the City required its vendors to comply with its nondiscrimination policy; that it had included sexual orientation as a protected class since the mid-1970s; and that it refused to conduct business with vendors who did not comply with the nondiscrimination policies. Unlike the situation in Fulton where "[t]he City offers no compelling reason why it has a particular interest in denying an exception to CSS while making them available to others," *id*. at 1882, there is no evidence the City has ever exempted anyone from compliance with its nondiscrimination ordinances. In Fulton, the evidence demonstrated that the City's exclusion of CSS actually contradicted its rationale for the exclusion. *Id*. at 1881 – 1882. Such is not the case here. The City's commitment to protecting sexual orientation as a class, and to requiring its vendors to fully serve those members of the class in public accommodations, can only be realized by refusing to conduct business with those who do not agree to follow the City's policies. There is no more narrow way to accomplish this goal.

The City respectfully requests the Court deny the Plaintiffs' motion.

                                           Respectfully submitted,

DATED:  August 13, 2021                 PLUNKETT COONEY

                                           BY:   */s/Michael S. Bogren*
                                           Michael S. Bogren (P34835)
                                           Attorney for Defendant City of East Lansing
                                           BUSINESS ADDRESS:
                                           333 Bridge Street, N.W., Suite 530
                                           Grand Rapids, Michigan  49503
                                           **Direct Dial:  269/226-8822**
                                           **mbogren@plunkettcooney.com**

n.26408.72010.26981674-1

10