IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

COUNTRY MILL FARMS, LLC and
STEPHEN TENNES,

      Plaintiffs,                            Case No.  1:17-cv-00487-PLM-RSK

v.                                     HON. PAUL L. MALONEY

CITY OF EAST LANSING,

      Defendant.

_____

## DEFENDANT CITY OF EAST LANSING'S POST-TRIAL BRIEF

## INTRODUCTION

" ... the very concept of ordered liberty precludes allowing every person to make his own standards on matters of conduct in which society as a whole has important interests." *Wisconsin v. Yoder*, 406 U.S. 205, 215–216 (1972).

"But the evidence here was replete at trial that **the Tennes, too, view their business** as having a religious mission. ... the whole enterprise exists to give glory to God." (Plaintiffs' Brief, ECF No. 134, PageID.2851). (Emphasis added).

"The Free Exercise Clause simply cannot be understood to require the Government to conduct its own internal affairs in ways that comport with the religious beliefs of particular citizens." *Bowen v. Roy*, 476 U.S. 693, 699 (1986)

" ... the Free Exercise Clause is written in terms of what the government cannot do to the individual, not in terms of what the individual can exact from the government." *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 451 (1988).

The Plaintiffs are attempting to do what the Supreme Court has prohibited: the Plaintiffs want to exact an exemption from the City and seek to have the City "conduct its own internal affairs in ways that comport with the religious beliefs" of the Plaintiffs. The City is not required to grant that exemption and the Plaintiffs cannot compel that result under the Supreme Court's free exercise jurisprudence.

The Plaintiffs are asking this Court to expand the scope of the Free Exercise Clause far beyond its original purpose, and far beyond what the Supreme Court's current rulings will support. At bottom, Plaintiffs seek a ruling that will allow every person (both real and corporate) to insulate their conduct from anti-discrimination laws based solely on each person's individual religious beliefs **and how they decide to implement those beliefs in their business practices and daily lives**. The Plaintiffs' argument collapses the "belief" and "conduct" distinction that has been a benchmark of the Free Exercise Clause cases and would create a patchwork of millions of individualized religions. This is not what the Free Exercise Clause was meant to accomplish.

Consider the scope of the right to free exercise the Plaintiffs advocate. The Plaintiff testified that his goal is to operate all aspects of Country Mill Farms as part of the exercise of his religion. (ECF No. 134-1, PageID 3014 – 3015). He also testified that God is the center of his family's life, the center of their farm life and governs the business. (*Id.* at 2916).  The Plaintiff also testified that he does not rent his business premises for same-sex weddings because of his sincerely held religious belief, derived from his Catholic faith, that marriage is between one man and one woman. (*Id.* at 2932, 3006). The Plaintiff testified that renting the business for weddings is not an obligation of his Catholic faith, but rather is a voluntary undertaking. (*Id.* at 2991). The Plaintiff also testified there has never been a Catholic wedding

at the Farm (*id*. at 3003), and the services conducted at the Farm have all been non-Catholic. (*Id.* at 3003 – 3004). The Plaintiff is not a minister and does not officiate at any of the wedding ceremonies. (*Id*. at 2992). The Plaintiffs' position is that when they rent their business premises out for a non-Catholic wedding, they are engaging in the exercise of **their** religion, and concomitantly, when they refuse to rent their business premises for a same-sex wedding they are also engaged in the exercise of **their** religion. What, then, would not be encompassed by the Plaintiffs' exercise of religion? Under the Plaintiffs' reading of the Constitution, the answer must be "nothing."

Consider next the Plaintiff's testimony that the Farm "serves" members of the LGBT community as customers both at the farm and at the ELFM. (*Id*. at 2928 – 2929). Also consider the Plaintiff's testimony that he would sell wine that the Farm has made for use at a same-sex wedding (*Id*. at 3015). But based on the Plaintiffs' constitutional argument, that is a matter of discretion rather than necessity. "Nothing in the principle for which they contend, however, would distinguish this case from another lawsuit in which they (or similarly situated religious objectors) might seek to exclude all human activity but their own from sacred areas of the public lands." *Lyng supra*, 485 U.S. at 452–453. The same is true in this situation. Another business with the same beliefs could refuse to serve a member of the LGBT community in any manner because providing goods or services would be contrary to their sincerely held religious beliefs. Plaintiffs' counsel in her closing argument stated:

> "We're not aware of a single religion in the world that advocates denying selling off-the-shelf products to someone because of their [sexual] orientation. And to suggest that the Catholic Church would teach that is offensive." (ECF No. 134-2, PageID 3441).

But that statement crystalizes the problem with the Plaintiffs' constitutional position. The Plaintiffs never hosted a single Catholic religious ceremony. They are engaged in a secular activity, not a religious one in terms of their own religion. If the Plaintiffs' sincerely held religious beliefs allow them to refuse to rent their business premises for same-sex weddings, another person's (or business's) sincerely held religious beliefs would allow them to refuse to sell their products to a same-sex couple – or to anyone else they found to be religiously objectionable. The question asked by Mark Meadows was actually quite prescient because the Plaintiffs' constitutional theory seems to have little to do with the teachings of the Catholic Church and everything to do with how the Plaintiffs act on their individualized beliefs. Under Plaintiffs' constitutional theory, it is not the tenets or teachings of an organized religion that matters, it is the interpretation given by each individual person and how that person acts on those beliefs. And since "'[i]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, **or the validity of particular litigants' interpretations of those creeds**'" *Resurrection School v. Hertel*, ____ F. 4th ____, (No. 20-2256, 2021 WL 3721475, at *11 (6th Cir. 2021), quoting *Hernandez v. Comm'r of Internal Revenue*, 490 U.S. 680, 699 (1989) (emphasis added), those millions of individual interpretations must be accepted on their face.

The consequences of such a ruling are far reaching and virtually limitless in their scope. Some have expressed outrage when the consequences of such a ruling have been raised. Specifically, the suggestion that the same rationale could be used to invalidate racial anti-discrimination laws is anathema to those who seek to justify discrimination against the LGBT community on the basis of religious beliefs. The issue, of course, is not one of comparison but of consequence. That is, the point being made is not: "A = B," but rather is:

"if A, then B." But to spare anyone any discomfort, the consequences will not be addressed in the context of racial discrimination. Instead, consider the consequences in terms of religious discrimination.

There are numerous interpretations of the Bible (and other texts considered sacred by other religions) among different religions, theologians, religious leaders, and individuals, including among those who identify themselves as Christians. In point of fact, some practitioners of Christianity reject the claim made by others of that they are Christian at all. One of the starkest examples is the website http://www.jesus-is-savior.com/False%20Religions/false_religions.htm maintained by David J. Stewart. This website lists the following religions (among many others) as "false": Roman Catholic, Lutheran, and Latter Day Saints (Mormons).

One of the many disparaging statements the website asserts about the Catholic Church is: "Pope John Paul II started the scam of The Image of Divine Mercy in the year 2,000 [sic]; telling all Catholics everywhere to worship this demonic image. The light in the image coming from Jesus' left hand forms a Masonic Pyramid. It is a symbol identifying the Catholic Church as part of the demonic New World Order. If you choose to remain in the Catholic Church, then you are NO FRIEND of Jesus Christ!" http://www.jesus-is-savior.com/False%20Religions/Roman%20Catholicism/idolatry.htm

The website states the following about the Lutheran Church: "Lutheranism is straight out of the pits of hell! ... The Lutheran church is NO church, but a bastard child of the Mother of harlots (Roman Catholicism)."

http://www.jesus-is-savior.com/False%20Religions/Lutherans/lutheranism_exposed.htm

The following statement is made about Latter Day Saints: "Please notice that the Mormon plan of salvation makes no mention at all of the cross upon which Christ DIED. There is no mention of Christ being BURIED. There is no mention of the Lord's RESURRECTION three days later. How tragic and sad! Oh, my friend, please don't be tricked by the Devil. Mormonism will send you to Hell!!!"

http://www.jesusisprecious.org/false_religion/mormon/not_the_gospel.htm

If Plaintiffs' constitutional theory is correct then if Mr. Stewart – or someone with the same beliefs – started a business and decided to run that business consistent with his religious beliefs, he would have constitutional protection for his business practices under the Free Exercise Clause. If that business owner declared his sincerely held religious beliefs prohibited him from doing business with those who practiced what he considered to be a false religion, he would constitutionally be entitled to do so. He could, therefore, refuse to engage in commerce with Catholics, Lutherans, or Mormons (or any of the other religions he deems to be "false"). He would also be exempt from any law that prohibited religious discrimination in places of public accommodation because he would be engaged in the "exercise of religion" by carrying out his sincerely held religious beliefs through his business practices. That cannot be the result contemplated by the drafters of the Free Exercise Clause or those who ratified the Constitution. Nor can that be the result demanded by the Supreme Court's free exercise decisions. In fact, that result flies in the face of the Court's decision in *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719, 1727 (2018):

> Nevertheless, while those religious and philosophical objections are protected, it is a general rule that such objections do not allow business owners and other actors in the economy and in society to deny protected persons equal access to goods and services under a neutral and generally applicable public accommodations law.

But the Plaintiffs have not attempted to address how their constitutional theory can be squared with the statement from *Masterpiece Cakeshop*, or numerous other Supreme Court decisions to the same effect. The issue cannot be brushed away by claiming that a false comparison is being made. No comparison at all is being made. This is simply the logical result based on the constitutional rule the Plaintiffs espouse. This is not a "slippery slope" argument; it is far more serious than that. This is no slippery slope. This is a cliff on a mountain hairpin turn. The Plaintiffs' argument, if adopted, would remove the guardrails from the edge of that cliff.

The City of East Lansing will discuss each of the claims asserted by Plaintiffs in light of that backdrop.

## I.    Free Exercise – Hostility Toward Religion

There are three decisions related to the 2017 East Lansing Farmers Market (ELFM) that are in issue. The first was the decision to revise the Vendor Guidelines. The second was the decision not to issue an automatic invitation to Country Mill. The third was the decision to deny Country Mill's application once it had been submitted. The Plaintiffs allege each of these decisions was motivated by religious animus. The evidence does not support the Plaintiffs' claim.

The Supreme Court's decision in *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993), is the starting point for analyzing a claim religious hostility under the Free Exercise Clause. In *Lukumi*, the City of Hileah, Florida, passed a series of ordinances that the Supreme Court held were designed to prevent the establishment of a Santeria church in the City. ("No one suggests, and on this record it cannot be maintained, that city officials had in mind a religion other than Santeria." *Id*. at 535). This constituted a

violation of the Free Exercise Clause. In reaching its conclusion the Court established the

framework for analyzing religious hostility claims. The Court began by reiterating the need

for neutrality by the government when dealing with free exercise issues:

> The Free Exercise Clause, like the Establishment Clause, extends beyond facial discrimination. The Clause 'forbids subtle departures from neutrality,' *Gillette v. United States*, 401 U.S. 437, 452 (1971), and 'covert suppression of particular religious beliefs,' *Bowen v. Roy, supra*, 476 U.S., at 703 (opinion of Burger, C.J.). Official action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality. The Free Exercise Clause protects against governmental hostility which is masked, as well as overt. 'The Court must survey meticulously the circumstances of governmental categories to eliminate, as it were, religious gerrymanders.' *Walz v. Tax Comm'n of New York City*, 397 U.S. 664, 696 (1970) (Harlan, J., concurring).

*Lukumi, supra*, 508 U.S. at 534. The Court concluded by explaining:

> The Free Exercise Clause commits government itself to religious tolerance, and **upon even slight suspicion that proposals for state intervention stem from animosity to religion or distrust of its practices, all officials must pause to remember their own high duty to the Constitution and to the rights it secures**. Those in office must be resolute in resisting importunate demands and must ensure that the sole reasons for imposing the burdens of law and regulation are secular. Legislators may not devise mechanisms, overt or disguised, designed to persecute or oppress a religion or its practices.

Id. at 547.

The Court relied heavily on equal protection precedent in creating the framework for

analyzing a claim of religious hostility:

> Here, as in equal protection cases, we may determine the city council's object from both direct and circumstantial evidence. *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266 (1977). Relevant evidence includes, among other things, the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the

decisionmaking body. *Id*., at 267–268. These objective factors bear on the question of discriminatory object. *Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 279, n. 24 (1979).

*Id*. at 540. The Supreme Court reiterated this framework verbatim in *Masterpiece Cakeshop, supra,* 138 S. Ct. at 1731.

Before analyzing the Plaintiffs' claim in this case, the City believes it is necessary to address an assertion made by Plaintiffs' counsel during trial that an inference of religious animus can be based on the conduct or statements of someone other than the decisionmaker. It is unclear of the legal authority for the Plaintiffs' position; however, it is not supported by binding precedent. Both *Lukumi* and *Masterpiece Cakeshop* addressed comments made by the decisionmakers: the members of the city council in *Lukumi* and the members of the civil rights commission in *Masterpiece Cakeshop*. All of the statements cited by the Sixth Circuit in *Meriwether v. Hartop*, 992 F.3d 492, 512 (6th Cir. 2021), were made by individuals involved in the decisionmaking process. The Complaint in *Meriwether* (which was decided at the Rule 12 stage) alleged that Department Chair Jennifer Pauley was involved in the decisionmaking process, and her statements were cited. *Id*. at 512 – 513. Additional statements were cited from Provost Jeffrey Bauer and the Director of Labor Relations, his designee. Both were directly involved in the decisionmaking process. The Sixth Circuit did not cite statements or conduct from a person who was not part of the decisionmaking process in holding that the Complaint stated a plausible claim of religious hostility. *Meriwether* does not support the Plaintiffs' theory.

The Plaintiffs also cited a Second Circuit decision in their trial brief on the issue of religious hostility. *New Hope Family Services, Inc. v. Poole*, 966 F.3d 145, 167–168 (2d Cir. 2020), also found that a plausible claim of religious hostility had been pled in the Complaint.

Arguably, the Second Circuit's opinion relied on statements apart from the decisionmakers in reaching its conclusion: "New Hope points to some statements by OCFS personnel that are similar to statements in Masterpiece Cakeshop that the Supreme Court interpreted as arguably evincing religious hostility." *Id*. at 167 – 168. Nevertheless, *New Hope* is not binding in this circuit and is not consistent with the Supreme Court precedent.

Turning to the evidence in this case, the City submits the Plaintiffs have failed to carry their burden of proof on the issue of religious hostility. The Plaintiffs attempted to prove the City Council was the actual decisionmaker in an attempt to impute after-the-fact statements made by Mark Meadows and Ruth Beier to the City. No proof was introduced into evidence at trial to support this theory. George Lahanas and Tim McCaffrey testified unequivocally that first McCaffrey and ultimately Lahanas were the decisionmakers for the amendments to the Vendor Guidelines, not giving Country Mill an automatic invitation to the 2017 ELFM and denying Country Mill's application for the 2017 ELFM. Heather Surface also testified that the City Council was not involved in any of those decisions. Mark Meadows and Ruth Beier both testified they were not involved in any of the decisions – either individually or collectively with the council as a whole.

The Plaintiffs tried to create an inference that the city council was, in essence, the puppet master for these decisions and the City Manager was carrying out the dictates of the council. There are many flaws with that theory. The most obvious flaw is the lack of a single bit of evidence to support it. The Plaintiffs try to reach back to the events of the weekend of August 26 – 28, 2016 to rescue their theory. They point to e-mails between McCaffrey, Lahanas, and two members of the City Council – Mark Meadows and Erik Altmann – in an attempt to support their theory. This attempt fails. First, Erik Altmann has made no

comments referring to religion at any point in time. His only comment directly related to Country Mill was in response to Tim McCaffrey's e-mail to George Lahanas recommending that the request that Country Mill agree not to vend on August 28, 2015 be withdrawn. Altmann's e-mail states: "I'd prefer maintaining the request not to vend until we get more direct assurances." (ECF No. 137 – 9). Mark Meadows also commented during this timeframe. (ECF No. 137 – 7, 137 – 8). There is no evidence in the record that any other council member responded or commented. George Lahanas testified he had no other contact with any council members apart from those e-mails. (ECF No. 134 – 2, PageID 3234). Tim McCaffrey testified he did not have any contact with any council members about the issue. (ECF No. 134 – 1, PageID 3119, 3150). Plaintiffs' counsel tried to get Lahanas to acknowledge Meadows and Altmann must have been involved in the process because of their fast response time. Lahanas refuted the suggestion:

"[Ms. Anderson] ... But the quick response back is that because they already knew about this?

"[Mr. Lahanas] No, because they both sit on their technology, and as soon as I send something out, these two respond just boom-boom-boom, it's just the way they are." (ECF No, 134 – 2, PageID 3223).

It is also important to note that Country Mill was asked to voluntarily agree not to vend; they were never instructed they could not vend, and they did attend the August 28, 2015 Market as a vendor. (ECF No. 137 – 15; ECF No. 134 – 1, PageID 2993 – 2995, 3130).

### A.  Revisions to Vendor Guidelines

In terms of the first of the three decisions that were made relative to the 2017 Market – the revisions of the Vendor Guidelines – there is no evidence that either the council as a

whole or any individual council members were even aware that revisions were made. The issue was not brought to the city council. (ECF No. 134 – 1, Page ID 3153; ECF No. 134 – 2, PageID 3242 – 3243; ECF No. 134 – 2, PageID 3302; ECF No. 134 – 2, PageID 3342). The testimony at trial was that Tim McCaffrey began the revision process to incorporate the City's antidiscrimination policies at the completion of the 2016 Market. (ECF No. 134 – 1, Page ID 3135, 3151; ECF No. 134 – 2, PageID 3210 – 3211). The Country Mill situation in August 2016 brought to light the fact that the Vendor Guidelines did not incorporate the antidiscrimination policies. (ECF No. 134 – 1, PageID 3135; ECF No. 134 – 2, PageID 3203 – 3204). George Lahanas made the final decision on the revisions to the Vendor Guidelines. (*Id.* at 3208). Lahanas testified that at the time the discussions began to revise the Vendor Guidelines Country Mill was in compliance with the nondiscrimination policy because they were not hosting any weddings. (*Id.* at 3239). MaCaffrey also testified Country Mill was in compliance with the antidiscrimination ordinance when the decision was made to revise the Vendor Guidelines. (ECF No. 134 – 1, PageID 3152). The revisions were made to address a "gap" in the Vendor Guidelines because they did not incorporate the nondiscrimination policy. Lahanas testified he considered the situation with the Market vendors to be "akin to our vendors having a relationship with us and that the business relationship was the same and that they should, they should have that same expectation of the ordinance." (*Id.* at 3239 – 3240). Lahanas considers ELFM participants to be the same as vendors of the City because the City controls the Market. (*Id.* at 3241 – 3242).

Applying the *Lukumi/Masterpiece Cakeshop* framework to the evidence in this case, the Plaintiffs have failed to meet their burden of proof on religious hostility.

**1.  The historical background of the decision under challenge.**

The historical background of the Vendor Guidelines actually begins in the early 1970s when the City of East Lansing first included sexual orientation as a protected class in its antidiscrimination ordinance. The City has incorporated its antidiscrimination policies into most of its contracts. The City considers the vendors at the ELFM in the same light they consider those vendors supplying goods and services to the City. When the events of August 2916 brought to light that the ELFM Vendor Guidelines did not specifically incorporate the antidiscrimination policies, steps were taken to address that oversight.

**2.  The specific series of events leading to the enactment or official policy in question.**

The specific series of events leading to the revisions of the Vendor Guidelines were the events of August 26 – 28, 2016, as outlined above. The City became aware that the antidiscrimination policies were not specifically incorporated into the Guidelines and that was remedied. At the time the decision was made to revise the Guidelines the City believed Country Mill was compliant with the antidiscrimination policies because it had announced it would no longer book weddings.

**3.  The legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body.**

The legislative and administrative history is described above. There are no contemporaneous statements from and decisionmaker that in any way reflect religious animus. The Plaintiffs point to statements made by George Lahanas after the lawsuit was filed to attempt to show animus. However, when these statements are read in context, they do not support the Plaintiffs' claim. The Plaintiffs claim that Lahanas equated them to racists

who relied on religious beliefs to justify racial discrimination. That is factually inaccurate and legally inapt.

First, it is important to apply the Supreme Court's **actual** holding in the *Masterpiece Cakeshop* case. This is the language the Plaintiffs rely upon:

> On May 30, 2014, the seven-member Commission convened publicly to consider Phillips' case. At several points during its meeting, commissioners endorsed the view that religious beliefs cannot legitimately be carried into the public sphere or commercial domain, implying that religious beliefs and persons are less than fully welcome in Colorado's business community. One commissioner suggested that Phillips can believe "what he wants to believe," but cannot act on his religious beliefs "if he decides to do business in the state." Tr. 23. A few moments later, the commissioner restated the same position: "[I]f a businessman wants to do business in the state and he's got an issue with the—the law's impacting his personal belief system, he needs to look at being able to compromise." Id., at 30.

*Masterpiece Cakeshop*, 138 S. Ct. at 1729. This is the rest of the Court's statement that is ignored:

> Standing alone, these statements are susceptible of different interpretations. **On the one hand, they might mean simply that a business cannot refuse to provide services based on sexual orientation, regardless of the proprietor's personal views**. On the other hand, they might be seen as inappropriate and dismissive comments showing lack of due consideration for Phillips' free exercise rights and the dilemma he faced.

*Id*. This Court made that very point in its Opinion on the cross motion for summary judgment. Lahanas' statements were made in response to questions – either from the press or from Plaintiffs' counsel – about the City's rationale for denying Country Mill's application for the 2017 ELFM. At no point did Lahanas make any of the statements that the Supreme Court ultimately found problematic in *Masterpiece Cakeshop*. He was not equating the Plaintiffs or their beliefs to racists. He was explaining that from the City's perspective discrimination on

the basis of sexual orientation is no different than discrimination on the basis of race. This is simply a factual statement. The City's ordinance does indeed offer the same level of protection to those discriminated against on the basis of sexual orientation as it does to those discriminated against on the basis of race. To say it's wrong to discriminate on the basis of sexual orientation for the same reason and to the same extent that it is wrong to discriminate on the basis of race does not in any way reflect religious animus. It is simply a statement of fact.

Lahanas testified: "There was no discussion about his religion. What we talked about was the fact that he wasn't hosting weddings, and there was a concern from somebody who raised a concern and said that he's not hosting weddings and he's discrimination against gay people." (ECF No. 134 – 2, PageID 3194).

He further testified: "So you're saying 'a Catholic like Steve.' I don't think that ever came into the situation. What it is, is that if there's a business practice that excludes people under our ordinance, that's something we consider. So it's the act; it has nothing to do with his faith." (ECF No. 134 – 2, PageID 3227).

Further: "Well, it puts us in a bit of an impasse, because we have an ordinance that says you can't discriminate against someone based of their sexual orientation, and he has – this is his religion. So I understand he has a concern about that, but, from our perspective, we have to, you know, faithfully sort of implement the ordinance that we have before us." (ECF No. 134 – 2, PageID 3228).

Mr. Lahanas testified that the example he gave related to race was not a comparison of beliefs, but of actions: the denial of service – one based on race and one based on sexual orientation. The City ordinance treats both the same. (ECF No. 134 – 2, PageID 3255).

Apparently relying on *Meriwether, supra*, Plaintiffs' counsel also asserted that statements made "by governmental officials, not just adjudicatory bodies" can be used to demonstrate religious animus. (ECF No. 134 – 2, PageID 3456). Perhaps so. But at no point did Meriwether hold that comments made outside of the decisionmaking process could be used to demonstrate religious animus. All of the statements cited by the Meriwether court were statements made by decisionmakers during the decisionmaking process. Contrary to the unsupported assertions made by Plaintiffs' counsel, no decisionmaker equated the teachings of the Catholic Church to invidious racial discrimination. What Mr. Lahanas said was that the City viewed the denial of service in public accommodations the same, regardless of the motivation of the person who denied service. Plaintiffs' counsel struggled mightily to fit that square peg into a round hole but failed to do so.

Moreover, the suggestion that any reference to racial discrimination in the context of a free exercise challenge equates to religious animus is one of the most intellectually dishonest tropes imaginable. The entire purpose of that assertion is to circumvent a discussion of a difficult legal issue. There is no validity to the assertion. It is not evidence of religious animus. To paraphrase Justice Roberts, proof of religious animus requires evidence that actually demonstrates religious animus – not an imputed animus with no factual basis.

In order for this Court to find that the Plaintiffs have met their burden of proof on this issue the Court has to find that George Lahanas and Tim McCaffrey took an oath to tell the truth and then deliberately lied to the court. They both testified unequivocally that the Plaintiffs' religious beliefs played no role whatsoever in the decisions made in this case. The Plaintiffs have offered no actual evidence to refute that testimony.

16

### B.  Not inviting Country Mill to the 2017 ELFM and denying the application.

Although these were two separate decisions, the evidence for both is essentially the same. Lahanas was responsible for the final decision not to invite Country Mill and if they applied to review the application. (ECF No. 134 – 1, PageID 3155; ECF No. 134 – 2, PageID 3212 – 3213, 3245 – 3246). The issue was not discussed with the city council. (ECF No. 134 – 1, PageID 3155 – 3156; ECF No. 134 – 2, PageID 3246). The city council was sent a copy of the letter to Country Mill denying their application in an e-mail dated March 8, 2017. (ECF No. 137 – 26; ECF No. 134 – 2, PageID 3219 – 3220) after the decision had been made. Lahanas made the decision to deny application. Religion was never brought up and never considered. (ECF No, 134 – 2, PageID 3247 – 3251). The city council not involved in the decision. (ECF No. 134 – 1, PageID 3157; ECF No. 134 – 2, PageID 3251 – 3252).

The same analysis that applied to the revisions to the guidelines applies here, with the addition of the fact that Plaintiffs' made a Facebook post in December 2016. The Facebook post does not change the outcome. The Plaintiffs desperately want to impute their own religious motive for refusing to rent their facility for same-sex weddings to the City. But the fact that they intertwined their religious motivation into the same Facebook post that announced their business practice does not mean the City is incapable of separating motivation from action. That is precisely what the City did. As described above, the City was not motivated by the Plaintiffs' religious beliefs or by the Plaintiffs' statement of those beliefs. The City was motivated only by the Plaintiffs' announcement of their actions – their prospective business practice of not renting their business venue to same-sex couples. The Plaintiffs cannot meet their burden of proof that the City's actions were motivated by religious animus.

## II.     Free Exercise – Targeting

The claim of targeting under the Free Exercise Clause is tied closely to the hostility claim. The Court ruled that the City's motivation would be the determining factor in both claims. (See, ECF No. 104, PageID 2235 – 2236). The Court did, however, include this additional issue with respect to the targeting claim: "A trier of fact could find that the City targeted Tennes and Country Mill **because of their religious practices**." (Id. at 2235). (Emphasis added).

As explained above and in the Response to Plaintiffs' Rule 52(c) motion, the Plaintiffs are not engaged in a religious exercise when they rent their business venue out for non-Catholic weddings. In addition to the testimony cited above, Plaintiff also testified that he does not inquire whether those who rent his wedding venue are divorced. That is significant because the Catholic Church considers marriage to be a lifelong commitment and can only be ended through death or annulment. A civil divorce that is not annulled by the Church is not recognized as ending a marriage. Thus, one who divorces and remarries without an annulment is committing adultery, a mortal sin. (ECF No. 134 – 1, PageID 3008 – 3010). This testimony reinforces the Plaintiff's other testimony about the nature of the weddings at the Farm. While those wedding ceremonies might be religious ceremonies to the bride and groom, they are not Catholic religious ceremonies.

The testimony from George Lahanas and Tim McCaffrey cited above demonstrates that the Plaintiffs' religious beliefs and religious practices played no role in the City's decision about the Plaintiffs' participation in the ELFM. The City was only concerned with the Plaintiffs' business practices, not what motivated those practices.

III.    **First Amendment Retaliation**

The Court ruled that the December Facebook post contained both protected and unprotected speech. (ECF No. 104, PageID 2221 – 2222). The protected speech was that part of the post that expressed the Plaintiffs' religious beliefs. The unprotected speech was the part of the post that stated the Plaintiffs would deny service to same sex couples. (*Id.* at 2222). The Court found genuine issues of fact remain on "whether it was the protected speech or the unprotected speech that caused the City to act in the manner it did [by enacting amendments to the Vendor Guidelines and subsequent enforcement]. (*Id.* at 2223).

The Supreme Court has held that discrimination by a business against its customers or employees in the public marketplace is commercial conduct, regardless of the service the business offers, and it "has never been accorded affirmative constitutional protections." *Hishon v. King & Spaulding*, 467 U.S. 69, 78 (1984). As stated above, the Supreme Court more recently reiterated that holding *Masterpiece Cakeshop,*:

> "the religious and philosophical objections to gay marriage are protected views and in some instances protected forms of expression. … Nevertheless, while those religious and philosophical objections are protected, it is a general rule that such objections do not allow business owners and other actors in the economy and in society to deny protected persons equal access to goods and services under a neutral and generally applicable public accommodations law."

*Id.* at 1727. The Plaintiffs cannot impute their own motivation onto the city. *Employment Div., Dep't of Human Resources of Oregon v. Smith*, 494 U.S. 872, 878 (1990). If they could, generally applicable anti-discrimination laws could be neutered by an announcement that a religious motivation was the basis for a discriminatory action. The Supreme Court again rejected that position in *Masterpiece Cakeshop, supra*. Plaintiffs cannot insulate themselves from an anti-

discrimination law by announcing they did what they did because of a sincerely held religious belief.

The evidence does not support a conclusion that the amendments to the Vendor Guidelines and the enforcement of the guidelines were motivated by the Plaintiffs' statement of religious beliefs. While the Facebook post is artfully crafted to intertwine action and motivation, the City's only concern was with the announcement of the business practice to refuse to rent the business for same-sex weddings. The evidence demonstrated that the City would have taken the same action if the Plaintiffs had attributed no motivation for their business practice or if they had attributed a non-religious motivation for their business practice. The City did not retaliate against the Plaintiffs for engaging in protected speech.

## IV.     Unconstitutional conditions.

This Court ruled that the same factual dispute regarding motivation existed with respect to the Unconstitutional Conditions claim as with the retaliation claim. (ECF No. 104, PageID 2224).  For the same reasons discussed in the previous sections, the evidence at trial does not support a conclusion that the amendments to the Vendor Guidelines and the enforcement of the guidelines were motivated by the Plaintiffs' statement of religious beliefs.

## V.     Establishment Clause

This Court ruled that the same factual issue remains on the Establishment Clause claim – the motivation of the City's challenged actions – as remained in the other claims that survived summary judgment. The evidence at trial demonstrated that the City's motivation for its actions was secular – the enforcement of the City's nondiscrimination policy. Government may neither officially promote religion, nor harbor "an official purpose to disapprove of a particular religion or of religion in general." *Lukumi, supra*, 508 U.S. at 532.

The evidence cited above demonstrated that the City was not disapproving of the Plaintiffs'
religion or of religion in general. See, *Satawa v. Macomb County Road Comm'n*, 689 F.3d 506,
526 (6th Cir. 2012). The City's purpose was to enforce its nondiscrimination policies. The
evidence did not support the conclusion that the City's actions were a reaction to the
Plaintiffs' announcement about their religious beliefs. The evidence established that the
actual effect of the City's actions was to bar the only vendor known to the City to not be in
compliance with the City's nondiscrimination policies.

## VI.    Michigan constitutional claims.

The Court ruled that it would evaluate the Plaintiffs' state constitutional claims in the
same manner as the Plaintiffs' federal constitutional claims. (ECF No. 104, PageID 2250). The
City relies on the preceding discussion of the federal constitutional claims for purposes of
addressing the state claims.

## VII.   Strict scrutiny.

Even assuming the Court determines that strict scrutiny is appropriate (which the
City denies), the City's actions satisfy that standard. The City's actions were the least
restrictive means available to advance its compelling governmental interest in enforcing its
antidiscrimination policies. Simply put, there are no gradations with respect to
discrimination – either it is allowed, or it is prohibited. If it is prohibited, enforcement is the
least restrictive means available to accomplish the government's interest. "Ohio has an
interest in preventing minors from potentially harmful materials and, as the statute applies
only to personally directed communication between an adult and a person that the adult
knows or should know is a minor, the statute is the least restrictive means of promoting this
interest." *American Booksellers Found. for Free Expression v. Strickland*, 601 F.3d 622, 628

(6th Cir. 2010). So too here, the City chose not to do business with the Plaintiffs because the Plaintiffs' had a business practice of not renting their venue for same-sex weddings – a practice that violated the City's antidiscrimination policies. Declining to do business with the Plaintiffs was the least restrictive way in which the City could accomplish its goal.

**CONCLUSION**

This Court ruled in its Opinion on the cross-motions for summary judgment that issues of fact remained regarding the City's motivation in its actions related to Country Mill. Was the City motivated by religious animus or by a desire to enforce its antidiscrimination policies. The City submits that the evidence introduced at trial demonstrates that the City had no interest in the Plaintiffs' motivation for their business practice of refusing to rent their business venue for same-sex weddings. The City's only motivation was applying and enforcing its antidiscrimination policies. If the Plaintiffs can avoid complying with a generally applicable antidiscrimination law based on their own motivation by imputing that motivation to the government, then no antidiscrimination law can stand in the face of a free exercise challenge. The Supreme Court's admonition in *United States v. Lee*, 455 U.S. 252, 261 (1982), remains in force:

> When followers of a particular sect enter into commercial activity as a matter of choice, the limits they accept on their own conduct as a matter of conscience and faith are not to be superimposed on the statutory schemes which are binding on others in that activity.

The Plaintiffs have failed to meet their burden of proof and the Court should enter judgment in favor of the City of East Lansing.

Respectfully submitted,

DATED:  August 27, 2021 PLUNKETT COONEY


BY: */s/Michael S. Bogren*
   Michael S. Bogren (P34835)
   Attorney for Defendant
   City of East Lansing
BUSINESS ADDRESS:
333 Bridge Street, N.W., Suite 530
Grand Rapids, Michigan  49503
**Direct Dial:  269/226-8822**
**mbogren@plunkettcooney.com**

Open.26408.72010.27031883-1